**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE EIGHTH CIRCUIT**

DENNIS DONNELLY, on behalf of himself
and all others similarly situated,

        Plaintiff-Appellant,

    v.

DES MOINES REGISTER AND TRIBUNE
CO., INC.; J. ANN SELZER; SELZER &
COMPANY; and GANNETT CO., INC.,

        Defendants-Appellees.

Case No. 25-3451

Southern District of Iowa

Case No. 4:25-cv-00150-RGE-WPK

# TABLE OF CONTENTS OF JOINT APPENDIX

1. The lower court docket. -- 2

2. The operative complaint (ECF 22). -- 11

3. The District Court's ruling on the motion for remand (ECF 47). -- 52

4. The District Court's ruling on the motions to dismiss (ECF 48). -- 62

5. The District Court's judgment (ECF 49). -- 82

# U.S. District Court
## Southern District of Iowa (Central)
## CIVIL DOCKET FOR CASE #: 4:25-cv-00150-RGE-WPK

Donnelly v. Des Moines Register and Tribune Co., Inc. et al
Assigned to: Judge Rebecca Goodgame Ebinger
Referred to: Magistrate Judge William P. Kelly
Case in other court: 8CCA, 25-03451
               IASD, 4-24-cv-449
               Polk County, Iowa, CVCV068445
Cause: 15:0045 Federal Trade Commission Act (unfair or deceptive acts)

Date Filed: 04/24/2025
Date Terminated: 11/06/2025
Jury Demand: Both
Nature of Suit: 370 Other Fraud
Jurisdiction: Federal Question

## **Plaintiff**

**Dennis Donnelly**
*on behalf of himself and all others similarly situated*

represented by **Robert Richard Anderson**
LAW OFFICE OF ROBERT R. ANDERSON
1001 EAST 6TH STREET
P.O. BOX 4
ATLANTIC, IA 50022
515-382-1278
Email: Bobandersoniowan@gmail.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Daniel Robert Suhr**
CENTER FOR AMERICAN RIGHTS
1341 WEST FULLERTON AVENUE
SUITE 170
CHICAGO, IL 60614
414-588-1658
Email: danielsuhrncjl@gmail.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

V.

## **Defendant**

**Des Moines Register and Tribune Co., Inc.**

represented by **Nick Klinefeldt**
FAEGRE DRINKER BIDDLE & REATH LLP (IA)
801 GRAND AVENUE
33RD FLOOR
DES MOINES, IA 50309-8011
515-447-4717
Email: nick.klinefeldt@faegredrinker.com
*LEAD ATTORNEY*

2

*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**David Yoshimura**
FAEGRE DRINKER BIDDLE & REATH
LLP (IA)
801 GRAND AVENUE
33RD FLOOR
DES MOINES, IA 50309-8011
515-447-4738
Fax: 515-248-9010
Email: david.yoshimura@faegredrinker.com
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Defendant**

**J. Ann Selzer**

represented by  **Matthew A. McGuire**
NYEMASTER GOODE PC (DSM)
700 WALNUT STREET
SUITE 1300
DES MOINES, IA 50309-3899
515-283-8014
Email: mmcguire@nyemaster.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Adam Steinbaugh**
FOUNDATION FOR INDIVIDUAL
RIGHTS AND EXPRESSION
510 WALNUT STREET
SUITE 900
PHILADELPHIA, PA 19106
215-717-3473
Email: adam@fire.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Conor T. Fitzpatrick**
FOUNDATION FOR INDIVIDUAL
RIGHTS AND EXPRESSION
700 PENNSYLVANIA AVENUE, SE
SUITE 340
WASHINGTON, DC 20003
215-717-3473
Email: conor.fitzpatrick@thefire.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Greg Harold Greubel**
FOUNDATION FOR INDIVIDUAL
RIGHTS AND EXPRESSION

510 WALNUT STREET
SUITE 900
PHILADELPHIA, PA 19106
267-838-8083
Email: greg.greubel@thefire.org
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Robert Corn-Revere**
FOUNDATION FOR INDIVIDUAL
RIGHTS AND EXPRESSION
700 PENNSYLVANIA AVENUE, SE
SUITE 340
WASHINGTON, DC 20003
202-973-4200
Fax: 202-973-4499
Email: bob.corn-revere@thefire.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Defendant**

**Selzer & Company**                    represented by **Matthew A. McGuire**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Adam Steinbaugh**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Conor T. Fitzpatrick**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Greg Harold Greubel**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Robert Corn-Revere**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Defendant**

**Gannett Co., Inc.**                    represented by **Nick Klinefeldt**
(See above for address)

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**David Yoshimura**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

| Date Filed | # | Docket Text |
|---|---|---|
| 12/31/2025 | 65 | **ORDER** denying 62 Motion for Leave to File a Surreply. Signed by Magistrate Judge William P. Kelly on 12/31/2025. (kgs) (Entered: 12/31/2025) |
| 12/15/2025 | 64 | USCA Scheduling Order as to 60 Notice of Appeal filed by Dennis Donnelly. (nla) (Entered: 12/15/2025) |
| 12/15/2025 | 63 | USCA Case Number 25-3451 for 60 Notice of Appeal filed by Dennis Donnelly. (nla) (Entered: 12/15/2025) |
| 12/10/2025 | 62 | MOTION for Leave to File *a surreply* by Dennis Donnelly.Motions referred to William P. Kelly. Responses due by 12/24/2025. (Attachments: # 1 Exhibit Proposed Brief)(Suhr, Daniel) (Entered: 12/10/2025) |
| 12/08/2025 | 61 | NOTIFICATION OF APPEAL and NOA Supplement by District Court Clerk to USCA re 60 Notice of Appeal filed on 12/5/2025. (nla) (Entered: 12/08/2025) |
| 12/05/2025 | 60 | NOTICE OF APPEAL as to 49 Judgment by Dennis Donnelly. Fee paid in the amount of $605 receipt number AIASDC-5890424. (Suhr, Daniel) (Entered: 12/05/2025) |
| 12/05/2025 | 59 | REPLY *Brief in Support of Motion for Sanctions Under Fed. R. Civ. P. 11, 28 U.S.C. § 1927* re 51 MOTION for Sanctions filed by J. Ann Selzer, Selzer & Company. (Attachments: # 1 Exhibit 1 - Attorney General Letter, # 2 Exhibit 2 - Petition for Special Relief in the Matter of Repeal of the News Distortion Policy)(Corn-Revere, Robert) (Entered: 12/05/2025) |
| 12/03/2025 | 58 | **TEXT ORDER** granting 57 Unresisted Motion to file overlength brief. The Defendants may file their overlength brief and the accompanying exhibits. Signed by Magistrate Judge William P. Kelly on 12/3/2025. (kgs) (Entered: 12/03/2025) |
| 12/03/2025 | 57 | Consent MOTION to file overlength brief *in Support of Motion for Sanctions Under Fed. R. Civ. P. 11, 28 U.S.C. § 1927* by J. Ann Selzer, Selzer & Company.Motions referred to William P. Kelly. Responses due by 12/17/2025. (Attachments: # 1 Reply Brief in Support of Motion for Sanctions Under Fed. R. Civ. P. 11, 28 U.S.C. § 1927, # 2 Exhibit 1: Attorney General Letter, # 3 Exhibit 2: Petition for Special Relief in the Matter of Repeal of the News Distortion Policy)(Corn-Revere, Robert) (Entered: 12/03/2025) |
| 11/26/2025 | 56 | RESPONSE Brief to Motion re 51 MOTION for Sanctions filed by Dennis Donnelly. Replies due by 12/3/2025. (btg) (Entered: 11/26/2025) |
| 11/25/2025 | 55 | **TEXT ORDER** granting 54 Unresisted Motion to file overlength brief. The Clerks Office is directed to detach and file ECF 54-1, Plaintiff's Brief in opposition to Dr. Selzer's Motion for Sanctions. Signed by Magistrate Judge William P. Kelly on 11/25/2025. (kgs) (Entered: 11/25/2025) |

| | | |
|---|---|---|
| 11/25/2025 | 54 | Unresisted MOTION to file overlength brief *in response to Rule 11 motion* by Dennis Donnelly.Motions referred to William P. Kelly. Responses due by 12/9/2025. (Attachments: # 1 Exhibit Proposed Brief)(Suhr, Daniel) (Entered: 11/25/2025) |
| 11/18/2025 | 53 | BRIEF by J. Ann Selzer, Selzer & Company re 51 MOTION for Sanctions . (btg) (Entered: 11/18/2025) |
| 11/17/2025 | 52 | **TEXT ORDER** granting 50 Unresisted Motion to file overlength brief. The Clerks Office is directed to detach and file ECF 50-1, Defendant's Brief in Support of Motion for Sanctions. Signed by Magistrate Judge William P. Kelly on 11/17/2025. (kgs) (Entered: 11/17/2025) |
| 11/17/2025 | 51 | MOTION for Sanctions by J. Ann Selzer, Selzer & Company.Motions referred to William P. Kelly. Responses due by 12/1/2025. (Corn-Revere, Robert) (Entered: 11/17/2025) |
| 11/17/2025 | 50 | Consent MOTION to file overlength brief *in support of Motion for Sanctions* by J. Ann Selzer, Selzer & Company.Motions referred to William P. Kelly. Responses due by 12/1/2025. (Attachments: # 1 Brief in Support of Motion for Sanctions)(Corn-Revere, Robert) (Entered: 11/17/2025) |
| 11/06/2025 | 49 | JUDGMENT in favor of Des Moines Register and Tribune Co., Inc., Gannett Co., Inc., Selzer & Company, J. Ann Selzer against Dennis Donnelly. Signed by Clerk of Court Chandlor G. Collins on 11/6/2025. (btg) (Entered: 11/06/2025) |
| 11/06/2025 | 48 | **ORDER** Granting 26 and 29 Motions to Dismiss for Failure to State a Claim. See order for particulars. Signed by Judge Rebecca Goodgame Ebinger on 11/6/2025. (h) (Entered: 11/06/2025) |
| 10/22/2025 | 47 | **ORDER** Denying 21 Motion to Remand to State Court. See order for particulars. Signed by Judge Rebecca Goodgame Ebinger on 10/22/2025. (h) (Entered: 10/22/2025) |
| 09/29/2025 | 46 | Errata re 36 Response to Motion filed by Dennis Donnelly. (Attachments: # 1 Errata Corrected Version)(Suhr, Daniel) Modified on 10/3/2025 (btg). Linked to Motions 26 and 29 . (Entered: 09/29/2025) |
| 08/13/2025 | 45 | **TEXT ORDER** granting 44 Joint Motion to Stay Discovery and Continue Scheduling Conference. The Scheduling Conference set for 8/25/2025 is continued until further order of the Court. The parties shall submit a Proposed Scheduling Order and Discovery Plan 14 days following the Court's ruling on the pending 21 Motion to Remand to State Court and 26 Motion to Dismiss for Failure to State a Claim. Signed by Magistrate Judge William P. Kelly on 8/13/2025. (rls) (Entered: 08/13/2025) |
| 08/12/2025 | 44 | Joint MOTION to Stay *Discovery and Continue Scheduling Conference* by Gannett Co., Inc., Des Moines Register and Tribune Co., Inc..Motions referred to William P. Kelly. Responses due by 8/26/2025. (Klinefeldt, Nick) (Entered: 08/12/2025) |
| 08/05/2025 | 43 | **TEXT ORDER** SETTING SCHEDULING CONFERENCE. Remote Scheduling Conference set for 8/25/2025 at 10:30 AM before Magistrate Judge William P. Kelly. Counsel shall join via Webex, with meeting ID 2301-540-1362 and password "iasd-wpk". *Photographing, recording, or broadcasting of any judicial proceedings, including proceedings held by remote conference, is strictly and absolutely prohibited*. The parties shall file a proposed scheduling order and discovery plan as provided under Local Rule 16 by 8/18/2025. Signed by Magistrate Judge William P. Kelly on 8/27/2025. (rls) (Entered: 08/05/2025) |
| 07/08/2025 | 42 | REPLY BRIEF re 29 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Gannett Co., Inc., Des Moines Register and Tribune Co., Inc. (btg) (Main Document 42 replaced on 7/8/2025) (btg). (Entered: 07/08/2025) |

| 07/08/2025 | 41 | REPLY BRIEF re 29 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Selzer & Company, J. Ann Selzer. (btg) Modified on 7/8/2025 (btg). Linked to 26 Motion to Dismiss (Main Document 41 replaced on 7/8/2025) (btg). (Entered: 07/08/2025) |
|---|---|---|
| 07/07/2025 | 40 | **TEXT ORDER** granting 39 Press Defendants Des Moines Register & Tribune Co. and Gannett Co., Inc.'s Unopposed Motion for Leave to File Overlength Reply Brief in Support of Motion to Dismiss. The Clerk of Court shall detach and file [39-1] Press Defendants Des Moines Register & Tribune Co. and Gannett Co., Inc.'s Reply Brief in Support of Motion to Dismiss. Signed by Magistrate Judge William P. Kelly on 7/7/2025.(rls) (Entered: 07/07/2025) |
| 07/07/2025 | 39 | Unresisted MOTION to file overlength brief by Gannett Co., Inc., Des Moines Register and Tribune Co., Inc..Motions referred to William P. Kelly. Responses due by 7/21/2025. (Attachments: # 1 Press Defendants Des Moines Register & Tribune Co. and Gannett Co., Inc.'s Reply Brief in Support of Motion to Dismiss)(Klinefeldt, Nick) (Entered: 07/07/2025) |
| 07/07/2025 | 38 | **TEXT ORDER** granting 37 Defendants J. Ann Selzer and Selzer & Company's Unresisted Motion for Leave to File Overlength Reply to Plaintiff's Consolidated Response Brief in Opposition to the Motions to Dismiss. The Clerk of Court shall detach and file [37-1] Defendants J. Ann Selzer and Selzer & Company's Reply to Plaintiff's Consolidated Response Brief in Opposition to the Motions to Dismiss. Signed by Magistrate Judge William P. Kelly on 7/7/2025.(rls) (Entered: 07/07/2025) |
| 07/07/2025 | 37 | Unresisted MOTION to file overlength brief by Selzer & Company, J. Ann Selzer.Motions referred to William P. Kelly. Responses due by 7/21/2025. (Attachments: # 1 Reply to Plaintiff's Consolidated Response Brief in Opposition to the Motions to Dismiss)(Corn-Revere, Robert) (Entered: 07/07/2025) |
| 06/30/2025 | 36 | RESPONSE BRIEFto Motion re 26 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , 29 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Dennis Donnelly. Replies due by 7/7/2025. (btg) . (Entered: 06/30/2025) |
| 06/27/2025 | 35 | **TEXT ORDER** granting 34 Plaintiff's Unresisted Motion to File Oversized Brief. The Clerk of Court is directed to detach and file [34-1] Plaintiff's Consolidated Response Brief in Opposition to the Motions to Dismiss. Signed by Magistrate Judge William P. Kelly on 6/27/2025.(rls) (Entered: 06/27/2025) |
| 06/27/2025 | 34 | Unresisted MOTION to file overlength brief by Dennis Donnelly.Motions referred to William P. Kelly. Responses due by 7/11/2025. (Attachments: # 1 Exhibit Proposed Brief) (Suhr, Daniel) (Entered: 06/27/2025) |
| 06/17/2025 | 33 | BRIEF in Support of Motion to Dismiss Amended Complaint Under Rule 12(b)(6) by Selzer & Company, J. Ann Selzer re 22 Amended Complaint . (Corn-Revere, Robert) Modified on 6/25/2025 - Linked to Motion 26 (sml). (Entered: 06/17/2025) |
| 06/17/2025 | 32 | BRIEF In Support of Motion to Dismiss First Amended Complaint by Gannett Co., Inc., Des Moines Register and Tribune Co., Inc. re 22 Amended Complaint . (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F) (Klinefeldt, Nick) Modified on 6/25/2025 - Linked to Motion 29 (sml). (Entered: 06/17/2025) |
| 06/17/2025 | 31 | **TEXT ORDER** granting 30 Des Moines Register & Tribune Co. and Gannett Co., Inc.'s Unopposed Motion for Leave to File Overlength Brief in Support of their Motion to Dismiss. Defendants Des Moines Register & Tribune Co. and Gannett Co., Inc. may file their overlength brief in support of their Motion to Dismiss. Signed by Magistrate Judge William P. Kelly on 6/17/2025. (rls) (Entered: 06/17/2025) |

| Date | No. | Description |
|---|---|---|
| 06/16/2025 | 30 | Unresisted MOTION to file overlength brief by Gannett Co., Inc., Des Moines Register and Tribune Co., Inc..Motions referred to William P. Kelly. Responses due by 6/30/2025. (Attachments: # 1 Exhibit A - Brief, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F)(Klinefeldt, Nick) (Entered: 06/16/2025) |
| 06/16/2025 | 29 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM by Gannett Co., Inc., Des Moines Register and Tribune Co., Inc.. Responses due by 6/30/2025. (Klinefeldt, Nick) (Entered: 06/16/2025) |
| 06/16/2025 | 28 | **TEXT ORDER** granting 27 Defendants J. Ann Selzer and Selzer & Company's Unresisted Motion for Leave to File Overlength Brief in Support for Motion to Dismiss Amended Complaint Under Rule 12(b)(6). Defendant J. Ann Selzer and Selzer & Company may file their overlength brief in support of their Motion to Dismiss. Signed by Magistrate Judge William P. Kelly on 6/16/2025. (rls) (Entered: 06/16/2025) |
| 06/16/2025 | 27 | Unresisted MOTION to file overlength brief *in Support of Motion to Dismiss Amended Complaint Under Rule 12(b)(6)* by Selzer & Company, J. Ann Selzer.Motions referred to William P. Kelly. Responses due by 6/30/2025. (Attachments: # 1 Brief in Support of Motion to Dismiss Amended Complaint Under Rule 12(b)(6))(Corn-Revere, Robert) (Entered: 06/16/2025) |
| 06/16/2025 | 26 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM by Selzer & Company, J. Ann Selzer. Responses due by 6/30/2025. (Corn-Revere, Robert) (Entered: 06/16/2025) |
| 06/13/2025 | 25 | REPLY re 21 First MOTION to Remand to State Court *or in the alternative for jurisdictional discovery* filed by Dennis Donnelly.(Suhr, Daniel) (Entered: 06/13/2025) |
| 06/06/2025 | 24 | RESPONSE to Motion re 21 First MOTION to Remand to State Court *or in the alternative for jurisdictional discovery* filed by Gannett Co., Inc., Des Moines Register and Tribune Co., Inc.. Replies due by 6/13/2025. (Attachments: # 1 Declaration of Nicholas A. Klinefeldt, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Declaration of Helen Trask)(Klinefeldt, Nick) (Entered: 06/06/2025) |
| 06/05/2025 | 23 | **TEXT ORDER** Denying as moot 20 Motion to Dismiss for Failure to State a Claim. In light of 22 First Amended Complaint, the Court finds the motion to dismiss moot. Signed by Judge Rebecca Goodgame Ebinger on 6/5/2025. (h) (Entered: 06/05/2025) |
| 06/02/2025 | 22 | First AMENDED COMPLAINT *per FRCP 15(a)(1)(B)* against All Defendants. All Defendants., filed by Dennis Donnelly. (Attachments: # 1 Exhibit Redline)(Suhr, Daniel) (Entered: 06/02/2025) |
| 05/23/2025 | 21 | First MOTION to Remand to State Court *or in the alternative for jurisdictional discovery* by Dennis Donnelly.Motions referred to William P. Kelly. Responses due by 6/6/2025. (Attachments: # 1 Brief in Support)(Suhr, Daniel) (Entered: 05/23/2025) |
| 05/19/2025 | 20 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM by Selzer & Company, J. Ann Selzer. Responses due by 6/2/2025. (Attachments: # 1 Brief in Support of Motion to Dismiss Under Rule 12(b)(6))(Corn-Revere, Robert) (Entered: 05/19/2025) |
| 05/13/2025 | 19 | Corporate Disclosure/Statement of Interest by Des Moines Register and Tribune Co., Inc.. (Klinefeldt, Nick) (Entered: 05/13/2025) |
| 05/13/2025 | 18 | Corporate Disclosure/Statement of Interest by Gannett Co., Inc.. (Klinefeldt, Nick) (Entered: 05/13/2025) |
| 05/08/2025 | 17 | NOTICE of Appearance by David Yoshimura on behalf of Gannett Co., Inc., Des Moines Register and Tribune Co., Inc. (Yoshimura, David) (Entered: 05/08/2025) |

| | | |
|---|---|---|
| 05/08/2025 | 16 | NOTICE of Appearance by Nick Klinefeldt on behalf of Gannett Co., Inc., Des Moines Register and Tribune Co., Inc. (Klinefeldt, Nick) (Entered: 05/08/2025) |
| 05/02/2025 | 15 | TEXT ORDER granting 12 Motion for Leave to Appear Pro Hac Vice Conor T. Fitzpatrick; granting 13 Motion for Leave to Appear Pro Hac Vice Adam B. Steinbaugh; granting 14 Motion for Leave to Appear Pro Hac Vice Robert Corn-Revere. Signed by Magistrate Judge William P. Kelly on 5/2/2025. (nla) (Entered: 05/02/2025) |
| 05/02/2025 | 14 | MOTION for Leave to Appear Pro Hac Vice by Selzer & Company, J. Ann Selzer. (Corn-Revere, Robert) (Entered: 05/02/2025) |
| 05/02/2025 | 13 | MOTION for Leave to Appear Pro Hac Vice by Selzer & Company, J. Ann Selzer. (Steinbaugh, Adam) (Entered: 05/02/2025) |
| 05/02/2025 | 12 | MOTION for Leave to Appear Pro Hac Vice by Selzer & Company, J. Ann Selzer. (Fitzpatrick, Conor) (Entered: 05/02/2025) |
| 05/01/2025 | 11 | TEXT ORDER granting 9 Joint Motion to Extend Selzer Defendants' Time to Respond to the Petition. The Selzer Defendants may have to and including 5/23/2025 to respond to the Petition. If claims remain following the parties' initial motion practice, the parties shall submit a proposed Rule 16(b) and Rule 26(f) scheduling order and discovery plan within 30 days of the Court's order resolving the parties' initial motion practice. Signed by Magistrate Judge William P. Kelly on 5/1/2025. (rls) (Entered: 05/01/2025) |
| 05/01/2025 | 10 | NOTICE of Appearance by Matthew A. McGuire on behalf of Selzer & Company, J. Ann Selzer (McGuire, Matthew) (Entered: 05/01/2025) |
| 05/01/2025 | 9 | Joint MOTION for Extension of Time to File *Response to the Petition* by Selzer & Company, J. Ann Selzer.Motions referred to William P. Kelly. Responses due by 5/15/2025. (Greubel, Greg) (Entered: 05/01/2025) |
| 05/01/2025 | 8 | Corporate Disclosure/Statement of Interest by Selzer & Company. (Greubel, Greg) (Entered: 05/01/2025) |
| 05/01/2025 | 7 | NOTICE of Appearance by Greg Harold Greubel on behalf of Selzer & Company, J. Ann Selzer (Greubel, Greg) (Entered: 05/01/2025) |
| 05/01/2025 | 6 | TEXT ORDER granting 5 Motion for Leave to Appear Pro Hac Vice Daniel R. Suhr. Signed by Magistrate Judge William P. Kelly on 5/1/2025. (nla) (Entered: 05/01/2025) |
| 04/30/2025 | 5 | MOTION for Leave to Appear Pro Hac Vice Receipt Number: AIASDC-5734760 Fee paid in the amount of $100. by Dennis Donnelly. (Suhr, Daniel) (Entered: 04/30/2025) |
| 04/25/2025 | 4 | Corporate Disclosure Packet Note: Counsel should download the attached corporate disclosure packet in compliance with Local Rule 7.1 for the disclosure statements. Corporate Disclosure Statement deadline set for defendant 5/16/2025. (btg) (Entered: 04/25/2025) |
| 04/24/2025 | 3 | Answer to Complaint (Notice of Removal) by Gannett Co., Inc., Des Moines Register and Tribune Company.(Klinefeldt, Nick) (Entered: 04/24/2025) |
| 04/24/2025 | 2 | CERTIFICATE *Pursuant to L.R. 81* re 1 Notice of Removal, by Gannett Co., Inc.. (Klinefeldt, Nick) (Entered: 04/24/2025) |
| 04/24/2025 | 1 | NOTICE OF REMOVAL by Gannett Co., Inc. from Iowa District Court for Polk County, case number CVCV068445. Filing fee paid in the amount of $ 405, receipt number AIASDC-5730006., filed by Gannett Co., Inc.. Rule 16 Notice of Dismissal set for 6/23/2025. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Klinefeldt, Nick) (Entered: 04/24/2025) |

| PACER Service Center | | | |
|---|---|---|---|
| **PACER Service Center** | | | |
| **Transaction Receipt** | | | |
| 01/20/2026 12:33:59 | | | |
| **PACER Login:** | danielsuhr | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 4:25-cv-00150-RGE-WPK Start date: 1/1/1980 End date: 1/20/2026 |
| **Billable Pages:** | 8 | **Cost:** | 0.80 |

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF IOWA

| | |
|---|---|
| Dennis Donnelly, on behalf of himself and all others similarly situated, *Plaintiff*, | Case No.: 4:25-cv-00150-RGE-WPK |
| | FIRST AMENDED COMPLAINT |
| v. | CLASS ACTION |
| Des Moines Register and Tribune Co., Inc.; J. Ann Selzer; Selzer & Company; and Gannett Co., Inc., *Defendants*. | JURY TRIAL DEMANDED |

---

Plaintiff Dennis Donnelly, by and through his counsel, brings this action against Defendants Des Moines Register and Tribune Co., Inc. ("the Des Moines Register"); J. Ann Selzer ("Dr. Selzer"); Selzer & Company; and Gannett Co., Inc. (collectively "Defendants"), and petitions as follows:

### INTRODUCTION

1. When subscribers pick up their copy of the *Des Moines Register*, they are promised "trustworthy, smart and engaging news and information" (the *Register's* mission statement). The *Register* pledges to its subscribers that it will continue its legacy as a "venerable source of information and current news for the heart of Iowa" from "the state's premier source of information."

2. The *Register* utterly failed to live up to those promises with its decision to publish its signature Iowa Poll in the days leading up to the 2024 presidential election. It promised subscribers like Dennis Donnelly that it would provide trustworthy news, and instead it delivered the dictionary definition of fake news. In doing so, it

defrauded Dennis and every other subscriber who paid good money to receive accurate, trustworthy information from the state's "premier source of information."

3. The *Register* is owned by Gannett Co. Gannett's principles of ethical news coverage include expectations like, "Don't publish a story if it doesn't feel right. Check it further." "Watch carefully for red flags that give reason to be skeptical of news-gathering or editing conduct." And "[b]e especially careful with technical terms, statistics, mathematical computations, crowd estimates and poll results."

4. But the *Register* was not careful with these poll results. Every possible red flag should have been blazing high in the sky. The poll results were contrary to historic Iowa election results, other publicly available polling in Iowa of this election, and polling in actual swing states. Yet rather than double-checking or re-running the poll or bringing in an outside expert to analyze the sample and methodology or undertaking any of the other industry practices that would validate a seemingly shocking poll number, the *Register* released it as a banner headline.

5. That banner headline brought in hundreds of thousands of "clicks" from across the world, as the shocking revelation of numbers that seemed too good to be true generated massive enthusiasm for one candidate in the final stretch of the campaign.

6. But of course, the numbers were too good to be true. They were off. Massively off. One in a million chances off. Technically, one in 3.5 million chances off.

7. This lawsuit is brought by a *Register* subscriber on behalf of a putative class of all *Register* subscribers who were provided a fundamentally flawed product. As

consumers, they thought they were purchasing a daily report of trustworthy news—the *Register* failed to provide the product it promised them.

## PARTIES

8.  Dennis Donnelly is a resident of West Des Moines. He is a longtime subscriber to the *Register*. In recent years he switched from a print subscription to a digital subscription (retail price, $69.99/year). He was intensely frustrated by the inaccurate poll and felt like the *Register* was disserving him and other readers when it ran and when its results were compared to the final outcome.

9.  The *Des Moines Register and Tribune Co.* is the company that owns and publishes the print and digital editions of the *Des Moines Register*. It is a wholly owned subsidiary of Gannett Co., Inc. It is a domestic for-profit corporation registered with the Iowa Secretary of State (No. 8971).

10. J. Ann Selzer (Dr. Selzer) is a natural person. She lives in the Des Moines area. She is the president of Selzer & Company. She holds a Ph.D. in Communication Theory and Research from the University of Iowa.

11. Selzer & Co. is a company that conducts polling for, among other clients, the *Des Moines Register*. Its president is Dr. Selzer. It is a domestic for-profit corporation registered with the Iowa Secretary of State (No. 200824). Its office is 308 Fifth St., West Des Moines, IA, 50265.

12. Gannett Co. Inc. is a publicly traded corporation that owns the most local newspapers of any chain in the country, led by USA Today. It is headquartered in New York City.

## JURISDICTION & VENUE

13. Jurisdiction is established under Iowa Code 714H.5(1) (private right of action for consumer fraud) and 602.6101 (general civil jurisdiction).

14. Venue is appropriate in Polk County pursuant to Iowa Code 616.14, as Selzer & Co., the *Des Moines Register*, and Gannett Co. (through its subsidiary the *Des Moines Register*) maintain a place of business in Polk County. Venue is also appropriate as to Dr. Selzer, who works and lives in Polk County, pursuant to Iowa Code 616.17. Similarly, Iowa Code 714.16(10) instructs that consumer protection actions should be brought in the county where the transaction took place. Here, both Mr. Donnelly and the *Register* are in Polk County.[1]

## FACTUAL ALLEGATIONS

15. Across the country, the 2020 polling results were the most inaccurate in history to that point. It was a scandal of epic, industry-shaking proportions that the polls were off so badly. These were "the worst polls in decades" or "the worst misfire in generations." According to an after-action autopsy by the American Association of Public Opinion Research (AAPOR), "It was the highest [error] in 40 years for the national popular vote and the highest in at least 20 years for state-level estimates of the vote in presidential, senatorial, and gubernatorial contests."

16. How badly did these polls miss the final result to constitute the worst polls in decades? According to the AAPOR report, "Among polls conducted in the final two

---

[1] This first amended complaint is filed in the U.S. District Court for the Southern District of Iowa pursuant to Gannett's removal under the Class Action Fairness Act. It does not constitute a waiver of Mr. Donnelly's motion to remand to state court or for discovery to determine if the Southern District lacks jurisdiction.

4

weeks, the average error on the margin in either direction was 4.5 points for national popular vote polls and 5.1 points for state-level presidential polls."

17. Defendants put together and published a poll that was off by <u>16 points</u> in the final pre-election presidential poll in 2024. If a miss by five points was a miss of historic proportions, then a miss by 16 points is not an innocent error—it is either intentional fraud or reckless disregard for accuracy. Either way it is actionable.

18. Dr. Selzer has a track record of undersampling Republicans in her polling. In 2018, her final poll missed the Republican candidate's eventual victory for governor by five points.[2]

19. In 2020, after showing the Republican candidate for U.S. Senate down throughout the fall, Dr. Selzer's final poll showed her up four. She won by seven.[3]

20. In 2022, her final poll missed the Republican candidate's eventual victory for attorney general by a breath-taking eighteen points.[4]

21. In the June 2024 Iowa Poll, Dr. Selzer found President Trump leading President Biden by 18 points.[5]

---

[2] https://www.desmoinesregister.com/story/news/politics/iowa-poll/2018/11/03/iowa-poll-governor-race-kim-reynolds-fred-hubbell-jake-porter-selzer-iowa-election-2018-medicaid/1871874002/

[3] https://www.desmoinesregister.com/story/news/politics/iowa-poll/2020/10/31/election-2020-iowa-poll-greenfield-ernst-us-senate-race-voters/6055545002/

[4] https://www.desmoinesregister.com/story/news/politics/iowa-poll/2022/10/25/iowa-poll-attorney-general-election-tom-miller-brenna-bird-2022/69563197007/

[5] https://www.yahoo.com/news/trump-maintains-big-lead-over-111909245.html

22. In September 2024, the first poll testing President Trump versus Vice President Harris, Dr. Selzer's Iowa Poll showed the lead had narrowed from 18 to 4 points in favor of President Trump.

23. Then, a month later, Dr. Selzer and the *Register* released a "stunning," "shocking," "surprise" Iowa Poll showing Vice President Harris at 47 and President Trump at 44.

24. Dr. Selzer's October poll was contrary to recent results in Iowa elections, other polling that cycle in Iowa, and other polling that cycle in similar states.

25. In 2022, Republican Governor Kim Reynolds won reelection by a substantial margin, securing 58% of the vote to Democrat Deidre DeJear's 40%. Republicans also won six of seven statewide races that year. U.S. Senator Chuck Grassley secured reelection by twelve percentage points, earning 56% of the vote compared to 44% for his Democratic challenger, Michael Franken.

26. In the 2020 election, President Trump won Iowa by eight percentage points, with 53% of the vote compared to then-Vice President Biden's 45%.

27. In the 2020 election, Republican U.S. Senator Joni Ernst won reelection by seven percentage points, securing 52% of the vote to Democrat Theresa Greenfield's 45%.

28. In 2018, the Republican at the top of the ticket, Kim Reynolds, won 50 to 47 for an open seat over Democrat Fred Hubbell.

29. In 2016, President Trump won Iowa by nine percentage points, securing 51% of the vote to former Secretary Hillary Clinton's 42%.

30. In other words, in every ticket-topping race—president, governor, senator—from 2016 to 2022, the Republican has won in Iowa and usually done so by a convincing

margin. A three-point lead by a Democrat candidate for president would have been markedly out-of-place compared to election results in the prior four cycles.

31. That result was also out-of-place compared to other polling in Iowa in the 2024 cycle. A November 2-3 poll of likely voters by SoCal Strategies showed Trump up in Iowa by eight points, 52-44. A poll those same dates by InsiderAdvantage showed Trump up by seven points, 52-46. A poll November 1-2 by Emerson College showed Trump up nine points, 54-45. A poll a few weeks earlier by Cygnal showed Trump up about seven as well, 51.3 to 44.6%.

32. Other pollsters who frequently work in swing states, like Quinnipiac University, did not even poll in Iowa in 2024, assuming it was a lock for Trump. When news outlets like the *New York Times*, *US News*, or *Forbes* reported on the "swing states" that would determine the election, Iowa was never even on the list.[6]

33. Another red flag should have been national and swing-state polling at the time, all of which showed the race moving in President Trump's direction in mid-October. NPR, reporting on the swing state polling shortly before Dr. Selzer's poll, wrote, "Surveys in the past couple of weeks have moved in Trump's direction, and the leads Harris had in the most competitive and critical states have mostly evaporated. . . . the

---

[6] See, e.g., https://www.nytimes.com/interactive/2024/us/elections/presidential-election-swing-states.html and https://www.usnews.com/news/elections/articles/7-swing-states-that-could-decide-the-2024-presidential-election and https://www.forbes.com/sites/saradorn/2024/11/05/election-2024-swing-state-polls-trump-harris-race-deadlocked-on-election-day-all-eyes-on-pennsylvania-final-update/.

consistency of the change — and the fact that it's all in Trump's direction — has Democrats concerned."[7]

34. A Suffolk University/*USA Today* poll of Arizona at the end of September showed Trump with a six-point lead.[8] Trump went on to win Arizona by 5.5.

35. A Suffolk University/*USA Today* poll of Wisconsin at the end of October showed Trump with a one-point lead, 48-47.[9] He went on to win Wisconsin by one point.

36. A Suffolk University/*USA Today* poll of Michigan at the end of October showed President Trump winning by 0.4%.[10] He won Michigan by 1.4 percent.

37. A Suffolk University/*USA Today* poll of Pennsylvania at the end of October showed the two candidates tied at 48.6 percent.[11] Trump won by 1.7 percent.

---

[7] https://www.npr.org/2024/10/15/nx-s1-5153420/swing-state-map-donald-trump-kamala-harris-polls

[8] https://www.suffolk.edu/-/media/suffolk/documents/academics/research-at-suffolk/suprc/polls/other-states/2024/9_26_2024_arizona_press_release.pdf?la=en&hash=981425C109076562038921D972FF6F07B9A9B4D2.

[9] https://www.suffolk.edu/-/media/suffolk/documents/academics/research-at-suffolk/suprc/polls/other-states/2024/10_28_2024_wisconsin_press_release.pdf?la=en&hash=8AEAAC7A93066525EFD06619E0A0A06A86C7BFA7

[10] https://www.suffolk.edu/-/media/suffolk/documents/academics/research-at-suffolk/suprc/polls/other-states/2024/10_30_2024_michigan_press_release.pdf?la=en&hash=793141821068CC6E351B5F01772C9C242DC4B550.

[11] https://www.suffolk.edu/-/media/suffolk/documents/academics/research-at-suffolk/suprc/polls/other-states/2024/11_1_2024_pennsylvania_press_release.pdf?la=en&hash=0103970D933D95E3AEBB85DEABC178EFBFE81CCB.

38. The foregoing battleground polls, sponsored by Gannett's *USA Today* paper, all showed the momentum favoring President Trump in the final days. Dr. Selzer's poll was an obvious outlier compared to other publicly available polling in swing states.

39. PollFair, an online polling analyst that reweights polls based on historic exit poll data, took Dr. Selzer's October poll and reweighted it according to historical data. Dr. Selzer weighted her sample at R+2, while PollFair weighted its sample at R+10. Doing so moved the results from Harris +3 (47-44) to Trump +6 (50-44).[12]

40. "'It's hard for anybody to say they saw this coming,' said pollster J. Ann Selzer, president of Selzer & Co.," in the *Register* story on Sunday, November 3, announcing the poll results.[13]

41. No one saw this coming because it wasn't coming. It was wrong. Flat-out, epically, recklessly wrong.

42. In the final event, President Trump won Iowa by thirteen points, meaning that Dr. Selzer's Iowa poll was off by sixteen points.

43. The Iowa Poll was also wrong in its polling of the First Congressional District. Dr. Selzer's poll found that "[b]y a 16-point margin, likely Iowa voters prefer a Democrat over a Republican in the 1st District, where Democrat Christina Bohannan and Republican U.S. Rep. Mariannette Miller-Meeks are competing."[14]

---

[12] https://x.com/poll_fair/status/1852857893307158678

[13] https://www.desmoinesregister.com/story/news/politics/iowa-poll/2024/11/02/iowa-poll-kamala-harris-leads-donald-trump-2024-presidential-race/75354033007/

[14] https://www.desmoinesregister.com/story/news/politics/iowa-poll/2024/11/03/iowa-poll-democrats-preferred-over-republicans-congress-nunn-baccam-miller-meeks-bohannan-hinson/75988058007/.

44. A poll from a few weeks earlier by the Democratic Party had shown Bohannan up only four points, 50-46.[15]

45. A poll from the end of August by Normington, Petts & Associates for the Bohannan campaign had showed the race tied, 47-47.[16]

46. The Iowa First is an R+3 seat normally according to the Cook Political Report. President Trump had won it in 2020 by three points. Kim Reynolds won it in 2018 by three points.

47. The 2024 race was a rematch between Bohannan and incumbent Mariannette Miller-Meeks. Miller-Meeks had won in 2022 by 6.7 points.

48. Thus, the idea that Bohannan was up sixteen, in an R+3 seat, when she had lost in 2022 by almost seven points, was a massive red flag that the Iowa Poll was wrong. But the Defendants ran with it anyway.

49. Miller-Meeks ended up winning the 2024 race as well, by 0.2 points, meaning that Dr. Selzer's Iowa poll was off by a scandalous sixteen points.

50. A similar story could be told in Iowa's Third Congressional District. Dr. Selzer's poll predicted that the Democrat would win by seven in a district rated R+3 by the Cook Political Report. In the end the Republican incumbent won by four, meaning Dr. Selzer was off by eleven points.

51. The other two U.S. House seats were considered safe, but the Iowa Poll was still radically off. In the Second District, Dr. Selzer found a three-point lead for the

---

[15] https://projects.fivethirtyeight.com/polls/house/2024/iowa/1/
[16] https://projects.fivethirtyeight.com/polls/house/2024/iowa/1/

Republican, 45-42. She ended up winning 57 to 41.5, off by over twelve points. In the Fourth District, Dr. Selzer found the Republican leading 53 to 47. The final result was 67 to 33, from a predicted six-point win to an actual 34-point blow-out. Put differently, Dr. Selzer was off by 28 points.

52. Off by 16 (presidential). Off by 16 (IA-1), 12.5 (IA-2), 11 (IA-3), and 28 (IA-4). In an industry where being off by five was the greatest miss in modern history.

53. The same point can be made another way: the margin of error.

54. The margin of error accounts for the potential inaccuracy of a polling due to limited sample size.

55. The *Register's* story announcing the poll explains, "Questions based on the sample of 808 Iowa likely voters have a maximum margin of error of plus or minus 3.4 percentage points. This means that if this survey were repeated using the same questions and the same methodology, 19 times out of 20, the findings would not vary from the true population value by more than plus or minus 3.4 percentage points."

56. In a November 2021 Q&A with Brian Smith, the *Register* posed and answered this question from a reader's perspective: "**I see references to margin of error in articles about the Iowa Poll. Does that mean the data isn't accurate?** No. The Iowa Poll is carefully constructed to ensure that it is accurate. But, anytime you're using a representative sample, there is some room for error. The margin of error means that if the survey were repeated using the same questions and the same methodology, 19 out of 20 times, the findings would not vary from the true population value by more than plus or minus the listed margin of error."

11

57. The Brian Smith Q&A makes multiple representations about the accuracy of the Iowa Poll. "one thing that has stayed true: The Des Moines Register and its polling partner, West Des Moines-based Selzer & Co., take great care in shaping each Iowa Poll. We pay careful attention to the design of the questions, when a poll will be in the field and even how we reach Iowans." And later, "we continue to conduct multiple Iowa Polls each year because we believe in their value. The Iowa Poll helps us as journalists, our politicians and all Iowans to understand the viewpoints of our neighbors." And later, "J. Ann Selzer, president of Selzer & Co., continues to watch industry trends and looks for opportunities to use new technology to improve the Iowa Poll in ways that protect its longstanding reputation." And later, "For now, we have a track record of accuracy. That means, for now, the people who do respond to the poll act much like the people who do not."

58. The margin of error in the House races was plus or minus 7.2 percent.

59. Again, with the margin of error, Dr. Selzer and the *Register* are telling their readers and subscribers, like Mr. Donnelly, that 19 out of 20 times, they will be accurate within 3.4 percent. Here they were off by 16 percent.

60. According to James Piereson of the Manhattan Institute (and formerly of the Iowa State University political science faculty): "The Selzer Poll, with a margin of error of 3.4, missed the real outcome by 16 points, or by as many as five standard deviations from the true result as revealed on election day. What are the odds of drawing such a sample by legitimate means? Answer: roughly one time in 3.5 million trials. In other

words, given these odds, the results in the Iowa poll likely did not come about by 'honest error.'"[17]

61. They say close only counts in horseshoes and hand grenades. This wasn't even close to close. This was either intentionally fraudulent or recklessly irresponsible. Either way it is actionable.

## ALLEGATIONS ABOUT THE POLL LEAK

62. As if all of this were not bad enough on its own, the Poll leaked prior to its public release.

63. The poll originally ran in print on Sunday, November 3, immediately before the election.

64. The story about the poll posted online on Saturday, November 2, on the Register's website.

65. About an hour before the poll was online, a tweet reported that Illinois Governor J.B. Pritzker was publicly discussing the poll's findings at a College Democrats event at Duke University.[18]

66. It is unclear at this time how Pritzker knew of the poll, but somehow the information was in the hands of a major Democrat surrogate before the general public.

67. The leak again is evidence of either an intent to defraud or a recklessness with the Poll.

## ALLEGATIONS SPECIFIC TO THE REGISTER

---

[17] https://newcriterion.com/dispatch/statistical-questions-about-the-iowa-poll/
[18] https://www.semafor.com/article/11/10/2024/gannett-probes-possible-leak-of-bombshell-iowa-poll

68. "Carol Hunter, executive editor [of the Register], has been with the Register since 2004. She has supervised award-winning politics coverage in five presidential caucus cycles. A native of Kansas and a graduate of the University of Kansas School of Journalism, she previously was top editor of the Press-Gazette in Green Bay, Wisconsin, and the Courier-News in Bridgewater, New Jersey." She "guid[es] the Register newsroom."

69. "Hunter's duties also include oversight of the Register's sister papers, the Ames Tribune and the Iowa City Press-Citizen, as well as the Sioux Falls Argus Leader in South Dakota. At various times her duties have encompassed supervision of editors at papers from Arkansas to Montana belonging to Register parent Gannett Co." This again shows the editorial management tie between Gannett papers and Gannett corporate.

70. "Hunter joined the Register in 2004 as editorial editor and later served as political editor and then news director, the newsroom's No. 2 leadership position."

71. In mid-December 2024, Hunter announced her retirement from the *Register*.

72. In a Gannett press release about an earlier iteration of the Iowa Poll, Ms. Hunter was the spokesperson for the company, showing the tie between Gannett and the *Register* specific to the poll.[19]

73. Mike Trautmann is "News Director/Politics Editor for the Des Moines Register. Former news director for the Louisville Courier Journal. Native South Dakotan who

---

[19] https://gannett2023cr.q4web.com/news/news-details/2023/The-Des-Moines-Register-Iowa-Poll-Partners-With-NBC-News/default.aspx

decided he had enough of the snow and cold and then reconsidered. Reporting and editing gigs in Aberdeen, Brookings, Sioux Falls, Des Moines and Louisville."

74. Brianne Pfannenstiel is the chief political correspondent for the *Register* and the author of the story reporting the Iowa Poll's presidential results. She has a degree in journalism from the University of Kansas. "After graduating from the University of Kansas, Pfannenstiel worked as a reporter for The Kansas City Star and Lawrence Journal-World, where she covered the 2010 United States elections. She joined the Kansas City Business Journal in 2013. In 2015, she relocated to Iowa to join The Des Moines Register. In the 2016 Iowa caucus cycle, Pfannenstiel initially covered the Scott Walker campaign, followed by the Donald Trump campaign."

75. Steven Gruber-Miller is a statehouse politics reporter for the *Register* who wrote the story on the congressional race results from Dr. Selzer's poll. A graduate of Grinnell College, he has worked for the *Register* for seven years, including six covering Iowa politics. He previously covered local politics for the *Iowa City Press-Citizen*, another Gannett paper.

76. The *Register* exercises significant control over the way it reports Dr. Selzer's polling. "The Des Moines Register is legendarily careful with Selzer's polls."[20]

### ALLEGATIONS SPECIFIC TO SELZER & CO. AND DR. SELZER

77. Dr. Selzer's company Selzer & Co. describes itself: "Selzer & Company, a Des Moines-based company founded by J. Ann Selzer, Ph.D., is a nationally recognized, industry

---

[20] https://www.semafor.com/article/11/10/2024/gannett-probes-possible-leak-of-bombshell-iowa-poll

leading polling and audience research firm. Since 1994, Selzer has worked with a wide variety of clients, including healthcare organizations, financial institutions, universities, advocacy groups and technology start-ups. Selzer & Company conducts the Iowa Poll, which is regarded by political insiders as the gold standard for its accuracy and insights about the Iowa caucuses."

78. On her website, next to a picture of J. Ann Selzer, Ph.D., she explains, "The best news I can give to any client is the truth. This informs the way I approach their problem, develop methods, analyze data, and report results. It is a core value. Over the years, the accuracy of my work has won wide praise, and I'm humbled by the honors and kind words."

79. Her website continues, "What sets me apart from other creative minds who have a lot of ideas is the discipline of research. I am data-driven. And so, I have a good idea when to step away from an idea that cannot be supported by evidence."

80. "After working as the internal pollster for the *Register* in 1987, Selzer founded her own company in 1992 and began conducting polls for the paper through her firm."[21]

81. "In 2016, she described the company's atmosphere to *FiveThirtyEight*, saying, 'Part of our culture in this office is we have the phrase, "I just want to say this out loud." It's a culture of overcommunication, and some day I will write a book called "Just Say It Out Loud.""" Whatever corporate culture Dr. Selzer has cultivated at her company, apparently no one had the temerity to just say out loud what someone must have thought: these poll results can't be right. Or someone did and got railroaded.

---

[21] https://ballotpedia.org/Selzer_%26_Company

82. "In a 2016 interview with *Politico*, Selzer explained her approach and its success, saying, 'I think it has to do with being more of a traditionalist, science-based pollster. And because it has worked for me, I've not been tempted to go and try other methods. And because I have clients who are willing to pay the premium that it takes to do it this way, I've not had to cut corners.'"

83. Asked about this poll, Dr. Selzer responded after the poll's publication but prior to election day: "These are the kinds of comments seen for virtually any poll, including mine. *The Des Moines Register* includes a methodology statement with each story they publish. It's the same methodology used to show Trump winning Iowa in the final polls in 2016 and 2020. It would not be in my best interest, or that of my clients— The Des Moines Register and Mediacom—to conjure fake numbers."

## ALLEGATIONS SPECIFIC TO GANNETT CO.

84. Gannett has owned the Des Moines Register and Tribune Co. since 1985.

85. Gannett syndicates its content through the USA Today Network.

86. Upon information and belief, Gannett exercises editorial control over its affiliates to an extent unseen in other chain newspapers. As one academic study put it, "The comparison of the editorial positions taken by the Gannett papers with those taken by the non-Gannett papers showed a high level of homogeneity within the chain and significant differences between the Gannett and non-Gannett papers." Roya Akhavan-Majid, Anita Rife, and Sheila Gopinath, *Chain Ownership and Editorial Independence: A Case Study of Gannett Newspapers*, Mass Communication Faculty Publications (1991).

87. Gannett has a history of telling its newspapers what they can and cannot do while covering politically sensitive issues. See, e.g., Rick Edmonds, *Gannett is scuttling daily editorial pages at its regional papers*, Poynter (June 8, 2022); Irie Senter, *USA Today and its 200-plus local affiliates punt on presidential endorsement*, Politico (Oct. 29, 2024) ("USA Today and the 200-plus local publications under its umbrella will not endorse a presidential candidate, the latest in a slew of non-endorsements among major national outlets that have left the media industry reeling. The Gannett-owned newspaper, which oversees a network of hundreds of local affiliates, announced late Monday that none of its publications would make an endorsement in this year's neck-and-neck presidential election.").

88. As one long-time Gannett editor, now at Middle Tennessee State University, wrote in October 2024: "It was about 45 years ago that Gannett adopted a new motto: 'A World of Different Voices Where Freedom Speaks.' It was a poetic way of saying that while the growing company was going to keep a close eye on business operations and profit margins, local newsrooms were going to be able to publish the news independently. . . A company culture can change pretty dramatically when a business is sold. New Media Investment Group (*nee* Gatehouse) acquired Gannett in 2019. It kept the name, but not the values or most of the employees. Maybe the new Gannett can dust off that circa-1980 motto to make its new standards clear. Perhaps 'A World of Different Properties Where No One Speaks Without Our Permission.'" Ken Paulson, *Gannett's gag order on local journalism*, MTSU (Oct. 29, 2024).

89. Gannett has principles of ethical conduct for its newsrooms. They begin "**WE ARE COMMITTED TO: <u>Seeking and reporting the truth in a truthful way</u>**." They continue: "We will dedicate ourselves to reporting the news accurately, thoroughly and in context." "We will be honest in the way we gather, report and present news." "We will seek to gain sufficient understanding of the communities, individuals and stories we cover to provide an informed account of activities." "We will provide the news and information that people need to function as effective citizens." "We will strive to include all sides relevant to a story and not take sides in news coverage." "We will explain to readers our journalistic processes."

90. The Gannett principles then explain further, "Editors are the gatekeepers who determine what will be published and what will not be. Their responsibility is to question and scrutinize, even when it is uncomfortable to do so." The "best practices" include, "When feasible, at least two editors should see stories before publication. Complex or controversial stories may require even more careful scrutiny." "Consider involving an in-house skeptic on major stories – a contrarian who can play the role of devil's advocate." "Heed their 'gut instinct.' Don't publish a story if it doesn't feel right. Check it further." "Consider how others – especially antagonists or skeptical readers – may view the story. What questions would they ask? What parts would they think are unfair? Will they believe it?" "Watch carefully for red flags that give reason to be skeptical of news-gathering or editing conduct." "Don't be stampeded by deadlines, unrealistic competitive concerns or peer pressure."

91. The Gannett principles go on in the next section, Ensuring Accuracy: "Dedication to the truth means accuracy itself is an ethical issue. Each news person has the responsibility to strive for accuracy at each step of the process." "Be especially careful with technical terms, statistics, mathematical computations, crowd estimates and poll results."

92. The Gannett principles close, "Because these Principles embody the highest standards of professional conduct, the Gannett Newspaper Division is committed to their adherence. They have been put in writing specifically so that members of every Gannett Newspaper Division newsroom know what the Division stands for and what is expected of them."

93. The *Register* promises on its website, "Our journalists adhere to the USA TODAY NETWORK Principles of Ethical Conduct For Newsrooms."

94. Gannett may be held liable for its influence over its local papers' newsroom decisions. *Sandmann v. Gannett Co.*, 2021 U.S. Dist. LEXIS 3792 (E.D.Ky. Jan. 8, 2021).

## FIRST AMENDMENT ANALYSIS

95. In a lawsuit against a media outlet, "[f]actual error [ . . . is . . . ] insufficient for an award of damages for false statements unless actual malice -- knowledge that the statements are false or in reckless disregard of the truth -- is alleged and proved." *Time, Inc. v. Hill*, 385 U.S. 374, 387 (1967).

96. A court "could not, consistent with the requirements of the First Amendment, impose liability for a negligently untruthful new story. Recovery may be had at best only for

knowing or reckless falsehood." *Tumminello v. Bergen Evening Record, Inc.*, 454 F. Supp. 1156 (D.N.J. 1978).

97. Plaintiff alleges that the factual errors were made with knowledge that they presented a false description of the state of the electorate.

98. Plaintiff alleges alternatively that the statements were made with reckless disregard for the truth. Dr. Seltzer is an experienced pollster in Iowa. The news editors and reporters at the *Des Moines Register* are also experienced observers of Iowa politics. Their Poll was not merely wrong—it was obviously, patently wrong. And it was reckless to publish it when it was in significant contradiction with all other publicly available polling in Iowa, polling in other swing states, and election results in similar races in recent Iowa history.

99. The Defendants' recklessness is seen when comparing their actions to industry customs and practices. *See* RESTATEMENT (SECOND) OF TORTS § 580B cmt. g (1977) ("The defendant, if a professional disseminator of news, such as a newspaper, a magazine or a broadcasting station, or an employee, such as a reporter, is held to the skill and experience normally possessed by members of that profession. Customs and practices within the profession are relevant in applying the negligence standard, which is, to a substantial degree, set by the profession itself, though a custom is not controlling. Evidence of custom within the profession of news dissemination would normally come from an expert who has been shown to be qualified on the subject. It may be testimony that the course of conduct followed by the defendant was or was not in accordance with recognized professional practices.").

100.    Here, journalistic custom and practice would dictate that a poll that is wildly different from all other publicly available polling in Iowa, polling in other swing states, and election results in similar races in recent Iowa history would be held, subject to an outside second opinion, or re-run to ensure an accurate result.

101.    For instance, the American Association for Public Opinion Research, the main trade association for pollsters, has a professional code of ethics that includes, "We will not knowingly select research tools and methods of analysis that yield misleading conclusions." "We will not knowingly make interpretations of research results that are inconsistent with the data available, nor will we tacitly permit such interpretations. We will ensure that any findings we report, either privately or for public release, are a balanced and accurate portrayal of research results."

102.    The AAPOR's best practices for survey research advise, "Odd patterns of responses may reflect a programming error or interviewer training issue that needs to be addressed immediately."

103.    AAPOR's explanation of election-related polling notes, "Polls with misleading results often stem from methodological flaws like biased sampling, leading questions, or poor weighting."

104.    The Defendants' actions here reflect a clear failure of AAPOR standards. These were obviously "odd patterns of responses," but rather than addressing these patterns immediately, as the AAPOR recommends, the Defendants completed the poll and published it as a ground-breaking revelation, when in fact it was just false misinformation.

105.     The same can be said of the Gannett ethics principles above. The principles demand that editors be skeptical, that red flags be taken seriously, that polling be subject to special scrutiny, and that accuracy is paramount. Those principles were all tossed by the wayside here.

## PLAINTIFF CLASS ACTION ALLEGATIONS

106.     Iowa permits class actions for torts. Iowa R. Civ. P. 1.261.

107.     Iowa specifically permits class actions for consumer protection claims with the approval of the Attorney General of Iowa. Iowa Code 714H.7

108.     Class certification is appropriate where the class is so numerous that joinder of all members is impracticable.

109.     Class certification also requires that there be a question of law or fact common to the class.

110.     The Iowa Poll ran on Sunday, November 3, immediately prior to the Tuesday election day.

111.     The *Des Moines Register* has a subscriber base of approximately 40,000 on Sundays. This class is too numerous to join individually.

112.     There are common questions of law to the class:

    a. Do newspapers and their employees and contractors owe a duty of care to subscribers to exercise ordinary care? Or ordinary care according to journalistic practice and custom?

113.     There are also common questions of fact to the class:

    a. Did the Defendants intentionally run a fraudulent poll?

b.  Did the Defendants recklessly run an obviously inaccurate poll?

c.  Did the Defendants conspire to run the poll?

114.    This original complaint asserts a class on Count I and Counts III and IV.

115.    The Plaintiff has received written authorization from the Office of the Attorney General of Iowa to pursue a class action on the consumer fraud claim, pursuant to Iowa Code 714H.7.

116.    The Plaintiff is a fair representative of the class and has hired competent counsel to represent the class.

117.    Thus, Plaintiff requests that this Court certify the following class: All digital and print subscribers to the Sunday edition of the Des Moines Register as of November 3, 2024.

118.    The contact information for the class can easily be extracted from the business records of the Defendants.

119.    To the extent that Plaintiff may be bound by a waiver of class action claims according to the adhesion contact he may have entered as a subscriber to the *Register*, that provision is unconscionable and therefore unenforceable. *Webster v. State*, 2022 Iowa App. LEXIS 621, *7 (Aug. 17, 2022). *See Lima v. Gateway, Inc.*, 886 F. Supp. 2d 1170, 1176 (C.D.Cal. 2012) (discussing *Discover Bank v. Sup. Ct.*, 36 Cal. 4th 148, 165 (2005) (adhesion contracts with a class-action waiver provision unlawful as unconscionable in circumstances like this). *See also Lukken v. Fleischer*, 962 N.W.2d 71, 82 (Iowa 2021) (contract terms that protect against liability for intentional or reckless misconduct are disfavored).

120.    In all events, that adhesion contract applies only to Plaintiff and the *Register*, not to any other defendant.

## CLAIMS

121.    At the end of the day, the Defendants acted with intentional fraud or reckless disregard on two separate inflection points. First, when Dr. Selzer, her team at Selzer & Co., and the *Register* editorial leadership designed the poll, they did so in a way that the methodology resulted in a radically flawed result. At this point, the Poll designers failed basic journalist and polling practices to construct a reasonably accurate estimate of the Iowa electorate.

122.    Second, when the poll results came back, the Defendants acted with either intentional deceit or reckless disregard by choosing to publish the Poll results as a banner headline rather than conducting any due diligence on such wildly unbelievable results.

## COUNT I – Fraudulent Misrepresentation

123.    The elements of fraudulent misrepresentation are: (1) representation; (2) falsity; (3) materiality; (4) scienter; (5) intent to deceive; (6) justifiable reliance; and (7) resulting injury. *Gibson v. ITT Hartford Ins. Co.*, 621 N.W.2d 388, 391 (Iowa 2001).

124.    In a certain sense, the *Register* committed two fraudulent misrepresentations. The first was when it promised Mr. Donnelly and the Plaintiff Class trustworthy news. The second was when the *Register* chose to publish the poll.

125.    The *Register* represented to Mr. Donnelly and the Plaintiff Class when they decided to purchase their subscription that they would receive "trustworthy, smart

and engaging news and information" from a "venerable source of information and current news for the heart of Iowa," indeed, "the state's premier source of information."

126.    The *Register* misrepresented the product it promised. The *Register* did not deliver trustworthy information but *untrustworthy* information. Put differently, it did not deliver information at all, but *mis*information.

127.    The promise to provide trustworthy information is material to the decision to subscribe to the *Register*. Mr. Donnelly was not subscribing to a satire magazine like the *Onion* or the Babylon Bee, expecting laughably fake news—he was subscribing to the *Register* expecting real, reliable news about important topics, because that is what the *Register* promised him.

128.    The representation that the *Register* would publish trustworthy news was false. The *Register* knowingly published untrustworthy news when it ran the Iowa Poll on November 2, 2024.

129.    The *Register* knew or should have known that its subscribers look to news like the Iowa Poll as a core part of their subscription.

130.    The *Register* knew or should have known that the poll was untrustworthy when it ran it and that it represented a breach of its promise to its subscribers.

131.    Mr. Donnelly and the Plaintiff Class justifiably relied on the *Register's* promise of trustworthy news—the *Register* is a professional news operation affiliated with a national journalism company—Gannett—with standards of professionalism.

132.    Mr. Donnelly and the Plaintiff Class suffered a real injury from the *Register's* failure to deliver the product it promised. Not only can Mr. Donnelly not trust that one news story, but now he questions whether any news story from the *Register* is trustworthy.

133.    More specifically, the Poll was a misrepresentation of the state of the race at the time it was taken. It was more than an outlier—it was egregiously incorrect.

134.    The Poll was a *false* misrepresentation of the state of the race. It was not even close to accurate.

135.    The Poll was a *material* misrepresentation—it was long regarded as the standard in Iowa politics, and it was the banner headline story for the day that it ran. Numerous news stories from other in-state, national, and global news outlets subsequently rereported the Poll. Voters across Iowa like Mr. Donnelly saw the poll and credited its findings. Mr. Donnelly and others subscribed to the *Register* precisely to receive important and accurate information about Iowa news like this.

136.    The Poll was *knowingly* a false misrepresentation of the race. Any responsible pollster or journalist with experience in Iowa politics would recognize the clear inaccuracy of the Poll, yet Dr. Selzer and the *Register* chose to publish the poll anyway. Statistically, it was a 1 in 3,500,000 chance of an honest error.

137.    The Poll was an *intentionally deceptive* misrepresentation. Dr. Selzer and Gannett's senior staff at the *Des Moines Register* knew that the Iowa Poll was considered an accurate representation of the Iowa electorate and that this poll was

inaccurate, and yet they decided to publish it anyway, showing their intent to deceive their readers and the broader electorate with a false poll.

138.    Given the Iowa Poll's historic accuracy and the *Register's* general reputation for accuracy, the Plaintiff and Plaintiff Class *justifiably relied* on the poll.

139.    His reliance was justified given Dr. Selzer's academic credentials (she has a Ph.D. in a related field), her long-asserted standing as "the gold standard" for Iowa polling, and the experience and trustworthiness of the Register's reporters and editors who reviewed and ran her poll.

140.    The Plaintiff and the Plaintiff Class were *injured* by the Poll's fraudulence: they pay good money to subscribe to the *Register* to read accurate and important news, not to be misled by fraudulent misrepresentations.

141.    Dr. Selzer and Selzer & Co. are liable for presenting a false poll, the Register is liable for presenting this false poll to its subscribers including Mr. Donnelly, and Gannett is liable based on its editorial control of the *Register* and its failure to ensure the *Register* staff acted in line with its ethical principles.

**ALTERNATE COUNT I – Negligent Misrepresentation in a Reckless Degree**

142.    If the Court finds that the misrepresentation was not intentional, then in the alternative plaintiff pleads the tort of negligent misrepresentation in a reckless degree (recklessness is not inherently part of the tort, but is specifically pled here because of the First Amendment standard requiring reckless or knowing behavior).

143.    Negligent misrepresentation is also sometimes described as "the tort of negligently giving misinformation. *Sain v. Cedar Rapids Cmty. Sch. Dist.*, 626 N.W.2d 115, 123 (2001).

144.    "[P]rofessionals such as accountants, abstractors, and attorneys owe a duty of care in supplying information to foreseeable third parties as members of a limited class of persons who would be contemplated to use and rely upon the information." *Id.*

145.    The "duty [of care for negligent misrepresentation] arises only when the information is provided by persons in the business or profession of supplying information to others." *Id.*

146.    "[T]he foreseeability of harm helps support the imposition of a duty of care." *Id.*

147.    "[T]he pecuniary interest which a person has in a business, profession, or employment which supplies information serves as an additional basis for imposing a duty of care." *Id.*

148.    Newspaper journalists and pollsters are professionals with white-collar jobs that expect at least a bachelor's degree and some years of experience, if not advanced degrees in journalism, political science, or statistics. (Dr. Selzer has a Ph.D.).

149.    Newspaper subscribers are a limited class of foreseeable third parties who rely on the information provided by these professionals.

150.    Newspaper journalists and pollsters are in the business of supplying accurate, reliable information to others.

151.     Newspaper journalists and pollsters do not provide information to their readers in a setting that is arms-length or adversarial.

152.     The Defendants could foresee that reporting obviously inaccurate polling results would harm their readers by delivering a product other than the one they purchased. *Register* subscribers purchase a product—accurate news—not the recklessly negligent reporting of inaccurate news.

153.     The *Register* and the Seltzer Company have a pecuniary interest in their business of supplying information—this is how the *Register* gets and keeps readers and how the Seltzer Company gets and keeps clients.

154.     The inaccurate information supplied by Defendants harmed the Plaintiff in his relationship to third parties—it gave him a false impression of the state of the world as he thought about voting and discussed voting and politics with friends and neighbors.

155.     The information supplied by the Defendants was a false estimate of the facts, not a statement of personal opinion or future intentions.

156.     The decision of Defendants to publish this information was not reasonable. In fact, given the Defendants' knowledge of previous elections in Iowa and other polling data on Iowa at the time, it was downright reckless.

157.     Defendants' negligence created an ascertainable pecuniary loss: the value of a subscription to the *Des Moines Register*, as Mr. Donnelly and others can no longer trust what they have read or will read in the paper.

### COUNT II – Consumer Fraud

158.    "A person shall not engage in a practice or act the person knows or reasonably should know is an unfair practice, deception, fraud, false pretense, or false promise, or the misrepresentation, concealment, suppression, or omission of a material fact, with the intent that others rely upon the unfair practice, deception, fraud, false pretense, false promise, misrepresentation, concealment, suppression, or omission in connection with the advertisement, sale, or lease of consumer merchandise, or the solicitation of contributions for charitable purposes. For the purposes of this chapter, a claimant alleging an unfair practice, deception, fraud, false pretense, false promise, or misrepresentation must prove that the prohibited practice related to a material fact or facts." Iowa Statutes 714H.3(1).

159.    "A consumer who suffers an ascertainable loss of money or property as the result of a prohibited practice or act in violation of this chapter may bring an action at law to recover actual damages. The court may order such equitable relief as it deems necessary to protect the public from further violations, including temporary and permanent injunctive relief." Iowa Statutes 714H.5(1).

160.    "A class action lawsuit alleging a violation of this chapter shall not be filed with a court unless it has been approved by the attorney general. The attorney general shall approve the filing of a class action lawsuit alleging a violation of this chapter unless the attorney general determines that the lawsuit is frivolous." Iowa Statutes 714H.7. In this case, the Office of the Attorney General has issued a letter to the Plaintiff authorizing him to proceed on a class basis on this claim.

161.    A newspaper is consumer merchandise—it is a service (news reporting) sold primarily for personal, family, or household usage. Iowa Statutes 714H.2.

162.    To be clear, the consumer merchandise at issue is the *Des Moines Register* as a whole. The false promise was that a subscriber to the Register would receive trustworthy and reliable information during the course of the subscription. Mr. Donnelly and the Plaintiff Class rely on the *Register* for trustworthy and reliable information. Indeed, the Register sells itself to Mr. Donnelly and the Plaintiff Class on this promise, and Mr. Donnelly and the Plaintiff Class relied on that promise when they chose to purchase their subscriptions. The Register, with the cooperation of its contractor Dr. Selzer/Selzer & Co. and its parent company Gannett, failed to provide trustworthy and reliable information. It failed to provide the product it promised at the time of sale.

163.    Dr. Selzer and Selzer & Co. are paid by the Register and Gannett to conduct the poll. Selzer had a contract with the Register to provide the poll.[22]

164.    The decision by Dr. Selzer and the Register to report the poll as an accurate news item when in fact it was obviously inaccurate constituted an unfair practice, deception, fraud, misrepresentation of a material fact. It was either known or reasonably should have been known to be so.

165.    The decision to publish was made with the intent that others, at minimum subscribers like Plaintiff, would rely on the misinformation as accurate.

---

[22] *See* https://www.youtube.com/watch?v=GovfaGQrYDE (*Veteran pollster J. Ann Selzer ends contract with Iowa Poll,* KCCI News, Nov. 17, 2024).

166.    The misinformation was published and pushed as a banner headline with the intention to sell newspapers, sell digital passes and subscriptions, and generate "clicks" that resulted in ad revenue for the *Register*.

167.    The Plaintiff suffered an ascertainable loss—the cost of his subscription to the *Des Moines Register*, which he can no longer rely on to provide trustworthy and accurate information. For his digital subscription, that is $69.99.

## COUNT III – Professional Malpractice

168.    "In professional negligence actions, as in other negligence actions, the plaintiff must prove a duty of care was owed to him or her, breach of that duty, and damages caused by the breach of duty." *McGraw v. Wachovia Sec., L.L.C.*, 756 F. Supp. 2d 1053, 1070 (N.D. Iowa 2010) (applying state law).

169.    "Persons engaged in the practice of a profession or trade are held to the standard of the skill and knowledge normally possessed by members of that profession or trade in good standing in similar communities." *Id.* (citation omitted).

170.    "Unless a professional's lack of care is so obvious as to be within the comprehension of a layperson, the standard of care and its breach must ordinarily be established through expert testimony." *Id.* (citation omitted).

171.    A journalist is engaged in a profession or trade. *Bank of Oregon v. Ind. News, Inc.*, 65 Ore. App. 29, 670 P.2d 616, 628 (Or. App. 1983) (holding that "when negligence is alleged against a media defendant, there should be a professional standard of care"). *See also* Restatement (Second) of Torts § 580B cmt. g (1977) (industry practice and custom for news outlets to ensure accuracy of news reports).

172.     A pollster is engaged in a profession or trade. As one piece of evidence that polling is a profession, it generally requires an advanced degree—Dr. Selzer holds a Ph.D.

173.     Industry standards can be seen in this instance in the AAPOR and Gannett statements of principles and best practices.

174.     A professional's duty arises when "'[r]ed flags' that would alert a" professional to the existence of a problem. *McGraw*, 756 F. Supp. 2d at 1075.

175.     Here, numerous "red flags" would notify a responsible pollster or a responsible journalist that the Iowa Poll was deeply flawed.

176.     In spite of these "red flags," the Defendants decided to recklessly proceed with publication.

177.     A professional's duty also arises to a customer—here, Mr. Donnelly and the other members of the Plaintiff Class who are customers, i.e., subscribers, of the *Register. McGraw*, 756 F. Supp. 2d at 1073-75.

178.     To the extent that Mr. Donnelly is an indirect customer of Dr. Selzer and Selzer & Co., Iowa recognizes that a professional may be liable to a third-party or non-customer. *See J.A.H. by R.M.H v. Wadle & Assocs., P.C.*, 589 N.W.2d 256, 260 (Iowa 1999) and *McGraw*, 756 F. Supp. 2d at 1072.

179.     A newspaper has a duty of care for information that it authors or approves (but not for advertisements it merely prints on behalf of others). *See Birmingham v. Fodor's Travel Publications*, 73 Haw. 359, 366 (1992).

180.    Here, the duty of care to exercise the ordinary care of a journalist or pollster required the Defendants to recognize the obvious problems with the Iowa Poll and not publish it without additional investigation or verification.

181.    Instead, the Defendants recklessly charged ahead and published the poll, providing inaccurate information to Mr. Donnelly and other subscribers. This denied him and other subscribers of the value of their newspaper subscription. Not only did they receive bad information that one day, but it undermined their confidence in the paper overall such that any past or future reporting can no longer be trusted.

182.    The value of that newspaper is an annual subscription cost--$69.99 for Mr. Donnelly, and a print or digital subscription cost for the Plaintiff Class.

183.    To the extent that the subscription terms that Mr. Donnelly or plaintiff class members may have accepted purports to limit damages to the value of one month of subscription cost, that is an unconscionable and unenforceable provision of an adhesion contract. *See, e.g., Mannion v. Manor Care, Inc.*, 4 Pa. D. & C.5th 321, 333-34 (2006) (damages limitation in adhesion contract unenforceable)/

## COUNT IV – Interference with the Right to Vote

184.    Iowa recognizes a tort for interference with the right to vote. *Lane v. Mitchell*, 153 Iowa 139, 143 (1911).

185.    The tort is also recognized in the Restatement (Second) of Torts, Section 865, and the Restatement (First) of Torts, also section 865.

186.    *Lane* recognizes an after-the-fact cause for actual and nominal damages for interference with the right to vote.

187.    The Restatement defines the tort to include engaging in "fraud" "with knowledge that his act is substantially certain to result in the failure of the other to exercise the right."

188.    *Lane* says "the jury would have been warranted in awarding the plaintiff a substantial recovery" in such a case where actual damages are difficult to calculate.

189.    Academic studies show that polling data of a race affects voter choices and voter turnout. Such polling may also change the candidates that voters select based on their assessment of their viability (for instance, a voter may cast a third-party protest vote in a race that he thinks won't be close). *See generally* Andre Blais, et al., *Do Polls Influence the Vote?,* chapter in  Henry E. Brady & Richard G. C. Johnston, eds., CAPTURING CAMPAIGN EFFECTS (U. Mich. Press 2009).

190.    "Besides receiving national news coverage, this poll had a significant impact on the expectations of Iowans themselves. Such dramatic public findings, which this Iowa Poll represents, can mislead voters and undermine trust in the polling enterprise itself." Samantha J. DeRagon, Tracy Osborn, and Michael S. Lewis-Beck, *The 2024 Iowa Poll for President: A Cautionary Tale*, Univ. of Virginia (Dec. 12, 2024).[23]

191.    "The notion that published vote intention polls influence voter behavior expresses an hypothesis of long standing. Normally, it would be difficult to trace out the effect of this last minute, single poll on would-be voters in a single state. However,

---

[23] https://centerforpolitics.org/crystalball/the-2024-iowa-poll-for-president-a-cautionary-tale/

we had in the field our own poll of Iowa voters, namely a sample of 214 University of Iowa students. . . . The results show a statistically significant 9-percentage-point rise ($p < .05$, one-tailed) in expectations of a Harris victory among those who said Iowa was their home state (150 respondents). While these data are observational, they are nevertheless highly suggestive. It looks like the *Iowa Poll* did, in fact, increase Iowa public opinion favoring Harris to win the state." *Id.*

### COUNT V – Civil Conspiracy

192.    "[C]ivil conspiracy requires an understanding between two or more parties to harm another; it involves some mutual mental action coupled with an intent to commit the act which results in injury. A person becomes liable for the harm caused by another's tortious conduct when they commit, encourage, or assist such conduct." *Anderson v. Anderson Tooling, Inc.*, 928 N.W.2d 821, 826 (Iowa 2019).

193.    Civil conspiracy is not an independent tort. It requires the plaintiff to demonstrate a predicate tort which the conspirators conspired to commit.

194.    Here, the four primary torts alleged above (fraudulent/negligent misrepresentation, consumer fraud, professional malpractice, and interference with the right to vote) are the predicate torts, any one of which is sufficient to serve as the predicate for a civil conspiracy.

195.    A violation of the consumer protection statute may be the basis for a conspiracy claim. *See State v. Ross*, 573 N.W.2d 906, 911 (Iowa 1998) (criminal conspiracy charge for violation of the consumer protection statute).

37

196.     Here, Dr. Selzer and Selzer and Co. conspired with the Des Moines *Register* and senior regional executives from Gannett Co. to harm Donnelly and the Plaintiff Class by providing material false information immediately prior to the election.

197.     This conspiracy occurred in conversations between the Defendants in the days immediately prior to the poll's publication, approximately October 28, 2024 (when the poll began running) to November 2, 2024 (when the poll was first published).

198.     As a result of this conspiracy, Donnelly and the Plaintiff Class were damaged by the failure to receive the product promised them.

## PUNITIVE DAMAGES

199.     Pursuant to Iowa Code 668A.1(1)(a), Plaintiff pleads that he can show by a preponderance of clear, convincing, and satisfactory evidence that the conduct of the Defendant from which the claims arose constituted willful, wanton, or reckless disregard for the rights of others.

200.     Punitive damages are appropriate here where deterrence is necessary. The American people do not trust the news media—according to the Pew Research Center, only 31 percent of the American people have a great deal or fair amount of faith in the news media. That loss of faith in these important institutions is because news outlets like the *Register* publish obviously incorrect information and then trumpet it to get "clicks." Deterrence is necessary to restore faith in the media by providing a strong disincentive to intentionally or recklessly push stories that are inaccurate but would generate significant public attention and coverage from other media. *See*

*Beeman v. Manville Corp. Asbestos Disease Comp. Fund*, 496 N.W.2d 247, 255 (Iowa 1993).

201.    Punitive damages are appropriate in cases of intentional or reckless misconduct. *Wolf v. Wolf*, 690 N.W.2d 887, 893 (Iowa 2005).

202.    In this case, Plaintiff has pled that Defendants acted to undertake an intentional fraud or at minimum acted with reckless disregard for the truth.

203.    Counts I, III, and IV are the predicate torts, any of which would justify punitive damages.

204.    Separately, Count II specifically authorizes punitive damages when "the finder of fact finds by a preponderance of clear, convincing, and satisfactory evidence that a prohibited practice or act in violation of this chapter constitutes willful and wanton disregard for the rights or safety of another." Iowa Code 714H.5(4).

205.    Again, the Defendants acted with either intentional or reckless disregard for the accuracy of the poll.

206.    To the extent that Mr. Donnelly's subscription contract with the *Register* may have included a waiver of punitive damages, that is an adhesion contract term that is unconscionable. *See Daniels v. Va. College at Jackson*, 478 Fed. Appx. 892, 894 (5th Cir. 2012). *See also Lukken v. Fleischer*, 962 N.W.2d 71, 82 (Iowa 2021) (contract terms that protect against liability for intentional or reckless misconduct are disfavored). It also only protects the *Register*, not the other Defendants.

## CONCLUSION AND PRAYER

Therefore, Plaintiff prays that the Court:

207.    Certify the Plaintiff Class.

208.    Declare that the Defendants engaged in intentional misrepresentation, or alternatively that they engaged in recklessly negligent misrepresentation.

209.    Declare that the Defendants engaged in consumer fraud under the Iowa Consumer Fraud statute.

210.    Declare that the Defendants engaged in professional malpractice.

211.    Declare that the Defendants interfered with the right to vote.

212.    Declare that the Defendants conspired to achieve these wrongful acts.

213.    Award Mr. Donnelly and every Plaintiff Class member actual damages equivalent to one year's subscription, whether digital or print.

214.    Award Mr. Donnelly and every Plaintiff Class member nominal damages.

215.    Award Mr. Donnelly and every Plaintiff Class member punitive damages.

216.    Award Mr. Donnelly and the Class attorneys' fees. *See* Iowa Code 714H.5(2).

217.    Award any other relief the Court awards just and appropriate.

218.    The Plaintiff demands a trial by jury on all issues so triable.

/s/ Robert Anderson
ROBERT R. ANDERSON
P.O. Box 4
Atlantic, Iowa 50022
(515) 382-1278
bobandersoniowan@gmail.com

/s/ Daniel R. Suhr
DANIEL R. SUHR
Center for American Rights
1341 W. Fullerton Ave., Suite 170
Chicago, IL 60614
dsuhr@americanrights.org

*Pro hac vice*

*Attorneys for Plaintiff Dennis Donnelly*

51

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| DENNIS DONNELLY, on behalf of himself and all others similarly situated, | |
| Plaintiffs, | **No. 4:25-cv-00150-RGE-WPK** |
| v. | |
| DES MOINES REGISTER AND TRIBUNE COMPANY, J. ANN SELZER, SELZER & COMPANY, and GANNETT CO., INC., | **ORDER DENYING MOTION TO REMAND** |
| Defendants. | |

## I.    INTRODUCTION

Plaintiff filed this case in the Iowa District Court for Polk County, asserting claims against Defendants on behalf of himself and a putative class. Defendant Gannett Co., Inc. removed the case to this Court, asserting federal jurisdiction under the Class Action Fairness Act.

Plaintiff moves to remand the case to state court or, in the alternative, to seek jurisdictional discovery. Plaintiff argues this case falls within an exception to the Class Action Fairness Act. In response, Defendants assert no exception applies. Defendants also argue Plaintiff's request for jurisdictional discovery is unnecessary.

For the reasons set forth below, the Court denies Plaintiff's motion to remand and declines to permit jurisdictional discovery.

## II.    PROCEDURAL BACKGROUND

Donnelly initially filed suit in the Iowa District Court for Polk County on January 6, 2025, alleging five claims. Pet., ECF No. 1-1. Count I asserts fraudulent misrepresentation, or in the alternative reckless negligent misrepresentation (Alternative Count I); Count II asserts a consumer fraud claim; Count III asserts a professional malpractice claim; and Count IV asserts interference with the right to vote. *Id.* Gannett accepted service on April 4, 2025. Certificate of Service, ECF

52

No. 1-2. Gannett removed the case on April 24, 2025, on the basis of class action diversity jurisdiction under the Class Action Fairness Act. Def. Gannett's Notice of Removal ¶¶ 14–15, ECF No. 1. Shortly thereafter, Donnelly filed a motion to remand, which is now before the Court. Pl.'s Mot. Remand, ECF No. 21; Pl.'s Br. Supp. Mot. Remand, ECF No. 21-1. Gannett and Defendant Des Moines Register and Tribune Company resist, and Donnelly replies to Defendants' resistance. Def. Des Moines Register & Gannett's Resist. Pl.'s Mot. Remand, ECF No. 24; Pl's. Reply Supp. Mot. Remand, ECF No. 25.

## III.    LEGAL STANDARD

Removal is permitted in "any civil action brought in a State court of which the district courts of the United States have original jurisdiction." 28 U.S.C. § 1441(a). Removable cases include those falling within the Court's diversity jurisdiction. *Id.* The Class Action Fairness Act (CAFA) grants federal courts jurisdiction over cases in which the amount in controversy exceeds $5,000,000, there is at least minimal diversity between the parties, and there is at least 100 members in the class. 28 U.S.C. § 1332(d); *Westerfeld v. Indep. Processing, LLC*, 621 F.3d 819, 822 (8th Cir. 2010). Minimal diversity is satisfied where "any class member and any defendant are citizens of different states." *Westerfeld*, 621 F.3d at 822. The Class Action Fairness Act includes two mandatory exceptions to federal jurisdiction. *Id.*; § 1332(d)(4). These exceptions operate as an abstention doctrine, requiring courts to abstain from exercising jurisdiction but not stripping the court of subject matter jurisdiction. *Graphic Commc'ns Local 1B Health & Welfare Fund A v. CVS Caremark Corp.*, 636 F.3d 971, 973 (8th Cir. 2011). The first mandatory exception, the local-controversy exception, states courts "shall decline to exercise jurisdiction":

> (i) over a class action in which—
>> (I) greater than two-thirds of the members of all proposed plaintiff classes in the aggregate are citizens of the State in which the action was originally filed;
>> (II) at least 1 defendant is a defendant—
>>> (aa) from whom significant relief is sought by members of the plaintiff class;

> (bb) whose alleged conduct forms a significant basis for the claims asserted by the proposed plaintiff class; and
> (cc) who is a citizen of the State in which the action was originally filed; and
> (III) principal injuries resulting from the alleged conduct or any related conduct of each defendant were incurred in the State in which the action was originally filed; and
> (ii) during the 3-year period preceding the filing of that class action, no other class action has been filed asserting the same or similar factual allegations against any of the defendants on behalf of the same or other persons . . . .

28 U.S.C. § 1332(d)(4)(A). The second mandatory exception, the home-state exception, requires abstention where "two-thirds or more of the members of all proposed plaintiff classes in the aggregate, and the primary defendants, are citizens of the State in which the action was originally filed." 28 U.S.C. § 1332(d)(4)(B). Courts also have discretion to decline to exercise jurisdiction pursuant to the interest-of-justice exception. 28 U.S.C. § 1332(d)(3). This exception permits courts to "look[] at the totality of the circumstances" and "decline to exercise jurisdiction . . . over a class action in which greater than one-third but less than two-thirds of the members of all proposed plaintiff classes in the aggregate and the primary defendants are citizens of the State in which the action was originally filed . . . ." *Id.* Both the home-state exception and the interest-of-justice exception require all primary defendants be citizens of the State in which the action was originally filed.

"Although CAFA expanded federal jurisdiction over class actions, it did not alter the general rule that the party seeking to remove a case to federal court bears the burden of establishing federal jurisdiction." *Westerfeld*, 621 F.3d at 822. Once the removing party has established that the Class Action Fairness Act's jurisdictional requirements have been met, the burden is on the party seeking remand to establish that one of the Class Action Fairness Act exceptions applies. *Id.* at 822–23 (citing *Serrano v. 180 Connect, Inc.*, 478 F.3d 1018, 1024 (9th Cir. 2007) ("[O]nce federal jurisdiction has been established under [§ 1332(d)(2)], the objecting party bears the burden of proof as to the applicability of any express statutory exception" under § 1332(d)(4)(A) and

3

(B))).

The Court relies on the facts alleged in Donnelly's state court petition rather than the amended complaint filed subsequent to removal. *See* Am. Compl., ECF No. 22. "It is axiomatic the court's jurisdiction is measured either at the time the action is commenced or, more pertinent to this case, at the time of removal." *Schubert v. Auto Owners Ins. Co.*, 649 F.3d 817, 822 (8th Cir. 2011) (citing *McLain v. Andersen Corp.*, 567 F.3d 956, 965 (8th Cir. 2009) (finding an argument in favor of remand based on an amended complaint was meritless because jurisdiction was to be determined at the time of removal)).

## IV.    DISCUSSION

Donnelly first alleges the motion to remand should be granted because Defendants did not timely remove the case. ECF No. 21-1 at 4–7. Donnelly also argues even if removal was timely, one of the Class Action Fairness Act exceptions applies. *Id.* Donnelly also seeks jurisdictional discovery. ECF No. 21-1 at 7. The Court first addresses the timelessness of removal, then addresses the applicability of the Class Action Fairness Act exceptions, and finally addresses the request for jurisdictional discovery.

### A.    Timeliness of Removal

Donnelly filed the state court action on January 6, 2025. ECF No. 21-1 at 4. Counsel for Defendants in this case also represent Defendants in another action with significantly overlapping subject matter.[1] Counsel for Donnelly provided Defense counsel with a courtesy copy of the complaint in this action and sought to discuss arranging convenient service of process. *Id.* Because of the overlapping subject matter between this case and the *Trump* case, counsel for Donnelly agreed to allow the full ninety-day timeline for service of process to run in this case so proceedings

---

[1] Defendants here are also defendants in *Trump v. Selzer*, No. 4:24-cv-00449-RGE-WPK (S.D. Iowa). The *Trump* case also centers around the Des Moines Register's publication of the Seltzer presidential election poll.

in the *Trump* case could develop further. *Id.* Once counsel for both parties recognized that the timeline for the *Trump* case would extend past the ninety-day window for service in this case, both parties met again to "finalize plans." *Id.* at 5. Service of process was accepted in this case on April 4, 2025. *Id.* Gannett's notice of removal was filed on April 24, 2025. *Id.* This is twenty days after service of process.

A "notice of removal of a civil action or proceeding shall be filed within 30 days after the receipt by the defendant." 28 U.S.C. § 1446(b)(1). The clock for removal of a case to federal court starts on the date of service. *Murphy Bros., Inc v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 346 (1999) (rejecting "the so-called 'receipt rule'—starting the time to remove on receipt of a copy of the complaint, however informally, despite the absence of any formal service"); *Brown v. Tokio Marine & Fire Ins. Co.*, 284 F.3d 871, 873 (8th Cir. 2002) ("The law is settled in this Circuit that the thirty-day period to file a notice of removal runs from the time that a defendant is served with the complaint").

Donnelly requests this rule be set aside because of alleged "gamesmanship" by Defendants. ECF No. 21-1 at 5. It appears, however, that both parties agreed to additional time before service of process was accepted so the parties could monitor the progress of the *Trump* case. *Id.* at 4; ECF No. 24 at 7; Klinefeldt Decl. Supp. Defs. Des Moines Register & Gannett's Resist. Pl.'s Mot. Remand, Exs. 1–5, ECF Nos. 24-2, 3, 4, 5, 6. There is, therefore, no basis to depart from the bright line rule set forth in § 1446(b)(1). Notice of removal was filed twenty days after service of process. Notice of removal was therefore timely.

### B.    Class Action Fairness Act Exceptions

The Court next turns to the applicability of the three jurisdictional exceptions contained in the Class Action Fairness Act. Donnelly first asserts the local-controversy exception applies. ECF No. 21-1 at 7. Because Defendants have met their initial burden to show original jurisdiction, Donnelly has the burden to show an exception applies. *Cf. Westerfeld*, 621 F.3d at 822–23. To

demonstrate the applicability of the local-controversy exception, Donnelly has the burden of showing four things: 1) at least two-thirds of the putative class are citizens of the forum state; 2) at least one defendant whose actions form a significant basis for the claims must be a citizen of the forum state; 3) the principal injuries occurred in the forum state; and 4) there has been no similar class action filed within the last three years. *Cf.* 28 U.S.C. § 1332(d)(4)(A). Prongs two and four—the significant basis and similar class action prongs—are not in dispute. ECF No. 24 at 11. Donnelly seeks judicial discovery to establish the first—the citizenship prong. ECF No. 21-1 at 7. However, even if Donnelly shows at least two-thirds of the punitive class are from Iowa, Donnelly must still meet his burden as to the third—the principal injury prong. The question of principal injury is therefore the focus of the Court's discussion.

The local-controversy exception is a "narrow exception." *Atwood v. Peterson*, 936 U.S. 835, 839 (8th Cir. 2019). Donnelly does not address the principal injury prong in detail, but seemingly alleges an interpretation of "principal" in § 1332(d) as meaning where a majority or significant amount of the total injuries of the class took place. *See* ECF No. 21-1 at 8–9. This interpretation of the statute does not comport with the plain language of the statute, Congress's intent, or how other courts have interpreted the term.

For the local-controversy exception to apply, the principal injuries resulting from Defendants' alleged conduct must have been incurred in Iowa. This requires answering two questions: what is the alleged principal injury and where did class members suffer this injury. The Fifth Circuit recently considered the question of whether the local-controversy exception applies where the principal injury alleged is financial and most, but not all, class members reside in the forum state. *Cheapside Mins., Ltd. v. Devon Energy Prod. Co., L.P.*, 94 F.4th 492 (5th Cir. 2024) (finding the local-controversy exception did not apply where ninety percent of class members resided in the forum state but ten percent did not). The *Cheapside* court conducted a thorough and persuasive analysis and concluded "'principal injuries' qualitatively and comparatively

evaluates the types of injury, not the quantity of plaintiffs who were injured." *Id.* at 499–500.

"Thus, when some plaintiffs sustain their primary injuries in the forum state but others do not

§ 1332(d)(4)(A)(i)(III) is not satisfied." *Id.* at 500. The Court finds the Fifth Circuit's interpretation

of § 1332(d)(4)(A)(i)(III) articulated in *Cheapside* persuasive and applies it here.

An interpretation requiring all class members to incur the principal injury in the forum state

comports with how Congress contemplated the exception would apply. The Class Action Fairness

Act Senate Report provides an instructive example illustrating how the local-controversy

exception should apply to the present case:

> For example, a class action in which local residents seek compensation for
> property damage resulting from a chemical leak at a manufacturing plant in that
> community would fit this criterion, provided that the property damage was limited
> to residents in the vicinity of the plant. However, if the defendants engaged in
> conduct that could be alleged to have injured consumers throughout the country or
> broadly throughout several states, the case would not qualify for this exception,
> even if it were brought only as a single-state class action.

S. Rep. No. 109-14, at 40 (2005).

Identifying the principal injury here is simple, as only one injury is alleged. The principal

injury alleged here is "an ascertainable pecuniary loss: the value of a subscription to the *Des

Moines Register*." ECF No. 22 ¶ 157. The dispositive question is therefore whether all class

members incurred this financial injury in Iowa. The general rule is a plaintiff incurs a financial

injury in the place where they reside, not where the alleged conduct causing the injury occurred.

*See e.g., Cheapside*, 94 F.4th at 499 ("Generally, a plaintiff sustains an economic injury where he

resides."); *Cantor Fitzgerald Inc. v. Lutnick*, 313 F.3d 704, 710 (2d Cir. 2002) (noting where

"injury is purely economic, the place of injury usually is where the plaintiff resides and sustains

the economic impact of the loss") (citation omitted); *CollegeSource, Inc. v. AcademyOne, Inc.*,

653 F.3d 1066, 1079 (9th Cir. 2011) ("We have repeatedly held that a corporation incurs economic

loss, for jurisdictional purposes, in the forum of its principal place of business.").

On the date the alleged injury occurred, November 3, 2025, the Des Moines Register had

subscribers in all fifty states. ECF No. 24-7 ¶ 4. Each of these subscribers experienced the same alleged financial injury—the decrease in value of their Des Moines Register subscription. This financial injury would be felt where these subscribers reside. Therefore, the principal injury alleged in the complaint occurred in all fifty states. Donnelly alleges Defendants engaged in conduct which financially injured consumers throughout the country. Therefore, the local-controversy exception does not apply.

Donnelly next asserts the home-state and interest-of-justice exceptions apply. ECF No. 21-1 at 8–9. Both these exceptions require all primary defendants be residents of Iowa. Donnelly claims Gannett is a secondary defendant "sued for its role as a parent company and for setting broad policies and standards." ECF No. 25 at 6. While the statute itself does not define what a primary defendant is, other courts examining this question have looked to whether defendants "are directly liable to the proposed class, as opposed to being vicariously or secondarily liable based upon theories of contribution or indemnification." *Vodenichar v. Halcon Energy Props., Inc.*, 733 F.3d 497, 504 (3d Cir. 2013) (encouraging courts to "determine if the plaintiffs seek to hold the defendant responsible for its own actions, as opposed to seeking to have it pay for the actions of others"). Courts also find all defendants to be primary defendants where the complaint fails to distinguish liability between defendants. *See Nicholson v. Prime Tanning Corp.*, No. 09-6083-CV, 2009 WL 2900042, at *2 (W.D. Mo. Sept. 3, 2009) ("Courts have routinely held that when a complaint fails to distinguish among defendants as to theories of liability, all are considered primary defendants.").

Donnelly seeks to hold Gannett liable for its own actions in relation to the release of the poll and does not meaningfully distinguish between theories of liability between the parties. The original petition contains several specific assertions against Gannett directly. Donnelly claims "Gannett has a history of telling its newspapers what they can and cannot do while covering politically sensitive issues." ECF No. 1-1 ¶ 86. In addition, Donnelly states "Gannett exercises

8

editorial control over its affiliates to an extent unseen in other chain newspapers." *Id.* ¶ 85. Donnelly offers a press release "showing the tie between Gannett and the *Register* specific to the poll." *Id.* ¶ 71. Donnelly also asserts the Des Moines Register's code of ethics is promulgated by Gannett. *Id.* ¶¶ 88–92. Donnelly states "Gannett may be held liable for its influence over its local papers' newsroom decisions." *Id.* ¶ 93. The original petition seeks to hold Gannett responsible for its actions in connection with the release of the poll. Gannett is therefore a primary defendant for purposes of § 1332(d)(3) and (d)(4)(B).

Because not all primary defendants are citizens of Iowa, the Court may not invoke the home-state exception or the interest-of-justice exception. None of the exceptions in the Class Action Fairness Act apply to this removal. Therefore, Donnelley's motion to remand is denied.

### C.   Jurisdictional Discovery

Donnelly requests jurisdictional discovery to obtain the Des Moines Register's list of subscribers. ECF No. 21-1 at 7. Through this discovery Donnelly expects to show more than two-thirds of these subscribers are citizens of Iowa. *Id.* However, conducting jurisdictional discovery would be futile. Here, the facts necessary to resolve the jurisdictional inquiry are known. *Cf. Viasystems, Inc. v. EBM-Papst St. Georgen GmbH & Co., KG*, 646 F.3d 589, 598 (8th Cir. 2011) (affirming the district court's denial of jurisdictional discovery because "facts necessary to resolving the jurisdictional inquiry [were not] . . . unknown or disputed").

The dispositive question for the applicability of the local-controversy exception is whether there were subscribers in other states who incurred the alleged financial injury. It is undisputed that the Des Moines Register has subscribers across the country. Therefore, Donnelly would not be able to satisfy the principal injury prong no matter what jurisdictional discovery yielded.

The dispositive question for the applicability of the home-state exception and the interest-of-justice exception is whether Gannet is a primary defendant. The allegations contained in the original petition are sufficient to establish Donnelly seeks to hold Gannett liable for its

own actions in connection with the poll. Because Gannett is not an Iowa citizen, these exceptions cannot apply. Therefore, jurisdictional discovery would not alter this result either.

Accordingly, the Court declines to permit jurisdictional discovery.

## V.    CONCLUSION

For the foregoing reasons,

**IT IS ORDERED** that Plaintiff Dennis Donnelly's Motion to Remand, ECF No. 21, is **DENIED**.

**IT IS SO ORDERED**.

Dated this 22nd day of October, 2025.

REBECCA GOODGAME EBINGER
UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| DENNIS DONNELLY, on behalf of himself and all others similarly situated | **No. 4:25-cv-00150-RGE-WPK** |
| Plaintiff, | |
| v. | **ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS** |
| DES MOINES REGISTER AND TRIBUNE CO., INC., J. ANN SELZER, SELZER & COMPANY, and GANNETT CO., INC., | |
| Defendants. | |

## I.    INTRODUCTION

The *Des Moines Register* released its Iowa poll of the 2024 presidential election on November 2 and 3, 2024. The poll predicted a surprisingly close race, a prediction which ultimately proved mistaken. Plaintiff Dennis Donnelly now brings suit on behalf of all *Des Moines Register* subscribers asserting this mistaken poll is "fake news" constituting fraud upon the entire punitive class.

For the reasons set forth below, the Court grants Defendants' motions to dismiss.

## II.    BACKGROUND

### A.    Factual Background

The Court accepts the facts alleged in Donnelly's amended complaint as true for the purpose of considering Defendants' motion to dismiss. *See Topchian v. JPMorgan Chase Bank, N.A.*, 760 F.3d 843, 848 (8th Cir. 2014). The Court also considers the *Des Moines Register* articles and associated methodology statements discussing the poll results, which are incorporated by reference in the complaint, attached as exhibits, and whose authenticity is unquestioned. *See Zean v. Fairview Health Servs.*, 858 F.3d 520, 526 (8th Cir. 2017); Defs.' Ex. A, ECF No. 32-1;

Defs.' Ex. B, ECF No. 32-2; Defs.' Ex. C, ECF No. 32-3; Defs.' Ex. D, ECF No. 32-4.

Donnelly is a West Des Moines resident and longtime subscriber to the *Des Moines Register*. Am. Compl. ¶ 8, ECF No. 22. Donnelly pays a yearly subscription fee of $69.99. *Id.* Defendant Des Moines Register and Tribune Co., Inc. owns and publishes the digital and print editions of the *Des Moines Register*. *Id.* ¶ 9. The Des Moines Register is a wholly owned subsidiary of Defendant Gannett Co., Inc. *Id.* Defendant Dr. J. Ann Selzer is a Des Moines resident and president of Defendant Selzer & Company. *Id.* ¶ 10. Selzer is a nationally recognized pollster with a wide spectrum of clients. *Id.* ¶ 77. Selzer has been the primary pollster for the *Des Moines Register* since 1987. *Id.* ¶ 80.

The *Des Moines Register* released its final 2024 presidential poll of Iowa online on November 2 and in print on November 3. *Id.* ¶¶ 63–64. The poll showed Vice President Kamala Harris with a 47 percent vote share compared to a 44 percent vote share for then-candidate Trump. *Id.* ¶ 23. The article accompanying the poll described the results as a "shocking development" and "hard for anybody to say they saw this coming." ECF No. 32 at 4. The *Des Moines Register* and Dr. Selzer included an extensive statement explaining the methodology of the poll. *Id.* at 15–16. The statement of methodology explained the poll was conducted by interviewing 1,038 Iowans over telephone with the phone numbers randomly selected. *Id.* From this random sample, the poll consisted of 808 responses with adjustments made to the sample to account for age, sex, and congressional district so that the random sample would better reflect the general population as shown by census data. *Id.*

Additional facts are discussed below as necessary.

**B.     Procedural Background**

Donnelly initially filed suit in the Iowa District Court for Polk County on January 6, 2025, alleging five claims. Pet., ECF No. 1-1. Count I asserts fraudulent misrepresentation, or in the

alternative reckless negligent misrepresentation (Alternative Count I); Count II asserts a consumer fraud claim; Count III asserts a professional malpractice claim; and Count IV asserts interference with the right to vote. *Id.* Gannett removed the case on April 24, 2025. Gannett's Notice of Removal ¶¶ 14–15, ECF No. 1. Shortly thereafter, Donnelly filed a motion to remand. Pl.'s Mot. Remand, ECF No. 21. Donnelly later filed an amended complaint. ECF No. 22. The amended complaint recites the same claims as the original petition with additional allegations throughout, and adds an additional claim of civil conspiracy (Count V). *Id.* The Court denied the motion to remand. Order Den. Mot. Remand, ECF No. 47. Defendants filed motions to dismiss the amended complaint, which the Court now considers. Defs.' J. Ann Selzer and Selzer & Co.'s Mot. Dismiss, ECF No. 26; Defs.' Des Moines Register and Gannett's Mot. Dismiss, ECF No. 29.

Gannett and the *Des Moines Register* move to dismiss all claims against them. ECF No. 29; Defs.' Des Moines Register and Gannett's Br. Supp. Mot. Dismiss, ECF No. 31. Selzer and Selzer & Co. separately move to dismiss all claims against them. ECF No. 26; Defs.' J. Ann Selzer and Selzer & Co.'s Br. Supp. Mot. Dismiss, ECF No. 33. Donnelly resists Defendants' motions to dismiss. Pl.'s Consolidated Resist. Defs.' Mot. Dismiss, ECF No. 36. Defendants separately reply to Donnelly's consolidated resistance. Defs.' J. Ann Selzer and Selzer & Co.'s Reply Br. Supp. Mot. Dismiss, ECF No. 41; Defs.' Des Moines Register and Gannett's Reply Br. Supp. Mot. Dismiss, ECF No. 42.

The Court finds the parties' briefing adequately presents the issues without need for oral argument. *See* LR 7(c); Fed. R. Civ. P. 78(b).

## III.   LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss a claim if a party fails "to state a claim upon which relief can be granted." "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is

plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*; *accord Kelly v. City of Omaha*, 813 F.3d 1070, 1075 (8th Cir. 2016). The aim of the plausibility standard "is to give the opposing party 'fair notice of the nature and basis or grounds for a claim, and a general indication of the type of litigation involved.'" *Topchian*, 760 F.3d at 848 (quoting *Hopkins v. Saunders*, 199 F.3d 968, 973 (8th Cir. 1999)).

Plaintiffs must "nudge[] their claims across the line from conceivable to plausible, [else] their complaint must be dismissed." *Twombly*, 550 U.S. at 570. "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

"Though matters outside the pleading may not be considered in deciding a Rule 12 motion to dismiss, documents necessarily embraced by the complaint are not matters outside the pleading." *Gorog v. Best Buy Co., Inc.*, 760 F.3d 787, 791 (8th Cir. 2014) (quoting *Ashanti v. City of Golden Valley*, 666 F.3d 1148, 1151 (8th Cir. 2012)).

> While courts primarily consider the allegations in the complaint in determining whether to grant a Rule 12(b)(6) motion, courts additionally consider "matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned."

*Miller v. Redwood Toxicology Lab'y, Inc.*, 688 F.3d 928, 931 n.3 (8th Cir. 2012) (quoting 5B Wright & Miller, *Federal Practice & Procedure* § 1357 (3d ed. 2004)).

The Court must accept as true all factual allegations in the complaint but not its legal conclusions. *Iqbal*, 556 U.S. at 678–79. "In deciding a motion to dismiss under Rule 12(b)(6), a

court assumes all facts in the complaint to be true and construes all reasonable inferences most favorably to the complainant." *United States ex rel. Raynor v. Nat'l Rural Utils. Coop. Fin., Corp.,* 690 F.3d 951, 955 (8th Cir. 2012).

## IV.    DISCUSSION

Defendants move to dismiss Donnelly's claims, asserting the First Amendment bars suits against newspapers engaged in political polling absent a showing of actual malice. ECF No. 32 at 18–24; ECF No. 33 at 4–11. Defendants also assert Donnelly fails to plead a prima facia case for each count alleged. ECF No. 32 at 27–45; ECF No. 33 at 23–42. Donnelly resists, asserting the First Amendment does not bar his claim, he has shown actual malice, and he has made out a prima facia case for each claim. *See* ECF No. 36.

The Court begins with a discussion of the applicable First Amendment standard then discusses each of the six claims alleged in turn. Upon review of the parties' filings, the Court concludes Donnelly has failed to sufficiently plead his claims and grants Defendants' motions to dismiss with prejudice.

### A.    First Amendment

The Court first addresses whether the First Amendment applies to Donnelly's claims. The First Amendment of the United States Constitution protects the freedom of speech and of the press. U.S. Const. amend. I. While, as discussed below, Donnelly's claims likely do not meet the plausibility threshold of *Iqbal*, for purposes of this First Amendment applicability discussion, the Court assumes the truth of Donnelly's assertion that Defendants knew the falsity of the poll results before they chose to publish it. Donnelly describes this case as no different than the sale of a defective oven for which the First Amendment affords no additional protections. ECF No. 36 at 6. Donnelly argues "fake news" is simply one way of describing a claim for defamation because the claim is predicated upon a false statement. *Id.* at 9. Yet this assertion ignores critical context—the

statements Donnelly alleges are false were political speech made by a newspaper covering a political campaign.

The Eighth Circuit has addressed whether knowingly false political speech is categorically outside the protection of the First Amendment. *281 Care Comm. v. Arneson*, 638 F.3d 621, 633–34 (8th Cir. 2011). The Eighth Circuit stated "the Supreme Court has never placed knowingly false campaign speech categorically outside the protection of the First Amendment and we will not do so today." *Id*. An important difference between false political speech and defamation is the latter seeks to vindicate the private rights of private individuals. *Id*. at 634. This is because "they cause damage to an individual's reputation that cannot easily be repaired by counterspeech, however persuasive or effective." *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 52 (1988). In contrast, "the First Amendment precludes punishment for generalized 'public' frauds, deceptions, and defamation." *281 Care Comm.*, 638 F.3d at 634 (quoting Charles Fried, *The New First Amendment Jurisprudence: A Threat to Liberty,* 59 U. Chi. L. Rev. 225, 238 (1992)). Donnelly does not claim the Iowa Poll damaged his personal reputation or the reputation of the class members. He instead asserts claims predicated on an alleged generalized deception in the form of a knowingly false political opinion poll. Applying this precedent, the Court concludes the speech at issue here is entitled to First Amendment protections.

The Court next turns to what level of protection is afforded to the speech Donnelly challenges. Each of Donnelly's claims must satisfy First Amendment scrutiny because "there is no free pass around the First Amendment." *281 Care Comm. v. Arneson*, 766 F.3d 774, 783 (8th Cir. 2014). A party cannot evade First Amendment scrutiny by "[s]imply labeling an action one for 'fraud.'" *Illinois ex rel. Madigan v. Telemarketing Assocs., Inc.*, 538 U.S. 600, 617 (2003). Donnelly acknowledges as such in his reply, stating "the First Amendment sets a standard (actual malice) that protects all speakers, media or non-media." ECF No. 36 at 13. Donnelly asserts all his

claims are governed by the actual malice standard. *Id.* at 14 n.4.

Defendants advocate for a higher standard than actual malice, asserting Donnelly's "claims amount to a frontal assault on the First Amendment" for which Defendants are entitled to "absolute immunity." ECF No. 32 at 18–19; *see* ECF No. 33 at 12. In the context of individuals and groups expressing divisive political opinions, the Supreme Court has granted broad immunity from liability. *See Snyder v. Phelps*, 562 U.S. 443, 452 (2011). The Supreme Court has observed "speech concerning public affairs is more than self-expression; it is the essence of self-government." *Garrison v. Louisiana*, 379 U.S. 64, 74–75 (1964). This is why "speech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Snyder*, 562 U.S. at 452 (quoting *Connick v. Myers,* 461 U.S. 138, 145 (1983)). Strong protections for "inappropriate or controversial" statements which relate to matters of public concern "ensure that courts themselves do not become inadvertent censors." *Snyder*, 562 U.S. at 452–53 (internal quotation marks and citation omitted).

However, it is far from clear whether the protections afforded to controversial political opinions expressed by individuals extend to newspapers reporting on matters of public concern as well. Neither the Supreme Court nor the Eighth Circuit has yet clearly announced such a category of absolute immunity from tort or consumer protection actions for newspapers engaged in political reporting. The Supreme Court has instead—although in the context of defamation cases—required plaintiffs to show actual malice when challenging a newspaper's constitutionally protected speech on matters of public concern. *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964).

A statement is made with actual malice when it is made "with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.* at 280. The actual malice standard originates from *Sullivan* and was developed in the context of defamation actions brought by public officials against the news media. *Id.* 279–80. *Sullivan* was decided "against the background of a

profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *Id.* at 270. The speech-chilling concerns articulated in *Sullivan* are similar to the concerns supporting broad immunity for speech on matters of public concern articulated in *Snyder*, yet the Supreme Court has imposed different standards in each context. While the Court recognizes that newspapers often engage in speech on matters of public concern and therefore could be entitled to broad immunity for such speech, the Court also recognizes the actual malice standard has traditionally applied in the context of newspaper reporting. Because the Supreme Court has not yet recognized newspaper coverage on a matter of public concern as the type of speech which is entitled to broad immunity, the Court follows the actual malice standard here. Therefore, while current First Amendment jurisprudence may not provide Defendants absolute immunity from suit challenging their protected speech, they are entitled to, at minimum, the heightened protections of the actual malice standard.

Actual malice requires showing "sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of [their] publication." *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968). Importantly, "reckless conduct is not measured by whether a reasonably prudent [person] would have published, or would have investigated before publishing." *Id.* "Failure to recognize a mistake or ambiguity and its potential consequences is not evidence of a reckless disregard for the truth." *Nelson Auto Center, Inc. v. Multimedia Holdings Corp.*, 951 F.3d 952, 958 (8th Cir. 2020). Instead, the *Sullivan* standard permits liability for "only those false statements made with the high degree of awareness of their probable falsity." *Garrison*, 379 U.S. at 74. Even "a showing of highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers" is insufficient to meet the strict actual malice standard. *Harte-Hanks Commn's, Inc. v. Connaughton*, 491 U.S. 657, 666 (1989).

With this high standard in mind, the Court turns to how the *Iqbal/Twombly* pleading standard applies to claims of actual malice at the motion to dismiss stage. "[E]very circuit that has considered the matter has applied the *Iqbal/Twombly* standard and held that a defamation suit may be dismissed for failure to state a claim where the plaintiff has not pled facts sufficient to give rise to a reasonable inference of actual malice." *Nelson Auto*, 951 F.3d at 958 (quoting *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 702 (11th Cir. 2016)) (alteration in original). "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Id.* (quoting *Twombly*, 550 U.S. at 556) (alteration in original).

However, "[t]he standard of actual malice is a daunting one." *Howard v. Antilla*, 294 F.3d 244, 252 (1st Cir. 2002) (citation omitted). "For a pleading of actual malice to survive a motion to dismiss, the plaintiff must plead 'non-conclusory, non-speculative[] facts' 'from which malice might reasonably be inferred.'" *Franchini v. Bagnor Publ'g Co., Inc.*, 109 F.4th 13, 35 (1st Cir. 2024) (alteration in original) (citation omitted). "'[A]ctual-malice buzzwords,' such as that the defendant 'had "knowledge" that its statements were "false" or had "serious doubts" about their truth and a "reckless disregard" for whether they were false . . . are merely legal conclusions, which must be backed by well-pled facts' to be sufficient." *Id.* (citation omitted). "Where a plaintiff 'has not "nudged" his actual-malice claim "across the line from conceivable to plausible,"' the district court is right to dismiss the complaint." *Id.* (citing *Twombly*, 550 U.S. at 570).

Donnelly asserts the mere fact of the polling miss indicates "factual errors were made with knowledge that they presented a false description of the state of the electorate." *Id.* ¶ 97. Yet Donnelly does not allege the methodology used to conduct the poll differed from the one disclosed in the accompanying article, nor does he allege Defendants altered responses or weighed the sample in an attempt to produce a certain result. Without more facts alleged,

Donnelly's allegation, in essence is that Defendants designed the poll's methodology to produce an intentionally inaccurate result and knowingly published the inaccurate result. *See* ECF No. 22 ¶ 121; ECF No. 36 at 15, 17. No specific facts have been alleged to support such a theory. Donnelly notes the Iowa Poll is historically accurate and is the "gold standard" for polling in Iowa. ECF No. 22 ¶¶ 138, 139. Finding actual malice requires Donnelly to plausibly allege Defendants sacrificed decades of work in cultivating this reputation for accuracy by "knowingly or recklessly" manufacturing a poll they knew was incorrect in pursuit of an unclear goal. *See* ECF No. 36 at 33. With no factual allegations to support such an assertion and mere conclusory statements, Donnelly asserts only a bare legal conclusion accompanied by actual malice buzzwords that Defendants acted knowingly or recklessly. This is insufficient to meet the plausibility standard of *Iqbal/Twombly. Cf. Franchini*, 109 F.4th at 35.

Donnelly also cites to the magnitude of the polling miss as evidence of actual malice. ECF No. 22 ¶¶ 4, 6, 60. Donnelly points to a claim that there was only a one in 3.5 million chance of such an inaccuracy resulting from "legitimate means" or by "honest error." *Id.* ¶ 60. The Court is required to take all factual allegations as true for purposes of a motion to dismiss.[1] While the Court takes as true the probability of a five standard deviation error is one in 3.5 million, it is not required to take as true that a poll using Defendants' methodology would only deviate from the true election outcome once in 3.5 million samples because the factual predicate for such an assumption has not

---

[1] The Court notes this statistic appears to represent the two-sided probability of a result at least five standard deviations from the true result. This one in 3.5 million statistic assumes the Iowa Poll methodology was capturing a true representative sample of the electorate. The Court notes Donnelly in other parts of the amended complaint cites to pollsters who use a different methodology, including PollFair, which reweighed the Selzer sample using historical election poll data. ECF No. 22 ¶ 39. Using this alternate methodology changed the poll result by nine points. This indicates the reason for differences among polls is the different weighting methodologies used by pollsters. Therefore, the assumption undergirding the one in 3.5 million claim appears to lack support in the amended complaint.

been alleged in the complaint. Donnelly asserts such a large difference between the results of the Iowa Poll and other polls of the race should have given Defendants pause. ECF No. 22 ¶ 100. However, "[t]hat an editor or reporter should have known or should have doubted [the] accuracy of an article before publishing it is insufficient to show reckless disregard for the truth." *Lee v. TMZ Prods. Inc.*, 710 F. App'x 551, 560 (3d Cir. 2017) (alteration in original) (emphasis omitted). Donnelly's conclusory statements that the magnitude of the polling miss demonstrates actual malice therefore similarly fails to meet the plausibility standard of *Iqbal* and *Twombly*.

Finally, Donnelly asserts "Defendants' recklessness is seen when comparing their actions to industry customs and practices" and "principles of ethical conduct for . . . newsrooms." ECF No. 22 ¶ 99. The Court "do[es] not sit as some kind of journalism review seminar offering our observations on contemporary journalism and journalists." *Tavoulareas v. Piro*, 817 F.2d 762, 796 (D.C. Cir. 1987) (internal quotation marks and citation omitted). Allegations that a newspaper deviated from the ordinary ethics and customs of the industry are insufficient to establish actual malice. *Harte-Hanks*, 491 U.S. at 666 (1989) (holding "highly unreasonable conduct" and an "extreme departure from [ ] standards" is insufficient to allege actual malice); *Marcone v. Penthouse Int'l Mag. For Men*, 754 F.2d 1072, 1090 (3d Cir. 1985) (finding "unprofessional, even negligent" conduct does not constitute actual malice); *Triestman v. Turkheimer*, No. 19-cv-03081, 2020 WL 9594315, *2 (N.D. Ill. Aug. 4, 2020) (finding although "Defendant's published article admittedly contained a falsehood," "it is not enough that Defendant might have acted unprofessionally, carelessly, or irresponsibly under journalistic standards" to establish actual malice). Donnelly therefore again fails to allege with any specificity facts which would constitute actual malice.

Donnelly invokes mere buzzwords and speculation and falls far short of nudging his actual malice claim across the line from conceivable to plausible. However, while Donnelly's failure to

plausibly allege Defendants acted with actual malice is sufficient to dismiss Counts I–V, the Court need not dispose of the case on these grounds alone and continues its analysis of each claim below.

### B.    Misrepresentation

#### 1.    Fraudulent Misrepresentation

In Count I, Donnelly alleges fraudulent misrepresentation of the state of the election. ECF No. 22 ¶¶ 123–41. Under Iowa law, a claim for fraudulent misrepresentation requires a plaintiff to show: 1) a representation was made; 2) the representation was false; 3) the representation was material; 4) the defendant knew the representation was false; 5) the defendant intended to deceive the plaintiff; 6) the plaintiff acted in reliance on the truth of the representation and that reliance was justified; and 7) the representation was a proximate cause of plaintiff's damages. *Gibson v. ITT Hartford Ins. Co.*, 621 N.W.2d 388, 400 (Iowa 2001). Donnelly's fraudulent misrepresentation claim fails because no false representation was made.

No false representation was made. Defendants conducted a poll using a particular methodology which yielded results that later turned out to be different from the event the poll sought to measure. The results of an opinion poll are not an actionable false representation merely because the anticipated results differ from what eventually occurred. *See Scott v. Roberts*, 612 F.3d 1279, 1283 (11th Cir. 2010) (noting "opinion polls of random selections of voters are snapshots with margins of error, and campaigns are, to say the least, dynamic projects"). Donnelly, and all other readers, knew how the poll was conducted because the poll results were accompanied by a thorough discussion of methodology. ECF No. 32-2 at 2–6. Donnelly does not claim the disclosed methodology was not followed, that results were falsified, or that Defendants altered the poll in some other way which did not reflect the publicly disclosed methodology. Defendants told readers exactly what they did and how they did it. Therefore, no false representation was made.

Donnelly instead seems to disagree with the methodology Defendants utilized to conduct

the poll. *See* ECF No. 22 ¶ 121. Donnelly states Defendants "designed the poll . . . in a way that the methodology resulted in a radically flawed result." *Id.* Donnelly points to other possible methodologies he believes Defendants should have utilized instead to yield poll results more closely resembling the eventual election result. *Id.* ¶ 38. Donnelly asserts "[he] read the story, and the story was all wrong." ECF No. 36 at 26. The "wrong" information in the story "was that [Vice President] Kamala Harris was ahead by three at the time of the poll" which was "not a speculation of a future outcome, but a factual statement of the present reality at the time the poll was taking [sic]." *Id.* at 29.

This allegation is flawed because it is impossible to know what the state of the presidential race was during the days the poll was conducted. As the Eleventh Circuit observed, polls are a mere snapshot of a dynamic and changing electorate. *Scott*, 612 F.3d at 1283. Donnelly cites to several other polls which had then-candidate Trump ahead by between seven and nine points. ECF No. 22 ¶ 31. The actual margin of the election was thirteen points. *Id.* ¶ 42. Donnelly cites these other polls favorably, yet, by his definition of misrepresentation, every single one of these polls cited also "was all wrong." ECF No. 36 at 26. These polls were not fraudulently misrepresenting the state of the race, they merely used different methodologies in an attempt to best capture a snapshot of a dynamic race. *See Buchanan v. Fed. Election Comm'n*, 112 F.Supp.2d 58, 76 (D.D.C. 2000) (recognizing claims of bias in a poll requires "at least some evidence that the independent pollsters have an incentive to rig the process in favor or against any candidate or party"). Donnelly fails to cite to any authority finding an opinion poll of a future event constitutes a false factual assertion.

Because Donnelly has failed to plausibly allege a false representation was made, the Court declines to address Defendants' arguments concerning Donnelly's additional failure to show materiality, intent, or justified reliance. Count I is dismissed with prejudice.

### 2.    Negligent Misrepresentation

In the alternative, Donnelly alleges negligent misrepresentation to a reckless degree. ECF

No. 22 ¶¶ 142–57. Donnelly "recognizes that he must show actual malice, which means either

knowing falsehood or reckless disregard." ECF No. 36 at 31. The Court has discussed Donnelly's

failure to establish actual malice above, and so focuses this analysis on the elements of negligent

misrepresentation under Iowa law. Negligent misrepresentation requires:

> (1) the defendant was in the business or profession of supplying information to others; (2) the defendant intended to supply information to the plaintiff or knew that the recipient intended to supply it to the plaintiff; (3) the information was false; (4) the defendant knew or reasonably should have known that the information was false; (5) the plaintiff reasonably relied on the information in the transaction that the defendant intended the information to influence; (6) and the false information was the proximate cause of damage to the plaintiff.

*McLeodUSA Telecommc'ns. Serv., Inc. v. Qwest Corp.*, 469 F.Supp.2d 677, 692 (N.D. Iowa

2007) (citing *Sain v. Cedar Rapids Comm. Sch. Dist.,* 626 N.W.2d 115, 127 (Iowa 2001)). The

Iowa Supreme Court "recognized professionals such as accountants, abstractors, and attorneys

owe a duty of care in supplying information to foreseeable third parties as members of a limited

class of persons who would be contemplated to use and rely upon the information." *Sain*, 626

N.W.2d at 123. The court in *Sain* emphasized the limitation on the scope of the tort is "a stricter

standard of knowledge." *Id.* The duty extends only to "a person in the profession of supplying

information for the guidance of others acts in an advisory capacity and is manifestly aware of the

use that the information will be put, and intends to supply it for that purpose." *Id.* at 124–25.

Donnelly's negligent misrepresentation claim fails because a pollster and a general

circulation newspaper reporting on the results of an election poll are not in the business or

profession of supplying information to a limited class of others who knowingly rely on the

information. The relationship between a newspaper and the public is fundamentally different from

the relationship between an accountant or attorney and his or her client. There is no "limited class

of persons" a newspaper contemplates will use the information the paper publishes. *Cf. Freeman v. Ernst & Young*, 516 N.W.2d 835, 838 (Iowa 1994). Indeed, it would be impossible for a newspaper to know how any one member of the public would use the information it reports because a newspaper does not act in "the guidance of others [ ] in an advisory capacity." *Id.* As a result, a newspaper, and the newspaper's pollster, cannot intend to supply information for any particular purpose because no singular particular purpose exists among the myriad readers. Because a newspaper and a pollster do not act as an advisor to a limited class of persons when it reports on the poll results of a national election, Defendants did not owe a duty to Donnelly. Because Donnelly has failed to plausibly allege Defendants owed him a duty, Alternative Count I is dismissed with prejudice.

### C.    Iowa Consumer Fraud Act

In Count II, Donnelly asserts a violation of the Iowa Consumer Fraud Act. The Act states:

> A person shall not engage in a practice or act the person knows or reasonably should know is an unfair practice, deception, fraud, false pretense, or false promise, or the misrepresentation, concealment, suppression, or omission of a material fact, with the intent that others rely upon the unfair practice, deception, fraud, false pretense, false promise, misrepresentation, concealment, suppression, or omission in connection with the advertisement, sale, or lease of consumer merchandise, or the solicitation of contributions for charitable purposes. For the purposes of this chapter, a claimant alleging an unfair practice, deception, fraud, false pretense, false promise, or misrepresentation must prove that the prohibited practice related to a material fact or facts.

Iowa Code § 714H.3(1). Donnelly's claim fails because publishing the results of a political opinion poll that matches the co-published methodology is not an unfair or deceptive practice. The Court notes that even if Donnelly did make out a prima facia case for violation of the Iowa Consumer Fraud Act as a result of Defendants' reporting, such a claim would face significant resistance from the First Amendment. However, because Donnelly fails to plead a prima facia case, the Court does not further address the threat such a claim would pose to free expression and a free press as

guaranteed by the First Amendment.

Iowa law defines an unfair practice as "an act or practice which causes substantial, unavoidable injury to consumers that is not outweighed by any consumer or competitive benefits which the practice produces." Iowa Code § 714H.2(9) (referencing the definition of unfair practice found in Iowa Code § 714.16(1)(i)). Publication of election polls which follow the co-published methodology is not an act which causes substantial and unavoidable injury to consumers. Donnelly alleges Defendants promised one product, "trustworthy, accurate news," and "knowingly or recklessly failed to deliver that product" by "blowing their biggest story of the year." ECF No. 36 at 33. Under Iowa law, "[a] course of conduct contrary to what an ordinary consumer would anticipate contributes to a finding of an unfair practice." *State ex rel. Miller v. Vertrue, Inc.*, 834 N.W.2d 12, 37 (Iowa 2013). Ordinary customers of the *Des Moines Register* would expect the paper to publish the Iowa Poll as it has done for decades. ECF No. 22 ¶ 80. Consumers would expect the poll to be conducted commensurate with the methodology accompanying the poll. Consumers would understand from the methodology statement, as well as the inherently uncertain nature of opinion polling, that polling is an inexact science which can yield errant results in prognosticating future election results.

Having failed to plausibly plead an intentionally poor methodological design, Donnelly's sole remaining allegation for how publication of the poll constitutes an unfair practice is the seeming inaccuracy of the poll when compared to the election results. Yet Donnelly cites to no law which establishes that mere inaccuracy of an opinion poll constitutes an unfair practice. Donnelly's assertion is also internally contradictory as such a standard would mean every poll cited favorably by Donnelly was similarly engaged in an unfair practice because they too published polls which did not accurately forecast the election outcome. ECF No. 22 ¶ 31.

"'Deception' means an act or practice that is likely to mislead a substantial number of

consumers as to a material fact or facts." Iowa Code § 714H.2(5). Deception therefore necessarily requires the false statement or material omission of a fact. Donnelly does not allege any misrepresentation with regard to either the methodology statement or the poll results itself. No factual information regarding how the poll was conducted was withheld from readers. The article fully described the poll results, the poll methodology, and provided additional analysis of the surprising nature of the results. *See* ECF No. 32-1; ECF No. 32-2; ECF No. 32-4. Publication of the Iowa Poll cannot have been deceptive because readers knew exactly how the poll was conducted and what results it yielded—readers were therefore informed of all material facts needed to judge the reliability of the poll. *Cf. Moeller v. Samsung Elecs. Am., Inc.*, 623 F.Supp.3d 978, 987 (S.D. Iowa 2022) (finding statements which give consumers a misleading impression regarding honoring a warranty were deceptive).

The Court does not address Defendants' additional arguments regarding Donnelly's failure to show Defendants' actions proximately caused an "ascertainable loss of money or property" as required by Iowa law. *See* Iowa Code § 714H.5(1). Because Donnelly fails to plausibly allege Defendants engaged in an unfair or deceptive practice, Count II is dismissed with prejudice.

### D.    Professional Malpractice

To state a claim for professional malpractice in Iowa, a plaintiff must show 1) the existence of a relationship between the parties which gives rise to a duty; 2) the defendant breached that duty either through an act or a failure to act; 3) the alleged breach proximately caused the plaintiff's injury; and 4) damages resulted from the breach. *Ruden v. Jenk*, 543 N.W.2d 605, 610 (Iowa 1996). Because Donnelly fails to allege the necessary element of duty, the claim for professional malpractice necessarily fails.

Donnelly describes the duty he seeks to impose on Defendants as "the ordinary care of a journalist or pollster . . . to recognize the obvious problems with the Iowa Poll and not publish it

without additional investigation or verification." The nature of the relationship between newspapers and their readers, however, does not impose such a general duty. Donnelly fails to cite to any Iowa law imposing such a duty on newspapers, and courts generally find no such duty exists. *First Equity Corp. v. Standard & Poor's Corp.*, 869 F.2d 175 (2d Cir.1989) (finding a publisher of financial information not liable for negligent misrepresentation); *Winter v. G.P. Putnam's Sons*, 938 F.2d 1033, 1037 (9th Cir. 1991) (noting a publisher has "no duty to investigate the accuracy of the contents of the books it publishes" and even if a court were inclined to recognize such a duty "the gentle tug of the First Amendment and the values embodied therein would remind us of the social costs"); *De Bardeleben Marine Corp. v. United States*, 451 F.2d 140, 148 (5th Cir. 1971) ("If a newspaper prints incorrect information . . . they cannot be 'liable' to those of the general public who read their works absent some special relationship between writer and reader."). The justification for refusing to impose such a duty is clear, "the chilling effect of imposing a high duty of care on those in the business of news dissemination and making that duty run to a wide range of readers or TV viewers would have a chilling effect which is unacceptable under our Constitution." *Stancik v. CNBC*, 420 F.Supp.2d 800, 808 (N.D. Ohio 2006). Guided by the First Amendment and following the clear consensus of the law, the Court finds Defendants owed no such duty to Donnelly.

Donnelly's claim also fails because political opinion polls are predictive and inherently uncertain. Defendants here carried out a randomized survey and published the results along with a full explanation of the poll methodology. Donnelly's novel attempt to impose liability for news prediction is similar to *Brandt v. Weather Channel, Inc.* in which a plaintiff sought to hold a news channel liable for an inaccurate weather forecast. 42 F.Supp.2d 1344 (S.D. Fl. 1999). That court noted "to impose such a duty would be to chill the well established first amendment rights of the broadcasters." *Id.* at 1346. The court in *Brandt* further observed the litany of absurd suits which

could follow from imposing such a duty, such as construction workers suing when they pour concrete in reliance on a weather report forecasting no rain or commuters suing when they are stuck in traffic and late to work because the news reported there would be light traffic. *Id.* Finding for Donnelly here would permit similar absurdity. The Court declines to permit such absurdity and finds Defendants owed no such duty to Donnelly.

The Court does not address Defendants' arguments regarding Donnelly's failure to show Defendants breached the alleged duty of care. Because Donnelly fails to plausibly allege Defendants owed a duty of care, Count III is dismissed with prejudice.

### E.    Interference With the Right to Vote

Donnelly alleges Defendants' actions constitute "interference with the right to vote." ECF No. 22. ¶ 184. Defendants resist, arguing no such tort exists under Iowa law. ECF No. 32 at 45. Donnelly cites one case in support of this tort, *Lane v. Mitchell.* 153 Iowa 381 (Iowa 1911). This case dealt with judges in a precinct refusing to permit an individual to vote. *Id.* The court in *Lane* focused on the proper interpretation of the Iowa Code section governing voter eligibility. *Id.* The court held "the duties and powers conferred by this section on judges of election are ministerial, and not judicial." *Id.* This case makes no mention of a cognizable tort under Iowa law for interference with the right to vote. The case instead centered on the duties of election judges under the relevant Iowa Code. *Id.* Donnelley cites to no other Iowa law establishing such a tort. Because the asserted tortious interference with the right to vote is not a viable cause of action under Iowa law, Claim IV is dismissed.

Because Donnelly asserts no cognizable cause of action under Iowa law, Count IV is dismissed with prejudice.

### F.    Civil Conspiracy

The Court briefly addresses Donnelly's civil conspiracy claim. ECF No. 22 ¶¶ 192–98.

19

80

"Civil conspiracy is not in itself actionable; rather it is the acts causing injury undertaken in furtherance of the conspiracy [that] give rise to the action." *Wright v. Brooke Group Ltd.*, 652 N.W.2d 159, 172 (Iowa 2002) (alteration in original). As discussed above, Donnelly fails to adequately allege any underlying tort and therefore "the absence of any actionable wrong is fatal to the claim." *McDonnell v. Hesco Bastion, Inc.*, 781 F.Supp.3d 745, 757 (S.D. Iowa 2025). Count V is dismissed with prejudice.

## V.   CONCLUSION

For the foregoing reasons,

**IT IS ORDERED** that Defendants Des Moines Register and Tribune Co., Inc. and Gannett Co., Inc.'s Motion to Dismiss, ECF No. 26, is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendants J. Ann Selzer and Selzer & Company's Motion to Dismiss, ECF No. 29, is **GRANTED**.

**IT IS SO ORDERED**.

Dated this 6th day of November, 2025.

REBECCA GOODGAME EBINGER
UNITED STATES DISTRICT JUDGE

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF IOWA

DENNIS DONNELLY, on behalf of himself
and all others similarly situated,

                    Plaintiff,

  v.

DES MOINES REGISTER AND TRIBUNE
CO., INC., J. ANN SELZER, SELZER &
COMPANY, and GANNETT CO., INC.,

                  Defendants,

**CIVIL NO.: 4:25-cv-00150-RGE-WPK**

**JUDGMENT IN A CIVIL CASE**

☐ **JURY VERDICT.** This action came before the Court for trial by jury. The issues have been tried and the jury has rendered its verdict.

☑ **DECISION BY COURT**. This action came before the Court. The issues have been considered and a decision has been rendered.

        **IT IS ORDERED AND ADJUDGED**:

Pursuant to Order [48], the case is dismissed. Judgment is entered in favor of the Defendants, Des Moines Register and Tribune Co., Inc., J. Ann Selzer, Selzer & Company, and Gannett Co., Inc., and against the Plaintiff.

Date: November 6, 2025

                        CLERK, U.S. DISTRICT COURT

                        /s/ Kandy Sands
                        _____

                        By: Deputy Clerk