**No. 25-3451**

IN THE U.S. COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

——————

DENNIS DONNELLY,

*PLAINTIFF-APPELLANT,*

*V.*

DES MOINES REGISTER AND TRIBUNE CO., INC.;
GANNETT CO., INC.; ANN SELZER; AND SELZER & COMPANY.

*DEFENDANTS-APPELLEES.*

——————

*Appeal from the U.S. District Court
for the Southern District of Iowa*

Case No. 4:25-cv-00150-RGE-WPK
Hon. Rebecca G. Ebinger

——————

**OPENING BRIEF OF APPELLANT**

——————

Daniel R. Suhr
Center for American Rights
1341 W. Fullerton Ave.,
Suite 170
Chicago, IL 60614
414.588.1658
February 9, 2026          dsuhr@americanrights.org

## SUMMARY & ORAL ARGUMENT

Dennis Donnelly is a subscriber to the *Des Moines Register*. He filed a petition in state court on behalf of a putative class of subscribers bringing state law claims against the *Register*, its parent company (Gannett Co.), and its contractor. Gannett removed the case to the Southern District of Iowa under the Class Action Fairness Act (CAFA), 28 U.S.C. § 1453. Donnelly objected to removal under the local-controversy exception, the home-state exception, and the interest-of-justice exception, and requested discovery if necessary to establish one element of these exceptions. The District Court denied his motion. The District Court then granted motions to dismiss from all defendants based on both an asserted First Amendment defense and after analyzing the elements of each claim.

This Court should grant thirty minutes' argument because this case presents novel jurisdictional and substantive issues. This Court and the Supreme Court have yet to address the questions presented under CAFA or the First Amendment. *See* App. 68, R. Doc. 48 at 7, Add. 18. These multiple questions of first impression warrant substantial time.

## DISCLOSURE STATEMENT

Plaintiff Dennis Donnelly is a natural person.

# TABLE OF CONTENTS

**SUMMARY & ORAL ARGUMENT** ....................................................I

**DISCLOSURE STATEMENT**...............................................................II

**TABLE OF AUTHORITIES**.............................................................IV

**JURISDICTIONAL STATEMENT** ..................................................... 1

**DESIGNATION AND STATEMENT OF THE ISSUES** ..................... 2

**STATEMENT OF THE CASE** .............................................................. 5

**SUMMARY OF THE ARGUMENT**..................................................... 9

**ARGUMENT** ...................................................................................... 11

    I. STANDARDS OF REVIEW................................................................. 11

    II. THE DISTRICT COURT ERRED IN DENYING REMAND UNDER CAFA. ... 11

    *II.A. The District Court erred in its interpretation of the primary defendant prong of 28 U.S.C. § 1332(d)(4)(B) (the mandatory home-state exception) and 28 U.S.C. § 1332(d)(3) (the discretionary interests-of-justice exception).*............................................. *13*

    *II.B. The District Court erred in its interpretation of the "principal injuries" prong of the local-controversy exception, 28 U.S.C. § 1332(d)(4)(A).* ............................................................... *22*

    III. THE DISTRICT COURT ERRED IN GRANTING THE MOTIONS TO DISMISS. 28

    *III.A. The District Court erred in finding the First Amendment defense.*................................................................................ *28*

    *III.B. The District Court erred in finding the Plaintiff failed to plead the elements of the Iowa state law claims.*......................... *45*

**CONCLUSION**.................................................................................. 67

**CERTIFICATE OF COMPLIANCE** ................................................ 68

**CERTIFICATE OF VIRUS SCAN CERTIFICATE OF SERVICE.** 68

**ADDENDUM** ............................ ERROR! BOOKMARK NOT DEFINED.

# TABLE OF AUTHORITIES

<u>CASES</u>

*Aarstad v. Burlington No. Santa Fe Ry.*, 2020 U.S. Dist. LEXIS 60326, *12 (D. Mont. April 6, 2020) .................................................. 24

*Abraham v. St. Croix Renaissance Group, L.L.L.P.*, 719 F.3d 270, 278 (3d Cir. 2013) ................................................................. 22

*Anderson v. Hackett*, 646 F. Supp. 2d 1041, 1048 (S.D.Ill. 2009) .......... 17

*Anthony v. Small Tube Mfg. Corp.*, 535 F. Supp. 2d 506, 516 (E.D.Pa. 2005) .................................................................. 19

*Atwood v. Peterson*, 936 F.3d 835, 839 (8th Cir. 2019) ........................... 9

*Banks v. Cotter Corp.*, 22 F.4th 788, 795 (8th Cir. 2022) ...................... 16

*Berry v. National Broadcasting Co.*, 480 F.2d 428, 431 (8th Cir. 1973) 28

*Birmingham v. Fodor's Travel Pub.*, 73 Haw. 359 (1992) ................. 4, 58

*Bose Corp. v. Consumers Union*, 466 U.S. 485 (1984) ............................. 28

*Brandt v. Weather Channel, Inc.,* 42 F.Supp.2d 1344 (S.D. Fl. 1999) ... 61

*Brooks v. Roy*, 556 Fed. Appx. 553, 554 (8th Cir. 2014) .......................... 1

*Brown v. SBC Communs. Inc.*, 2006 U.S. Dist. LEXIS 71208, *8 (S.D.Ill. Sept. 29, 2006) .......................................................... 20

*Cantrell v. Forest City Pub. Co.*, 419 U.S. 245 (1971) ............................. 28

*Caruso v. Allstate Ins. Co.*, 469 F. Supp. 2d 364 (E.D.La. 2007).... 2, 8, 17

*Cheapside Mins., Ltd. v. Devon Energy Prod. Co., L.P.,* 94 F.4th 492, 501 (5th Cir. 2024).................................................... 22, 23

*Connick v. Suzuki Motor Co.,* 174 Ill. 2d 482, 504 (1996) ..................... 52

*Couser v. Shelby Cnty.*, 2024 U.S. App. LEXIS 2940, *2 (8th Cir. Jan. 16, 2024) .................................................................. 1

*Dammann v. Progressive Direct Ins. Co.*, 856 F.3d 580, 584 (8th Cir. 2017) ................................................................. 10

*Deng v. White*, 2018 Iowa Dist. LEXIS 110, *14 (Polk Cty. Dist. Ct. Aug. 28, 2018) ................................................................. 57

*Dinsdale Constr., LLC v. Lumber Specialties, Ltd.,* 888 N.W.2d 644, 650 (Iowa 2016) ............................................................... 49

*Dunham v. Coffeyville Res., LLC*, 2007 U.S. Dist. LEXIS 82606, \*9-10 (D.Kan. Nov. 6, 2007) ........................................................................ 19

*Gavlock v. Coleman*, 493 N.W.2d 94, 98 (Iowa Ct. App. 1992) ............. 42

*Green v. Sheraton, LLC*, 2022 U.S. Dist. LEXIS 103642, \*6 (Magistrate's Report) (W.D.N.Y. May 31, 2022) .................................. 20

*Hanberry v. Hearst Corp.*, 276 Cal. App. 2d 680, 81 Cal. Rptr. 519 (Cal. Ct. App. 1969) .............................................................................. 59, 60

*Hempstead v. General Fire Extinguisher Corp.*, 269 F. Supp. 109 (D. Del. 1967) ........................................................................................ 59

*Hines v. Evergreen Cemetery Ass'n*, 865 S.W.2d 266, 269 (Tex. App. 1993) .............................................................................................. 53

*Hunter v. City of Montgomery*, 859 F.3d 1329, 1336 (11th Cir. 2017) ... 13

*Hustler Mag., Inc. v. Falwell*, 485 U.S. 46 (1988) ................................... 28

*In re Trump*, 2025 U.S. App. LEXIS 28284, \*1 (8th Cir. Oct. 24, 2025) . 7

*In the Int. of J.F.*, 997 N.W.2d 441, \*8 (table) (Iowa Ct. App. 2023) ..... 42

*Iverson v. SND Nat'l Ministry Corp.*, 2024 U.S. Dist. LEXIS 172670, \*24 (N.D. Cal. Sept. 23, 2024) ...................................................... 23, 25, 26

*Jones v. J.B. Lippincott Co.*, 694 F. Supp. 1216, 1216 (D.Md. 1988)..... 58

*Kearns v. Ford Motor Co.*, 2005 U.S. Dist. LEXIS 41614, \*25-26 (C.D.Cal. Nov. 18, 2005)................................................................... 18

*Kendrick v. Conduent State & Local Sols., Inc.*, 910 F.3d 1255, 1260 (9th Cir. 2018) ...................................................................................... 27

*King v. Albert & Carol Mueller L.P.*, 2015 U.S. Dist. LEXIS 37525, \*7-8 (M.D.Pa. Mar. 25, 2015) ................................................................. 24

*Kitson v. Bank of Edwardsville*, 2006 U.S. Dist. LEXIS 85285, \*54 (S.D. Ill. Nov. 22, 2006) ..................................................................... 14, 26

*Kress Stores of P.R., Inc. v. Wal-Mart P.R., Inc.*, 121 F.4th 228, 237 (1st Cir. 2024) ....................................................................................... 15

*Kuklenski v. Medtronic USA, Inc.*, 134 F.4th 528, 531 (8th Cir. 2025) . 16

*Lane v. Mitchell*, 153 Iowa 381 (Iowa 1911)...................................... 4, 62

*Lewin v. McCreight*, 655 F. Supp. 282, 284 (E.D. Mich. 1987) ............. 58

*Mackey v. Chemtool Inc.*, 2022 U.S. Dist. LEXIS 143498, \*5-6 (N.D.Ill. Aug. 11, 2022) ................................................................................ 19

*Madison v. ADT, L.L.C.*, 11 F.4th 325, 328 (5th Cir. 2021) .................. 13

*Malat v. Riddell*, 383 U.S. 569, 572 (1966) .............................................. 17

*Mayo Clinic v. United States*, 145 F.4th 877, 886 (8th Cir. 2025) ......... 17

*McAuslin v. Grinnell Corp.*, 1999 U.S. Dist. LEXIS 8659, *9 (E.D.La. June 8, 1999) ............................................................................... 60

*McClendon v. Challenge Financial Investors Corp.*, 2009 U.S. Dist. LEXIS 17908, *13 (N.D. Ohio Mar. 9, 2009) ..................................... 19

*McDonald v. Wise*, 769 F.3d 1202, 1219-20 (10th Cir. 2014) ................. 41

*McGraw v. Wachovia Sec., L.L.C.*, 756 F. Supp. 2d 1053, 1070 (N.D. Ia. 2010) .......................................................................................... 58

*McGuire v. Pacificorp*, 2025 U.S. Dist. LEXIS 136615, *32 (D.Or. May 7, 2025) ........................................................................................ 23

*Moua v. Jani-King of Minnesota, Inc.*, 613 F. Supp. 2d 1103, 1108 (D.Minn. 2009) ............................................................................... 13

*Nelson Auto Ctr., Inc. v. Multimedia Holdings Corp.*, 951 F.3d 952, 958 (8th Cir. 2020) ................................................................ 29, 31, 41

*Nunes v. Lizza*, 12 F.4th 890, 899 (8th Cir. 2021) ................................. 34

*Passa v. Derderian*, 308 F. Supp. 2d 43 (D.R.I. 2004) ....................... 2, 14

*Peoples Bank & Trust Co. v. Globe Int'l Pub.*, 978 F.2d 1065, 1068 (8th Cir. 1992) ................................................................. 28, 30, 45

*Poller v. Okoboji Classic Cars, LLC*, 960 N.W.2d 496, 510 (Iowa 2021) 51

*Richins v. Hofstra Univ.*, 908 F. Supp. 2d 358, 360 (E.D.N.Y. 2012) ... 16, 24

*Sain v. Cedar Rapids Cmty. Sch. Dist.*, 626 N.W.2d 115 (2001) ........ 3, 48

*Serrano v. 180 Connect, Inc.*, 2006 U.S. Dist. LEXIS 61035, *4 (N.D.Cal. Aug. 11, 2006) .............................................................................. 20

*Singh v. Am. Honda Fin. Corp.*, 925 F.3d 1053, 1068 (9th Cir. 2019)... 15

*Smith v. Marcus & Millichap, Inc.*, 991 F.3d 1145, 1162 n.11 (11th Cir. 2021) .......................................................................................... 12

*Sorrentino v. ASN Roosevelt Ctr., LLC*, 588 F. Supp. 2d 350, 351 (E.D.N.Y. 2008) ............................................................................... 20

*State ex rel. Miller v. Cutty's Des Moines Camping Club, Inc.*, 694 N.W.2d 518, 527 (Iowa 2005) ......................................... 51, 52, 53, 54

*State ex rel. Miller v. Hydro Mag, Ltd.*, 436 N.W.2d 617, 621 (Iowa 1989) .......................................................................................... 52

*State ex rel. Miller v. Vertrue, Inc.*, 834 N.W.2d 12, 34 (Iowa 2013)53, 54, 57

*State v. Simon*, No. 20-0653, 965 N.W.2d 498, 2021 WL 2709478, at *1 (Iowa Ct. App. June 30, 2021) ........................................................... 42

*Sudholt v. Country Mut. Ins. Co.*, 83 F.4th 621, 628 (7th Cir. 2023)..... 15

*Talen Mont. Ret. Plan v. PPL Corp.*, 2019 U.S. Dist. LEXIS 159130, *22 (D. Mont. Sept. 13, 2019) ................................................. 2, 9, 24, 25, 26

*Tholen v. Assist Am., Inc.*, 970 F.3d 979, 985 (8th Cir. 2020) ............... 41

*Time, Inc. v. Hill*, 385 U.S. 374 (1967) ................................................... 28

*United States v. American Tobacco Co.*, 221 U.S. 106, 143 (1911) ........ 14

*Vodenichar v. Halcón Energy Props.*, 733 F.3d 497, 505-06 (3d Cir. 2013)................................................................................................. 15, 24

*Wallace v. ConAgra Foods, Inc.*, 747 F.3d 1025, 1032 (8th Cir. 2014) .. 10

*Watson v. City of Allen*, 821 F.3d 634 (5th Cir. 2016) ................. 2, 16, 17

*Winter v. G.P. Putnam's Sons*, 938 F.2d 1033, 1037 (9th Cir. 1991) ..... 59

## Statutes

28 U.S.C. § 1291 .......................................................................................... 1

28 U.S.C. § 1332 ................................................................................. passim

28 U.S.C. § 1369 ........................................................................................ 13

28 U.S.C. § 1453 .......................................................................................... 1

CAFA, Pub. L. No. 109-2, § 2(b)(2), 119 Stat. 4, 5 (2005)...................... 10

Iowa Code § 714.16(1)(f)........................................................................... 53

Iowa Code § 714H.2(9) .............................................................................. 55

Iowa Code § 714H.3(1) ................................................................................ 3

Iowa Code § 714H.4(1)(c) .......................................................................... 61

## Other Authorities

Restatement (Second) of Torts § 580B (1977) ........................................... 4

Restatement (Second) of Torts, § 865 ................................................... 4, 63

Restatement (Second) of Torts, § 865, cmt. a........................................... 63

VIII

## <u>Treatises</u>

3d American Law of Products Liability, § 5:16 (1987) .......................... 60

5d. Prosser and Keeton on the Law of Torts, § 100, P5 (1984) ............. 60

## JURISDICTIONAL STATEMENT

On October 22, 2025, the District Court held that it had jurisdiction under the Class Action Fairness Act (CAFA), 28 U.S.C. § 1453(b) (App. 52, R. Doc. 47 at 1, Add. 2). Mr. Donnelly filed a petition for review with this Court under 28 U.S.C. § 1453(c)(1), case number 25-8012.

While that petition was pending, on November 6, 2025, the District Court issued a final order (App. 62, R. Doc. 48 at 1, Add. 12) and judgment on the underlying case (App. 82, R. Doc. 49 at 1). The parties then entered a stipulation agreeing to dismiss the petition as moot because review of an interlocutory order merges into review of the final judgment. *See, e.g., Couser v. Shelby Cnty.*, 2024 U.S. App. LEXIS 2940, *2 (8th Cir. Jan. 16, 2024); *Brooks v. Roy*, 556 Fed. Appx. 553, 554 (8th Cir. 2014).

On December 5, 2025, Mr. Donnelly timely filed an appeal of the final order and judgment, and this Court has jurisdiction over that appeal pursuant to 28 U.S.C. § 1291.

## DESIGNATION AND STATEMENT OF THE ISSUES

1. Did the District Court err in denying the plaintiff's motion to remand under the Class Action Fairness Act (28 U.S.C. § 1332(d))?[1]

   a. Under 28 U.S.C. § 1332(d)(3) & (4)(B), is a defendant a "primary defendant" under the Home-State Exception and Interests-of-Justice Exception where it is present in the case for its role as a parent corporation setting standards and providing supervision but not for the direct action causing the injury?

      1. *Watson v. City of Allen*, 821 F.3d 634 (5th Cir. 2016).

      2. *Passa v. Derderian*, 308 F. Supp. 2d 43 (D.R.I. 2004).

      3. *Caruso v. Allstate Ins. Co.*, 469 F. Supp. 2d 364 (E.D.La. 2007).

   b. Under 28 U.S.C. § 1332(d)(4)(A)(i)(III), is the "principal injuries" prong satisfied when the injuries are uniquely related

---

[1] Mr. Donnelly does not appeal that portion of the District Court's first order concerning the Press Defendants' timing of the removal. App. 56, R. Doc. 47 at 5, Add. 6.

to and concentrated amongst the people and places of the forum state?

    4. *Talen Mont. Ret. Plan v. PPL Corp.*, 2019 U.S. Dist. LEXIS 159130 (D. Mont. Sept. 13, 2019).

c. Did the District Court err in denying the plaintiff's request for jurisdictional discovery?

2. Did the District Court err in granting the Defendants' motions to dismiss for failure to state a claim?

a. Did Donnelly plead sufficient allegations to survive the actual malice standard when the First Amendment is asserted as a defense?

b. Did Donnelly plead sufficient allegations to show an intentional false representation (Count 1)?

c. In the alterative, are newspapers (and their contractors) in the business or profession of supplying information to others (Alternative Count 1)?

    1. *Sain v. Cedar Rapids Cmty. Sch. Dist.*, 626 N.W.2d 115

(2001).

d. Did Donnelly plead sufficient allegations to show an unfair or deceptive practice under Iowa's consumer fraud law (Iowa Code § 714H.3(1)) (Count 2)?

e. Do newspapers (and their contractors) owe a professional duty of care to their readers (Count 3)?

    2. *Birmingham v. Fodor's Travel Pub.*, 73 Haw. 359 (1992).

    3. Restatement (Second) of Torts § 580B (1977).

f. Does *Lane v. Mitchell*, 153 Iowa 381 (Iowa 1911), establish a tort of election interference under Iowa law (Count 4)?

    4. Restatement (Second) of Torts, Section 865.

g. Because the plaintiff stated at least one predicate count above, may the plaintiff preserve his claim for civil conspiracy (Count 5)?

## STATEMENT OF THE CASE

Dennis Donnelly is a subscriber to *The Des Moines Register*. As a subscriber, the *Register* promised him "trustworthy, smart and engaging news and information" from "the state's premier source of information." App. 11, R. Doc. 22 at 1. Regarding the Iowa Poll specifically, the *Register* told its readers that "[t]he Iowa Poll is carefully constructed to ensure that it is accurate." App. 21, R. Doc. 22 at 11. That explanation continued, "The Des Moines Register and its polling partner, West Des Moines-based Selzer & Co., take great care in shaping each Iowa Poll. We pay careful attention to the design of the questions, when a poll will be in the field and even how we reach Iowans." App. 22, R. Doc. 22 at 12. The *Register* also promised to follow Gannett's principles of ethical news coverage: "Don't publish a story if it doesn't feel right. Check it further." "Watch carefully for red flags that give reason to be skeptical of news-gathering or editing conduct." And "[b]e especially careful with technical terms, statistics, mathematical computations, crowd estimates and poll results." App. 30, R. Doc. 22 at 20. More specifically, the poll promised an

accurate representation of the electorate within the margin of error—a certification that had a 1 in 3.5 million chance of being true in this case, according to a former Iowa State political science professor. App. 22, R. Doc. 22 at 12.

The *Register* broke its promises to Mr. Donnelly and its other subscribers. It gave him a product that was fundamentally inaccurate and untrustworthy. So Mr. Donnelly filed a consumer protection action on behalf of himself and all other subscribers for that broken promise, just like any other consumer would do when they receive a product that doesn't live up to the promises made to sell it. He sued the Des Moines Register and Tribune Co., which owns and publishes the paper; Gannett Co., the corporate parent of the Register & Tribune Co.; and Dr. Ann Selzer and Selzer & Co., the *Register* contractor who was hired to conduct and explain the poll.

Mr. Donnelly originally filed his case as a putative class action in Iowa state court presenting exclusively Iowa state law claims. Gannett Co., which is not an Iowa company, filed for removal to federal court under

CAFA. Mr. Donnelly filed a motion for remand to Iowa state court, invoking three statutory exceptions to federal jurisdiction: the local-controversy exception, the home-state exception, and the interest-of-justice exception, and requesting discovery if necessary to establish the elements of these exceptions.[2] The District Court denied the motion on October 22, 2025, App. 61, R. Doc. 47 at 10, Add. 11, and Mr. Donnelly timely filed a petition for appeal to this Court.

While that petition was pending, the District Court ruled on two motions to dismiss, one from the Register and Gannett, the other from Dr. Selzer and Selzer & Co. This final judgment mooted the pending petition.

Thus, this appeal focuses on two rulings: the order denying the plaintiff's requested relief on jurisdiction (App. 52, R. Doc. 47 at 1, Add. 2), and

---

[2] Below, Mr. Donnelly also contended that Gannett did not file a timely removal because Gannett removed more than 100 days after being provided with a courtesy copy of the complaint, though it did act within 30 days of filing a formal stipulation of service. Mr. Donnelly asserted that Gannett engaged in litigation gamesmanship, but the District Court rejected that contention. App. 56, R. Doc. 47 at 5, Add. 6. Mr. Donnelly recognizes that this is a situation-sensitive question rather than a legal question and therefore chooses not to appeal on this point.

the order granting the motions to dismiss and directing the entry of final judgment (App. 62, R. Doc. 48 at 1, Add. 12).

For clarity, Mr. Donnelly's case is separate from a similar case filed by President Donald Trump and other individuals (not on behalf of a class) against the same defendants. The cases were treated as related at the District Court and both assigned to Judge Ebinger, but the President recently voluntarily dismissed his federal action without prejudice while filing a new state action. This Court granted mandamus to effectuate that decision. *In re Trump*, 2025 U.S. App. LEXIS 28284, *1 (8th Cir. Oct. 24, 2025).

## SUMMARY OF THE ARGUMENT

1. The District Court erred in denying Mr. Donnelly's request for remand under 28 U.S.C. § 1332(d)(4)(B) and 28 U.S.C. § 1332(d)(3) because the diverse defendant, Gannett, is not a "primary defendant" as that term is used in CAFA. Gannett is present in the case for its role as a parent corporation setting standards and providing supervision but not for the direct action causing the injury. This interpretation of "primary defendant" is the best reading of the statutory text laid alongside a neighboring provision's use of the term "significant defendant." *Caruso v. Allstate Ins. Co.*, 469 F. Supp. 2d 364, 369 (E.D.La. 2007). It is also (correctly) the position of many district courts that a parent company is not a primary defendant when its subsidiary or sister company was the one that undertook the alleged misconduct. *See infra.* at 19-20 (listing seven such cases).

2. The District Court erred in denying Mr. Donnelly's request for remand under 28 U.S.C. § 1332(d)(4)(A)(i)(III) because the "principal injuries" prong of the statute is satisfied when the injuries are uniquely related to and concentrated amongst the people and places of the forum

state. *Talen Mont. Ret. Plan v. PPL Corp.*, 2019 U.S. Dist. LEXIS 159130, *22 (D. Mont. Sept. 13, 2019), *permission to appeal denied*, 2019 U.S. App. LEXIS 39220, *2 (9th Cir. Nov. 21, 2019).

3. The District Court erred in granting the motions to dismiss based on the First Amendment. The District Court erred by holding Mr. Donnelly had to show intentionality, when the actual-malice standard permits a showing of intentionality or recklessness. Either way, Mr. Donnelly pled numerous facts that justify a reasonable inference of malice.

4. The District Court erred in granting the motions to dismiss based on the individual elements of the claims under Iowa state law, as explained below by each count.

# ARGUMENT

## I.    Standards of Review.

As for the plaintiff's motion to remand, "We review *de novo* the denial of a motion to remand to state court under CAFA." *Atwood v. Peterson*, 936 F.3d 835, 839 (8th Cir. 2019).

As for the motions to dismiss, "We review a district court order granting a motion to dismiss *de novo* and accept as true all facts alleged in the complaint. A defendant's motion to dismiss should be granted if it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him to relief." *Dammann v. Progressive Direct Ins. Co.*, 856 F.3d 580, 584 (8th Cir. 2017) (cleaned up).

## II.    The District Court erred in denying remand under CAFA.

"Congress passed CAFA to 'restore the intent of the framers of the United States Constitution by providing for Federal court consideration of interstate cases of national importance under diversity jurisdiction.'" *Wallace v. ConAgra Foods, Inc.*, 747 F.3d 1025, 1032 (8th Cir. 2014) (quoting CAFA, Pub. L. No. 109-2, § 2(b)(2), 119 Stat. 4, 5 (2005)). CAFA

allows removal of certain class action cases filed in state court even in the absence of complete diversity of parties when one diverse party files for removal to federal court.

In order to ensure that CAFA was only used on "interstate cases of national importance," Congress wrote into the Act two mandatory exceptions to jurisdiction and one discretionary exception: the local-controversy exception, the home-state exception, and the interest-of-justice exception. If a plaintiff in a removed case could prove one of the first two applied, or could convince a judge to apply the third, then the case would be remanded to the state court where it more properly belonged for resolution. To determine whether an exception applies, the Act lays out various factors that a plaintiff must establish.

Here, Gannett, which is not an Iowa company, filed a notice of CAFA removal. Mr. Donnelly timely filed a motion for remand to Iowa state court, invoking all three statutory exceptions and requesting discovery if necessary to establish the elements of those exceptions.

**II.A. The District Court erred in its interpretation of the primary defendant prong of 28 U.S.C. § 1332(d)(4)(B) (the mandatory home-state exception) and 28 U.S.C. § 1332(d)(3) (the discretionary interests-of-justice exception).**

The term "primary defendant" is used twice in CAFA—once in the "home-state exception," where it is one of two prongs necessary to establish a mandatory remand,[3] and once in the "interests-of-justice exception,"[4] where it is a required box to check before turning to the discretionary factors.[5]

---

[3] "A district court shall decline to exercise jurisdiction under paragraph (2) . . . [where] two-thirds or more of the members of all proposed plaintiff classes in the aggregate, and the primary defendants, are citizens of the State in which the action was originally filed."

[4] "A district court may, in the interests of justice and looking at the totality of the circumstances, decline to exercise jurisdiction under paragraph (2) over a class action in which greater than one-third but less than two-thirds of the members of all proposed plaintiff classes in the aggregate and the primary defendants are citizens of the State in which the action was originally filed based on consideration of . . . [six factors]."

[5] *Smith v. Marcus & Millichap, Inc.*, 991 F.3d 1145, 1162 n.11 (11th Cir. 2021) ("both the percentage of Florida citizens and the primary defendant requirements must be found before the court can consider the six discretionary factors").

"The term 'primary defendant' is not expressly defined in CAFA." *Moua v. Jani-King of Minnesota, Inc.*, 613 F. Supp. 2d 1103, 1108 (D.Minn. 2009). "The courts that have been asked to ascertain the meaning of 'primary defendants' have relied on several potential (and sometimes incongruent) understandings of the term." *Id.* This Circuit currently lacks a leading case defining "primary defendant."[6] Though the formulations differ, other courts have adopted one of three approaches to defining "primary defendants."

One approach asks: "who pays?" Who is "the deep pocket?" On that approach, a defendant who did not play a significant role in the alleged injurious conduct is still a "primary defendant" because it faces significant liability at the end of the case. *See Madison v. ADT, L.L.C.*, 11 F.4th 325, 328 (5th Cir. 2021); *Hunter v. City of Montgomery*, 859 F.3d 1329, 1336 (11th Cir. 2017) ("whether, given the claims asserted against the

---

[6] The only other place the term "primary defendants" is used in the U.S. Code is the Multiparty, Multiforum, Trial Jurisdiction Act of 2002 (28 U.S.C. § 1369), where it was also undefined and no decision of this circuit has illuminated its meaning in that context either.

defendant, [the defendant] has potential exposure to a significant portion of the class and would sustain a substantial loss as compared to other defendants if found liable.").

Other courts focus on the "who done it" question—"the United States Supreme Court has historically defined 'primary defendants' as those parties having a 'dominant relation to the subject matter of the controversy.'" *Passa v. Derderian*, 308 F. Supp. 2d 43, 62 (D.R.I. 2004) (quoting *United States v. American Tobacco Co.*, 221 U.S. 106, 143 (1911)). *Passa*'s survey of caselaw revealed "a settled judicial understanding of 'primary defendants' as those parties having a 'dominant relation to the subject matter of the controversy,' in contrast to defendants who played a secondary role by merely assisting alleged wrongdoing." *Kitson v. Bank of Edwardsville*, 2006 U.S. Dist. LEXIS 85285, *54 (S.D. Ill. Nov. 22, 2006). This case law from other contexts such as RICO, securities, and indemnification differentiates between primary and secondary defendants such as "participants" versus "aiders and abettors." *Id.* (collecting cases).

A third approach is to blend these considerations into a multifactor balancing test that looks at all of the above and the kitchen sink. *See Vodenichar v. Halcón Energy Props.*, 733 F.3d 497, 505-06 (3d Cir. 2013); *Sudholt v. Country Mut. Ins. Co.*, 83 F.4th 621, 628 (7th Cir. 2023); *Singh v. Am. Honda Fin. Corp.*, 925 F.3d 1053, 1068 (9th Cir. 2019).[7]

The District Court below adopted something like the third approach, finding that "Donnelly seeks to hold Gannett liable for its own actions in relation to the release of the poll and does not meaningfully distinguish between theories of liability between the parties." App. 59, R. Doc. 47 at 8, Add. 9.

The District Court erred in adopting this approach, and as a result erred in the conclusion it reached. The best way to read the statute is the second method: "primary defendants" are those most at the center of the action, as opposed to secondary defendants who can play a significant but not chief role in the action.

---

[7] *See Kress Stores of P.R., Inc. v. Wal-Mart P.R., Inc.*, 121 F.4th 228, 237 (1st Cir. 2024) (adopting *Singh*).

There are several reasons that this Circuit should adopt this approach. First, it most naturally comports with the regular meaning of the word "primary." This Court has said "the first rule of statutory interpretation [is] that the court interpret a word not defined in a statute according to its plain meaning unless context requires otherwise." *Banks v. Cotter Corp.*, 22 F.4th 788, 795 (8th Cir. 2022). *See Kuklenski v. Medtronic USA, Inc.*, 134 F.4th 528, 531 (8th Cir. 2025). The plain meaning of "[t]he phrase 'primary defendants' indicates a chief defendant or chief class of defendants." *Watson v. City of Allen*, 821 F.3d 634, 641 (5th Cir. 2016).

Second, such a reading comports with the surrounding statutory context. *See Kuklenski*, 134 F.4th at 532. Nearby in the same statute, in the home-state exception, CAFA directs that remand is mandatory where "there is at least one defendant from whom 'significant relief' is sought, whose conduct forms a 'significant basis' for the asserted claims, and who is a citizen of the state in which the action was filed." *Richins v. Hofstra Univ.*, 908 F. Supp. 2d 358, 360 (E.D.N.Y. 2012) (quoting 28 U.S.C. §

1332(d)(4)(A)(2)). The question, then, is how to read "primary defendants" in light of the use of the term "significant defendant" just above.

"Clearly, CAFA intended there to be a substantive difference between 'primary defendants' and 'significant defendants' as contemplated by the two exceptions to the exercise of jurisdiction under the statute. The dictionary definition of 'primary' includes 'first in importance; chief; principal; main.' Webster's New World College Dictionary 1140 (4th ed. 1999). By contrast, the dictionary definition of 'significant' includes 'important.' *Id.* at 1334. These definitions appear particularly apt in the context of CAFA, meaning that a significant defendant is of less importance than a primary defendant." *Caruso v. Allstate Ins. Co.*, 469 F. Supp. 2d 364, 369 (E.D.La. 2007). *Accord Anderson v. Hackett*, 646 F. Supp. 2d 1041, 1048 (S.D.Ill. 2009) ("one need not be a 'primary' defendant in order to be a 'significant' defendant.").[8] The Fifth Circuit recognized this reasoning in

---

[8] It is this nearby statutory language that differentiates between the meaning of primary as "principally" versus as "substantial." *See Mayo Clinic v. United States*, 145 F.4th 877, 886 (8th Cir. 2025). *See also Malat v. Riddell*, 383 U.S. 569, 572 (1966).

*Watson*: "According ['primary defendants'] a broader meaning is inconsistent . . . with CAFA's distinct treatment of 'primary' defendants, *see* 28 U.S.C. § 1332(d)(4)(B), (d)(5), and 'significant' defendants, *see id.* at § 1332(d)(4)(A)(i)(II)." 821 F.3d at 641.

If a "significant" defendant is one "from whom 'significant relief' is sought [and] whose conduct forms a 'significant basis' for the asserted claims," then a "primary defendant" must be even more than that—a chief or main defendant. Gannett arguably fails even as a significant defendant, given the limited role its conduct played in the asserted claims (again, Gannett is sued as a parent company, not for the direct conduct)— it can hardly be considered a primary defendant.

Third, asking whether a party is a chief defendant is a rule that district courts can more easily apply at the early stage of litigation where these motions are made. Who has the deep pockets is a fact question that often won't be known at the start of the case. Similarly, how a jury might assess comparative liability amongst multiple defendants such that several are hit particularly hard and others are let off lightly cannot be

known at this early stage. *Kearns v. Ford Motor Co.*, 2005 U.S. Dist. LEXIS 41614, *25-26 (C.D.Cal. Nov. 18, 2005) ("The *Passa* court rejected suggestions of the parties that 'primary defendants', be defined either as those with the deepest pockets or those with the greatest culpability. Those definitions were seen as being inappropriate and unworkable because they were too fact-based to be evaluated at the procedural point at which they were to be applied."). *Accord Anthony v. Small Tube Mfg. Corp.*, 535 F. Supp. 2d 506, 516 (E.D.Pa. 2005). While courts cannot know at this early stage the financial resources of defendants or make more than guesses at jury determinations of comparative fault, they can easily look at the face of the complaint to determine whether a defendant is a primary or secondary actor in the alleged misconduct.

Fourth and finally, this approach comports with how numerous district courts have considered the particular situation presented in this case: finding that a parent company is not a primary defendant when its subsidiary or related company was the one that undertook the alleged misconduct. *See, e.g.*, *Mackey v. Chemtool Inc.*, 2022 U.S. Dist. LEXIS

143498, *5-6 (N.D.Ill. Aug. 11, 2022); *McClendon v. Challenge Financial Investors Corp.*, 2009 U.S. Dist. LEXIS 17908, *13 (N.D. Ohio Mar. 9, 2009); *Dunham v. Coffeyville Res., LLC*, 2007 U.S. Dist. LEXIS 82606, *9-10 (D.Kan. Nov. 6, 2007); *Brown v. SBC Communs. Inc.*, 2006 U.S. Dist. LEXIS 71208, *8 (S.D.Ill. Sept. 29, 2006); *Serrano v. 180 Connect, Inc.*, 2006 U.S. Dist. LEXIS 61035, *4 (N.D.Cal. Aug. 11, 2006), *rev'd on other grounds*, 478 F.3d 1018 (9th Cir. 2007). *See also Green v. Sheraton, LLC*, 2022 U.S. Dist. LEXIS 103642, *6 (Magistrate's Report) (W.D.N.Y. May 31, 2022) (employing franchisee is the primary defendant; affiliated franchisor is a secondary defendant), *adopted*, 2022 U.S. Dist. LEXIS 159170 (W.D.N.Y. Sept. 1, 2022); *Sorrentino v. ASN Roosevelt Ctr., LLC*, 588 F. Supp. 2d 350, 351 (E.D.N.Y. 2008) (apartment complex operator is primary defendant; corporate affiliates are secondary defendants).

Here, Mr. Donnelly alleged Gannett's role was typical of parent corporations—establishing policies and setting standards for its subsidiaries, one of which is the *Register. See, e.g.,* App. 12, R. Doc. 22 at 2. Gannett did not make the promises and Gannett did not break the promises. It is

still an appropriate defendant (and Gannett did not move to dismiss based on any sort of piercing-the-corporate-veil sort of theory), but it is not a *primary* defendant. It is certainly not "the chief defendant" compared to its subsidiary who did the deeds at issue. This is the simplest, most straightforward path to reverse the district court.

## II.B. The District Court erred in its interpretation of the "principal injuries" prong of the local-controversy exception, 28 U.S.C. § 1332(d)(4)(A).

Separate from the home-state exception, the local-controversy exception also is a mandatory exception to CAFA jurisdiction. It requires the court to grant remand and decline jurisdiction "**(i)** over a class action in which— **(I)** greater than two-thirds of the members of all proposed plaintiff classes in the aggregate are citizens of the State in which the action was originally filed; **(II)** at least 1 defendant is a defendant— **(aa)** from whom significant relief is sought by members of the plaintiff class; **(bb)** whose alleged conduct forms a significant basis for the claims asserted by the proposed plaintiff class; and **(cc)** who is a citizen of the State in which the action was originally filed; and **(III)** principal injuries resulting from the alleged conduct or any related conduct of each defendant

were incurred in the State in which the action was originally filed; and **(ii)** during the 3-year period preceding the filing of that class action, no other class action has been filed asserting the same or similar factual allegations against any of the defendants on behalf of the same or other persons[.]" 28 U.S.C. § 1332(d)(4)(A).

The District Court below determined that elements (i)(II) and (ii) were met in this case.[9] App. 57, R. Doc. 47 at 6, Add. 7. The District Court declined to order discovery so Mr. Donnelly could determine whether element (i)(I) was met because the Court determined that Mr. Donnelly could not establish element (i)(III), the "principal injuries" prong. App. 58, R. Doc. 47 at 7, Add. 9. The District Court followed the Fifth Circuit in finding that Congress "intended to require that *all* plaintiffs sustain their principal injuries in the forum state and nowhere else." *Cheapside Mins., Ltd. v. Devon Energy Prod. Co., L.P.,* 94 F.4th 492, 501 (5th Cir.

---

[9] The District Court described this as a "narrow" exception, App. 57, R. Doc. 47 at 6, Add. 7, but the Third Circuit has said Congress employed "broad language" in this exception. *Abraham v. St. Croix Renaissance Group, L.L.L.P.*, 719 F.3d 270, 278 (3d Cir. 2013).

2024). Further following the Fifth, the Court reasoned that the injury here was financial in nature (purchasing a subscription), and "a plaintiff sustains an economic injury where he resides." *Id*. at 498. Gannett provided an affidavit that the *Register* has subscribers in states other than Iowa, so the Court reasoned this element could not be met. App. 60, R. Doc. 47 at 9, Add. 10.

The District Court erred in adopting the Fifth Circuit's approach. "There are two ways in which this standard may be satisfied." *McGuire v. Pacificorp*, 2025 U.S. Dist. LEXIS 136615, *32 (D.Or. May 7, 2025). "First, and most obviously, this requirement may be met when the conduct alleged is truly limited to a single state," as in *Cheapside Minerals*. *Id*. "Second, the principal injuries requirement may be satisfied if the harm inflicted is unique to [one state], even if not exclusively incurred within the state." *Id*. This is the case here—the harm is unique to Iowa and Iowans, even if there are a handful of class members in other states.

Though the District Court adopted the first approach as the only method to meet the prong, many other courts rightly agree with *McGuire*

that it can be sufficient for the "principal injuries" to be "concentrated in" or to "uniquely affect" the forum state, even if a few class members were injured outside the forum state. *Iverson v. SND Nat'l Ministry Corp.*, 2024 U.S. Dist. LEXIS 172670, *24 (N.D. Cal. Sept. 23, 2024); *Talen Mont. Ret. Plan v. PPL Corp.*, 2019 U.S. Dist. LEXIS 159130, *22 (D. Mont. Sept. 13, 2019), *permission to appeal denied*, 2019 U.S. App. LEXIS 39220, *2 (9th Cir. Nov. 21, 2019); *Richins*, 908 F. Supp. 2d at 363 (prong satisfied even where over 20% of putative class members had out-of-state addresses). *See Aarstad v. Burlington No. Santa Fe Ry.*, 2020 U.S. Dist. LEXIS 60326, *12 (D. Mont. April 6, 2020) ("the Court could have relied on the unique extent of injuries to Montanans…"); *King v. Albert & Carol Mueller L.P.*, 2015 U.S. Dist. LEXIS 37525, *7-8 (M.D.Pa. Mar. 25, 2015) ("this controversy uniquely affects Northeast Pennsylvania and that the principal injuries are concentrated within Pennsylvania.").[10] *See also Vodenichar*, 733 F.3d at 508 (finding principal injuries prong satisfied

---

[10] Both "uniquely affects" and "concentrated in" are concepts drawn from the legislative history and subsequently incorporated into the analysis by courts. *See Vodenichar,* 733 F.3d at 508 n.11.

where "most class members who sought to lease their oil and gas rights allegedly reside in, and all of the land is located in, Mercer County, Pennsylvania.")

For instance, the court in *Talen Montana Retirement Plan* found that the "principal injuries" prong was satisfied where, "[a]lthough some other states each have a smattering of Talen Montana creditors, the sheer amount of damage caused to Montana citizens, particularly the hundreds of employees and retirees residing in Rosebud County, and to the Montana Department of Environmental Quality makes this a controversy that 'uniquely affects' Montana unlike anywhere else." 2019 U.S. Dist. LEXIS 159130, *22. "Here, the harm is the Defendants defrauding mostly Montanan creditors, many of whom are employees or retirees, of a then Montana-based company." *Id*. at *21.

Similarly, where "donors of [a non-profit organization] are likely spread across the country," the court nevertheless held the principal injuries prong was met when "the issues center around a closure of a local school in Ventura County, California and the harm it has on its students,

applicants, benefactors/factors, and donors—who are, as the Removing Defendants concede, at least two thirds California citizens." *Iverson*, 2024 U.S. Dist. LEXIS 172670, *24. *Accord Kitson*, 2006 U.S. Dist. LEXIS 85285, *28-29 (principal injuries that were economic in nature occurred in Illinois where wrongful act occurred in Illinois and 90% of class members have Illinois mailing addresses).

Courts consistently recognize that the focus of the "principal injuries" prong is to ensure that the event or conduct at issue took place in the forum state. Sometimes creative plaintiffs' lawyers try to avoid CAFA by attacking a nationwide policy or problem but only alleging a class of consumers in a single state under that state's consumer-protection statute. The "principal injuries" prong prevents this sort of playing fast-and-loose by asking whether the injuries from the conduct affected multiple states. *See Talen Mont. Ret. Plan*, 2019 U.S. Dist. LEXIS 159130, *19 (courts "consider whether the conduct alleged in the complaint could have plausibly caused harm to people or places nationwide. . . . courts reject[] the

notion that the location of the class determined the outcome and instead focused on whether the alleged harm was plausibly national in scope.").

Decisions like *Talen* or *Iverson* better fit CAFA by recognizing a local controversy even where "a smattering" of class members live in other states. "The exception's purpose is to ensure that class actions with a local focus remain in state court rather than being removed to federal court because state courts have a strong interest in resolving local disputes." *Kendrick v. Conduent State & Local Sols., Inc.*, 910 F.3d 1255, 1260 (9th Cir. 2018). The Defendants' misconduct pushing the Iowa Poll about Iowa news out to a subscriber base of overwhelmingly Iowa consumers is a classic local dispute that properly belongs in an Iowa state court even if a small slice of *Register* subscribers live in other states.

## III. The District Court erred in granting the motions to dismiss.

## III.A. The District Court erred in finding the First Amendment defense.

The District Court starts its First Amendment discussion by rejecting the broad, absolute, or categorical immunity sought by the Defendants.

The District Court said "[n]either the Supreme Court nor the Eighth Circuit has yet clearly announced such a category of absolute immunity from tort or consumer protection actions for newspapers engaged in political reporting." App. 68, R. Doc. 48 at 7, Add. 18. Indeed, such an absolute immunity would be contrary to multiple holdings of the U.S. Supreme Court, which has consistently recognized that the correct standard is actual malice, not absolute immunity, for claims involving speech on matters of public concern. *Time, Inc. v. Hill*, 385 U.S. 374 (1967) (actual malice standard applied to action upon state statute protecting name/image/likeness); *Cantrell v. Forest City Pub. Co.*, 419 U.S. 245 (1971) (same, as to tort of false light invasion of privacy); *Bose Corp. v. Consumers Union*, 466 U.S. 485 (1984) (same, as to tort of product disparagement); *Hustler Mag., Inc. v. Falwell*, 485 U.S. 46 (1988) (same, as to tort of intentional infliction of emotional distress).[11] Thus, the District Court ended

---

[11] *Accord Peoples Bank & Trust Co. v. Globe Int'l Pub.,* 978 F.2d 1065, 1068 (8th Cir. 1992) (analyzing whether plaintiff proved actual malice in false light and intentional infliction of emotional distress action against newspaper); *Berry v. National Broadcasting Co.*, 480 F.2d 428, 431 (8th Cir. 1973) ("The United States Supreme Court has consistently held that

up where Mr. Donnelly began: the correct question is whether he has sufficiently alleged actual malice. *Compare* App. 69, R. Doc. 48 at 8, Add. 19 (District Court says that "while current First Amendment jurisprudence may not provide Defendants absolute immunity from suit challenging their protected speech, they are entitled to, at minimum, the heightened protections of the actual malice standard.") *with* App. 31, R. Doc. 22 at 21 (in operative complaint, plaintiff pleads that he can show actual malice).

The District Court then goes on to hold that Mr. Donnelly has not "pled facts sufficient to give rise to a reasonable inference of actual malice." App. 70, R. Doc. 48 at 9, Add. 20 (internal citation omitted). More particularly, the District Court said that "Donnelly's allegation, in essence is that Defendants designed the poll's methodology to produce an intentionally inaccurate result and knowingly published the inaccurate result. No specific facts have been alleged to support such a theory." App. 71, R. Doc. 48 at 10, Add. 21 (internal citation omitted). *See id.* ("manufacturing a poll they knew was incorrect").

---

the First Amendment protection of the freedom of the press requires that 'false light' cases be subject to the same restraints as defamation cases.").

First, this holding represents a legal error by the District Court. Actual malice does not require that the Defendants "intentionally" and "knowingly" acted. It is sufficient for actual malice that they published with reckless disregard for the statement's falsity. *Nelson Auto Ctr., Inc. v. Multimedia Holdings Corp.*, 951 F.3d 952, 958 (8th Cir. 2020) (plaintiff must show news outlet "published one or more statements with actual malice, that is, knowing they were false or with reckless disregard for whether they were false or not."). *Accord Peoples Bank & Trust Co. v. Globe Int'l Pub., Inc.*, 978 F.2d 1065, 1068 (8th Cir. 1992) ("The central issue on appeal is the existence of actual malice: whether Globe intended, or recklessly failed to anticipate, that readers would construe the story as conveying actual facts or events concerning Mitchell."). Here, the district court's holding "appears to ignore the reckless prong of the definition of actual malice." *Peoples Bank & Trust Co. v. Globe Int'l, Inc.*, 786 F. Supp. 791, 798 (D.Ark. 1992), *aff'd in relevant part*, 978 F.2d 1065. That was a legal error.

Mr. Donnelly alleged recklessness by the Defendants (App. 31, R. Doc. 22 at 21), and the numerous facts he pled in support of his theory could demonstrate either intentionality or recklessness. The District Court committed a legal error by holding Mr. Donnelly to an artificially high standard and ignoring the recklessness prong of actual malice.

Next, far from "mere conclusory statements" and "buzzwords" (App. 71, R. Doc. 48 at 10, Add. 21), Mr. Donnelly pled *voluminous* facts to allege that the poll was intentionally or recklessly published in spite of its obviously inaccurate result.

"Actual malice 'may be alleged generally,' Fed. R. Civ. P. 9(b), but 'to make out a plausible malice claim, a plaintiff must still lay out enough facts from which malice might reasonably be inferred.'" *Nelson Auto Ctr.*, 951 F.3d at 958 (internal citation omitted). "This standard does not impose a probability requirement at the pleading stage. A well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of

those facts is improbable, and that a recovery is very remote and un-likely." *Id*. (cleaned up). Mr. Donnelly's actual malice allegations fit into two general categories.

First, Mr. Donnelly has pled extensively that the Defendants are experts in polling and politics and are familiar with journalistic custom and Gannett's standards, all of which supports the inference they subjectively knew all was not well with the information.

The Defendants were experts in Iowa politics. Dr. Selzer has a Ph.D. in communications theory and research. App. 13, R. Doc. 22 at 3. She has been polling in Iowa for many years. App. 26, R. Doc. 22 at 16. Similarly, the then-executive editor at the *Register* had two decades of experience covering Iowa politics. App. 24, R. Doc. 22 at 14. The news director (who doubled as the political editor), chief political correspondent, and statehouse political correspondent, all three of whom wrote or reviewed stories on the poll, also had significant experience as journalists covering politics. App. 24-25, R. Doc. 22 at 14-15. In other words, Dr. Selzer and

all four of the *Register* journalists associated with the story had the requisite experience and expertise to know the context of Iowa politics.

Next, Mr. Donnelly laid out on Gannett's own internal news principles, on which its presumably trains its journalists. Gannett's principles of ethical news coverage charge its staff: "Don't publish a story if it doesn't feel right. Check it further." "Watch carefully for red flags that give reason to be skeptical of news-gathering or editing conduct." And "[b]e especially careful with technical terms, statistics, mathematical computations, crowd estimates and poll results." App. 12, R. Doc. 22 at 2.

The FAC also pleads the *Register*'s attitude toward and explanation of the Iowa Poll in general. The *Register* had previously told its readers, "The Iowa Poll is carefully constructed to ensure that it is accurate." App. 21, R. Doc. 22 at 11. That explanation continued, "The Des Moines Register and its polling partner, West Des Moines-based Selzer & Co., take great care in shaping each Iowa Poll. We pay careful attention to the design of the questions, when a poll will be in the field and even how we reach Iowans." App. 22, R. Doc. 22 at 12. Those sentiments are echoed on

Dr. Selzer's website, which proclaims her Iowa Poll "the gold standard for its accuracy and insights. . ." App. 26, R. Doc. 22 at 16. These allegations support a reasonable inference that the Defendants acted with knowing or reckless disregard: they had previously reiterated the diligent care given the Poll's results. This was not a mistake made haphazardly in a story (or tweet) written on the fly amidst a fast-moving news cycle.

Finally, Mr. Donnelly also mentioned industry customs and practices. App. 31-32, R. Doc. 22 at 21-22. Mr. Donnelly did not do so to ask the District Court to sit in judgment as a journalism seminar. *Contra* App. 72, R. Doc. 48 at 11, Add. 22. Rather, industry customs and practices are one thread in a tapestry of allegations that collectively raise a reasonable inference the Defendants subjectively had reason to doubt the information's veracity.

Taken together, these go a long way to raising a reasonable possibility "the defendant must have made the false publication with a high degree of awareness of probable falsity, or must have entertained serious doubts as to the truth of his publication." *Nunes v. Lizza*, 12 F.4th 890, 899 (8th

Cir. 2021) (cleaned up). The Defendants were not political novices who got the numbers back from the callers in their cubicles and ran with them without any context or evaluation. These were smart, serious people with deep experience in the field and corporate management and industry customs that encouraged great care with facts like these. All of this raises the reasonable inference that they had serious doubts and plowed ahead anyway.

Then turn to the allegations about that situation. Start with the poll itself. The poll as run in the *Register* stated: "Questions based on the sample of 808 Iowa likely voters have a maximum margin of error of plus or minus 3.4 percentage points. This means that if this survey were repeated using the same questions and the same methodology, 19 times out of 20, the findings would not vary from the true population value by more than plus or minus 3.4 percentage points." App. 21, R. Doc. 22 at 11. Given the margin of error and confidence interval that the poll itself gave readers, a former Iowa State political scientist concluded there was a roughly 1 in 3.5 million chance that this was an "honest miss," i.e., that

it was simply an innocently inaccurate sample. App. 22, R. Doc. 22 at 12.[12]

Next, take how Dr. Selzer and the *Register* itself described the poll: a "stunning," "shocking," "surprise" Iowa Poll result. App. 16, R. Doc. 22 at 6. *See* App. 19, R. Doc. 22 at 9 ("'It's hard for anybody to say they saw this coming,' said pollster J. Ann Selzer, president of Selzer & Co.," in the *Register* story announcing the poll results.). A responsible pollster, reporter, or editor, given a "stunning, shocking, surprising" poll result "no one saw coming," would question that result rather than recklessly providing it to all their consumers (and the rest of the world) as accurate news.

---

[12] The District Court dismisses this statistic, App. 71, R. Doc. 48 at 10 n.1, Add. 21, but misses its significance. The poll wasn't just wrong in retrospect. It was egregiously, outrageously, outlandishly wrong. Standing alone, this may not be enough to prove actual malice. But when seen in the context of all the other allegations, it raises a reasonable possibility that the Defendants entertained serious doubts about the information and ignored those doubts to publish it anyway.

*This allegation alone should be enough to show recklessness on a motion to dismiss*. If the Defendants themselves describe the contested information as "stunning, shocking, and surprising," that should be sufficient to raise the reasonable inference that they subjectively entertained serious doubts about its veracity but chose to go forward with publication anyway. It is a reasonable inference that anyone who describes information as "shocking" and "stunning" contemplates at some point that the information may not be accurate. If the choice is between the new information and the literally everything else we know about the topic, it is reasonably possible the person doubts the information.

Why was the result stunning, shocking, and surprising? Well, because Gannett and Dr. Selzer would know that in the last statewide election cycle in Iowa, the Republican gubernatorial candidate won by 18 points, and the Republican U.S. Senate candidate won by 12 points. App. 16, R. Doc. 22 at 6. It's "shocking" at minimum to think that the Democratic presidential candidate was leading by three, representing a party-preference swing in the Iowa electorate of at least nine points in two years.

Specific to President Trump, he won Iowa by nine points in 2016 and by eight points in 2020. App. 16, R. Doc. 22 at 6. Again, this would mean an 11-to-12 point swing in how the Iowa electorate feels about Donald Trump. Those sorts of numbers are unheard-of in politics.

It was also shocking because the four previous public polls taken in Iowa in fall 2024 showed Trump leading by 7, 7, 8, and 9 points. App. 17, R. Doc. 22 at 7. Then the Selzer poll shows Harris by 3? To quote Sesame Street, one of these things is not like the others.

It was shocking because no one—no one—thought Iowa was a swing state. Not *The New York Times*, *US News*, or *Forbes*, to pick three prominent examples of media outlets keeping lists of swing states. App. 17, R. Doc. 22 at 7.

It was shocking because Gannett's own polling in other (actual) swing states (App. 18-19, R. Doc. 22 at 8-9) and other polling in swing states showed Trump with the momentum in the final days (App. 17-18, R. Doc. 22 at 7-8) (until the *Register* poll generated fake momentum for Harris at the end).

It was shocking because Dr. Selzer's own previous poll for the *Register* in June 2024 showed Trump leading then-candidate President Biden by 18 points. App. 15, R. Doc. 22 at 5. In other words, her second poll showed a breath-taking 21-point swing in the change from Biden to Harris.

If the presidential results were not shocking enough, then certainly the congressional race results were so shocking that someone somewhere should have pumped the breaks before running the poll as headline news. In the First District, an R+3 seat that was considered a close race by some analysts, Selzer's poll showed the Democrat ahead by a whopping 16 points. App. 20, R. Doc. 22 at 10. Again: alarm bells ringing all over.

The FAC also shows how the poll got it so massively wrong: "PollFair, an online polling analyst that reweights polls based on historic exit poll data, took Dr. Selzer's October poll and reweighted it according to historical data. Dr. Selzer weighted her sample at R+2, while PollFair weighted its sample at R+10. Doing so moved the results from Harris +3 (47-44) to Trump +6 (50-44)." App. 19, R. Doc. 22 at 9. Another data point in support

of knowing or reckless misbehavior is the gap between the weighting used and the historic exit poll data.

Take these allegations together. The poll was  . . .

- Clearly discordant with Trump's performance in Iowa in 2016 and 2020.

- Clearly discordant with the results in 2016, 2018, 2020, and 2022 Iowa races.

- Clearly discordant with historic exit polling data from Iowa.

- Clearly discordant with other publicly available polling of Iowa in the 2024 election cycle.

- Clearly discordant with Gannett's own polling of actual swing states in the 2024 election cycle.

- Clearly discordant with national news reporting on which states were in play.

- Clearly discordant with Dr. Selzer's own poll for the *Register* in June 2024.

No wonder the result was "shocking," "stunning," and a "surprise."

Plus, keep in mind what else we know about the context around the poll:

- Dr. Selzer has a Ph.D. in communications theory and research.

- The four *Register* journalists reporting on the poll had decades of collective experience reporting on Iowa politics.

- The *Register* had previously told its readers that it takes extra special care to ensure that the Poll is accurate and trustworthy.

- The *Register* is part of a company that tells its employees to be extra careful when reporting on statistics and polling.

The complaint did not rely on "buzzwords" or "legal conclusions" or "conclusory statements." The complaint was deeply stocked with facts, which collectively showed two things: (1) there were numerous red flags about the poll obvious to anyone who knew anything about Iowa politics, and (2) the Defendants knew lots about Iowa politics. "The allegations of these inaccuracies present a reasonable inference that [Defendants] acted with knowledge or reckless disregard for the truth when publishing this [story]." *Tholen v. Assist Am., Inc.*, 970 F.3d 979, 985 (8th Cir. 2020).

Put differently, Mr. Donnelly has alleged plenty to show this was more than just a "[f]ailure to recognize a mistake or ambiguity . . ." *Nelson Auto Ctr., Inc.*, 951 F.3d at 958. This was the front-page, above-the-fold, banner-headline Sunday story the weekend before the election. They did not just fail to recognize a mistake—they injected "stunning, shocking, surprising" information of national impact in the last 72-hours of the race despite overwhelming evidence something was obviously wrong.

Compare this to a case from the Tenth Circuit involving defamation by a false claim of sexual harassment. The court reversed the trial court's decision to grant the motion to dismiss and found actual malice where the plaintiff had pled that the defendant "made 31 calls to Mr. McDonald on his personal cell phone in the four months after the alleged sexual harassment. In addition, following the alleged sexual harassment she initiated a Christmas gift exchange with Mr. McDonald and visited the church he attended, where Mr. McDonald introduced her to his family." *McDonald v. Wise*, 769 F.3d 1202, 1219-20 (10th Cir. 2014). If that level

of circumstantial evidence was sufficient to establish a reasonable inference to support actual malice, certainly the score of facts pled by Mr. Donnelly should also be sufficient in this case.[13]

The Court should also be attentive to the rule it would create otherwise. If the foregoing is not sufficient to clear the hurdle set in *Nelson Auto Center*—"A well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." 951 F.3d at 958—then no defamation or false light or similar claim will survive without a direct admission by

---

[13] Below, only Gannett and the *Register* (which filed a joint brief) argued that Mr. Donnelly had failed to plead sufficient facts to establish actual malice—Dr. Selzer went all-in on her categorical First Amendment arguments and did not address whether Mr. Donnelly had pled actual malice. Dr. Selzer should be limited to her arguments below on appeal; any argument on whether Mr. Donnelly has sufficiently pled actual malice should be treated as waived. "[A] party did not preserve error when the party did not raise the issue before the district court or join in the objection raised by another party." *In the Int. of J.F.*, 997 N.W.2d 441, *8 (table) (Iowa Ct. App. 2023) (summarizing holding of *Gavlock v. Coleman*, 493 N.W.2d 94, 98 (Iowa Ct. App. 1992)). Put differently, "a party could not rely on the objection of another party when 'he never moved to join in such objection.'" *Id.* (summarizing and quoting holding of *State v. Simon*, No. 20-0653, 965 N.W.2d 498, 2021 WL 2709478, at *1 (Iowa Ct. App. June 30, 2021)).

a defendant or a whistleblower prior to filing the complaint. Such a rule would basically foreclose virtually all such claims at the 12(b)(6) stage. That is not the law this Court set in *Nelson Auto Center*.

**III.B. The District Court erred in finding the Plaintiff failed to plead the elements of the Iowa state law claims.**

**III.B.1.** The District Court erred when it found that Mr. Donnelly did not state a claim for (intentional) false misrepresentation because "no false representation was made." App. 73, R. Doc. 48 at 12, Add. 23.

The *Register* made two sets of false representations. The first was when it promised Mr. Donnelly and other subscribers that it would provide "trustworthy, smart and engaging news and information" from a "venerable source of information and current news for the heart of Iowa" from "the state's premier source of information." App. 11, R. Doc. 22 at 1.

Gannett and the *Register* made more specific promises about how the newsroom would run: "WE ARE COMMITTED TO: Seeking and reporting the truth in a truthful way." App. 29, R. Doc. 22 at 19. They continue: "We will dedicate ourselves to reporting the news accurately, thoroughly

and in context." "We will be honest in the way we gather, report and present news." "We will provide the news and information that people need to function as effective citizens." *Id*. "Dedication to the truth means accuracy itself is an ethical issue. Each news person has the responsibility to strive for accuracy at each step of the process." "Be especially careful with technical terms, statistics, mathematical computations, crowd estimates and poll results." App. 30, R. Doc. 22 at 20. The *Register* pledges to its readers to operate on these principles. *Id*.

The *Register* also made representations specific to the Iowa Poll: "The Iowa Poll is carefully constructed to ensure that it is accurate." App. 21, R. Doc. 22 at 11. "The Des Moines Register and its polling partner, West Des Moines-based Selzer & Co., take great care in shaping each Iowa Poll. We pay careful attention to the design of the questions, when a poll will be in the field and even how we reach Iowans." App. 22, R. Doc. 22 at 12.

Second, the *Register* and Dr. Selzer also made representations specific to this particular poll: "Questions based on the sample of 808 Iowa likely

voters have a maximum margin of error of plus or minus 3.4 percentage points. This means that if this survey were repeated using the same questions and the same methodology, 19 times out of 20, the findings would not vary from the true population value by more than plus or minus 3.4 percentage points." App. 21, R. Doc. 22 at 11.

Mr. Donnelly has alleged plenty to show that both sets of representations were false. Whether the *Register* reported "trustworthy news," whether it was "true" and "accurate," whether it was "careful with poll results," whether this Iowa Poll was "carefully constructed to ensure that it is accurate," whether this Iowa Poll was constructed to a margin of error of 3.4% as a matter of statistical science—these are falsifiable statements that a jury can hear, consider, and decide. *See Peoples Bank & Trust Co.*, 978 F.2d at 1069 (jury entitled to hear and decide publication that was "not an opinion" but "could be proved either true or false."). As with the *Sun* tabloid in that case, when a newspaper holds itself out as publishing "news," and then publishes "fake news," it can be liable for the gap between its promise and its publication. *Id.* at 1068-71.

The District Court dismissed this claim by reasoning that the Iowa Poll was a "snapshot" of a "dynamic and changing electorate," an "opinion poll of a future event." App. 74, R. Doc. 48 at 13, Add. 24.

This holding entirely ignores any of the other false representations made by the Defendants, such as promising that the Register would be "careful with poll results" and that the Iowa Poll was "carefully constructed to ensure that it is accurate." App. 21, R. Doc. 22 at 11. Mr. Donnelly's allegations, detailed above, should be more than sufficient to raise the reasonable possibility that the *Register* was not careful here.

Second, this Court should decline to adopt a rule that gives the polling industry a free pass from ever behind held accountable in court. Imagine a more mundane case: a large business contracts with a polling firm to poll its current and potential customers on its brand. The company pays good money for the poll. The poll shows the company has a stellar brand reputation contrary to numerous indications it does not. Three days later, a Better Business Bureau survey comes out differing from the firm's poll

by 16 points, in line with all other indicators. The company's stock plummets. The business digs into the disaster and finds its contracted polling company totally goofed its poll sample. Can the business not bring a breach of contract action for a junk poll? According to the District Court, the answer is no—the poll is a snapshot, the consumer preferences are dynamic, and as long as the poll was done in line with its methodology, the polling company cannot be sued, even if the poll was junk. Pollsters and poll publishers don't deserve that sort of open-ended get-out-of-jail free card.

Rather, pollsters can be held accountable to a jury and the law like any other industry. Mr. Donnelly will have to bring in an expert witness to show that the Iowa Poll was cooked and combine it with other evidence, but he has alleged enough (as discussed in the actual malice section) to raise the reasonable inference the poll presentation was false.

Put differently, the District Court's "snapshot" analysis treats the poll like an "opinion" about future election results. That's not what it is. It is a factual statement based on statistical science of the here-and-now state

of the electorate. The Defendants' statement was not: "Kamala Harris will win Iowa." That is a prediction or opinion or guess (even an educated guess). Their statement was: "As of today, Kamala Harris is leading in Iowa." The first statement is speculation. The second is a falsifiable statement of fact that can be tried to a jury. As can the statement the *Register* is careful before publishing polling data.

**III.B.2.** Mr. Donnelly alleged in the alternative that this fits the Iowa tort of negligent misrepresentation. The District Court denied this claim on a question of Iowa law. Iowa limits this tort to "recognized professionals such as accountants, abstractors, and attorneys [who] owe a duty of care in supplying information to foreseeable third parties as members of a limited class of persons who would be contemplated to use and rely upon the information." App. 75, R. Doc. 48 at 14, Add. 25 (quoting *Sain v. Cedar Rapids Comm. Sch. Dist.*, 626 N.W.2d 115, 123 (Iowa 2001)). "The duty extends only to 'a person in the profession of supplying information for the guidance of others acts in an advisory capacity and is manifestly aware of the use that the information will be put, and intends to

supply it for that purpose.'" App. 75, R. Doc. 48 at 14, Add. 25 (quoting *Sain,* 626 N.W.2d at 124–25).

The District Court erred when it held that Defendants "are not in the business or profession of supplying information to a limited class of others who knowingly rely on the information." App. 75, R. Doc. 48 at 14, Add. 25.

First, Mr. Donnelly can check all these boxes. Dr. Selzer and the *Register*'s journalists are professionals. Dr. Selzer has a Ph.D. in a relevant field. App. 13, R. Doc. 22 at 3. The *Register*'s journalists hold bachelor's degrees in fields like journalism. App. 24-25, R. Doc. 22 at 14-15. A jury can reasonably conclude these are white-collar professionals.

Second, a newspaper and its polling contractor are both in the business of supplying information. A jury can reasonably conclude that.

Third, there is a limited, knowable class of others here—the *Register*'s subscribers. Indeed, that fact is inherent in bringing this case as a class action.

The tort of negligent misrepresentation is available because "those in the business of supplying information to others owe a duty to ensure that information is correct, accurate, and thorough." *Dinsdale Constr., LLC v. Lumber Specialties, Ltd.,* 888 N.W.2d 644, 650 (Iowa 2016). *Dinsdale Construction* lays out the principles that "frame the parameters of the tort" (*Id*. at 650-51):

\* "We seek to distinguish advisory relationships from relationships that are adversarial and at arm's length." *Id*. Is a newspaper subscriber in an adversarial relationship with the newspaper, negotiating a tough business deal against one another, with each party responsible to ensure the other party isn't cutting corners or engaging in sharp dealing? No.

\* "We seek to distinguish the sale of information as a product from information given incidentally as part of another transaction." *Id*. Does Gannett sell information as a product or is the information incidental to its business? Accurate, timely information is its core product—it's how it sells itself (App. 11, R. Doc. 22 at 1) and why people subscribe (App. 37, R. Doc. 22 at 27).

\* "We distinguish professional purveyors of information from those who work in another capacity." *Id.* Does Gannett operate as a professional purveyor of information? Yes, that's its main reason for being, to provide information, and it hires experienced, college-educated, white-collar professionals to do that work for it.

\* "Finally, we seek to capture the concept of foreseeability within those circumstances that impose a duty of care." *Id.* Is it foreseeable that others would rely on Gannett's information? Yes, the *Register* invites Iowans to depend on it for their news. App. 11, R. Doc. 22 at 1.

Across the factors laid out by the Iowa Supreme Court, the Defendants fit within the tort. The District Court erred in deciding otherwise.

**III.B.3.** The District Court erred in deciding that Mr. Donnelly failed to state a claim under the Iowa Consumer Protection Act. App. 76, R. Doc. 48 at 15, Add. 26.

The Iowa Supreme Court has emphasized that the ICFA is "a statute that serves a remedial purpose and must be interpreted liberally." *State ex rel. Miller v. Cutty's Des Moines Camping Club, Inc.*, 694 N.W.2d 518,

527 (Iowa 2005). "The definitions presented in the Iowa Consumer Fraud Act are broad and comprehensive in order to effect the wide application of the Act." *Id*. at 526. And "[a]s a consumer protection statute, the terms of the [ICFA] should be interpreted liberally in favor of the consumer." *See Poller v. Okoboji Classic Cars, LLC*, 960 N.W.2d 496, 510 (Iowa 2021) (discussing motor vehicle consumer protection act).

The ICFA provides two bases for a cause of action: "Deceptive and unfair practices are distinct lines of inquiry . . . . While a practice may be both deceptive and unfair, it may be unfair without being deceptive." *Cutty's*, 694 N.W.2d at 527 (internal citation omitted). Mr. Donnelly has pled both, but he only needs to state a viable theory under one prong to proceed: "The disjunctive language of the Iowa Act clearly requires proof of only one, not both, sorts of conduct." *Id*.

*Deceptive*. The District Court rejected the claim that the Iowa poll was deceptive because the Defendants told readers "exactly how the poll was conducted and what results it yielded." App. 78, R. Doc. 48 at 17, Add. 28. In so holding, the District Court committed a legal error.

"[D]eception occurs primarily (though not exclusively) at the formation stage of the contract." *Cutty's*, 694 N.W.2d at 527. In other words, deceptive conduct generally describes how a company goes about selling its product. *See Connick v. Suzuki Motor Co.,* 174 Ill. 2d 482, 504 (1996).[14] The ICFA defines deception as "an act or practice which has the tendency or capacity to mislead a substantial number of consumers as to a material fact or facts." Iowa Code § 714.16(1)(f). "To ascertain whether a practice is likely to mislead in the consumer protection context, courts typically evaluate the overall or 'net impression' created by the representation." *State ex rel. Miller v. Vertrue, Inc.*, 834 N.W.2d 12, 34 (Iowa 2013). Conduct may be deceptive prior to the individual plaintiff's purchase but revealed as such afterwards; the deceptive practices "statute applies to post-sale conduct when [a] sale gives rise to ongoing rights and obliga-

---

[14] Illinois caselaw is especially persuasive authority because "[t]he Iowa Consumer Fraud Act was patterned after the Illinois Consumer Fraud Act." *State ex rel. Miller v. Hydro Mag, Ltd.*, 436 N.W.2d 617, 621 (Iowa 1989).

tions in the future." *Cutty's*, 694 N.W.2d at 529 (approvingly summarizing holding of *Hines v. Evergreen Cemetery Ass'n*, 865 S.W.2d 266, 269 (Tex. App. 1993)).

Here, the *Register* promised Mr. Donnelly and all the other members of the putative class that "[t]he Iowa Poll is carefully constructed to ensure that it is accurate." App. 21, R. Doc. 22 at 11. That explanation continued, "The Des Moines Register and its polling partner, West Des Moines-based Selzer & Co., take great care in shaping each Iowa Poll. We pay careful attention to the design of the questions, when a poll will be in the field and even how we reach Iowans." App. 22, R. Doc. 22 at 12.

In short, when a company makes claims to sell its products to current and potential customers, and then fails to meet those claims, that is the basis for a deceptive-practices suit. The District Court evaluated whether the Iowa Poll was deceptive rather than conducting the correct inquiry under Iowa law, which was to ask whether the statements made to sell the *Register* were deceptive. That is a legal error warranting reversal.

*Unfair*. "[U]nfairness occurs primarily (though not exclusively) with respect to the substance or performance of a contract." *Vertrue, Inc.*, 834 N.W.2d at 34 (citation omitted). The term "unfair" is "dizzying in its generality." *Cutty's*, 694 N.W.2d at 525. For purposes of Iowa law, "an unfair practice is nothing more than conduct a court of equity would consider unfair." *Id.* (cleaned up). The term is "designed to infuse flexible equitable principles into consumer protection law so that it may respond to the myriad of unscrupulous business practices modern consumers face." *Id.* "A course of conduct contrary to what an ordinary consumer would anticipate contributes to a finding of an unfair practice." *Vertrue, Inc.*, 834 N.W.2d at 37.

"Determining what constitutes an unfair practice is a highly fact-specific inquiry that will depend upon the circumstances of each case." *Cutty's*, 694 N.W.2d at 525. (cleaned up). "In cases such as this one where the facts are disputed and open to different interpretations, a court should be especially wary to grant a motion for summary judgment," *id.*,

little less a motion to dismiss. In other words, what constitutes an "unfair" business practice is a question for a jury.

The District Court held that Mr. Donnelly could not state a claim for an unfair practice because he could not show a "substantial and unavoidable injury" as required by Iowa Code § 714H.2(9). App. 77, R. Doc. 48 at 16, Add. 27. The District Court explained that "[c]onsumers would expect the poll to be conducted commensurate with the methodology accompanying the poll. Consumers would understand from the methodology statement, as well as the inherently uncertain nature of opinion polling, that polling is an inexact science which can yield errant results in prognosticating future election results." *Id.*

First, the story did not disclose the partisan weighting in the sample. App. 21, R. Doc. 22 at 11. Yet the partisan weighting is largely what threw off the poll results. App. 19, R. Doc. 22 at 9. So even a conscientious reader who read the margin-of-error statement would not have seen the details necessary to spot the obvious problem with the poll's underlying data.

Second, rather than the Court's view of a normal customer's expectations, here's another way to look at it: consumers expect the Iowa Poll to be reasonably accurate. Consumers know polling is a social science and—when conducted by a person with a Ph.D. and deep experience—expect it to be reasonably accurate. Especially when it guarantees its own accuracy within the margin of error. App. 21, R. Doc. 22 at 11. They also expect the *Register* to report accurate information in general, especially in its front-page, above-the-fold, banner-headline on a Sunday edition.

This was a motion to dismiss. Reasonable inferences are supposed to be drawn in favor of the plaintiff. The plaintiff's explanation of consumer expectation is at least as viable as the District Court's explanation in the opinion. The District Court erred in drawing a reasonable inference *against* the plaintiff rather than in his favor at this stage of the case.

Here's a further alternate way to look at it: the District Court's inquiry turns the purpose of the statute on its head—it blames the consumer for failing to look under the hood to decide whether the engine wear-and-tear is commensurate to the odometer reading. But that's not what we ask of

consumers in car purchases—we allow them to trust the car salesman and car mechanic rather than expecting the consumer to do his or her own due diligence on a topic where the consumer is not the expert. The District Court's whole approach of placing the burden on the consumer is contrary to the statutory scheme.

In many instances consumers could avoid being misled or treated unfairly if they read all the small print, hired a lawyer to explain the situation to them precisely, or listened more closely to the script of the telemarketing call. But that is not the rule for consumer fraud. *See Vertrue*, Inc., 834 N.W.2d at 36 (rejecting a similar argument). Instead, damage is unavoidable unless the consumer has a meaningful and direct opportunity to seek correction of the damage. *See Deng v. White*, 2018 Iowa Dist. LEXIS 110, *14 (Polk Cty. Dist. Ct. Aug. 28, 2018), *aff'd* 941 N.W.2d 360 (table), 2019 Iowa App. LEXIS 1066. Again, the District Court erred in its interpretation of Iowa law.

**III.B.4.** The District Court erred when it found that Mr. Donnelly failed to state a claim for professional malpractice because he failed to allege the necessary element of duty. App. 78, R. Doc. 48 at 17, Add. 28.

The District Court is right—there is no "Iowa law imposing such a duty on newspapers." App. 79, R. Doc. 48 at 18, Add. 29. Nor is there any Iowa law holding there is not such a duty, so the court must turn to persuasive precedents and broader principles. *See McGraw v. Wachovia Sec., L.L.C.*, 756 F. Supp. 2d 1053, 1070 (N.D. Ia. 2010).

The District Court cites several cases saying that publishers do not owe a duty of care to their readers. App. 79, R. Doc. 48 at 18, Add. 29 (citing four cases).

Mr. Donnelly, on the other hand, pointed to multiple cases that say publishers *do* have a duty of care to their readers when "the publisher authored or guaranteed the information." *Birmingham v. Fodor's Travel Pubs.*, 73 Haw. 359, 367 (1992)).

The idea in *Birmingham* is that a publisher does not have an independent duty to readers to investigate the materials provided by its authors—the duty lies with the authors not to author problematic materials. *See id.* at 370 (no duty for publisher "absent authorship or warranty of the publication's contents"). Other courts draw a similar line. *See*, *e.g., Jones v. J.B. Lippincott Co.*, 694 F. Supp. 1216, 1216 (D.Md. 1988); *Lewin v. McCreight*, 655 F. Supp. 282, 284 (E.D. Mich. 1987). Indeed, that's the line put forth in one of the cases relied on by the District Court. App. 79, R. Doc. 48 at 18, Add. 29 (discussing *Winter v. G.P. Putnam's Sons*, 938 F.2d 1033, 1037 (9th Cir. 1991), which holds a publisher does not have "a duty to investigate the accuracy of" a book it publishes from an independent author).

Here the *Register* is not the third-party vessel of information but the directly responsible first-party author of information (its reporters and its contract pollster reporting on its signature poll), and thus the bearer of the duty to exercise care as to the information.

Seen in a slightly different light, when the *Register* chose to put its brand, its reputation, its "good housekeeping seal of approval" behind Dr. Selzer's work by running the Iowa Poll as the *Register'*s official poll, it voluntarily assumed a duty of care for that product.

"Most jurisdictions that have considered the issue find that an endorser voluntarily assumes a duty to use ordinary care in certifying a product. *See, e.g., Hanberry v. Hearst Corp.*, 276 Cal. App. 2d 680, 81 Cal. Rptr. 519 (Cal. Ct. App. 1969); *Hempstead v. General Fire Extinguisher Corp.*, 269 F. Supp. 109 (D. Del. 1967). Commentators agree that endorsers are subject to liability for negligence. *See, e.g.*, 5d. Prosser and Keeton on the Law of Torts, § 100, P5 (1984); 3d American Law of Products Liability, § 5:16 (1987)." *McAuslin v. Grinnell Corp.*, 1999 U.S. Dist. LEXIS 8659, *9 (E.D.La. June 8, 1999).

Put differently, the *Register* guaranteed or warrantied the poll's veracity both beforehand (App. 21, R. Doc. 22 at 11) and in the specific margin of error statement associated with the poll (App. 21-22, R. Doc. 22 at 11-12). The *Register'*s decision to "endorse" and "warranty" Dr. Selzer's work

as its own constituted a voluntary assumption of care to those who rely on the *Register*'s good opinion to guide their own views. *See Hanberry*, 276 Cal. App. 2d 680 (*Good Housekeeping* magazine as a publisher voluntarily adopted a duty of care by publishing its seal of approval in an article on a product). Under either conception, it has a duty as publisher to exercise care, which Mr. Donnelly alleges it failed to do here.

The District Court erred by concluding otherwise. One way we know Iowa would prefer Mr. Donnelly's authorities is its own statutory scheme. Iowa law says a plaintiff cannot sue a newspaper as the publisher of the advertisement for failing to check on the veracity of the ad before running it. Iowa Code § 714H.4(1)(c). Which is to say, Iowa newspapers are not liable to check third-party content but are liable for their own first-party content. In this instance, the *Register* reported this as its own story, not as an advertisement. And it owned the poll as its own product that it sponsored—it's not like it was reporting news from a campaign or political party or SuperPAC that put out the poll—this was the *Register*'s proprietary poll. Because Dr. Selzer and the journalists of the *Register* are

professionals, they owe a duty to their subscribers to ensure the accuracy of the information.[15]

**III.B.5.** Finally, the District Court erred in holding that there is no "cognizable tort under Iowa law for interference with the right to vote." App. 80, R. Doc. 48 at 19, Add. 30. Mr. Donnelly disagrees with the District Court's reading of the key case: *Lane v. Mitchell*, 133 N.W. 381 (Iowa 1911). *Lane* permitted a plaintiff to go forward with an "action to recover

---

[15] The District Court raised a concern that liability for news outlets would transgress the First Amendment. App. 79, R. Doc. 48 at 18, Add. 29. This problem is solved by the Supreme Court's high standard discussed above—actual malice. It is not a separate reason to say there is no duty—rather, it is a reason to say that the negligence must be shown to an intentional or reckless degree.

Separately, the District Court analogizes this case to *Brandt v. Weather Channel, Inc.,* "in which a plaintiff sought to hold a news channel liable for an inaccurate weather forecast. 42 F.Supp.2d 1344 (S.D. Fl. 1999)." App. 79, R. Doc. 48 at 18, Add. 29. Weathermen, like pollsters, are not entitled to a blanket exemption from legal liability. If a weatherman knowingly lies about the weather, for instance to advance his private ideological agenda about climate change, and that causes actual damage to real people (say a farmer who depends on weather forecasts to make crop decisions), then the farmer should be able to sue the weatherman for fraud. What's absurd is thinking that certain news-related industries get an absolute pass on the First Amendment, especially in light of the District Court's own holding earlier that there is no absolute or categorical immunity for news reporting under the First Amendment.

damages, alleging malice on the part of the defendants," for interfering with his right to vote. *Id*. at 382. Later, the Iowa Supreme Court says that the plaintiff was not limited to nominal damages; if he could prove his case, "the jury would have been warranted in awarding the plaintiff a substantial recovery." *Id*. at 143.

The Reporter of the Restatement reads *Lane* the same way as Mr. Donnelly: as establishing a tort in Iowa for interference with the political process. The Reporter's Notes to Section 865 of both the First and Second Restatement of Torts include *Lane* on the list of decisions "in support of this Section as to the right to vote and engage in the political process." This section, by the way, "describes a tort existing at common law." Restat. (2d) of Torts 865, cmt. a. It includes the use of "fraud" to discourage another from voting, even if the person does indeed end up voting. *Id*.

Mr. Donnelly does not cite the Restatement as setting the rule for Iowa, but rather because the Restatement recognizes the rule Iowa has set for itself. The District Court erred in holding otherwise.

**III.B.6.** Because Mr. Donnelly has stated a claim for at least one of the causes of action above, he has also stated a predicate for civil conspiracy. *Contra* App. 81, R. Doc. 48 at 20, Add. 31.

## CONCLUSION

Mr. Donnelly respectfully requests that the Court reverse the District Court and order that this case be remanded for jurisdictional discovery on what percentage of *Register* subscribers live in Iowa. If the number exceeds two-thirds, as Mr. Donnelly expects, then the case belongs back in Iowa state court.

If the Court disagrees on the jurisdictional questions, then the Court should vacate the judgment and reverse the District Court on the motions to dismiss, remanding the case to proceed to discovery and trial.

Respectfully submitted,

/s/ Daniel R. Suhr
Daniel R. Suhr
Center for American Rights
1341 W. Fullerton Ave. Suite 170
Chicago, Illinois 60614
414.588.1658
dsuhr@americanrights.org

**CERTIFICATE OF COMPLIANCE**

This brief, including the footnotes, is presented in Century Schoolbook 14. The body is 11,492 words. *See* F.R.A.P. 32.      /s/ Daniel R. Suhr

**CERTIFICATE OF VIRUS SCAN**

This brief was scanned for viruses by NordVPN.      /s/ Daniel R. Suhr

**CERTIFICATE OF SERVICE**

This document, addendum, and appendix were served on counsel for all parties simultaneously with e-filing via ECF.      /s/ Daniel R. Suhr