**No. 25-3451**

---

# UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

---

DENNIS DONNELLY,
on behalf of himself and all others similarly situated,
*Plaintiff-Appellant*,

*v.*

DES MOINES REGISTER AND TRIBUNE COMPANY, INC.;
J. ANN SELZER; SELZER & COMPANY; and GANNETT CO., INC.,
*Defendants-Appellees*.

---

On Appeal from the United States District Court for the Southern District of Iowa, Case No. 4:25-cv-00150-RGE-WPK
The Honorable Rebecca Goodgame Ebinger

---

# BRIEF OF APPELLEES J. ANN SELZER AND SELZER & COMPANY

---


Greg H. Greubel
Adam Steinbaugh
FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION (FIRE)
510 Walnut St., Ste 900
Philadelphia, PA 19106
(215) 717-3473
greg.greubel@fire.org
adam@fire.org

Matthew A. McGuire
Nyemaster Goode, P.C.
700 Walnut St., Suite 1300
Des Moines, IA 50309
(515) 283-8014
mmcguire@nyemaster.com

Robert Corn-Revere
Conor T. Fitzpatrick
Samuel Rudovsky
FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION (FIRE)
700 Pennsylvania Ave. SE, Ste. 340
Washington, DC 20003
(215) 717-3473
bob.corn-revere@fire.org
conor.fitzpatrick@fire.org
sam.rudovsky@fire.org

*Attorneys for Appellees J. Ann Selzer and Selzer & Company*

## SUMMARY OF THE CASE
## AND REQUEST FOR ORAL ARGUMENT

The district court properly dismissed this lawsuit with prejudice, holding that well-settled First Amendment law bars Donnelly's class-action "fake news" claims. His opening brief incorrectly calls this a "case of first impression," but it can be so only to the extent no court has ever *upheld* a claim that the news or election poll reporting are actionable as fraud. The theories Donnelly cobbles together in hopes of creating new causes of action are by no means issues of first impression. This Court and the Supreme Court expressly *have* considered—and rejected—creation of a new unprotected category of false speech, and other courts have specifically rejected that any claim can lie for "fraudulent news."

In addition to being barred by the First Amendment, the district court held that Donnelly failed to plead a plausible consumer fraud claim or any other tort claims. Donnelly claims the opinion poll was a "broken promise" to newspaper subscribers but, as the district court held, an opinion poll is not a promise to anyone for anything, and a detailed methodology explaining how it was conducted accompanied it.

Appellees J. Ann Selzer and Selzer & Company respectfully request 15 minutes for their oral argument.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eighth Circuit Local Rule 26.1A, Appellee Selzer & Company states that it does not have a parent corporation, and no publicly held corporation owns 10% or more of its stock.

**TABLE OF CONTENTS**

SUMMARY OF THE CASE AND REQUEST FOR ORAL ARGUMENT ........ ii

CORPORATE DISCLOSURE STATEMENT ........ iii

TABLE OF AUTHORITIES ........ vi

STATEMENT OF THE ISSUES ........ 1

STATEMENT OF THE CASE ........ 3

INTRODUCTION ........ 7

SUMMARY OF THE ARGUMENT ........ 8

ARGUMENT ........ 14

I. Statement of the Standard of Review. ........ 14

II. The First Amendment Bars Donnelly's Claims ........ 14

A. The First Amendment Was Adopted to Deprive Government Authority Over "False News." ........ 15

B. Donnelly Erroneously Seeks to Expand Categories of Unprotected Speech. ........ 19

1. Donnelly's Constitutional Analysis is Inverted. ........ 20

2. First Amendment Exceptions are Few, Narrow, and Specifically Defined. ........ 23

3. Donnelly Cannot Justify Expanding Existing Unprotected Categories. ........ 25

C. This Court Should Uphold the District Court Under Any First Amendment Standard. ........ 36

D. Donnelly Makes No Nonfrivolous Argument for a Change in the Law. ........ 39

III. The District Court Correctly Held Donnelly's Claims are Deficient on the Elements. .......................................................... 40

A. The ICFA's Plain Text Bars Donnelly's Claim..................... 41

B. Donnelly's Amended Complaint Fails to State a Fraudulent Misrepresentation Claim.................................. 46

C. Donnelly Failed to State Professional Malpractice or Negligent Misrepresentation Claims.................................... 52

1. Selzer owes Donnelly no legal duty. ............................ 52

2. Donnelly's "malpractice" and "negligent misrepresentation" claims bear no resemblance to those causes of action. ................................................ 59

D. Donnelly's Voting Interference Claim is Meritless. ............. 62

CONCLUSION ......................................................................... 63

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT.................................................................................... 65

CERTIFICATE OF COMPLIANCE WITH EIGHTH CIRCUIT RULE 28A(h) ......................................................................... 65

CERTIFICATE OF SERVICE ............................................................ 66

## TABLE OF AUTHORITIES

**Cases**

*16 Front Street, LLC v. Mississippi Silicon, LLC*,
886 F.3d 549 (5th Cir. 2018) ............................................................ 39

*281 Care Comm. v. Arneson*,
638 F.3d 621 (8th Cir. 2011) ....................................................... passim

*281 Care Comm. v. Arneson*,
766 F.3d 774 (8th Cir. 2014) ....................................................... passim

*Absolute Essence LLC v. Pub. Consulting Grp. LLC*,
117 F.4th 1044 (8th Cir. 2024) ........................................................... 2

*Alm v. Van Nostrand Reinhold Co.*,
480 N.E.2d 1263 (Ill. App. 1985) ..................................................... 58

*Ambassador Press, Inc. v. Durst Image Tech. U.S., LLC*,
949 F.3d 417 (8th Cir. 2020) ............................................................ 51

*Bantam Books, Inc. v. Sullivan*,
372 U.S. 58 (1963) ............................................................................ 18

*Behlmann v. Century Sur. Co.*,
794 F.3d 960 (8th Cir. 2015) ............................................................ 43

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .......................................................................... 14

*Berry v. Nat'l Broad. Co., Inc.*,
480 F.2d 428 (8th Cir. 1973) ............................................................ 27

*Bertrand v. Mullin*,
846 N.W.2d 884 (Iowa 2014) ..................................................... 44, 55

*Birmingham v. Fodor's Travel Publications*,
833 P.2d 70 (Haw. 1992) ............................................................ 56, 57

*Bose Corp. v. Consumers Union*,
466 U.S. 485 (1984) .................................................................... 26, 27

*Brandt v. Weather Channel, Inc.*,
42 F. Supp. 2d 1344 (S.D. Fla. 1999)................................. 2, 37, 40, 55

*Brown v. Ent. Merchs. Ass'n*,
564 U.S. 786 (2011) ........................................................................ 26

*Burbach v. Radon Analytical Lab'ys, Inc.*,
652 N.W.2d 135 (Iowa 2002)........................................................ 56, 60

*Burnham v. Ianni*,
119 F.3d 668 (8th Cir. 1997)............................................................ 23

*Bursey v. United States*,
466 F.2d 1059 (9th Cir. 1972)........................................................... 20

*Butts v. Iowa Health Sys.*,
863 N.W.2d 36, 2015 WL 1046119 (Iowa Ct. App. 2015)............... 1, 45

*Cantrell v. Forest City Publ'g Co.*,
419 U.S. 245 (1974) ........................................................................ 27

*Cheapside Mins., Ltd. v. Devon Energy Prod. Co., L.P.*,
94 F.4th 492 (5th Cir. 2024) .............................................................. 2

*Chiles v. Salazar*,
607 U.S. ___ (2026)...........................................................................passim

*Christiansen v. West Branch Cmty. Sch. Dist.*,
674 F.3d 927 (8th Cir. 2012)............................................................ 21

*Citizens United v. FEC*,
558 U.S. 310 (2010) ........................................................................ 34

*Commonwealth v. Lucas*,
34 N.E.3d 1242 (Mass. 2015) ...................................................... 17, 35

*Counterman v. Colorado*,
600 U.S. 66 (2023) ............................................................. 19, 22, 24, 32

*Daily Herald Co. v. Munro*,
838 F.2d 380 (9th Cir. 1988)............................................................ 35

*De Bardeleben Marine Corp. v. United States*,
451 F.2d 140 (5th Cir. 1971) .......... 2, 55

*Demien Const. Co. v. O'Fallon Fire Prot. Dist.*,
812 F.3d 654 (8th Cir. 2016) .......... 14

*Demuth Dev. Corp. v. Merck & Co.*,
432 F. Supp. 990 (E.D.N.Y. 1977) .......... 37, 38

*Denver Area Educ. Telecomms. Consortium, Inc. v. FCC*,
518 U.S. 727 (1996) .......... 25

*Doe v. Grinnell Coll.*,
473 F. Supp. 3d 909 (S.D. Iowa. 2019) .......... 60

*Dzielak v. Whirlpool Corp.*,
No. 2:12-cv-0089, 2017 WL 1034197 (D.N.J. Mar. 17, 2017) .......... 50

*Freeman v. Ernst & Young*,
516 N.W.2d 835 (Iowa 1994) .......... 54

*Gertz v. Robert Welch, Inc.*,
418 U.S. 323 (1974) .......... passim

*Gibson v. ITT Hartford Ins. Co.*,
621 N.W.2d 388 (Iowa 2001) .......... 1, 47

*Gorog v. Best Buy Co., Inc.*,
760 F.3d 787 (8th Cir. 2014) .......... 4

*Grimmett v. Freeman*,
59 F.4th 689 (4th Cir. 2023) .......... 35

*Hanberry v. Hearst Corp.*,
276 Cal. App. 2d 680 (Cal. Ct. App. 1969) .......... 58, 59

*Hempstead v. General Fire Extinguisher Corp.*,
269 F. Supp. 109 (D. Del. 1967) .......... 59

*Higgins Elec., Inc. v. O'Fallon Fire Prot. Dist.*,
813 F.3d 1124 (8th Cir. 2016) .......... 14

*Hollander v. CBS News, Inc.*,
No. 16 Civ. 6624 (PAE), 2017 WL 1957485 (S.D.N.Y. May 10, 2017) 14

*Hollander v. Garrett*,
710 F. App'x 35 (2d Cir. 2018) ........................................................ 15

*Hustler Mag., Inc. v. Falwell*,
485 U.S. 46 (1988) ........................................................................ 26, 27

*Illinois ex rel. Madigan v. Telemarketing Assocs., Inc.*,
538 U.S. 600 (2003) ........................................................................passim

*J.A.H. ex rel. R.M.H. v. Wadle & Associates, P.C.*,
589 N.W.2d 256 (Iowa 1999)............................................................. 56

*Jones v. J.B. Lippincott Co.*,
694 F. Supp. 1216 (D. Md. 1988) ...................................................... 57

*Lafayette v. Abrami*,
No. 25-CV-00624, 2025 WL 1617346 (Vt. Sup. Ct. May 20, 2025) ..... 15

*Lane v. Mitchell*,
133 N.W. 381 (Iowa 1911)............................................................. 2, 62

*Lewin v. McCreight*,
655 F. Supp. 282 (E.D. Mich. 1987)............................................. 57, 58

*McDonnell v. Hesco Bastion, Inc.*,
781 F. Supp. 3d 745 (S.D. Iowa 2025) ............................................... 63

*McGraw v. Wachovia Sec., L.L.C.*,
756 F. Supp. 2d 1053 (N.D. Iowa 2010) ................................. 53, 56, 61

*McIntyre v. Ohio Elections Comm'n*,
514 U.S. 334 (1995) ........................................................................... 34

*Meyer v. U.S. Bank Nat'l Ass'n*,
792 F.3d 923 (8th Cir. 2015)............................................................... 39

*Mills v. Alabama*,
384 U.S. 214 (1966) ........................................................................... 34

*Minnesota Citizens Concerned for Life, Inc. v. Swanson*,
692 F.3d 864 (8th Cir. 2012) .................... 21

*Mulhern v. Cath. Health Initiatives*,
799 N.W.2d 104 (Iowa 2011) .................... 43

*NAACP v. Button*,
371 U.S. 415 (1963) .................... 18, 23

*Near v. Minnesota*,
283 U.S. 697 (1931) .................... 17, 18

*New York Times Co. v. Sullivan*,
376 U.S. 254 (1964) .................... passim

*Newhouse v. McCormick & Co., Inc.*,
130 F.3d 302 (8th Cir. 1997) .................... 7

*Olivier v. City of Brandon*,
146 S. Ct. 916 (2026) .................... 27

*Peoples Bank & Trust Co. v. Globe Int'l Publ'g, Inc.*,
978 F.2d 1065 (8th Cir. 1992) .................... 27

*Republican Party of Minn. v. White*,
536 U.S. 765 (2002) .................... 34

*Rickert v. State Pub. Disclosure Comm'n*,
168 P.3d 826 (Wash. 2007) .................... 35

*Sain v. Cedar Rapids Cmty. Sch. Dist.*,
626 N.W.2d 115 (Iowa 2001) .................... passim

*Sechler v. State*,
340 N.W.2d 759 (Iowa 1983) .................... 53

*Shivvers v. Hertz Farm Mgmt., Inc.*,
595 N.W.2d 476 (Iowa 1999) .................... 55

*Snyder v. Phelps*,
562 U.S. 443 (2011) .................... 18

*Sorrell v. IMS Health Inc.*,
564 U.S. 552 (2011) .......................................................................... 21

*Spreitzer v. Hawkeye State Bank*,
779 N.W.2d 726 (Iowa 2009)................................................................ 51

*Stancik v. CNBC*,
420 F. Supp. 2d 800 (N.D. Ohio 2006)................................................. 55

*Stender v. Blessum*,
897 N.W.2d 491 (Iowa 2017)................................................................ 61

*Susan B. Anthony List v. Driehaus*,
814 F.3d 466 (6th Cir. 2016) ............................................................... 35

*Time, Inc. v. Hill*,
385 U.S. 374 (1967) .......................................................................... 27

*Tumminello v. Bergen Evening Rec., Inc.*,
454 F. Supp. 1156 (D.N.J. 1978)........................................................... 55

*United States v. Alvarez*,
567 U.S. 709 (2012) ..........................................................................passim

*United States v. Alvarez*,
617 F.3d 1198 (9th Cir. 2010) .................................................. 23, 24, 28

*United States v. Kepler*,
879 F. Supp. 2d 1006 (S.D. Iowa 2011) ............................................... 30

*United States v. Playboy Ent. Grp., Inc.*,
529 U.S. 803 (2000) .......................................................................... 23

*United States v. Stevens*,
559 U.S. 460 (2010) ........................................................... 1, 22, 24, 25

*Wash. League for Increased Transparency & Ethics v. Fox News*,
2021 WL 3910574 (Wash. Ct. App. Aug. 30, 2021) ....................... 15, 36

*Wicker v. Bayview Loan Services, LLC*,
843 F. App'x 117 (10th Cir. 2021)....................................................... 39

*Winter v. G.P. Putnam's Sons*,
938 F.2d 1033 (9th Cir. 1991) .......... 57

*Wycoff v. Menke*,
773 F.2d 983 (8th Cir. 1985) .......... 21

*Young ex rel. Young v. Rally Appraisal, L.L.C.*,
928 N.W.2d 660, 2019 WL 1486608 (Iowa Ct. App. 2019) .......... 52

**Statutes**

28 U.S.C.
§ 1332(d) .......... 2

Iowa Code
§ 714.16 .......... 44
§ 714H.2 .......... 2, 44, 45
§ 714H.3 .......... 2, 41, 42, 45
§ 714H.5 .......... 43

Sedition Act of 1798, 1 Stat. 596 .......... 8, 15, 16

**Rules**

Fed. R. App. P. 28(b)(1) .......... 1

**Constitutional Provisions**

U.S. Const. amend. I .......... passim

**Treatises**

Restatement (Second) of Torts (A.L.I. 1977)
§ 525 .......... 47
§ 538 .......... 45
§ 865 .......... 2, 63

**Other Authorities**

4 JEFFERSON'S WORKS (Washington ed.) (Letter to Abigail Adams,
July 22, 1804) .......... 17

Brianne Pfannenstiel,
*Iowa Poll: Kamala Harris leapfrogs Donald Trump to take lead near Election Day. Here's how*, DES MOINES REG. (Nov. 7, 2024) ......... 4

Charles Slack,
LIBERTY'S FIRST CRISIS: ADAMS, JEFFERSON, AND THE MISFITS WHO SAVED FREE SPEECH 109 (New York: Atlantic Monthly Press, 2015) ........................................................................................ 15

Eric Burns,
INFAMOUS SCRIBBLERS: THE FOUNDING FATHERS AND THE ROWDY BEGINNINGS OF AMERICAN JOURNALISM (2006)..................................... 16

*Fraud*, Black's Law Dictionary (12th ed. 2024)...................................... 46

Leonard Levy,
LEGACY OF SUPPRESSION (1960) ............................................................. 16

Nate Cohn,
*Outlier Poll Results Are Inevitable. They're Also Sometimes Right.*, THE N.Y. TIMES (June 26, 2024) ............................................................. 4

Phillip I Blumberg,
REPRESSIVE JURISPRUDENCE IN THE EARLY AMERICAN REPUBLIC (2006) ......................................................................................... 16

William L. Prosser,
*Handbook of the Law of Torts* § 105 (4th ed. 1971)............................. 46

## STATEMENT OF THE ISSUES[1]

1. Does the First Amendment permit expanding unprotected speech categories to include allegedly false election polling?

    a. *United States v. Stevens*, 559 U.S. 460 (2010)

    b. *United States v. Alvarez*, 567 U.S. 709 (2012)

    c. *281 Care Comm. v. Arneson*, 766 F.3d 774 (8th Cir. 2014)

    d. *Chiles v. Salazar*, 607 U.S. ___ (2026)

    e. U.S. Const. amend. I

2. Does election polling fall within the unprotected category of "fraud" where there is no attempt to persuade anyone to enter a transaction, no transaction results, nothing of value is exchanged in reliance thereon, and no cognizable damage?

    a. *United States v. Alvarez*, 567 U.S. 709 (2012)

    b. *Illinois ex rel. Madigan v. Telemarketing Assocs., Inc.*, 538 U.S. 600 (2003)

    c. *Gibson v. ITT Hartford Ins. Co.*, 621 N.W.2d 388 (Iowa 2001)

    d. *281 Care Comm. v. Arneson*, 766 F.3d 774 (8th Cir. 2014)

3. Under the Iowa Consumer Fraud Act, is an election poll which does not solicit any transaction an actionable false statement "of material fact … in connection with the advertisement, sale, or lease of consumer merchandise"?

    a. *Butts v. Iowa Health Sys.*, 863 N.W.2d 36, 2015 WL 1046119 (Iowa Ct. App. 2015)

---

[1] Selzer omits the jurisdictional statement pursuant to Federal Rule of Appellate Procedure 28(b)(1).

b. Iowa Code § 714H.2

c. Iowa Code § 714H.3

4. Did the district court correctly hold that political pollsters do not owe a legal duty to the general public?

    a. *Sain v. Cedar Rapids Cmty. Sch. Dist.*, 626 N.W.2d 115 (Iowa 2001)

    b. *Brandt v. Weather Channel, Inc.*, 42 F. Supp. 2d 1344 (S.D. Fla. 1999), *aff'd*, 204 F.3d 1123 (11th Cir. 1999)

    c. *De Bardeleben Marine Corp. v. United States*, 451 F.2d 140 (5th Cir. 1971)

5. Can Donnelly bring a claim for "voting interference" based on an allegation that a political poll discouraged others from voting?

    a. *Lane v. Mitchell*, 133 N.W. 381 (Iowa 1911)

    b. Restatement (Second) of Torts § 865 (A.L.I. 1977)

6. Can Donnelly sustain a claim for civil conspiracy where there is no actionable underlying tort?

    a. *Absolute Essence LLC v. Pub. Consulting Grp. LLC*, 117 F.4th 1044 (8th Cir. 2024)

7. Did the district court correctly deny Donnelly's motion for remand?

    a. *Cheapside Mins., Ltd. v. Devon Energy Prod. Co., L.P.*, 94 F.4th 492 (5th Cir. 2024)

    b. 28 U.S.C. § 1332(d)

## STATEMENT OF THE CASE

This case is a misguided attempt to impose liability for consumer fraud on a pollster and newspaper for publishing a poll that failed to accurately project the election's outcome.[2]

Defendant-Appellee J. Ann Selzer is an Iowa resident with a Ph.D. in Communication Theory and Research from the University of Iowa. App. 13; R.Doc. 22, at 3 ¶ 10. She founded Defendant-Appellee Selzer & Company ("Selzer"), which conducts opinion research. App. 13; R.Doc. 22, at 3 ¶ 11. Selzer was the *Des Moines Register*'s primary pollster for four decades, overseeing its signature Iowa Poll. App. 25–26; R.Doc. 22, at 15–16 ¶¶ 77, 80. The Iowa Poll is "regarded by political insiders as the gold standard for its accuracy and insights about the Iowa caucuses." App. 25–26; R.Doc. 22, at 15–16 ¶ 77.

Pollsters, however, are not seers. Every election has outlier polls which can be well afield of the final tally. App. 14; R.Doc. 22, at 4 ¶ 15 (news reports describing 2020 polling as the "worst polls in decades"); *see*

[2] Selzer joins the Press Defendants' argument that the district court correctly denied Donnelly's motion for remand. As the Press Defendants' brief explains, removal was proper under the Class Action Fairness Act. To avoid duplicative briefing, Selzer adopts and incorporates the Press Defendants' arguments.

Nate Cohn, *Outlier Poll Results Are Inevitable. They're Also Sometimes Right.*, THE N.Y. TIMES (June 26, 2024), https://www.nytimes.com/2024/06/26/upshot/biden-trump-poll-outlier.html. Selzer's polling reflects this, occasionally missing the mark, but also producing surprising outliers that accurately foretold election results. App. 15; R.Doc. 22, at 5 ¶¶ 18–20.

The *Register* published its final Iowa Poll of the 2024 election on November 2 and 3, 2024. App. 19, 23; R.Doc. 22, at 9, 13 ¶¶ 40, 64.[3] The poll surveyed 808 likely Iowa voters. App. 21; R.Doc. 22, at 11 ¶ 55. It showed candidate Donald Trump trailing Kamala Harris by three points. App. 16; R.Doc. 22, at 6 ¶ 23. The results were surprising because Selzer's preceding polls (and other contemporaneous polls) showed Trump leading. App. 16–17; R.Doc. 22, at 6–7 ¶¶ 22, 31. Along with the

---

[3] Brianne Pfannenstiel, *Iowa Poll: Kamala Harris leapfrogs Donald Trump to take lead near Election Day. Here's how*, DES MOINES REG. (Nov. 7, 2024), https://www.desmoinesregister.com/story/news/politics/iowa-poll/2024/11/02/iowa-poll-kamala-harris-leads-donald-trump-2024-presidential-race/75354033007 [https://archive.is/UqdGz]. As the article is core to Plaintiff's claims, it was properly before the district court for it to consider, and this Court may do so as well. *See Gorog v. Best Buy Co., Inc.*, 760 F.3d 787, 791 (8th Cir. 2014).

results, the *Register* published Selzer's methodology and detailed analysis. App. 19, 27; R.Doc. 22, at 9, 17 ¶¶ 40, 83.

Candidate Trump and others immediately disputed the poll. The same day, *PollFair* "reweighted" the poll and calculated Trump leading Iowa by six points. App. 19; R.Doc. 22, at 9 ¶ 39. Ultimately, Trump won Iowa by thirteen points. App. 19; R.Doc. 22, at 9 ¶ 42.

Winning, however, wasn't enough. On December 16, 2024, Trump sued in Iowa state court, raising one claim under the Iowa Consumer Fraud Act ("ICFA") against Selzer, Selzer & Company, and the *Register* and its parent, Gannett Company. Gannett removed the case to federal court. Notice of Removal, *Trump v. Selzer*, No. 4:24-cv-00449 (S.D. Iowa Dec. 17, 2024), ECF No. 1. Trump alleged the final 2024 Iowa Poll was "fake news" published to foster enthusiasm for Democrats. Am. Compl. ¶¶ 19, 41, *Trump*, No. 4:24-cv-00449, ECF No. 23.

Weeks later, the Plaintiff here, Dennis Donnelly, filed this copycat action in Iowa state court, bringing class-action "fake news" claims against the same defendants as Trump, asserting a claim under the ICFA and common-law claims for fraudulent misrepresentation, "reckless negligent misrepresentation," professional malpractice, and interference

with the right to vote. R.Doc. 1-1, at 1–2, 25–34 ¶¶ 2, 121–177. Donnelly alleged he pays $69.99 for an online subscription to the *Register* and was "frustrated" when the poll "results were compared to the final outcome." R.Doc. 1-1, at 3 ¶ 8.

**Proceedings in the district court**

Defendants *Des Moines Register* and Gannett removed this case to federal court. R.Doc. 1, 3. After Selzer filed a Motion to Dismiss, Donnelly filed an Amended Complaint on June 2, 2025. R.Doc. 20, 22.

Selzer again moved to dismiss, pointing out that Donnelly's Amended Complaint was barred by the First Amendment and failed to allege essential elements of his hodgepodge of causes of action. R.Doc. 33, at 4–22. The district court denied Donnelly's remand motion and granted the motions to dismiss with prejudice. App. 52–61, 62–81; R.Doc. 47, 48, Add. 2–11, 12–31.

The court rejected all five counts on constitutional grounds, holding a party cannot evade First Amendment scrutiny by labeling his action as one for fraud (App. 67; R.Doc. 48, at 6, Add. 17), and that "publishing the results of a political opinion poll that matches the co-published methodology is not an unfair or deceptive practice." App. 76; R.Doc. 48,

at 15, Add. 26. It held Donnelly had failed to allege sufficient facts to meet the pleading standard as to each of his state-law causes of action. App. 73–81; R.Doc. 48, at 12–20, Add. 23–31.

## INTRODUCTION

This is a frivolous appeal from the dismissal of frivolous claims. *See Newhouse v. McCormick & Co., Inc.*, 130 F.3d 302, 304–05 (8th Cir. 1997). It is an attempt to convert a political slogan—“fake news”—into a cause of action, contrary to First Amendment principles that are as old as the Republic. Based on the fever-dream conviction that any unfavorable election polling could only be the product of conspiracy, Appellant never connected his political rhetoric to any cognizable claim. In fact, he has been forced to admit that “no governing precedent is directly on point” and he “could not cite a single case where such a claim succeeded.”[4] And now, after the district court dismissed all claims as contrary to the First Amendment and unfounded in state law, he appeals that decision

[4] Plaintiff’s Br. in Opp. to Dr. Selzer’s Mot. for Sanctions. R.Doc. 56, at 6, 12–13. A motion for sanctions against Appellant’s counsel for bringing frivolous claims is pending in the district court. R.Doc. 53.

*without even citing* controlling Supreme Court and Eighth Circuit cases. The appeal is meritless, and this Court should affirm the decision below.

## SUMMARY OF THE ARGUMENT

Donnelly's suit is nothing more than a political stunt and an attempt to pervert the law. His allegation that an outlier poll constitutes "fraud" contradicts basic First Amendment principles and cannot satisfy any Iowa statutory or common law requirements. The district court correctly dismissed all counts with prejudice on both constitutional and state law grounds.

The lessons learned from the Sedition Act of 1798—that the government cannot become the arbiter of truth—shaped the development of First Amendment doctrine that bars this suit. Donnelly misstates the constitutional question as being whether the First Amendment creates "broad, absolute, or categorical immunity" for election reporting. But this case does not involve any question of "immunity," and Donnelly gets the First Amendment analysis backwards.

Speech is presumptively protected by the First Amendment—especially speech about politics and public affairs—and the Supreme Court has repeatedly reaffirmed that unprotected categories (including

obscenity, child pornography, defamation, fraud, incitement, fighting words, and speech integral to criminal activity) are few, specifically defined, and not subject to expansion. *Chiles v. Salazar*, 607 U.S. ___, slip. op. at 19 (2026). That means the First Amendment protects speech *unless* it falls into one of the historically-defined categories, whereupon it becomes subject to specialized rules (like the "actual malice" test for an unprotected category like defamation).

"Fake news" does not remotely fall into any unprotected category. And controlling precedent directly forecloses Donnelly's attempt to create a new category for "false" speech and to expand the definition of fraud. The Supreme Court has made clear "false speech" in general is not excluded from First Amendment protection, *United States v. Alvarez*, 567 U.S. 709, 720–22 (2012), and that a party cannot evade First Amendment scrutiny simply by labeling it "fraud." *Illinois ex rel. Madigan v. Telemarketing Assocs., Inc.*, 538 U.S. 600, 617 (2003); *see also Chiles*, 607 U.S. at ___, slip. op. at 12–13 ("The First Amendment is no word game. And the rights it protects cannot be renamed away or their protections nullified by 'mere labels.'").

This Court likewise has declined to expand the categories of unprotected speech to include "knowingly false" political speech, *281 Care Comm. v. Arneson*, 638 F.3d 621, 633–36 (8th Cir. 2011) ("*Arneson I*"), and expressly rejected applying an "actual malice" test to such speech because it would offer insufficient protection, *281 Care Comm. v. Arneson*, 766 F.3d 774, 788, 794 (8th Cir. 2014) ("*Arneson II*"). Donnelly's appeal *does not even mention* these cases even though the district court relied on them after they were briefed below.

The district court correctly held the First Amendment bars all Donnelly's claims, holding "there is no free pass around the First Amendment," (App. 67; R.Doc. 48, at 6, Add. 17 (quoting *Arneson II*, 766 F.3d at 783)) and that "[a] party cannot evade First Amendment scrutiny by '[s]imply labeling an action one for fraud.'" *Id.* (quoting *Madigan*, 538 U.S. at 617). Donnelly tries to dodge this holding—largely by ignoring it—asserting the court erred in concluding he had not adequately alleged actual malice. Appellant's Br. 28–29. This misunderstands the law.

The actual malice test is a "strategic protection" that applies only *after* speech is determined to fall within a recognized First Amendment exception, such as defamatory speech. *E.g.*, *Gertz v. Robert Welch, Inc.*,

418 U.S. 323, 342 (1974). Donnelly's argument is foreclosed by *Alvarez*, where the Supreme Court explained why the actual malice requirement cannot be extended "for a new purpose," as Donnelly advocates here. *Alvarez*, 567 U.S. at 719. It also is barred by *Arneson II*, where this Court rejected application of the actual malice test as insufficiently speech-protective, observing that allowing potential liability for "false" political speech would open "a Pandora's box to disingenuous politicking." *Arneson II*, 766 F.3d at 796. This case is Exhibit A for that concern.

The district court correctly called out the "absurdity" of Donnelly's position and held the First Amendment bars his claims because they lack any limiting principle. App. 79–80; R.Doc. 48, at 18–19, Add. 29–30. Donnelly no doubt wishes the law were different but makes no good faith argument for overruling controlling precedent. He has failed even to acknowledge these governing authorities and deals with contrary cases by ignoring them.

Donnelly's claims are equally absurd under state law, as the court properly held. Donnelly sued pollster J. Ann Selzer, a person with whom he has no business relationship, has had no interaction, and from whom he has received no representations of any kind. There can be no

"misrepresentation" where there has never been any "representation." Accordingly, the court categorically rejected each of Donnelly's state claims. App. 73–81; R.Doc. 48, at 12–20, Add. 23–31.

The court also correctly held Donnelly's ICFA claim fails because "publishing the results of a political opinion poll that matches the co-published methodology is not an unfair or deceptive practice." App. 76; R.Doc. 48, at 15, Add. 26. His claims fail to satisfy the statute's plain terms because a public opinion poll is not "consumer merchandise," something Donnelly conceded below when he insisted the "Iowa Poll is not the merchandise—the newspaper is." R.Doc. 36, at 37. Neither Selzer nor her company sold or leased anything to Donnelly as the statute requires.

The court likewise disposed of Donnelly's fraudulent misrepresentation claim, beginning with the threshold requirement that "[n]o false representation was made." App. 73; R.Doc. 48, at 12, Add. 23. This essential element is missing because "[t]he results of an opinion poll are not an actionable false representation merely because the anticipated results differ from what eventually occurred." *Id*. Donnelly failed to even plead the elements of the claim and undermined any argument he relied

on the poll to his detriment by arguing that anyone "with experience in Iowa politics" recognized it as an outlier. App. 37; R.Doc. 22, at 27 ¶ 136. Donnelly sued not because of any misrepresentations about the poll, but because of what he believes the poll *should have been* to reach the "right" result.

Donnelly's allegations of negligent misrepresentation and professional malpractice also failed to establish the necessary elements. The court correctly held "a pollster and general circulation newspaper reporting on the results of an election poll are not in the business or profession of supplying information to a limited class of others who knowingly rely on information." App. 75; R.Doc. 48, at 14, Add. 25. Selzer owed no legal duty to Donnelly, with whom she had no business relationship. The authorities on which Donnelly relies stand for *the opposite* proposition: General publications owe no duty except where they have pledged a specific warranty for a particular product.

Donnelly's voter interference claim is similarly ungrounded in Iowa law. App. 80; R.Doc. 48, at 19, Add. 30. The court held that such a claim "is not a viable cause of action under Iowa law" and noted Donnelly "cites no other Iowa law establishing such a tort." *Id.* That deficiency remains

true on appeal. Likewise, Donnelly's civil conspiracy count fails for lack of any underlying tort. App. 81; R.Doc. 48, at 20, Add. 31.

## ARGUMENT

### I. Statement of the Standard of Review.

This Court reviews *de novo* the holding below. *Demien Const. Co. v. O'Fallon Fire Prot. Dist.*, 812 F.3d 654, 657 (8th Cir. 2016). The Court will affirm dismissal "if the complaint fails 'to state a claim for relief that is plausible on its face.'" *Higgins Elec., Inc. v. O'Fallon Fire Prot. Dist.*, 813 F.3d 1124, 1129 (8th Cir. 2016) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Though factual allegations are accepted as true, surviving a motion to dismiss "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

### II. The First Amendment Bars Donnelly's Claims.

There is no such thing in American law as a claim for "fraudulent news." No court has ever upheld such a cause of action and few plaintiffs have ever attempted even to bring such outlandish claims. Those who have tried were promptly dismissed.[5] And for good reason: Appellant's

[5] *E.g.*, *Hollander v. CBS News Inc.*, No. 16 Civ. 6624 (PAE), 2017 WL 1957485 (S.D.N.Y. May 10, 2017), *aff'd but vacated on other grounds sub*

"fake news" claims ignore American constitutional traditions and flatly contradict controlling Supreme Court and Eighth Circuit precedent.

### A. The First Amendment Was Adopted to Deprive Government Authority Over "False News."

The earliest lessons of our Republic confirmed the government could neither be trusted to protect only "truth" nor empowered to punish "falsity." The Sedition Act of 1798 made it a crime to "write, print, utter or publish … any false, scandalous and malicious writing or writings against the government" with the intent to defame Congress or the President. Sedition Act of 1798, 1 Stat. 596. The Act was a reaction to what Congress saw as Adams Derangement Syndrome.[6] It "was less a

---

*nom.*, *Hollander v. Garrett*, 710 F. App'x 35 (2d Cir. 2018) (dismissing complaint alleging purportedly false and misleading news stories about candidate Trump constituted wire fraud); *Wash. League for Increased Transparency & Ethics v. Fox News*, No. 81512-1-I, 2021 WL 3910574 (Wash. Ct. App. Aug. 30, 2021) (dismissing claims under Washington's consumer protection act for allegedly false reporting about COVID-19); *Lafayette v. Abrami*, No. 25-CV-00624, 2025 WL 1617346, at *4 (Vt. Sup. Ct. May 20, 2025) (dismissing claims under Vermont Consumer Protection Act based on a newspaper's "reporting and editorial decisions").

[6] "Most of those convicted [under the Sedition Act] would be prosecuted for criticizing Adams." Charles Slack, LIBERTY'S FIRST CRISIS: ADAMS, JEFFERSON, AND THE MISFITS WHO SAVED FREE SPEECH 109 (New York: Atlantic Monthly Press, 2015). Representative John Allen of Connecticut advocated for the Act as being necessary to punish publication of "the

piece of legislation than an act of vengeance by federalist lawmakers who decided to strike back at the republican newspapers that they felt had been demonizing their intentions and slandering their character."[7]

While many Sedition Act prosecutions were prompted by partisan rants, others were predicated on allegedly "false" factual statements. Phillip I Blumberg, REPRESSIVE JURISPRUDENCE IN THE EARLY AMERICAN REPUBLIC 119–20 (2006). Newspaper editors in major cities—Philadelphia, New York, and Boston—were charged with sedition, as were publishers in smaller towns in Connecticut and Vermont. *Id.* at 101. The Sedition Act expired by its own terms and was never tested in court, but the consensus of history is that it was fundamentally inconsistent with the First Amendment. *New York Times Co. v. Sullivan*, 376 U.S. 254, 276 (1964).

As one of his first acts as President, Thomas Jefferson pardoned and remitted the fines of those convicted under the law, which he

most shameless falsehoods against the Representatives of the people." Eric Burns, INFAMOUS SCRIBBLERS: THE FOUNDING FATHERS AND THE ROWDY BEGINNINGS OF AMERICAN JOURNALISM 356–57 (2006).

[7] Burns, *supra*, at 356. *See* Leonard Levy, LEGACY OF SUPPRESSION 258 (1960).

considered "a nullity, as absolute and as palpable as if Congress had ordered us to fall down and worship a golden image." 4 JEFFERSON'S WORKS 555–56 (Washington ed.) (Letter to Abigail Adams, July 22, 1804). That experience with the nation's initial effort to prohibit false speech "first crystallized a national awareness of the central meaning of the First Amendment." *Sullivan*, 376 U.S. at 273. The consensus regarding the Sedition Act's invalidity has conditioned "[t]he fabric of jurisprudence woven across the years." *Commonwealth v. Lucas*, 34 N.E.3d 1242, 1253 (Mass. 2015).

As it developed modern First Amendment jurisprudence, the Supreme Court made clear that the government cannot be the arbiter of truth. In *Near v. Minnesota*, 283 U.S. 697 (1931), it struck down a law that permitted the suppression of malicious, scandalous, and defamatory newspapers and periodicals. *Near* involved an injunction barring publication of a "scandal sheet" called *The Saturday Press*, in which "[m]any of the statements are so highly improbable as to compel a finding that they are false," and "[i]n every edition slanderous and defamatory matter predominates to the practical exclusion of all else." *Id.* at 724

(Butler, J., dissenting). Nevertheless, the Court held the Minnesota law was "the essence of censorship." *Id.* at 713.

The Court repeatedly has affirmed that "constitutional protection does not turn upon 'the truth, popularity, or social utility'" of speech. *Sullivan*, 376 U.S. at 271 (quoting *NAACP v. Button*, 371 U.S. 415, 445 (1963)). And it has observed that "[a]uthoritative interpretations of the First Amendment guarantees have consistently refused to recognize an exception for any test of truth—whether administered by judges, juries, or administrative officials." *Id.*

These limitations on government action include civil lawsuits. *Id.* at 265; *see also Snyder v. Phelps*, 562 U.S. 443, 451, 460 (2011) ("The Free Speech Clause of the First Amendment … can serve as a defense in state tort suits[.]"). "What a State may not constitutionally bring about by means of a criminal statute is likewise beyond the reach of its civil law[.]" *Sullivan*, 376 U.S. at 277. The prospect of civil liability can be "'a form of regulation that creates hazards to protected freedoms markedly greater than those that attend reliance upon the criminal law.'" *Id.* at 278 (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963)).

The Court acknowledged that certain specified categories of speech lack protection but the government cannot avoid constitutional limitations simply by invoking "'mere labels' of state law." *Id.* at 269. As the Court just reaffirmed, "[t]he First Amendment is no word game." *Chiles*, 607 U.S. at ___, slip. op. at 12. Rather, any such exception to First Amendment protection "must be measured by standards that satisfy the First Amendment." *Sullivan*, 376 U.S. at 269.

### B. Donnelly Erroneously Seeks to Expand Categories of Unprotected Speech.

Donnelly misstates the First Amendment question before the Court. He asserts that Selzer is seeking "broad, absolute, or categorical immunity" from liability, and that the only constitutional question is whether he had "plead sufficient allegations to survive the actual malice standard when the First Amendment is asserted as a defense." Appellant's Br. 3, 28–29. But this skips a step: Donnelly must first demonstrate the speech he is targeting falls in an unprotected category, and only then address what type of showing is required to impose liability. *See Counterman v. Colorado*, 600 U.S. 66, 73–78 (2023). The question is not one of "immunity," absolute or otherwise; it is whether

Donnelly's "fake news" claim fits within a recognized First Amendment exception.

1. Donnelly's Constitutional Analysis is Inverted.

Donnelly's insistence that the only constitutional question on appeal is whether he adequately pleaded actual malice turns First Amendment law upside down. Contrary to his assumption, speech is presumptively protected unless it falls within a previously recognized unprotected category; it is not the law that all speech is fair game for imposing liability unless the defendant can locate some "immunity." Donnelly may not "take[] as [his] premise the conclusion to be proved," *i.e.*, that "[t]he expressions … in issue are not protected by the First Amendment." *Bursey v. United States*, 466 F.2d 1059, 1082 (9th Cir. 1972). Such an approach "has it backwards." *Id.*

In framing the issue this way, Donnelly reads too much into the district court's reasoning, which held only that Appellees were "entitled to, *at minimum*, the heightened protections of the actual malice standard." App. 69; R.Doc. 48, at 8, Add. 19 (emphasis added). This just means the district court was able to resolve the case by applying actual malice as a constitutional floor without having to render a more

expansive ruling.[8] Nothing in the district court's ruling bars this Court from applying broader principles of First Amendment law to hold Appellant's "fake news" claims are fictitious.[9]

Donnelly latches on to the district court's discussion of actual malice as a constitutional life raft, Appellant's Br. 30, yet ignores its holding that the First Amendment barred all five counts of Donnelly's complaint. App. 72–73; R.Doc. 48, at 11–12, Add. 22–23. As the court explained, "[e]ach of Donnelly's claims must satisfy First Amendment scrutiny because 'there is no free pass around the First Amendment,'" (App. 67; R.Doc. 48, at 6, Add. 17 (quoting *Arneson II*, 766 F.3d at 783)), and "[a] party cannot evade First Amendment scrutiny by '[s]imply labeling an action one for fraud.'" *Id.* (quoting *Madigan*, 538 U.S. at 617).

---

[8] It is not uncommon for courts to resolve First Amendment questions by applying a lower level of scrutiny, finding it unnecessary to resolve whether a higher standard applies. *E.g.*, *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 571 (2011); *Minnesota Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 874–75 (8th Cir. 2012) (*en banc*) (declining to resolve whether to apply higher level of scrutiny because "even if exacting scrutiny is appropriate, Minnesota's law fails") (citations omitted).

[9] *See Wycoff v. Menke*, 773 F.2d 983, 986 (8th Cir. 1985) (court may affirm judgment below "on any ground supported by the record, whether or not raised or relied on in the District Court") (internal quotation marks omitted); *Christiansen v. West Branch Cmty. Sch. Dist.*, 674 F.3d 927, 934 (8th Cir. 2012) (same).

Ultimately, it concluded that "publishing the results of a political opinion poll that matches the co-published methodology is not an unfair or deceptive practice." App. 76; R.Doc. 48, at 15, Add. 26.

To the extent the district court described the constitutional issue as whether there exists "a category of absolute immunity" for reporting on "controversial political opinions," (App. 68; R.Doc. 48, at 7, Add. 18), Selzer respectfully disagrees with that characterization.[10] Under the First Amendment, *protected* speech is not described as falling into "categories." Protection for speech is the constitutional default, and only *unprotected* speech is defined by enumerated exceptions. *United States v. Stevens*, 559 U.S. 460, 468–69 (2010); *Chiles*, 607 U.S. ___, slip. op. at 19. When speech fits within one of the historically-based categories of unprotected speech, the Supreme Court has developed heightened standards of *mens rea* (such as actual malice) to provide "'strategic protection'" even for so-called "unprotected" speech. *Counterman*, 600

[10] The district court's description of the issue is understandable given the Press Defendants used the term "immunity" at one point. R.Doc. 32, at 18–19. However, Press Defendants also clarified that claims for "'fake news' do not and cannot exist" under the First Amendment. R.Doc. 32, at 22–23.

U.S. at 75 (quoting *Gertz*, 418 U.S. at 342); *Button*, 371 U.S. at 433. But for that to happen, the targeted speech must first fall into one of the few, narrowly-defined First Amendment exceptions. *See Burnham v. Ianni*, 119 F.3d 668, 674 (8th Cir. 1997) ("Indeed, with a few exceptions, most speech receives First Amendment protection.") (*en banc*).

That condition has not been met. Precedent from both the Supreme Court and this Circuit makes clear that speech protection—especially for speech involving political opinions—is the constitutional norm; any deviation from that rule requires the government (or private litigant) to identify an applicable exception. *Alvarez*, 567 U.S. at 722; *Arneson I*, 638 F.3d at 633–35. Because Donnelly never did so, his claims are dead on arrival. No court has ever held—or even hinted—an election poll could fall within an unprotected speech category.

2. First Amendment Exceptions are Few, Narrow, and Specifically Defined.

The First Amendment presumptively protects expression and the burden is always on those who would restrict speech to prove otherwise. *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 816, 818 (2000); *United States v. Alvarez*, 617 F.3d 1198, 1205 (9th Cir. 2010) ("[W]e presumptively protect *all* speech against government interference,

leaving it to the government to demonstrate … a compelling need to remove some speech from protection[.]”), *aff’d*, 567 U.S. 709 (2012). As this Court summarized, “we presumptively protect all speech, including false statements, in order that clearly protected speech may flower in the shelter of the First Amendment.” *Arneson I*, 638 F.3d at 636 (quoting *Alvarez*, 617 F.3d at 1217). The Supreme Court subsequently affirmed this reading of the Constitution. *Alvarez*, 567 U.S. at 722, *aff’g*, 617 F.3d 1198.

*Alvarez* relied on a long line of cases to confirm what always has been the law. “‘From 1791 to the present,’ the First Amendment has ‘permitted restrictions upon the content of speech in a few limited areas.’” *Counterman*, 600 U.S. at 73 (quoting *Stevens*, 559 U.S. at 468). These “historic and traditional categories long familiar to the bar” include obscenity, child pornography, defamation, fraud, incitement, fighting words, and speech integral to criminal activity. *Stevens*, 559 U.S. at 468, 471 (cleaned up) (collecting cases). The Court has rejected any “freewheeling authority to declare new categories of speech outside the scope of the First Amendment” and steadfastly resists any attempt to expand these categories as “startling and dangerous.” *Id.* at 470, 472. It

has repeatedly confirmed that courts have no "authority to declare new categories of speech outside the scope of the First Amendment," *id.* at 472, and the Eighth Circuit has followed this command. *Arneson I*, 638 F.3d at 634–35 (declining to expand unprotected categories).

Former Justice Souter explained why this is so: "Reviewing speech regulations under fairly strict categorical rules keeps the starch in the standards for those moments when the daily politics cries loudest for limiting what may be said." *Denver Area Educ. Telecomms. Consortium, Inc. v. FCC*, 518 U.S. 727, 774 (1996) (Souter, J., concurring). His words were prophetic and directly applicable here—this case is *nothing but* an attempt to let politics warp the law.

3. Donnelly Cannot Justify Expanding Existing Unprotected Categories.

Donnelly's case is predicated entirely on redefining the concept of fraud, both as to its requisite elements under state law and as a First Amendment exception. His argument is contrary to basic principles of First Amendment law and is foreclosed by this Court's decisions in *Arneson I* and *II* and the Supreme Court's ruling in *Alvarez*.

***Generally***. Just as courts will not create new unprotected speech categories divorced from constitutional history and tradition, they deny

efforts to stretch existing categories to fit novel theories of liability. *See*, *e.g.*, *Chiles*, 607 U.S. ___, slip. op. at 10 (rejecting attempt to create a new exception for "professional speech"); *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 793 (2011) (rejecting "attempt to shoehorn speech about violence into obscenity"); *Hustler Mag., Inc. v. Falwell*, 485 U.S. 46, 55–56 (1988) (rejecting bid to hold "outrageous" speech unprotected because it is not "governed by any exception to the ... First Amendment").[11] Yet that is precisely what Donnelly is attempting to do, using arguments both this Court and the Supreme Court rejected.

Donnelly has admitted he cannot "cite a single case" where a claim like his succeeded and asserted "no governing precedent is directly on point" (R.Doc. 56, at 6, 12–13), so he instead relies on cases involving false light privacy invasion, product disparagement, and intentional

[11] Donnelly cites *Bose Corp. v. Consumers Union*, 466 U.S. 485 (1984), Appellant's Br. 29, but that case stressed it is a threshold requirement "that the communication in issue is within one of the few classes of 'unprotected' speech." *Id.* at 503. *Bose* established that courts must conduct an independent review to ensure "the speech in question actually falls within the unprotected category and to confine the perimeters of any unprotected category within acceptably narrow limits in an effort to ensure that protected expression will not be inhibited." *Id.* at 505.

infliction of emotional distress.[12] He reasons that courts applied actual malice review to allegedly false or injurious statements in those cases, so it must apply here as well, and that "the correct standard is actual malice, not absolute immunity." Appellant's Br. 29. But as the Supreme Court recently warned in a unanimous opinion, "general language in judicial opinions should be read as referring in context to circumstances similar to the circumstances then before the Court and not referring to quite different circumstances that the Court was not then considering." *Olivier v. City of Brandon*, 146 S. Ct. 916, 925 (2026) (citations omitted).

As noted above, Donnelly presents a false dichotomy, for no issue of "immunity" is involved, and he provides no theory or authority to justify treating an election poll as unprotected speech. His attempt to expand the concept of fraud is foreclosed by precedent, and it is particularly troubling that Donnelly *fails even to mention* the Supreme Court's decision in *Alvarez* or this Court's rulings in *Arneson I* and *II*, all of which

[12] *See* Appellant's Br. 29–30 & n.11 (citing *Time, Inc. v. Hill*, 385 U.S. 374 (1967); *Cantrell v. Forest City Publ'g Co.*, 419 U.S. 245 (1974); *Bose Corp.*, 466 U.S.; *Hustler Mag.*, 485 U.S.; *Peoples Bank & Trust Co. v. Globe Int'l Publ'g, Inc.*, 978 F.2d 1065 (8th Cir. 1992); *Berry v. Nat'l Broad. Co., Inc.*, 480 F.2d 428 (8th Cir. 1973)).

expressly rejected attempts to expand liability for allegedly "false" speech.

In *Arneson*, Minnesota tried to justify a law prohibiting knowingly false speech about ballot initiatives, arguing "the categorical exemption of defamatory speech is actually an exemption of all knowingly false speech." *See Arneson I*, 638 F.3d at 634. This Court bluntly rejected that proposition. *Id.* at 633. It acknowledged that "some language from the defamation cases could, on its face, be read broadly enough to include non-defamatory false speech," but decided it could not "extend a statement (often quoted, but often qualified) made in the complicated area of defamation jurisprudence into a new context in order to justify an unprecedented and vast exception to First Amendment guarantees." *Id.* at 634–35 (quoting *Alvarez*, 617 F.3d at 1208).

This Court applied the constitutional presumption articulated in *Stevens* and other cases that all speech is protected unless it falls within a historically grounded exception, and that it will not create new unprotected categories. *Id.* at 635. It held that because "Supreme Court precedent does not currently recognize knowingly false speech as a category of unprotected speech, we also decline to, ourselves, establish it

as such." *Id.*; *Arneson II*, 766 F.3d at 783 & n.9 ("false statements, as a general proposition, are not beyond constitutional protection").

In particular, this Court declined to stitch together "negative implications of dicta" in cases on other subjects to expand the unprotected speech categories, *Arneson I*, 638 F.3d at 636, as Donnelly attempts here. After *Arneson I*, the Supreme Court in *Alvarez* confirmed that "false speech" was not excluded from First Amendment protection and explained why historic exceptions (including fraud) cannot be expanded. *Alvarez*, 567 U.S. at 720–22. This Court then noted that *Alvarez* "guides our analysis to the extent it discusses the regulation of false speech in light of general First Amendment protections." *Arneson II*, 766 F.3d at 784. As the Supreme Court recently confirmed, "discrete traditions of content-based regulations cannot be aggregated together to sustain some new and broader category of lesser-protected speech." *Chiles*, 607 U.S. ___, slip. op. at 19.

***Expanding "fraud."*** Of special relevance here, both the Supreme Court and this Court delineated the outer bounds of fraud as a First Amendment exception. *Arneson I* rejected an attempt to apply "fraud principles to all knowingly false speech," 638 F.3d at 634 n.2, which is

the crux of Donnelly's case. It explained "the Supreme Court has carefully limited the boundaries of what is considered fraudulent speech" which does not include "all false speech, or even all knowingly false speech." *Id.* (citing *Madigan,* 538 U.S. at 620). Under both statutory and common law, fraud has "[e]xacting proof requirements" including that "the defendant made the representation with the intent to mislead the listener, and succeeded in doing so." *Id.* (internal quotation marks omitted).[13]

The Supreme Court confirmed these limitations in *Alvarez*, explaining that fraud is confined to false claims made to "secure moneys or other valuable considerations [such as] offers of employment." *Alvarez*, 567 U.S. at 723; *see also id.* at 734 (Breyer, J., concurring) ("Fraud statutes ... typically require proof of a misrepresentation that is material, upon which the victim relied, and which caused actual injury."). A litigant cannot simply label speech "fraud" and hope to prevail, and any attempt to bring a fraud claim without satisfying its essential elements "would support swift dismissal." *Madigan,* 538 U.S. at 617.

---

[13] *See United States v. Kepler*, 879 F. Supp. 2d 1006, 1009 n.1 (S.D. Iowa 2011) (finding that "fraud is not mere lying," because lying, by itself, "lacks an essential element of a fraud claim: proof of detrimental reliance or actual harm to the plaintiff") (citing *Madigan*, 538 U.S. at 620–21).

In this respect, the statutory or common law elements of any fraud claim are inextricably intertwined with constitutional limits (which states lack any authority to modify). The "[e]xacting" proof required to show fraud exists "to provide sufficient breathing room for protected speech." *Id.* at 620. And any argument to expand fraud "would give government a broad censorial power unprecedented in [the Supreme] Court's cases or in our constitutional tradition." *Alvarez*, 567 U.S. at 723.

Thus, Donnelly's failure to plead essential elements of his fraud and misrepresentation claims (*see infra* §§ III.B–C) dooms his case at the outset. Donnelly alleges no representations by Selzer inducing him into a transaction. Nor could he. A political opinion poll in a newspaper that Donnelly *already subscribed to* could not induce him to do anything. App. 13; R.Doc. 22, at 3 ¶ 8. Instead, he alleges Selzer made false statements in general and tacks on conclusory allegations that he "relied on" them. App. 36, 38; R.Doc. 22, at 26, 28 ¶¶ 131, 138.

Even if true, *that's not fraud*. Donnelly does not allege any statements Selzer ever made to him, much less statements made to induce him into doing anything. There simply is no transactional nexus between the parties and no purpose by Selzer to induce Donnelly into

doing anything. Where there is no cognizable (or even conceivable) fraud allegation, the First Amendment bars Donnelly's "fake news" claims.

***Misapplying actual malice***. Donnelly's assertion that his case should proceed if he adequately alleged actual malice is unsupported and misapplies precedent. He relies on cases involving false light privacy, product disparagement, and intentional infliction of emotional distress, Appellant's Br. 29–30, and offers no explanation how actual malice review could apply to "fake news" claims. The actual malice test is a "strategic protection" that applies only *after* speech is determined to fall within a recognized First Amendment exception. *Gertz*, 418 U.S. at 340; *Counterman*, 600 U.S. at 73–78. Once again, Donnelly's argument is foreclosed by *Alvarez* and *Arneson*.

In *Alvarez*, the Supreme Court explained why actual malice review cannot be extended "for a new purpose" as Donnelly advocates here. *Alvarez*, 567 U.S. at 719. The "knowing falsity and reckless disregard" standard drawn from defamation law exists to ensure the *narrowness* of that exception. *See Sullivan*, 376 U.S. at 279–80. *Alvarez* observed both that, "as the condition for recovery in certain defamation cases," the actual malice *mens rea* requirement "exists to allow more speech, not

less" and that "[a] rule designed to tolerate certain speech ought not blossom to become a rationale for a rule restricting it." *Alvarez*, 567 U.S. at 719–20. The Court refused to extend actual malice to allow for an exception for false statements generally because doing so would "expand[] liability in a different, far greater realm of discourse and expression," which "inverts the rationale for the exception." *Id*.

This case vividly illustrates the Court's concern. "Fake news" is not a recognized First Amendment exception, so allowing liability for "false news," even on a showing of actual malice, would threaten speech in a "far greater realm of discourse" and the exception would eat the rule. *Alvarez*, 567 U.S. at 719. This Court recognized as much in *Arneson*, where it held actual malice review was inadequate to save Minnesota's law barring false political speech. *Arneson II*, 766 F.3d at 788, 794 ("The mens rea requirement in this context does not safeguard the statute's constitutionality."). The *Arneson* Court concluded that allowing potential liability for "false" political speech would open "a Pandora's box to disingenuous politicking." *Id*. at 796.

*Arneson* rejected the actual malice standard because it recognized that speech about political campaigns "occupies the core of the protection

afforded by the First Amendment," and that the Supreme Court's pronouncements in myriad other cases discussing regulation of political speech "dictate the level of scrutiny to apply to our analysis." *Id.* at 784. But as this case shows, Pandora's Box has been opened and will remain so unless this Court slams the lid shut and holds that Donnelly's claims are illegitimate.

***Abridging political coverage***. The Supreme Court has repeatedly reaffirmed that the First Amendment "'has its fullest and most urgent application' to speech uttered during a campaign for political office." *Citizens United v. FEC*, 558 U.S. 310, 339 (2010) (citation omitted). Speech about the political process is "at the core of our First Amendment freedoms," *Republican Party of Minn. v. White*, 536 U.S. 765, 774 (2002), and "there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs." *Mills v. Alabama*, 384 U.S. 214, 218 (1966). The "First Amendment affords the broadest protection" to "[d]iscussion of public issues." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 346 (1995) (citation omitted). Election polling is "speech protected by the First Amendment" both because it "requires a discussion between pollster and

voter" and because the resulting poll itself "is speech." *Daily Herald Co. v. Munro*, 838 F.2d 380, 384 (9th Cir. 1988).

The First Amendment accords speech in this area a wide berth because "erroneous statement[s] [are] inevitable in free debate, and [they] must be protected if the freedoms of expression are to have the breathing space that they need to survive." *Sullivan*, 376 U.S. at 271–72 (cleaned up). Efforts to regulate "truth" in political commentary are thus presumptively unconstitutional and subject to strict scrutiny. *See Arneson II*, 766 F.3d at 784–85 (invalidating Minnesota law prohibiting knowingly false statements on ballot measures); *Grimmett v. Freeman*, 59 F.4th 689, 692 (4th Cir. 2023) (holding law prohibiting false statements about candidates "knowing such … to be false or in reckless disregard of its truth or falsity" was likely unconstitutional); *Susan B. Anthony List v. Driehaus*, 814 F.3d 466, 476 (6th Cir. 2016) (invalidating law prohibiting knowingly false statements about candidates); *Lucas*, 34 N.E.3d at 1253–57 (invalidating law prohibiting false statements about candidates and ballot measures); *Rickert v. State Pub. Disclosure Comm'n*, 168 P.3d 826, 856 (Wash. 2007) (*en banc*) (invalidating law prohibiting false statements of material fact about political candidates).

Bottom line, election polls and news reports are not the stuff of which First Amendment exceptions are made.

### C. This Court Should Uphold the District Court Under Any First Amendment Standard.

The district court was correct to describe "Donnelly's novel attempt to impose liability for news prediction" as an "absurdity." App. 79–80; R.Doc. 48, at 18–19, Add. 29–30. Attempts like Donnelly's are rare because most prospective litigants recognize that courts promptly dismiss fraud or misrepresentation claims over news reports, finding "none of the limited exceptions to the First Amendment apply." *E.g.*, *Wash. League for Increased Transparency & Ethics*, 2021 WL 3910574, at *4–5 (citing *Alvarez*, 567 U.S. at 717).

No court has ever adopted Donnelly's extraordinary theory of liability for "false news" because it is wholly at odds with our constitutional traditions and has no limiting principle. Litigants proposing similar theories have all failed. For example, the Southern District of Florida, affirmed by the Eleventh Circuit, rejected a "novel and unprecedented expansion of the scope of tort law" seeking to hold the Weather Channel liable for alleged damage caused by an incorrect

forecast. *Brandt v. Weather Channel, Inc.*, 42 F. Supp. 2d 1344, 1345–46 (S.D. Fla.), *aff'd*, 204 F.3d 1123 (11th Cir. 1999).

The district court here cited *Brandt*, noting the "litany of absurd suits which could follow from imposing" a legal duty on prognosticators, "such as construction workers suing when they pour concrete in reliance on a weather report forecasting no rain or commuters suing when they are stuck in traffic and late to work because the news reported there would be light traffic." App. 79–80; R.Doc. 48, at 18–19, Add. 29–30. As *Brandt* explained: "Predicting possible future events whose outcome is uncertain is not an exact science for which a [publisher] should be held liable." 42 F. Supp. 2d at 1346. The district court observed that a "[f]inding for Donnelly here would permit similar absurdity," as, like weather forecasting, "political opinion polls are predictive and inherently uncertain." App. 79–80; R.Doc. 48, at 18–19, Add. 29–30.

Similarly, the Eastern District of New York rejected an attempt to contort the elements of fraud against protected speech. *Demuth Dev. Corp. v. Merck & Co.*, 432 F. Supp. 990 (E.D.N.Y. 1977). *Demuth* involved a "novel claim" against chemical encyclopedia publisher Merck for "willful misrepresentation" of the toxicity of a chemical used in Demuth's

equipment that it alleged scared away purchasers. *Id.* at 991. The court, despite the allegation of intentional wrongdoing, explained Demuth could not "point to any relationship of the parties, arising out of contract or otherwise, which in morals or good conscience placed Merck under any duty towards plaintiff or its business." *Id.* at 993 (quotation marks omitted). The court held "Merck's right to publish free of fear of liability is guaranteed by the First Amendment … and the overriding societal interest in the untrammeled dissemination of knowledge." *Id.* (citing *Gertz*, 418 U.S. at 340).

In short, America's history and tradition protect political commentary. Donnelly's "fake news" claims do not fit within any category of unprotected speech, bear no resemblance to a recognized cause of action, and therefore are barred by the First Amendment.[14]

[14] The district court correctly held Donnelly's claims could not survive under the actual malice test. App. 69–73; R.Doc. 48, at 8–12, Add. 19–23. The court accurately observed that Donnelly "asserts only a bare legal conclusion accompanied by actual malice buzzwords that Defendants acted knowingly or recklessly." App. 71; R.Doc. 48, at 10, Add. 21.

### D. Donnelly Makes No Nonfrivolous Argument for a Change in the Law.

Donnelly has made no good faith argument for a change in the law. While lawyers are afforded latitude to make creative arguments to modify the law, they must first acknowledge what the law *is* and explain why controlling precedents should be changed. *Wicker v. Bayview Loan Services, LLC*, 843 F. App'x 117, 119 (10th Cir. 2021); *16 Front Street, LLC v. Mississippi Silicon, LLC*, 886 F.3d 549, 561 (5th Cir. 2018).

Donnelly's head-in-the-sand approach does neither. *See Meyer v. U.S. Bank Nat'l Ass'n*, 792 F.3d 923, 929 (8th Cir. 2015). His theory is squarely foreclosed by *Alvarez* and *Arneson*, *see supra* §§ II.B.2–3, yet he mentions neither. It is not as if Donnelly is unaware of these cases, having cited them in resisting dismissal below. R.Doc. 36, at 12. But as Selzer pointed out at the time, those cases stand for the *opposite* of what Donnelly asserts. R.Doc. 41, at 8–10 & n.4 (rejecting "applying defamation principles to 'false' political speech because it would create 'an unprecedented and vast' First Amendment exception") (quoting *Arneson I*, 638 F.3d at 634–35). Now, Donnelly no longer mentions these cases *at all* even though the district court relied on *Arneson I* and *II* for

its conclusion that Donnelly's claims fail First Amendment scrutiny. App. 67; R.Doc. 48, at 6, Add. 17.

The court also held Donnelly's "novel attempt to impose liability for news prediction" and opinion polls would impose "unacceptable" burdens under our Constitution and would lead to absurd results. App. 79–80; R.Doc. 48, at 18–19, Add. 29–30. Citing *Brandt*, the court concluded that Donnelly's theory "would permit similar absurdity." App. 80; R.Doc. 48, at 19, Add. 30. Donnelly responds to the court's discussion of *Brandt*, not to dispute the district court's conclusion, but to embrace the horror. Donnelly merely asserts in a footnote that "[w]eathermen, like pollsters, are not entitled to a blanket exemption from legal liability." Appellant's Br. at 65 n.15. The district court was right: Donnelly's position is absurd and unprecedented. This appeal is frivolous.

## III. The District Court Correctly Held Donnelly's Claims are Deficient on the Elements.

Even setting aside the First Amendment, Donnelly's business tort claims against Selzer are meritless. Donnelly does not allege he ever purchased anything from Selzer nor that Selzer advertised or sold anything to him. Yet Donnelly still tries to cram a political grudge into claims designed to provide a bamboozled buyer a remedy against a

deceitful seller. The district court rightly held each cause of action failed to state a claim, in addition to the Complaint's First Amendment infirmities. App. 73–81; R.Doc. 48, at 12–20, Add. 23–31. This Court should affirm.

### A. The ICFA's Plain Text Bars Donnelly's Claim.

Donnelly has no ICFA claim against Selzer because "publishing the results of a political opinion poll that matches the co-published methodology is not an unfair or deceptive practice." App. 76; R.Doc. 48, at 15, Add. 26. The district court explained the poll's methodology, released contemporaneously with the results, informed readers "exactly how the poll was conducted and what results it yielded." App. 78; R.Doc. 48, at 17, Add. 28. On appeal, Donnelly tries to paint the "deceptive and unfair practices" language as the sum total of the statute, where so long as he alleges *some* action that could qualify as "deceptive" or "unfair," he has a claim. Appellant's Br. 54–60. This ignores the law.

To state a claim under the ICFA a plaintiff must allege "deceptive and unfair practices" through a false statement "of a material fact, with the intent that others rely upon [it] … in connection with the advertisement, sale, or lease of consumer merchandise." Iowa Code

§ 714H.3(1). But Donnelly's sole focus on the issue is on "statements made to sell the *Register*." Appellant's Br. 56. Even setting aside the fact that Donnelly was a pre-existing subscriber of the *Register* (App. 13; R.Doc. 22, at 3 ¶ 8), he identifies no statements *by Selzer* to sell the *Register* (or anything else). Nor does he allege he purchased anything from Selzer. In short, there was no transaction and thus zero predicate for a consumer claim, especially against Selzer.

Donnelly does not mention Selzer *at all* in his discussion of "deception." Appellant's Br. 55–56. And with "unfairness," Donnelly's chief complaint appears to be that he "expected" the poll to be "accurate." *Id.* at 59. Donnelly no more has a claim than a subscriber who places a large bet on a sportswriter's predicted outcome of the Super Bowl. Donnelly's ICFA claim, in words, purpose, and substance, is nowhere close to what the ICFA requires.

The ICFA is a consumer fraud statute designed to protect Iowa consumers who are deceived into buying or leasing a product. It provides a cause of action for victims of "deception" and "fraud" "in connection with the advertisement, sale, or lease of consumer merchandise." Iowa Code § 714H.3. And it allows consumers to recover damages if they suffer an

"ascertainable loss of money or property as the result." *Id.* § 714H.5(1). Donnelly alleges none of this—no "fraud" or "deception" by Selzer to induce him into a transaction and no "ascertainable loss of money or property" from a transaction with Selzer. And Donnelly identifies no instance of the ICFA ever being applied to a context other than actual or attempted contractual privity between a seller and a consumer.

The district court also appropriately dismissed Donnelly's ICFA claim as deficient on other necessary elements. App. 76–78; R.Doc. 48, at 15–17, Add. 26–28. When interpreting state statutes, federal courts "appl[y] that state's rules of statutory construction." *Behlmann v. Century Sur. Co.*, 794 F.3d 960, 963 (8th Cir. 2015). "The first step in ascertaining the true intent of the legislature is to look at the statute's language." *Mulhern v. Cath. Health Initiatives*, 799 N.W.2d 104, 113 (Iowa 2011) (citation omitted). When that "language is plain and unambiguous, [courts] will look no further." *Id.* The ICFA's plain text forecloses Donnelly's ICFA claim against Selzer.[15]

---

[15] By its plain terms, the ICFA applies to commercial transactions, not political commentary. Donnelly's attempt to extend the law outside its statutory context would render it unconstitutional as applied, because it would reach political speech and news coverage the speaker allegedly "reasonably should know" were false. *See Sullivan*, 376 U.S. at 288

First, Donnelly does not allege Selzer sold or leased anything to him. And the ICFA defines "advertisement" as "the attempt by publication, dissemination, solicitation, or circulation to induce directly or indirectly any person to enter into any obligation or acquire any title or interest in any merchandise." Iowa Code § 714H.2(2) (incorporating *id.* § 714.16(1)(a)). The Iowa Poll offered and induced no obligation or transaction; *it's an opinion poll.* It did nothing more than attempt to measure which candidates were leading and set out its methodology for its findings. App. 27; R.Doc. 22, at 17 ¶ 83. The Iowa Poll is textually outside the ICFA's scope.

Second, a political opinion poll of the Iowa electorate is not "consumer merchandise." Under the ICFA, "consumer merchandise" is "merchandise offered for sale or lease, or sold or leased, *primarily for personal, family, or household purposes*." Iowa Code § 714H.2(4) (emphasis added). In other words, "consumer merchandise" refers to everyday goods Iowans purchase, like dish soap and can openers. A comprehensive opinion poll of the electorate commissioned by a

---

(evidence of negligently false speech is constitutionally insufficient); *Bertrand v. Mullin*, 846 N.W.2d 884, 894 (Iowa 2014) (same).

newspaper is not "merchandise … primarily for personal, family, or household purposes. *Id.*; *see Butts v. Iowa Health Sys.*, 863 N.W.2d 36 (Iowa Ct. App. 2015) (unpublished table decision), 2015 WL 1046119, at *9 (determining the ICFA inapplicable when defendant "does not offer or sell consumer merchandise"). Donnelly's briefing below insisted the "Iowa Poll is not the merchandise—the newspaper is." R.Doc. 36, at 37. But Donnelly doesn't allege Selzer sells newspapers. He has essentially conceded he cannot state an ICFA claim against Selzer.

Next, the Iowa Poll did not "relate[] to a material fact or facts" in an advertisement, sale, or lease. Iowa Code § 714H.3(1). Under the ICFA, it is not enough to allege a "deceptive" or "fraudulent" representation generally. Instead, a plaintiff "must prove that the prohibited practice related to a material fact" conveyed "in connection with the advertisement, sale, or lease of consumer merchandise." *Id.*

Donnelly tries to fashion the poll as a "misrepresentation of material fact" (App. 42; R.Doc. 22, at 32 ¶ 164), but materiality relates to whether the asserted representation is sufficiently important to the transaction that it would induce a buyer to make a purchase, not whether the representation *exists*. *See* Restatement (Second) of Torts § 538 (A.L.I.

1977). The transaction follows—and flows from—the representation. But Donnelly was already a subscriber, which is how he read reporting about the poll. And Donnelly points to no representation *by Selzer* to him related to the advertisement, sale, or lease of consumer merchandise, much less a material representation. In fact, Donnelly can point to no representations Selzer made to him *ever*, on any subject.

### B. Donnelly's Amended Complaint Fails to State a Fraudulent Misrepresentation Claim.

The district court also correctly held Donnelly's allegations cannot support a claim for fraudulent misrepresentation because Selzer told "readers exactly what [it] did and how [it] did it. Therefore, no false representation was made." App. 73; R.Doc. 48, at 12, Add. 23.

Donnelly has no response to this and instead repeatedly misstates the concept of fraud. Fraud is "[a] knowing misrepresentation or knowing concealment of a material fact made to induce another to act to his or her detriment." *Fraud*, Black's Law Dictionary (12th ed. 2024). It requires not just a false statement, but one made by the defendant in the context of persuading the plaintiff to "part[] with money, or property of value in reliance upon the defendant's representations." William L. Prosser, *Handbook of the Law of Torts* § 105, at 684 (4th ed. 1971); *see Alvarez*,

567 U.S. at 722–23 (distinguishing false statements generally from fraud). The classic example is a crooked used-car salesman rolling back an odometer. *See* Restatement (Second) of Torts § 525 cmt. b illus. 1.

For a fraudulent misrepresentation claim, "a plaintiff must prove (1) defendant made a representation to the plaintiff, (2) the representation was false, (3) the representation was material, (4) the defendant knew the representation was false, (5) the defendant intended to deceive the plaintiff, (6) the plaintiff acted in reliance on the truth of the representation and was justified in relying on the representation, (7) the representation was a proximate cause of plaintiff's damages, and (8) the amount of damages." *Gibson v. ITT Hartford Ins. Co.*, 621 N.W.2d 388, 400 (Iowa 2001). Even crediting Donnelly's allegations as true, he never even attempted to allege facts for more than half of these elements.

At the threshold: Selzer made no representation of any kind to Donnelly. And, as explained *supra* § III.A, Donnelly did not allege the Iowa Poll was "material" to an inducement directed to Donnelly by Selzer. Donnelly similarly never alleged Selzer intended to induce him into a transaction. Nor did he plead that he relied on Selzer's poll to take any action or that the reliance resulted in any damage to him caused by

Selzer's poll. Donnelly therefore failed *to even plead* elements (1), (3), (6), (7), or (8). For the few elements Donnelly *did* try to plead, the district court fully explained why his claims failed.[16]

Donnelly asserted he was "misled by fraudulent misrepresentations" and "now … questions whether any news story from the *Register* is trustworthy." App. 37–38; R.Doc. 22, at 27–28 ¶¶ 132, 140. But neither of these represents cognizable, monetary, recoverable damages (particularly against Selzer, from whom Donnelly bought nothing). Donnelly tries to paint the Poll as a "false" representation by pointing to the gap between the poll results and the outcome. *E.g.*, Appellant's Br. 39. But this reads the transactional aspect of a "representation" out of tort law, replacing it with a bare allegation that a statement was, in some sense, "false." That is not how the claim works.

Donnelly's primary complaint with Selzer's poll appears to be that it did not weight results in line with "historic exit poll data." Appellant's

---

[16] *See, e.g.*, App. 73; R.Doc. 48, at 12, Add. 23 ("The results of an opinion poll are not an actionable false representation merely because the anticipated results differ from what eventually occurred."); App. 76; R.Doc. 48, at 15, Add. 26 ("[P]ublishing the results of a political opinion poll that matches the co-published methodology is not an unfair or deceptive practice.").

Br. 40. Had it done so, Donnelly alleges, the change in methodology would have "moved the results from Harris +3 (47-44) to Trump +6 (50-44)." *Id.* But, as the district court explained, Donnelly's allegations cannot support a claim for fraudulent misrepresentation because Selzer told "readers exactly what [it] did and how [it] did it. Therefore, no false representation was made." App. 73; R.Doc. 48, at 12, Add. 23.

Donnelly acknowledged below that Selzer's poll stated that it weighted results "by age, sex, and congressional district" and did not mention historic exit poll data. R.Doc. 36, at 27. Donnelly cannot profess confusion (much less intentional fraud) related to Selzer's poll weighting when the poll expressly and accurately stated what it *did* weight. There was, to put it mildly, no shortage of political polling in 2024. The public was free to consider each poll and give it the credence they believed it deserved. Donnelly is suing not on what Selzer represented this poll to be, but what he, as a Monday-morning quarterback, believes it *should* have been to reach the "right" result.

On element (4), Donnelly's focus on his "1 in 3.5 million" statistic as supposed proof of skullduggery demonstrates nothing except the continued vitality of British economist Ronald Coase's truism that "if you

torture the data long enough, it will confess to anything." *See Dzielak v. Whirlpool Corp.*, No. 2:12-cv-0089, 2017 WL 1034197, at *10 & n.9 (D.N.J. Mar. 17, 2017). Selzer, of course, did not—and could not—know *before* releasing the poll that the future election results would be so different from the final tally. Selzer's polling had correctly predicted Barack Obama's surprise win in the 2008 Iowa caucuses and Donald Trump's 2016 victory in Iowa, even though no Republican presidential candidate had won the state since 2004, so Selzer was no stranger to bucking conventional wisdom. *See* App. 26–27; R.Doc. 22, at 16–17 ¶¶ 80, 83. But polling misses happen. Pollsters are data scientists, not clairvoyant seers.

On element (5), Donnelly alleged "Defendants" published the poll with an "intent to deceive their readers and the broader electorate with a false poll." App. 37–38; R.Doc. 22, at 27–28 ¶ 137. Again, Donnelly misperceives how fraud (and the ICFA) work by failing to allege that the allegedly false representation was for the purpose of inducing a transaction, which is what separates merely "false" statements from the unprotected category of fraud.

Donnelly's bare-bones attempt to plead element (6), justifiable reliance, likewise fails. "Parties alleging fraud must plead reliance with 'sufficient particularity to state a plausible claim of justifiable reliance,'" and "[c]onclusory allegations that a plaintiff detrimentally relied on" representations do not provide "sufficient factual matter to state a claim of relief plausible on its face." *Ambassador Press, Inc. v. Durst Image Tech. U.S., LLC*, 949 F.3d 417, 423 (8th Cir. 2020) (citations omitted). But Donnelly never says what he "relied on" Selzer's poll *for*. To vote? To buy something? He does not say and thus has no claim. He alleges "frustration" by the poll results (App. 13; R.Doc. 22, at 3 ¶ 8), but that is the opposite of reliance.

Moreover, Donnelly's allegation of "justifiable" reliance is undermined by his *actual* allegations. *See, e.g.*, App. 15; R.Doc. 22, at 5 ¶¶ 18–20. It is difficult to imagine any basis for a reliance claim after he asserted the poll had "obvious problems." App. 45; R.Doc. 22, at 35 ¶ 180. The "justifiable-reliance standard does not mean a plaintiff can blindly rely on a representation," *Spreitzer v. Hawkeye State Bank*, 779 N.W.2d 726, 737 (Iowa 2009), and "[a] person may not justifiably rely on a professional representation if 'red flags' signal such reliance is

unwarranted," *Young ex rel. Young v. Rally Appraisal, L.L.C.*, 928 N.W.2d 660 (Iowa Ct. App. 2019) (unpublished table decision), 2019 WL 1486608, at *4.

Donnelly's own allegations that everyone with experience in Iowa politics recognized the poll as an unreliable outlier defeats any claim that he "justifiably relied on" it. App. 38; R.Doc. 22, at 28 ¶ 138. He asserts Selzer had a "track record of undersampling Republicans in her polling" and that Selzer's results were an "obvious outlier." App. 15, 19; R.Doc. 22, at 5, 9 ¶¶ 18, 38. But these allegations that the poll had immediate, readily apparent problems amount to a concession that he did not, and could not, justifiably rely on it.

### C. Donnelly Failed to State Professional Malpractice or Negligent Misrepresentation Claims.

Donnelly's counts alleging negligent misrepresentation and professional malpractice also failed to establish essential elements.

#### 1. <u>Selzer owes Donnelly no legal duty.</u>

The district court found Donnelly's claims grounded in negligence ("Alternate Count I" for "Negligent Misrepresentation in a Reckless Degree" and Count III for "Malpractice") to be deficient. First, "negligent misrepresentation in a reckless degree" is not a cognizable claim. A

Westlaw search of Iowa federal and state court cases yields zero results for the phrase. That is because recklessness and negligence are different standards of culpability. *Sechler v. State*, 340 N.W.2d 759, 762–64 (Iowa 1983). Donnelly's claim is akin to charging a criminal defendant with "intentional involuntary manslaughter."

Iowa does, however, recognize negligent misrepresentation. Assuming that is what Donnelly intended to plead, this claim (and his malpractice claim) fails because Selzer owed no legal duty to Donnelly. *See McGraw v. Wachovia Sec., L.L.C.*, 756 F. Supp. 2d 1053, 1070 (N.D. Iowa 2010) ("In professional negligence actions, as in other negligence actions, the plaintiff must prove a duty of care was owed to him or her…."); *Sain v. Cedar Rapids Cmty. Sch. Dist.*, 626 N.W.2d 115, 124 (Iowa 2001) ("an essential element of negligent misrepresentation is that the defendant must owe a duty of care").[17] This fatal deficiency remains regardless of the mental state Donnelly insists he pleads, as there is no liability without a legal duty.

---

[17] Donnelly supplies no law suggesting pleading a more culpable mental state obviates the need for a legal duty.

The district court explained that Iowa courts limit negligent misrepresentation claims to "recognized professionals" like "accountants, abstractors, and attorneys [who] owe a duty of care in supplying information to foreseeable third parties as members of a limited class of persons who would be contemplated to use and rely upon the information." App. 75; R.Doc. 48, at 14, Add. 25 (quoting *Sain*, 626 N.W.2d at 123). But "a pollster and a general circulation newspaper are not in the business or profession of supplying information to a limited class of others who knowingly rely on the information." *Id*. As the district court reasoned, "it would be impossible for a newspaper to know how any one member of the public would use the information it reports because a newspaper does not act in 'the guidance of others in an advisory capacity.'" App. 76; R.Doc. 48, at 15, Add. 26 (quoting *Freeman v. Ernst & Young*, 516 N.W.2d 835, 838 (Iowa 1994)).

Newspapers—let alone their independent contractors—owe no legal duty as professional advisors *to the general public*. As the Fifth Circuit explained, "[i]f a newspaper prints incorrect information, if a scientist publishes careless statements in a treatise, or if an oil company prints an inaccurate road map, they cannot be 'liable' to those of the

general public who read their works absent some special relationship between [the] writer and reader." *De Bardeleben Marine Corp. v. United States*, 451 F.2d 140, 148 (5th Cir. 1971); *see also Stancik v. CNBC*, 420 F. Supp. 2d 800, 808 (N.D. Ohio 2006) ("[N]ews broadcasters do not owe the general public a heightened duty of care."); *Brandt*, 42 F. Supp. 2d at 1345–46 (refusing to "impose on a television broadcaster of weather forecasts a general duty to viewers").

No doubt, "[a]ccuracy in news reporting is certainly a desideratum, but the chilling effect of imposing a high duty of care on those in the business of news dissemination and making that duty run to a wide range of readers or TV viewers would have a chilling effect which is unacceptable under our Constitution." *Tumminello v. Bergen Evening Rec., Inc.*, 454 F. Supp. 1156, 1159–60 (D.N.J. 1978). Without duty, there is no negligence. And the First Amendment bars states from imposing a common law duty on news suppliers to "get it right." *See Sullivan*, 376 U.S. at 288; *Bertrand v. Mullin*, 846 N.W.2d 884, 894 (Iowa 2014).

Professional malpractice and negligence claims ordinarily require privity, which creates the duty. *See, e.g.*, *Shivvers v. Hertz Farm Mgmt., Inc.*, 595 N.W.2d 476, 479 (Iowa 1999). But Donnelly has no privity with

Selzer. Iowa recognizes limited exceptions where professional negligence claims may proceed without privity—for example, in narrow circumstances in the medical profession, when brokerage firms ignore evidence others are being defrauded, and when information providers are aware others rely on their work in determining a course of action and the information is for the purpose of making that type of determination.[18] Nothing of the sort is present here.

Donnelly's citation to *Birmingham v. Fodor's Travel Publications*, 833 P.2d 70 (Haw. 1992), exemplifies his misapplication of the law. Donnelly claims the case supports a legal "duty" by "authors not to author problematic materials." Appellant's Br. 62. But this is *the opposite* of what it held. *Birmingham* cited cases holding that newspapers are not liable in negligence for advertising defective products *unless the*

---

[18] *See J.A.H. ex rel. R.M.H. v. Wadle & Associates, P.C.*, 589 N.W.2d 256, 260 (Iowa 1999) (noting that the Court had "relaxed the privity requirement" in some narrow circumstances for "the medical profession"); *McGraw*, 756 F. Supp. 2d at 1072–75 (brokerage firm could be liable to non-customer when aware of signs that an employee may be defrauding non-customer in personal dealings); *Burbach v. Radon Analytical Lab'ys, Inc.*, 652 N.W.2d 135, 138 (Iowa 2002) (absent a showing that an inspector had awareness that "a limited but foreseeable class of users" would rely on their report for specific purchasing decisions, no liability for third parties' decisions).

*publication warrantees the product*. 833 P.2d at 75, n.3. It did not hold publishers (or their sources of information) have an independent legal duty to not publish "problematic" material (whatever that means). And even if *Birmingham* held as much, it would be squarely foreclosed by *Sullivan*, 376 U.S. at 287–88.

Donnelly's remaining authorities are no better and fall into two inapposite buckets: specialty periodicals and companies that independently test and certify consumer products. In *Jones v. J.B. Lippincott Co.*, the district court held the publisher of a medical textbook was not liable to a reader who used advice in the book to self-treat. 694 F. Supp. 1216, 1217 (D. Md. 1988). Far from helping Donnelly, the *Jones* court explained that "no case has extended [strict product liability] to the dissemination of an idea or knowledge in books or other published material," and doing so "could chill expression and publication," a result "inconsistent with fundamental free speech principles." *Id.* (citing *Gertz*, 418 U.S. at 323). *See Winter v. G.P. Putnam's Sons*, 938 F.2d 1033, 1034 (9th Cir. 1991).

Likewise in *Lewin v. McCreight*, the court held a publisher of a metalworks book was not liable when chemical mixing instructions

contributed by a third-party caused an explosion. 655 F. Supp. 282, 284 (E.D. Mich. 1987). Though *Lewin* deferred addressing the First Amendment issues (because the plaintiff could not establish the elements of their claim in any event), it cited an Illinois Court of Appeals decision warning of the danger to free expression presented by imposing liability on newsgatherers. *Id.* at 284 n.2 (citing *Alm v. Van Nostrand Reinhold Co.*, 480 N.E.2d 1263 (Ill. App. 1985)).

Donnelly then relies on cases standing for the unremarkable proposition that when a company's business is independently testing and *guaranteeing* consumer products, it is held to an ordinary duty of care if a consumer buys the product relying directly upon the guarantee and suffers harm. Br. 63–64. In *Hanberry v. Hearst Corp.*, the plaintiff purchased shoes after *Good Housekeeping* gave them its "Consumers' Guaranty Seal" warrantying "the advertising claims made for [products] in our magazine" and guaranteeing "replacement or refund" if the product fell short. 276 Cal. App. 2d 680, 682 (Cal. Ct. App. 1969). The court found the publisher liable, explaining that "[i]n voluntarily assuming [a] business relationship" with the plaintiff by independently

testing and guaranteeing products, "public policy imposes upon it the duty to use ordinary care." *Id.* at 684. No such guarantee exists here.

Donnelly's second case, *Hempstead v. General Fire Extinguisher Corp.*, is even further afield because it addressed the liability of a company that independently tested and certified the design of fire extinguishers. 269 F. Supp. 109 (D. Del. 1967). Selzer has no legal duty to Donnelly, a contractual (and actual) stranger, to accurately predict the result of an election.

2. Donnelly's "malpractice" and "negligent misrepresentation" claims bear no resemblance to those causes of action.

The district court dismissed Donnelly's negligence-based claims for the same reasons. App. 78–80; R.Doc. 48, at 17–19, Add. 28–30. Plaintiffs asserting negligent misrepresentation must establish: "(1) [t]he defendant was in the business or profession of supplying information to others; (2) the defendant intended to supply information to the plaintiff or knew that the recipient intended to supply it to the plaintiff; (3) the information was false; (4) the defendant knew or reasonably should have known that the information was false; (5) the plaintiff reasonably relied on the information in the transaction that the defendant intended the

information to influence; (6) and the false information was the proximate cause of damage to the plaintiff." *Doe v. Grinnell Coll.*, 473 F. Supp. 3d 909, 937 (S.D. Iowa. 2019) (citation omitted).

Donnelly's misrepresentation claim is utterly inapposite. Negligent misrepresentation allows recovery against those who supply information *knowing* recipients intend to rely on the information to determine a course of action and harm results from that reliance because the supplier's provision of its services fell below the legal standard of care. *Sain*, 626 N.W.2d at 124–25. In those situations, the information supplier, because of its contractual (or similar) relationship with the recipient, can be held liable because it "is manifestly aware of the use that the information will be put, and intends to supply it for that purpose." *Id.* at 125. For example, if a home inspection company prepares a report knowing prospective buyers will rely on it when deciding whether to purchase the building, the inspection company may be liable for negligent misrepresentation if the report is inaccurate, the inspector's preparation of the report fell below the legal standard of care, and a buyer detrimentally relied on the report. *Burbach*, 652 N.W.2d 135.

The district court accordingly rejected Donnelly's claims as facially deficient. He failed to satisfy elements (1), (2), and (4) because he never alleged Selzer supplied her poll for the purpose of informing a decision regarding a transaction. He failed to satisfy element (3) because, as explained above, an inaccurate poll is not a "false" statement. On element (5), Donnelly never alleged he relied on Selzer's poll to determine a course of action. And for Element 6 he never alleged he suffered damages from *relying on* Selzer's poll. In short, Donnelly's negligent misrepresentation claim failed because it is not a negligent misrepresentation claim at all.

Donnelly's "Professional Malpractice" claim failed on the same grounds.[19] "In professional negligence actions, as in other negligence actions, the plaintiff must prove a duty of care was owed to him or her, breach of that duty, and damages caused by the breach of duty." *McGraw*, 756 F. Supp. 2d at 1070. But Selzer owed no legal duty to Donnelly, and he does not plead damages resulting from his reliance on Selzer's poll.

---

[19] Negligent misrepresentation ("Alternate Claim 1") and Malpractice (Claim III) differ only in the type of duty (reasonable care for negligent misrepresentation versus the standard of care of a similarly situated professional for malpractice). *Compare Sain*, 626 N.W.2d at 122–25, *with Stender v. Blessum*, 897 N.W.2d 491, 502–06 (Iowa 2017). The analysis remains the same.

Donnelly incorrectly assumes he can save these claims by asserting Selzer acted "recklessly" or with "actual malice" rather than negligently. But, as explained above, culpability rising to recklessness (or even intentional falsity) is irrelevant because Selzer had no legal duty to Donnelly, a stranger, to produce an "accurate" opinion poll (or anything else). Nor does alleging a different mental state change the fact that Donnelly fails to assert either legal harm or that Selzer's polls caused it.

### D. Donnelly's Voting Interference Claim is Meritless.

The district court correctly dismissed Donnelly's "voting interference" claim. As the court explained, the sole case Donnelly offers in support "makes no mention of a cognizable tort under Iowa law for interference with the right to vote. The case instead centered on the duties of election judges under the relevant Iowa code." App. 80; R.Doc. 48, at 19, Add. 30 (discussing *Lane v. Mitchell*, 133 N.W. 381 (Iowa 1911)).

Even if Iowa recognized the claim and followed the Restatement's approach to the cause of action, the claim still fails. The Restatement provides that "[o]ne who by a consciously wrongful act intentionally deprives another of a right to vote in a public election … or seriously

interferes with … th[at] right[] is subject to liability to the other." Restatement (Second) of Torts § 865. News articles and polls that might influence voting decisions do not prevent any voter from casting a ballot. We can locate no court, anywhere, that has accepted Donnelly's strange theory. The district court didn't, and this Court should decline to be the first.[20]

## CONCLUSION

The Court should affirm the decision below.

Dated: April 10, 2026

Respectfully Submitted,

*/s/ Robert Corn-Revere*

Greg H. Greubel
Adam Steinbaugh
FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION (FIRE)
510 Walnut St., Suite 900
Philadelphia, PA 19106
(215) 717-3473
greg.greubel@fire.org
adam@fire.org

Robert Corn-Revere†
Conor T. Fitzpatrick
Samuel Rudovsky
FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION (FIRE)
700 Pennsylvania Ave. SE; Suite 340
Washington, DC 20003
(215) 717-3473
bob.corn-revere@fire.org

---

[20] Donnelly mounts no defense of his civil conspiracy claim other than to assert that his belief that he stated a cause of action means he "stated a predicate for a civil conspiracy claim." Br. 67. Given that threadbare defense of the claim, this Court should affirm the dismissal. *See also* App. 81; R.Doc. 48, at 20, Add. 31 ("Donnelly fails to adequately allege any underlying tort and therefore 'the absence of any actionable wrong is fatal to the claim.'") (quoting *McDonnell v. Hesco Bastion, Inc.*, 781 F. Supp. 3d 745, 757 (S.D. Iowa 2025)).

conor.fitzpatrick@fire.org
sam.rudovsky@fire.org

Matthew A. McGuire
NYEMASTER GOODE, P.C.
700 Walnut St., Suite 1300
Des Moines, IA 50309
(515) 283-8014
mmcguire@nyemaster.com

† *Counsel of Record*

*Attorneys for Appellees J. Ann Selzer and Selzer & Company*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

This document complies with the word limit of Fed. R. App. P. 32(a)(7) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 12,967 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook.

Dated: April 10, 2026

*/s/ Robert Corn-Revere*
Robert Corn-Revere

## CERTIFICATE OF COMPLIANCE WITH EIGHTH CIRCUIT RULE 28A(h)

Pursuant to this Court's Rule 28A(h), I hereby certify that the electronic version of this Brief of Appellees has been scanned for viruses and is virus-free.

I further certify that the electronic version of the brief has been generated by printing to PDF from the original word processing file.

Dated: April 10, 2026

*/s/ Robert Corn-Revere*
Robert Corn-Revere

## CERTIFICATE OF SERVICE

The undersigned certifies that on April 10, 2026, an electronic copy of the foregoing brief was filed with the Clerk of this Court using the CM/ECF system. The undersigned also certifies all parties in this case are represented by counsel who are registered CM/ECF users, and that service of the brief will be accomplished by the CM/ECF system.

*/s/ Robert Corn-Revere*
Robert Corn-Revere