**No. 25-3451**

**UNITED STATES COURT OF APPEALS**
**FOR THE EIGHTH CIRCUIT**

---

DENNIS DONNELLY,
Plaintiff-Appellant,

v.

DES MOINES REGISTER AND TRIBUNE CO., INC., et al.,
Defendants-Appellees.

---

On Appeal from the United States District Court for the
Southern District of Iowa
Case No. 4:25-cv-150-RGE-WPK
Hon. Rebecca G. Ebinger

---

# BRIEF OF *AMICUS CURIAE* AMERICAN ASSOCIATION FOR PUBLIC OPINION RESEARCH IN SUPPORT OF DEFENDANTS-APPELLEES AND AFFIRMANCE

---

Dated: April 21, 2026

Caesar Kalinowski IV
*Counsel of Record*
Shontee Pant
Nicole Saad Bembridge
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, Washington 98104-1610
Telephone: 206.622.3150
caesarkalinowski@dwt.com
shonteepant@dwt.com
nicolesaadbembridge@dwt.com

*Counsel for Amicus Curiae American Association for Public Opinion Research*

## F.R.A.P. 26.1 CORPORATE DISCLOSURE STATEMENT

*Amicus curiae* American Association for Public Opinion Research is a nongovernmental, nonprofit corporation that has no parent companies, subsidiaries, or affiliates. It does not issue shares to the public, and no publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

**Page**

IDENTITY AND INTEREST OF *AMICUS CURIAE* ............................................1

INTRODUCTION AND SUMMARY OF ARGUMENT .......................................3

ARGUMENT ..........................................................................................5

I. POLLING IS AN EXERCISE IN MEASUREMENT UNDER UNCERTAINTY, NOT A FALSIFIABLE STATEMENT OF FACT. ..........................................................................................5

A. Opinion Polling Is Necessarily Imperfect Because It Relies On Unknowable Human Factors .....................................7

B. Polls Conducted According to Accepted Methods Are Expected To Yield Varied Results, Even With Mitigation. ..........................................................................15

C. Outlier Results Are Valuable and Sometimes Correct. ............18

II. DONNELLY'S POSITION WOULD DRIVE INDEPENDENT POLLSTERS OUT OF THE MARKET AND CAUSE SELF-CENSORSHIP. ..........................................................................22

CONCLUSION ........................................................................................26

## TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*281 Care Committee v. Arneson*,
638 F.3d 621 (8th Cir. 2011) ....24

*Associated Press v. United States*,
326 U.S. 1 (1945)....21

*Brandt v. Weather Channel, Inc.*,
42 F. Supp. 2d 1344 (S.D. Fla. 1999)....14, 25

*Buckley v. Valeo*,
424 U.S. 1 (1976)....21

*First Nat'l Bank v. Bellotti*,
435 U.S. 765 (1978)....21

*McIntyre v. Ohio Elections Comm'n*,
514 U.S. 334 (1995)....5

*N.Y. Times Co. v. Sullivan*,
376 U.S. 254 (1964)....15, 23, 25

*NAACP v. Button*,
371 U.S. 415 (1963)....23

*Scott v. Roberts*,
612 F.3d 1279 (11th Cir. 2010) ....14

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014)....23

*United States v. Alvarez*,
567 U.S. 709 (2012)....25

**State Cases**

*Cornell v. Wunschel*,
408 N.W.2d 369 (Iowa 1987) ....14

*Wash. League for Increased Transparency & Ethics v. Fox News*, Wash. App. 2d 1006, 2021 WL 3910574 (2021) ....14

**Constitutional Provisions**

U.S. Const. amend. 1.... *passim*

**Other Authorities**

AAPOR, *Best Practices for Survey Research* ....1, 12, 24

AAPOR, *Herding*....24

AAPOR, *Margin of Sampling Error/Credibility Interval* ....8

AAPOR, *Polling Accuracy, Key Points to Remember About Polling in the Run-up to Election Day* ....5

AAPOR, *Standards and Ethics*....1, 22

AAPOR, *Transparency Initiative* ....1, 14, 22

Adam J. Berinsky, *Measuring Public Opinion with Surveys*, 20 ANN. REV. POL. SCI. 309 (Mar. 2, 2017)....7

Allison Parshall, *Why Election Polling Has Become Less Reliable*, SCI. AM. (Oct. 31, 2024) ....7

Andrew Howard, *'Big mistakes': Pollsters face recriminations for missing the Mamdani surge*, POLITICO (June 25, 2025) ....17

Andrew Mercer, *5 key things to know about the margin of error in election polls, How do I know if there has been a change in the race?*, PEW RSCH. CTR. (Sept. 8, 2016) ....18

Andy Brownback & Aaron Novotny, *Social Desirability Bias and Polling Errors in the 2016 Presidential Election*, 74 J. BEHAV. & EXPERIMENTAL ECON. 38 (June 2018)....11

Asma Khalid, *In 2012, Obama Won This Tiny Iowa County by 21 Points. Then Trump Won It by 20*, ME. PUB. (Jan. 16, 2020) ....20

Benjamin W. Domingue *et al.*, *The Mode Effect of Web-Based Surveying on the 2018 U.S. Health and Retirement Study Measure of Cognitive Functioning*, 78 J. GERONTOLOGY B 1466 (Aug. 2023)....................12

Christopher Prosser & Jonathan Mellon, *The Twilight of the Polls? A Review of Trends in Polling Accuracy and the Causes of Polling Misses*, 53 GOV'T & OPP. 757 (May 2018)....................12

Courtney Kennedy, *Building Trust Through More Realistic Expectations … And a More Accurate Margin of Error*, AAPOR NEWSL. (Aug. 29, 2024) ....................13

Courtney Kennedy et al., *Why and how we're weighting surveys for past presidential vote*, PEW RSCH. CTR. DECODED BLOG (July 23, 2025) ...........15, 16

Dave Leip, *1988 Presidential General Election Results-Vermont, U.S. Election Atlas* ....................20

Dave Leip, *1992 Presidential General Election Results-Vermont, U.S. Election Atlas* ....................20

David L. Chandler, *Explained: Margin of Error*, MIT (Oct. 31, 2012)....................8

David Lauter, *The USC/L.A. Times poll saw what other surveys missed: A wave of Trump support*, L.A. TIMES (Nov. 8, 2016)....................18

Emily Gersema, *Why the USC Dornsife/L.A. Times Presidential Poll Is Unlike Other Polls*, USC DORNSIFE (Oct. 12, 2016)....................10

G. Elliott Morris, *How outlier polls happen-and what to do with them,* ABC NEWS (Sept. 26, 2023)....................21

Hafsteinn Einarsson & Agnar Freyr Helgason, *Evaluating Nonresponse and Non-Sampling Error Trends in Election Studies*, 95 ELECTORAL STUD. 102934 (June 2025) ....................10

Harry Enten, *Why outlier polls are a good thing*, CNN (Aug. 28, 2019) ....................21

Jeff Brady, Nathan Rott & Jennifer Ludden, *There's a Lot at Stake for the Climate in the 2020 Election*, NPR (Oct. 22, 2020)....................13

Joel Mathis, *Is that big lead for Sharice Davids over Amanda Adkins just a polling mirage?*, KAN. CITY STAR (Nov. 3, 2022)....................19

Kaleigh Rogers & Christine Zhang, *Accurate Polls Hinge on a Tricky Question: Who's Actually Going to Vote?*, N.Y. TIMES (Sept. 23, 2024)....................16, 17

Kaleigh Rogers, *Where Polls Can Mess Up (and What Pollsters Do About It)*, N.Y. TIMES (Oct. 14, 2024) ...........................................................................16

Kristen Olson, *Survey Participation, Nonresponse Bias, Measurement Error Bias, and Total Bias*, 70 PUB. OP. QUARTERLY 737 (2006) .........................................6

Lee Rainie *et al*., *Polling in the age of cell phones*, PEW RSCH. CTR. (May 24, 2008) ...........................................................................................................9

NAT'L CTR. FOR SCI. & ENG'G, *General Methodology, Science and Engineering Indicators Methodology*.........................................................................9

Nate Silver, *How To Handle An Outlier Poll*, FIVETHIRTYEIGHT (Sept. 3, 2019)..18

Nate Silver, *Trust a pollster more when it publishes "outliers,"* SILVER BULLETIN (Sept. 23, 2024)..................................................................................19

*Outlier Poll Results Are Inevitable. They're Also Sometimes Right*, N.Y. TIMES (June 26, 2024) ..............................................................................................18

Paul P. Biemer, *Total Survey Error: Design, Implementation, and Evaluation*, 74 PUB. OP. Q. 817 (2011) ..........................................................................11, 12

PEW RSCH. CTR., *In Tied Presidential Race, Harris and Trump Have Contrasting Strengths, Weaknesses, 1. Harris, Trump and the state of the 2024 presidential race* (Sept. 9, 2024)...........................................................................7

PEW RSCH. CTR., *U.S. Survey Methodology* ............................................................6

QUINNIPIAC UNIV. POLL, *How can a poll of 1,000 respondents represent the whole country?* ...............................................................................................8

Scott Keeter & Kyley McGeeney, *Coverage Error in Internet Surveys*, PEW RSCH. CTR. (Sept. 22, 2015)..........................................................................9

Simon Jackman & Bradley Spahn, *Why Does the American National Election Study Overestimate Voter Turnout?*, 27 POL. ANALYSIS 193 (Apr. 2019).........11

Thomas Klausch, Joop J. Hox & Barry Schouten, *Measurement Effects of Survey Mode on the Equivalence of Attitudinal Rating Scale Questions*, 42 SOC. METHODS & RSCH. 227 (Aug. 2013) ....................................................................................................................12

## IDENTITY AND INTEREST OF *AMICUS CURIAE*[1]

Founded in 1947, the American Association for Public Opinion Research ("AAPOR") is the nation's leading professional organization of public opinion and survey researchers. AAPOR has more than 2,000 members, who span academia, media, government, nonprofit organizations, and private industry. AAPOR is committed to the principle that accurate, transparent data about public attitudes and behavior are essential to informed policymaking and to a healthy democracy.

AAPOR promotes rigorous ethical and professional standards in survey research. To this end, it publishes a Code of Professional Ethics and Practices,[2] a guide to Best Practices for Survey and Public Opinion Research,[3] and hosts the AAPOR Transparency Initiative.[4] AAPOR also publishes three academic journals: Public Opinion Quarterly, Survey Practice, and the Journal of Survey Statistics and Methodology. AAPOR's publications and programs emphasize transparency, methodological integrity, and the responsible use of survey results while

---

[1]All parties consented to the filing of this amicus brief. No party's counsel authored the brief in whole or in part. No party or party's counsel contributed money intended to fund preparing or submitting the brief. No person other than the *amicus curiae*, their members, or their counsel contributed money intended to fund preparing or submitting this brief.

[2]AAPOR, *Standards and Ethics*, https://perma.cc/A4VD-HQHB.

[3]AAPOR, *Best Practices for Survey Research*, https://perma.cc/PB8H-ES9D.

[4]AAPOR, *Transparency Initiative*, https://perma.cc/5MS2-HZ9K.

underscoring that error and that occasional outlier results are an expected feature—not a failure—of professionally conducted surveys.

Public opinion research plays a vital role in democratic governance. It helps ensure that public discourse is informed by evidence rather than speculation and provides a check against unsupported claims about the will of the people, particularly in moments of public uncertainty or crisis. In an era of increasing political polarization and fragmented media—where individuals are often exposed only to views that reinforce their existing beliefs—scientifically conducted polling offers a broader and more accurate picture of what Americans think and feel. Polling promotes a more informed understanding of public opinion and strengthens democratic discourse.

AAPOR has a strong interest in affirmance as a contrary determination would undermine the longstanding First Amendment protections afforded to AAPOR's members by making polling professionals liable for unavoidable statistical variation. AAPOR submits this brief to explain the scientific foundations of public opinion research, which demonstrates why, both as a matter of policy and under the First Amendment, polling professionals cannot be subject to liability for outlier results.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Appellant Dennis Donnelly asks this Court to create a novel "fake news" exception to the First Amendment's protections for freedom of speech—one that would allow polling professionals to be punished when elections diverge from their predictions. But Donnelly's claim that an outlier poll supports an inference of actual malice, recklessness, deception, or malpractice is unmoored from statistical science and well-established law; indeed, the First Amendment would bar such a claim under any standard. Political polling is not a representation, warranty, or covenant of future results. Rather, it is an approximation of the population it seeks to sample at the time interviews are conducted. Accepting Donnelly's argument would do far more than decide this case: it would chill future polling, degrade the information upon which voters and elected officials rely, and deprive the public of independent, transparent measurements of opinion.

In a system that relies on imperfect information and probabilistic methods, errors and outliers do not, and cannot, constitute evidence of actionable misconduct. At every stage of the polling process, polling professionals make informed judgment calls based on incomplete and imperfect information to minimize survey error. Some sources of error are known and measurable. Others are diffuse, shift with time, or are entirely unknowable. As polling professionals have long explained,

even the most rigorous survey has imprecision that cannot be fully predicted or controlled.

Outlier results are a predictable feature of statistical inference. In any system that relies on random sampling, each poll is an *estimate* of the true population value (*e.g.*, voter preference), and that estimate is subject to random sampling variation. It is statistically unavoidable under repeated sampling that some methodologically sound polls will land at the extremes of the distribution. In other words, even a methodologically sound poll can be an outlier. Even when results seem shocking, history reveals that outliers are signals that may reflect emerging changes in public opinion, shifts in turnout, or limitations in prevailing assumptions. There is no way to know, at the time of publication, whether a given outlier is "wrong" or instead capturing something real that other polls have missed.

If Donnelly's theory were accepted, polling professionals across the country—including academics, nonprofit researchers, and those at local news organizations—would suddenly face litigation risk whenever their findings diverged from a momentary consensus or from ultimate outcomes. Unlike large media companies, many polling organizations lack the resources to operate in an environment that risks even the threat of litigation. For these entities, liability tied to the inherent uncertainty of polling would create a powerful incentive to exit the market for high-profile election polling altogether, especially in presidential cycles

where scrutiny and stakes are highest. The predictable result is not better polling; it is less polling, and a degraded information ecosystem.

Without a doubt, the polling at issue in this case is "core political speech" at the heart of the First Amendment, which is "integral to the operation of the system of government established by our Constitution." *See McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 346 (1995) (citation omitted). The protections afforded to this democratic discourse do not depend on their accuracy in hindsight. Nor can they be skirted under the guise of a fraud or consumer protection action. To safeguard both the integrity of democratic discourse and the independence of those who inform it, this Court should affirm.

## ARGUMENT

### I. POLLING IS AN EXERCISE IN MEASUREMENT UNDER UNCERTAINTY, NOT A FALSIFIABLE STATEMENT OF FACT.

In a system that relies on imperfect information and probabilistic methods, the First Amendment bars liability outright for errors and outliers. But even on the bases Donnelly advocates—actual malice, *see* Opening Brief ("OB") at 31, recklessness, *see id.* at 38, deception, *see id.* at 56, or malpractice, *see id.* at 61—a polling "miss" cannot support a claim. Inferences derived about a population from a random sample cloaked in layers of uncertainty that no methodology can fully eliminate. *See* AAPOR, *Polling Accuracy, Key Points to Remember About Polling in the Run-up to Election Day* (explaining "polls are estimates, not forecasts, and should be

interpreted with caution").[5] At every stage of the process—sampling, contacting respondents, weighting results, and interpreting answers—polling professionals make informed judgment calls based on incomplete information. *See* Kristen Olson, *Survey Participation, Nonresponse Bias, Measurement Error Bias, and Total Bias*, 70 PUB. OP. QUARTERLY 737, 739 (2006).[6]

As detailed below, some sources of error are known and measurable; others are diffuse, shifting, and unknowable. Even the most rigorous survey has imprecision that cannot be fully predicted or controlled. *See* PEW RSCH. CTR., *U.S. Survey Methodology* (explaining Pew national surveys are designed to *minimize*, not eliminate, a host of sampling, measurement, and post-collection errors).[7] Contemporary election polling involves sophisticated methodological choices and equations designed to reduce error, yet even these methods are far from clairvoyant and cannot account for who will vote or how voters' opinions may shift before an election. The uncertainty inherent in polling underscores the importance of publishing a wide range of perspectives, including outlier polls—which are valuable in the open marketplace of ideas and sometimes prove correct.

[5]Available at https://perma.cc/ML8Q-5X35.
[6]Available at https://tinyurl.com/2k78xar8 (permalink not available).
[7]Available at https://perma.cc/A7GA-82DL.

### A. Opinion Polling Is Necessarily Imperfect Because It Relies On Unknowable Human Factors.

To see why polling is necessarily imperfect, consider how a typical national poll is conducted. On September 9, 2024, the Pew Research Center published a survey showing then-Vice President Kamala Harris and then-former President Donald Trump tied at 49% among registered voters. PEW RSCH. CTR., *In Tied Presidential Race, Harris and Trump Have Contrasting Strengths, Weaknesses, 1. Harris, Trump and the state of the 2024 presidential race* (Sept. 9, 2024) ("*In Tied Presidential Race*").[8] To create this poll, Pew did not survey every American voter. Instead, it surveyed a randomly selected sample of them—the same principle of random selection that underlies many areas of scientific inquiry—to yield a group that would reflect the public. Adam J. Berinsky, *Measuring Public Opinion with Surveys*, 20 ANN. REV. POL. SCI. 309, 311 (Mar. 2, 2017) (discussing random sampling).[9] Polling professionals obtain samples from a mix of phone calls, text messages, online surveys, and postal mail. *Id.* at 312–15 (describing common sampling techniques).

Response rates to pollsters' outreach can be as low as one to two percent, *see* Allison Parshall, *Why Election Polling Has Become Less Reliable*, SCI. AM. (Oct.

[8]Available at https://perma.cc/6FFN-VE7G.
[9]Available at https://perma.cc/Q5MU-GU9S.

31, 2024) (explaining the crisis of falling response rates),[10] which means pollsters have to reach out to as many as 100,000 people to get 1,000 respondents, the typical sample size of a national poll. *See* QUINNIPIAC UNIV. POLL, *How can a poll of 1,000 respondents represent the whole country?*, Frequently Asked Questions.[11] While the principles of random sampling mean that survey results should be close to the truth on average, no sample is ever perfectly random, and there are four main sources of error that can cause the sample to differ from the population, sometimes widely. *See* David L. Chandler, *Explained: Margin of Error*, MIT (Oct. 31, 2012).[12]

The first potential source of error is reflected in the poll's margin of sampling error, which is the "measure of how much a result based on interviews with a limited number of voters ... differs from the result that you would get if you were able to interview all the likely voters in the country." *Id.* A typical 1,000-person poll or survey has a margin of sampling error of roughly three percentage points in either direction at a 95% confidence level, which means an estimate of 49% for each candidate is actually merely the center point of a range (here, roughly 46% to 52%) that could plausibly contain the true population value. *See id.*; *see also generally* AAPOR, *Margin of Sampling Error/Credibility Interval* (margin of error "describes

[10]Available at https://perma.cc/K9K3-QSMW.
[11]Available at https://perma.cc/P57G-RGWB.
[12]Available at https://perma.cc/LV4G-2V64.

the range that the answer likely falls between *if* we had talked to everyone instead of just a sample").[13]

The second potential source of error is coverage error. *See* NAT'L CTR. FOR SCI. & ENG'G, *General Methodology, Science and Engineering Indicators Methodology*.[14] A pollster's target population consists of all the individuals or units that the pollster would like to study (here, the American voting public). *See id*. The sampling frame is the source (or sources) from which the sample is drawn. *See id*. Frequently, however, the target population includes members who are inaccessible or who cannot be identified in advance. The coverage error is the discrepancy between these two. *Id*. For example, political polls that rely only on landline calls may exclude younger and lower-income voters, creating inadvertent coverage error by omitting segments of the population from the sampling frame. *See* Lee Rainie *et al*., *Polling in the age of cell phones*, PEW RSCH. CTR. (May 24, 2008) (explaining landline samples tend to be older and higher-income than cell phone samples);[15] *see also* Scott Keeter & Kyley McGeeney, *Coverage Error in Internet Surveys*, PEW RSCH. CTR. (Sept. 22, 2015) (explaining that web-only surveys can produce

---

[13] Available at https://perma.cc/RX4T-KPZQ.
[14] Available at https://perma.cc/A6YR-A9NQ.
[15] Available at https://perma.cc/S6G7-8NHA.

substantial coverage error on technology-related measures, with particularly large distortions among older adults).[16]

The third source of error is nonresponse error. Nonresponse leads to bias when groups that differ in important ways have different rates of participation in a survey. This can bias the results in favor of groups that are more likely to respond. *See* Hafsteinn Einarsson & Agnar Freyr Helgason, *Evaluating Nonresponse and Non-Sampling Error Trends in Election Studies*, 95 ELECTORAL STUD. 102934 at 1 (June 2025) (explaining nonresponse error).[17] For example, "young adults (18-29-years-old) and those without university degrees are increasingly underrepresented among respondents." *Id.* at 2. As a result, nonresponse error can skew poll results and limit the extent to which a survey accurately reflects the views of the full population. And polls that *only* pursue "likely voter" samples exclude certain eligible voters—especially low-propensity or irregular voters—from the outset, creating a mismatch between the sampling frame and the target population. *See* Emily Gersema, *Why the USC Dornsife/L.A. Times Presidential Poll Is Unlike Other Polls*, USC DORNSIFE (Oct. 12, 2016) (explaining USC Dornsife/LA Times poll does

---

[16] Available at https://perma.cc/WLL4-TH5H.

[17] Available at https://tinyurl.com/5fukpkxc (permalink not available).

not use a "likely voter" sample, and instead "asks participants to rate their likelihood of voting and voting for each candidate").[18]

The fourth potential source of error is measurement error, which occurs when people "(deliberately or unintentionally) provide incorrect information in response to questions." Paul P. Biemer, *Total Survey Error: Design, Implementation, and Evaluation*, 74 PUB. OP. Q. 817, 823 (2011) ("*Total Survey Error*").[19] Political poll respondents sometimes provide socially desirable answers—responses that align with perceived social norms or project a favorable image—rather than their true preferences. *See generally* Simon Jackman & Bradley Spahn, *Why Does the American National Election Study Overestimate Voter Turnout?*, 27 POL. ANALYSIS 193, 193–95 (Apr. 2019) (explaining respondents frequently overreport their likelihood of voting). This phenomenon is a significant challenge in polling, often leading to the overreporting of "good" behaviors (like voting) and the underreporting of unpopular or controversial opinions. *See generally id.*; *see also* Andy Brownback & Aaron Novotny, *Social Desirability Bias and Polling Errors in the 2016 Presidential Election*, 74 J. BEHAV. & EXPERIMENTAL ECON. 38, 49 (June 2018) (explaining that members of both political parties are relatively more likely to

[18]Available at https://perma.cc/YYE3-N799.
[19]Available at https://perma.cc/58TM-KX7G.

conceal support for the opposing party's candidate).[20] Likewise, AAPOR members' and other polling professionals' research shows that the same question can be interpreted differently depending on whether it is asked by phone, online, or in person, due to differences in framing and available context. *See generally, e.g.*, Benjamin W. Domingue *et al.*, *The Mode Effect of Web-Based Surveying on the 2018 U.S. Health and Retirement Study Measure of Cognitive Functioning*, 78 J. GERONTOLOGY B 1466 (Aug. 2023)[21]; Thomas Klausch, Joop J. Hox & Barry Schouten, *Measurement Effects of Survey Mode on the Equivalence of Attitudinal Rating Scale Questions*, 42 SOC. METHODS & RSCH. 227 (Aug. 2013); *see also Best Practices*, *supra* note 3, at 3; *Total Survey Error*, *supra* at 823 (explaining interviewers' "speech, appearance, and mannerisms ... may undesirably influence responses").

In addition to these *known* error sources that impact surveys broadly, the task before election pollsters is further complicated by the fact that they must attempt to predict future behavior from self-reported opinions that can change between the time of the survey and the election. *See* Christopher Prosser & Jonathan Mellon, *The Twilight of the Polls? A Review of Trends in Polling Accuracy and the Causes of Polling Misses*, 53 GOV'T & OPP. 757, 768 (May 2018) (explaining that voters

---

[20]Available at https://tinyurl.com/46axfrsu (permalink not available).
[21]Available at https://perma.cc/B2PV-KLSR.

changing their minds between when they were polled and the time they cast their vote is one of the most commonly cited sources of polling error).[22] Voters may switch at the last minute when they learn they disagree with a candidate on a wedge issue, like fracking in the closing days of the 2020 campaign. Jeff Brady, Nathan Rott & Jennifer Ludden, *There's a Lot at Stake for the Climate in the 2020 Election*, NPR (Oct. 22, 2020) (describing how both presidential candidates emphasized sharply contrasting energy and climate policies, including positions on fossil fuel development and environmental regulation, in the final weeks of the 2020 campaign).[23] These unknown and unforeseeable factors also limit the predictive accuracy of election polling.

With all these (and more) factors in mind, polling professionals have long recognized and explained that the commonly cited three percentage point margin of sampling error, alone, *see supra*, underestimates a poll's total likely error. *See* Courtney Kennedy, *Building Trust Through More Realistic Expectations … And a More Accurate Margin of Error*, AAPOR NEWSL. (Aug. 29, 2024);[24] *see also* Prosser & Mellon, *supra* at 757, 768 (explaining "the level of error has always been substantially beyond that implied by stated margins of error" and noting "that polls

[22]Available at https://perma.cc/UT9U-QHFE.
[23] Available at https://perma.cc/XX99-UAWC.
[24]Available at https://perma.cc/LQ62-KD9U.

have *always been inaccurate and continue to be so*"). For this reason, AAPOR requires each member of its Transparency Initiative to include in their methods and limitations information a "general statement acknowledging the unmeasured error associated with all forms of public opinion research." *See Transparency Initiative*, *supra* note 4.

Because the limitations of polling are well-documented and unavoidable, a poll's deviation from its stated margin of sampling error cannot unilaterally be recast as a "falsifiable statement" of fact, OB at 47, 50—actionable whenever hindsight reveals it to be inconsistent with the election outcome. *See Cornell v. Wunschel*, 408 N.W.2d 369, 374 (Iowa 1987) (in an action for fraud, plaintiff must show scienter and *intent to deceive*). For good reason, plaintiffs offering similar theories in other courts have failed. The Southern District of Florida rejected a "novel and unprecedented expansion of the scope of tort law" seeking to hold the Weather Channel liable for damage caused by an incorrect forecast, because plaintiffs' theory would "chill the well established first amendment rights of the broadcasters." *Brandt v. Weather Channel, Inc.*, 42 F. Supp. 2d 1344, 1345–46 (S.D. Fla. 1999), *aff'd*, 204 F.3d 1123 (11th Cir. 1999). *See also, e.g.*, *Wash. League for Increased Transparency & Ethics v. Fox News*, Wash. App. 2d 1006, 2021 WL 3910574, at *5 (2021) ("Although WASHLITE pursues the meritorious goal of ensuring that the public receives accurate information … the [alleged COVID disinformation]

statements do not fall within the narrow exceptions to the First Amendment's protections."); *Scott v. Roberts*, 612 F.3d 1279, 1283 (11th Cir. 2010) (noting "opinion polls of random selections of voters are snapshots with margins of error, and campaigns are, to say the least, dynamic projects").

Indeed, the First Amendment affords political discourse the highest protection precisely because "erroneous statement[s] [are] inevitable in free debate, and [they] must be protected if the freedoms of expression are to have the breathing space that they need to survive." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270–72 (1964) (internal quotation marks & citation omitted). Because error is an inherent feature of polling sample populations—and an inevitable and constitutionally protected aspect of free political discourse—the Court should affirm the lower court's holding that liability cannot attach to an outlier poll.

### B. Polls Conducted According to Accepted Methods Are Expected To Yield Varied Results, Even With Mitigation.

Understanding that error is inherent in surveys and public opinion polling, pollsters and survey scientists engage in a process called weighting to mitigate distortions and errors in their data. AAPOR, *Weighting* at 1 (explaining weighting "adjusts the poll data in an attempt to ensure that the sample more accurately reflects the characteristics of the population from which it was drawn and to which an

inference will be made").[25] Weighting compensates for probabilities of selection, nonresponse, and other aspects of survey design to produce estimates that better reflect the true population values. Kaleigh Rogers, *Where Polls Can Mess Up (and What Pollsters Do About It)*, N.Y. TIMES (Oct. 14, 2024). If a pollster surveyed a population that was 50 percent women and 50 percent men, for example, but their sample included only 40 percent men, they would weight the men's responses more highly to match the target population more closely. Similarly, overrepresented groups would receive lower weights. Polling professionals use complex equations to weight data for many different traits, which can include age, race, partisan affiliation, and education. *See* Courtney Kennedy *et al.*, *Why and how we're weighting surveys for past presidential vote*, PEW RSCH. CTR. DECODED BLOG (July 23, 2025).[26]

But weighting poll data to accurately represent the United States population—the composition of which we *know* from the United States Census—is much easier than weighting to represent a population that does not yet exist. The latter is the task before election pollsters, who do not and could not possibly know who will vote on election day. *See* Kaleigh Rogers & Christine Zhang, *Accurate Polls Hinge on a Tricky Question: Who's Actually Going to Vote?*, N.Y. TIMES (Sept. 23, 2024)

[25] Available at https://perma.cc/SL42-Y6AC.
[26] Available at https://perma.cc/UQ26-SNEV.

("*Accurate Polls*"). There's no guarantee that any "likely voter" surveyed ahead of an election will actually vote. *Id.* And even the predictive value of someone's "likelihood" of voting has limits: some elections have voting populations that differ markedly from prior cycles. *See* Andrew Howard, *'Big mistakes': Pollsters face recriminations for missing the Mamdani surge*, POLITICO (June 25, 2025) ("*Big mistakes*") (explaining that only one polling firm predicted the 2025 New York mayoral primary by weighting for a much younger voting population than seen before).[27]

To deal with this uncertainty, individual pollsters and polling firms make an array of weighting decisions to minimize error based on their own estimate of the likely electorate. *Accurate Polls*, *supra* (in determining who is a likely voter, "[t]here's no one right answer, and every polling firm has its own strategy"). These differences reflect methodological independence and offer different interpretations for voters and other pollsters to consider. The court below was therefore correct in finding that opinion polling—which relies on pollsters' subjective assessments of probability and voter demographics—is *itself* a type of estimate or opinion. *See* App. 62; R. Doc. 48, at 1 (reasoning the Iowa poll was a "snapshot" of a "dynamic and changing electorate[,]" an "opinion poll of a future event") (citation omitted).

---

[27] Available at https://tinyurl.com/yh2szz5n (permalink not available).

### C. Outlier Results Are Valuable and Sometimes Correct.

Donnelly asks this Court to infer recklessness based on the Register's description of Ann Selzer's outlier poll as "stunning," "shocking," or a "surprise." *See* OB at 37, 38, 41. But far from being "reckless," it is statistically inevitable that some methodologically sound polls will land at the extremes of the distribution. "Outlier" poll results—polls whose results differ substantially from the consensus of other *contemporaneous* polls—are both inevitable and informative. *See* Andrew Mercer, *5 key things to know about the margin of error in election polls, How do I know if there has been a change in the race?*, PEW RSCH. CTR. (Sept. 8, 2016) (explaining that, under "the traditional 95% threshold, we would expect 5% … of … polls to produce" outlier results)[28]; *see also* Nate Silver, *How To Handle An Outlier Poll*, FIVETHIRTYEIGHT (Sept. 3, 2019) ("Outliers are a part of the business. In theory, 1 in 20 polls should fall outside the margin of error as a result of chance alone.").[29] And history shows that "stunning" outliers may accurately reflect emerging shifts in opinion and better capture voters underrepresented by the consensus. Indeed, "while outliers are less likely to be accurate, the most valuable poll of all is the outlier that's right." Nate Cohn, *Outlier Poll Results Are Inevitable. They're Also Sometimes Right*, N.Y. TIMES (June 26, 2024) ("*Outlier Poll Results*").

---

[28]Available at https://perma.cc/24XT-F8A8.

[29]Available at https://perma.cc/MKD7-Y9FS.

Consider the 2016 USC Dornsife/Los Angeles Times "Daybreak" Poll, which showed much stronger support for Donald Trump than most other national surveys. David Lauter, *The USC/L.A. Times poll saw what other surveys missed: A wave of Trump support*, L.A. TIMES (Nov. 8, 2016). Some Democrats denounced the poll's results and criticized *The Los Angeles Times* for running it, arguing it overstated Trump's support. *Id.* But the poll's methodology was rigorous and transparent, employing weighting and sampling techniques that captured segments of the electorate underrepresented by more conventional surveys. Likewise, the New York Times's midterm poll of Kansas's 3rd Congressional District in 2022 showed Democrat Sharice Davids with a 14-point lead over Republican Amanda Adkins—widely considered a striking margin given the district's recent redistricting and Davids's more modest margins in 2020. Joel Mathis, *Is that big lead for Sharice Davids over Amanda Adkins just a polling mirage?*, KAN. CITY STAR (Nov. 3, 2022).[30] The result drew skepticism, in part because it diverged from expectations and the district's historically Republican lean. *Id.*; *see also* Nate Silver, *Trust a pollster more when it publishes "outliers,"* SILVER BULLETIN (Sept. 23, 2024) ("*Trust a pollster*") (discussing the "narrative-defying" 2022 New York Times midterm polls, downplayed by New York Times itself, that all proved correct).[31] In

[30]Available at https://perma.cc/7G8X-P8SJ.

[31]Available at https://perma.cc/ZVE7-Z5QH.

another example from last year's New York mayoral primary, only one polling firm accurately predicted Zohran Mamdani's success by weighting for a spike in first-time primary voters that the consensus did not predict. *See 'Big mistakes', supra* ("At the time, people treated it as a wild outlier," but in retrospect, the poll provided "a very accurate representation of where [the race] was at that time."). Outliers are by definition "discordant," OB at 41, but nevertheless can be prescient.

Donnelly's additional claim that predicting substantial partisan shifts "show[s] recklessness" because such shifts are "unheard-of in politics" is also meritless. *Id.* at 38–39 (emphasis omitted). History is rife with examples of similar shifts. In 1988, George H.W. Bush won Vermont by 3.5 points, but in 1992, Bill Clinton claimed the state by 16 points—a 19.2-point swing. *Compare* Dave Leip's Atlas of U.S. Presidential Elections, *1988 Presidential General Election Results—Vermont, U.S. Election Atlas*[32] *with* Dave Leip's Atlas of U.S. Presidential Elections, *1992 Presidential General Election Results—Vermont, U.S. Election Atlas*.[33] More recently, in Howard County, Iowa, the shift from Obama to Trump in the same time period was forty-one points. Asma Khalid, *In 2012, Obama Won This Tiny Iowa County by 21 Points. Then Trump Won It by 20*, ME. PUB. (Jan. 16, 2020).[34]

[32] Available at https://perma.cc/K6DW-NM78.
[33] Available at https://perma.cc/XN4N-TCP9.
[34] Available at https://perma.cc/4PP3-B5QZ.

Substantial electoral swings are far from "unheard-of" and, like outliers more generally, provide no basis for inferring recklessness from a poll.

Even when they miss the mark in hindsight, methodologically sound outlier polls nevertheless provide the public with valuable information. Although it may seem counterintuitive, averages are actually made more accurate by outliers. *See* Harry Enten, *Why outlier polls are a good thing*, CNN (Aug. 28, 2019).[35] If pollsters were to discard or decline to publish outliers, it would undermine both the integrity of polling and would mislead the public by artificially truncating the range of projected outcomes. *See* G. Elliott Morris, *How outlier polls happen—and what to do with them*, ABC NEWS (Sept. 26, 2023).[36] But Donnelly's proposed rule would chill publication of outlier polls, and thus preclude the public's consideration of this information, in effect, "limiting the stock of information from which members of the public may draw." *First Nat'l Bank v. Bellotti*, 435 U.S. 765, 783 (1978). The court-sanctioned reduction of information Donnelly seeks is antithetical to a free system, and perhaps especially perverse in the context of opinion polling, which is most valuable to the public precisely when it diverges from expectations. *See Associated Press v. United States*, 326 U.S. 1, 20 (1945) ("the widest possible dissemination of

[35] Available at https://tinyurl.com/mvdxf4pe (permalink not available).
[36] Available at https://tinyurl.com/amk52a58 (permalink not available).

information from diverse and antagonistic sources is essential to the welfare of the public”).

## II. DONNELLY’S POSITION WOULD DRIVE INDEPENDENT POLLSTERS OUT OF THE MARKET AND CAUSE SELF-CENSORSHIP.

Effective self-governance depends on access to independent, transparent measurements of public opinion. *Buckley v. Valeo*, 424 U.S. 1, 14 (1976) (“Discussion of public issues ... [is] integral to the operation of the system of government established by our Constitution. The First Amendment affords the broadest protection to such political expression[.]”). Elections alone cannot capture the full range, intensity, or evolution of public attitudes between cycles; they register outcomes, not the underlying distribution of views. Rigorous surveys help to fill that gap, offering an empirical means for citizens, journalists, and policymakers to understand public opinion as it develops. Prerequisite to these benefits, however, is scientific independence. Both AAPOR’s Best Practices guidelines and Transparency Initiatives emphasize that public opinion research must be transparent in method, grounded in random sampling, and, critically, insulated from partisan or financial pressure. *See Standards and Ethics*, *supra* note 2 (“good professional practice imposes the obligation upon all public opinion and survey researchers to disclose sufficient information about how the research was conducted,” including who sponsored the research); *Transparency Initiative*, *supra* note 4 (requiring

members of the Transparency Initiative to disclose who sponsored their research, the methods used to generate and recruit samples, and a description of how and why the data were weighted). Donnelly's theory would invert those principles. If deviation from polling averages or eventual election outcomes carries a risk of liability, the predictable result is not better polling; it is less polling.

Independent public opinion research operates under significant financial constraints. Unlike large media companies, many polling organizations—including academic centers, nonprofit research groups, and smaller firms—lack the resources to operate in an environment that risks even the possibility of litigation. For these entities, exposure to lawsuits tied to the inherent uncertainty of polling would create a powerful incentive to exit the market for high-profile election polling altogether, especially in presidential cycles where scrutiny and stakes are highest. This chilling effect would not be limited to election polling. It would also deter organizations conducting broader survey research on social, economic, and public health issues, undermining the ability of researchers to gather and share vital data that informs public understanding and policy debates.

The First Amendment does not permit a regime that forces speakers to choose between silence and ruinous liability. *See, e.g.*, *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 161–62 (2014) (recognizing that a credible threat of liability can induce speakers to refrain from speaking altogether). In *Sullivan*, the Supreme Court

warned that imposing liability for erroneous statements would "dampen[] the vigor and limit[] the variety of public debate," as speakers steer far wider of the unlawful zone than necessary. 376 U.S. at 279; *see also NAACP v. Button*, 371 U.S. 415, 433 (1963) (recognizing that vague or expansive liability regimes deter the exercise of First Amendment rights by forcing speakers to withdraw from protected activity). More recently, a panel of this Court reaffirmed that principle in *281 Care Committee v. Arneson*, holding that even infrequently enforced laws can impose an impermissible chill on protected speech, as speakers self-censor rather than risk investigation, expense, or sanction. 638 F.3d 621, 628–31 (8th Cir. 2011).

The same principle applies here. Faced with the prospect of liability tied to outcomes they cannot control—inevitable in a probabilistic environment—polling organizations would withdraw from election polling or avoid publishing results that carry litigation risk.[37] The result would be a thinner, less reliable information environment, and remaining polls would be concentrated among entities best

---

[37] Some polling professionals might respond not by exiting, but by refusing to publish outliers or by conforming their results toward consensus averages—a phenomenon known as "herding." AAPOR has recognized that such pressure already exists in the field, as pollsters sometimes suppress outliers "to avoid being seen as the one firm that got it wrong." AAPOR, *Herding*, https://perma.cc/F748-X9T3. Herding is widely acknowledged within the profession as violative of best practices. *See Best Practices*, *supra* note 3. The threat of liability under Donnelly's proposed theory would encourage herding. Whether through exit or coerced conformity the effect is the same: a degraded and potentially misleading information ecosystem.

positioned to absorb legal exposure, reducing methodological diversity and increasing the risk of systemic blind spots.

Though Donnelly claims that he seeks relief from an inaccurate public opinion estimate, *see* OB at 5, reversal would not improve Iowa polls' accuracy. Instead, it would create a rule that would artificially compress the range of reported outcomes—degrading the predictive value of polls. *See* Morris, *supra* (explaining "[t]hrowing out polls you don't believe in is a recipe for 'herding' … [that] can decrease the accuracy of polling averages"). Donnelly's position directly conflicts with the First Amendment's "profound national commitment ... to the principle that debate on public issues should be uninhibited, robust, and wide-open." *Sullivan*, 376 U.S. at 270. And the chilling effect his theory would impose on public opinion research is one that "the First Amendment cannot permit if free speech, thought, and discourse are to remain a foundation of our freedom." *United States v. Alvarez*, 567 U.S. 709, 723 (2012).

There is no way, at the time of publication, to know whether a given outlier poll is "wrong" or instead capturing something real that other polls have missed—and "the most valuable poll of all is the outlier that's right." Cohn, *supra*. The Court should affirm to avoid an absurd result, one no different in principle from allowing lawsuits against a meteorologist for forecasting sunshine before an unexpected storm, *see Weather Channel*, 42 F. Supp. 2d at 1345–46, or against an economist for

projecting growth that later falters. Constitutional protection for public discourse extends to all opinions—not just unsurprising or agreeable ones—precisely because we cannot know in advance which will prove correct. *See Sullivan*, 376 U.S. at 270.

## CONCLUSION

For the foregoing reasons, *amicus* respectfully requests that this Court affirm dismissal.

April 21, 2026

Respectfully submitted,

*/s/ Caesar Kalinowski IV*

Caesar Kalinowski IV
*Counsel of Record*
Shontee Pant
Nicole Saad Bembridge
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, Washington 98104-1610
Telephone: 206.622.3150
caesarkalinowski@dwt.com
shonteepant@dwt.com
nicolesaadbembridge@dwt.com

*Counsel for Amicus Curiae American Association for Public Opinion Research*

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because this brief contains 5557 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(5) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

*/s/ Caesar Kalinowski IV*
Caesar Kalinowski IV

## **CIRCUIT RULE 28A(h) CERTIFICATION**

I certify that the electronically filed version of this document has been scanned for viruses and has been determined to be virus-free.

*/s/ Caesar Kalinowski IV*
Caesar Kalinowski IV

## CERTIFICATE OF SERVICE

I certify that I caused this document to be electronically filed with the Clerk of the Court using the appellate CM/ECF system on April 21, 2026. All participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

*/s/ Caesar Kalinowski IV*
Caesar Kalinowski IV