No. 25-3451

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE EIGHTH CIRCUIT**

---

DENNIS DONNELLY,
Plaintiff-Appellant,

v.

DES MOINES REGISTER AND TRIBUNE CO., INC., et al.,
Defendants-Appellees.

---

On Appeal from the United States District Court for the Southern District of Iowa,
Case No. 4:25-cv-00150 (Hon. Rebecca G. Ebinger)

---

# BRIEF OF AMICI CURIAE REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS AND 46 NEWS AND MEDIA ORGANIZATIONS IN SUPPORT OF DEFENDANTS-APPELLEES SEEKING AFFIRMANCE

---


Bruce D. Brown (Bar No. 1067194)
*Counsel of Record*
Lisa Zycherman*
Mara Gassmann*
Claudia Liss-Schultz*
**Of Counsel*
REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1020
Washington, D.C. 20005
Telephone: (202) 795-9300
bruce.brown@rcfp.org

*Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENTS

Pursuant to Federal Rule of Appellate Procedure 26.1, amici certify as follows:

The Reporters Committee for Freedom of the Press is an unincorporated association of reporters and editors with no parent corporation and no stock.

AIM Media Midwest is privately held and managed by AIM Media Management LLC, and no publicly held corporation owns 10% or more of AIM Media Midwest.

American Broadcasting Companies, Inc. is an indirect, wholly-owned subsidiary of The Walt Disney Company, a publicly traded corporation.

The Associated Press is a global news agency organized as a mutual news cooperative under the New York Not-For-Profit Corporation law. It is not publicly traded.

Association of Alternative Newsmedia has no parent corporation and does not issue any stock.

The Atlantic Monthly Group LLC is a privately-held media company, owned by Emerson Collective and Atlantic Media, Inc. No publicly held corporation owns 10% or more of its stock.

Axios Media Inc. is a privately owned company, and no publicly held company owns 10% or more of its stock.

Bloomberg L.P., the publisher of Bloomberg News, is a limited partnership. Its general partner is Bloomberg Inc., which is privately held. No publicly held corporation owns 10 percent or more of Bloomberg L.P.'s limited partnership interests.

CalMatters is a nonprofit California public benefit corporation recognized under Section 501(c)(3) of the Internal Revenue Code. No entity or person has an ownership interest of 10 percent or more of CalMatters.

The Center for Investigative Reporting, Inc. is a California non-profit public benefit corporation that is tax-exempt under section 501(c)(3) of the Internal Revenue Code. It has no statutory members and no stock.

Cityside Journalism Initiative is a 501(c)(3) nonprofit organization.

Courthouse News Service is a privately held corporation with no parent corporation and no publicly held corporation holds more than 10 percent of its stock.

The Dallas Free Press is a Texas non-profit public benefit corporation that is tax-exempt under section 501c)(3) of the Internal Revenue Code. It has no statutory members and no stock.

Dow Jones & Company, Inc. ("Dow Jones") is an indirect subsidiary of News Corporation, a publicly held company. Ruby Newco, LLC, an indirect subsidiary of News Corporation and a non-publicly held company, is the direct

parent of Dow Jones. News Preferred Holdings, Inc., a subsidiary of News Corporation, is the direct parent of Ruby Newco, LLC. No publicly traded corporation currently owns ten percent or more of the stock of Dow Jones.

Flagship Multimedia, Inc. is privately held, and no publicly held corporation owns 10% or more of its stock.

Guardian US's legal entity is Guardian News & Media LLC, a company incorporated in Delaware, whose registered office is at 315 West 36th St, New York, NY 10018. Guardian News & Media LLC's parent corporation is Guardian News & Media Limited, a private company. No publicly held corporation owns 10% or more of Guardian US's stock.

Harper's Magazine is published by Harper's Magazine Foundation, a 501(c)(3) non-stock corporation with no parent corporation.

Hearst Corporation is privately held and no publicly held corporation owns 10% or more of Hearst Corporation.

HuffPost is owned by BuzzFeed Inc., which is a privately owned company.

The Iowa Freedom of Information Council is a 501(c)(3) non-stock corporation with no parent corporation.

LION Publishers is a 501(c)(3) non-stock corporation with no parent corporation.

Montana Free Press is a 501(c)(3) non-stock corporation with no parent corporation.

National Broadcasting Company (NBC) owns 10% or more of Buzzfeed's stock.

National Press Photographers Association is a 501(c)(6) nonprofit organization with no parent company. It issues no stock and does not own any of the party's or amicus' stock.

The Nevada Independent is the dba for Nevada News Bureau, Inc., a 501(c)(3) non-stock corporation with no parent corporation.

The Institute for Nonprofit News is a 501(c)(3) non-stock corporation with no parent corporation.

The Intercept Media, Inc., publisher of The Intercept, is a non-profit non-stock corporation. It has no parent, subsidiaries, or affiliates.

The McClatchy Company, LLC is privately owned by certain funds affiliated with Chatham Asset Management, LLC and does not have publicly traded stocks.

MediaNews Group Inc. is a privately held company. No publicly-held company owns ten percent or more of its equity interests.

National Newspaper Association is a non-stock nonprofit Florida corporation. It has no parent corporation and no subsidiaries.

National Press Photographers Association is a 501(c)(6) nonprofit organization with no parent company. It issues no stock and does not own any of the party's or amicus' stock.

Comcast Corporation and its consolidated subsidiaries own 100% of the common equity interests of NBCUniversal Media, LLC.

New York Public Radio is a privately supported, not-for-profit organization that has no parent company and issues no stock.

The New York Times Company is a publicly traded company and has no affiliates or subsidiaries that are publicly owned. No publicly held company owns 10% or more of its stock.

News/Media Alliance represents the newspaper, magazine, and digital media industries, including nearly 2,200 diverse news and magazine publishers in the United States and internationally. It is a nonprofit, non-stock corporation organized under the laws of the commonwealth of Virginia. It has no parent company.

Newsday LLC is a Delaware limited liability company whose members are Tillandsia Media Holdings LLC and Newsday Holdings LLC. Newsday Holdings LLC is an indirect subsidiary of Cablevision Systems Corporation. Cablevision Systems Corporation is (a) directly owned by Altice USA, Inc., a Delaware

corporation which is publicly traded on the New York Stock Exchange and (b) indirectly owned by Altice N.V., a Netherlands public company.

Online News Association is a not-for-profit organization. It has no parent corporation, and no publicly traded corporation owns 10% or more of its stock.

Informed California Foundation, d/b/a Open Vallejo, is a California nonprofit corporation and an educational public charity organized pursuant to section 501(c)(3) of the U.S. Code. It has no parent corporation and issues no stock.

Pro Publica, Inc. ("ProPublica") is a Delaware nonprofit corporation that is tax-exempt under section 501(c)(3) of the Internal Revenue Code. It has no statutory members and no stock.

Radio Television Digital News Association is a nonprofit organization that has no parent company and issues no stock.

Reuters News & Media Inc. is a Delaware corporation whose parent is Thomson Reuters U.S. LLC, a Delaware limited liability company. Reuters News & Media Inc. and Thomson Reuters U.S. LLC are indirect and wholly owned subsidiaries of Thomson Reuters Corporation, a publicly-held corporation, which is traded on the New York Stock Exchange and Toronto Stock Exchange. There are no intermediate parent corporations or subsidiaries of Reuters News & Media Inc. or Thomson Reuters U.S. LLC that are publicly held, and there are no

publicly-held companies that own 10% or more of Reuters News & Media Inc. or Thomson Reuters U.S. LLC shares.

Rocky Mountain PBS is operated by Rocky Mountain Public Media, Inc., a 501(c)(3) non-stock corporation with no parent corporation.

The Seattle Times Company: The McClatchy Company, LLC owns 49.5% of the voting common stock and 70.6% of the nonvoting common stock of The Seattle Times Company.

Slate is part of The Slate Group, a wholly owned subsidiary of Graham Holding Company.

Society of Professional Journalists is a non-stock corporation with no parent company.

Undark Magazine is a publication of the Knight Science Journalism Program at MIT, a 501(c)(3) non-stock corporation with no parent corporation.

The War Horse is a non-profit 501(c)(3) and has no parent corporations or subsidiaries.

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENTS ..................................................... ii

TABLE OF AUTHORITIES ......................................................................... x

STATEMENT OF IDENTITY, INTEREST, AND AUTHORITY TO FILE ......... 1

RULE 29(A)(4)(E) CERTIFICATION ................................................................ 3

SUMMARY OF ARGUMENT ........................................................................ 4

ARGUMENT ................................................................................................... 6

I. Predictive analysis and commentary, including public opinion polls, are constitutionally protected opinions based on disclosed facts and cannot be characterized as "false" speech. ................................................................ 6

II. Even if the Iowa Poll could be characterized as "false," it is still entitled to strong First Amendment protection. ........................................................ 12

CONCLUSION ............................................................................................. 21

CERTIFICATE OF SERVICE ........................................................................ 22

CERTIFICATE OF COMPLIANCE .................................................................. 23

ADDENDUM: INDIVIDUAL AMICI CURIAE STATEMENTS OF IDENTITY .................................................................................................... 24

## TABLE OF AUTHORITIES

**Cases**

*Abbas v. Foreign Pol'y Grp., LLC*,
783 F.3d 1328 (D.C. Cir. 2015) ........ 13

*Arpaio v. Cottle*,
404 F. Supp. 3d 80 (D.D.C. 2019) ........ 16

*Biospherics, Inc. v. Forbes, Inc.*,
151 F.3d 180 (4th Cir. 1998) ........ 8, 9

*Bose Corp. v. Consumers Union of U.S., Inc.*,
466 U.S. 485 (1984) ........ 19

*Brown v. Ent. Merchs. Ass'n*,
564 U.S. 786 (2011) ........ 13

*Cary v. Brown*,
447 U.S. 455 (1980) ........ 4

*Chaplinsky v. New Hampshire*,
315 U.S. 568 (1942) ........ 13

*Cheng v. Neumann*,
51 F.4th 438 (1st Cir. 2022) ........ 15

*Connick v. Myers*,
461 U.S. 138 (1983) ........ 4

*Cox Broad. Corp. v. Cohn*,
420 U.S. 469 (1975) ........ 4

*Fairfax v. CBS Corp.*,
2 F.4th 286 (4th Cir. 2021) ........ 15

*Farah v. Esquire Mag.*,
736 F.3d 528 (D.C. Cir. 2013) ........ 10

*Garrison v. Louisiana*,
379 U.S. 64 (1964) ........ 6, 17

*Harte-Hanks Commc'ns, Inc. v. Connaughton*,
491 U.S. 657 (1989) .......... 17

*Hustler Mag., Inc. v. Falwell*,
485 U.S. 46 (1988) .......... 10, 13, 16

*Illinois ex rel. Madigan v. Telemarketing Assocs., Inc.*,
538 U.S. 600 (2003) .......... 10, 13, 14

*Janklow v. Newsweek, Inc.*,
788 F.2d 1300 (8th Cir. 1986) .......... 7, 8, 16

*Jolliff v. N.L.R.B.*,
513 F.3d 600 (6th Cir. 2008) .......... 19, 21

*Kahl v. Bureau of Nat'l Affs., Inc.*,
856 F.3d 106 (D.C. Cir. 2017) .......... 16

*Lovell v. City of Griffin*,
303 U.S. 444 (1938) .......... 5

*Melaleuca, Inc. v. Clark*,
66 Cal. App. 4th 1344 (1998) .......... 19

*Miami Herald Publ'g v. Tornillo*,
418 U.S. 241 (1974) .......... 12

*Milkovich v. Lorain J. Co.*,
497 U.S. 1 (1990) .......... 7, 8, 9, 10, 15

*Mills v. Alabama,*
384 U.S. 214 (1966) .......... 4, 5

*Minn. Citizens Concerned for Life, Inc. v. Swanson*,
692 F.3d 864 (8th Cir. 2012) .......... 4

*Moldea v. New York Times Co.*,
15 F.3d 1137 (D.C. Cir. 1994) .......... 7, 9

*Nelson Auto Ctr., Inc. v. Multimedia Holdings Corp.*,
951 F.3d 952 (8th Cir. 2020) .......... 15

*New York Times Co. v. Sullivan*,
376 U.S. 254 (1964) .......................................................................4, 15, 17, 20

*Partington v. Bugliosi*,
56 F.3d 1147 (9th Cir. 1995) ........................................................................ 8

*Richmond Newspapers, Inc. v. Virginia*,
448 U.S. 555 (1980) ........................................................................................ 4

*Riley v. Harr*,
292 F.3d 282 (1st Cir. 2002) ......................................................................... 8

*S. Middlesex Opportunity Council, Inc. v. Town of Framingham*,
752 F. Supp. 2d 85 (D. Mass. 2010)................................................................ 9

*Snyder v. Phelps*,
562 U.S. 443 (2011) ........................................................................................ 4

*St. Amant v. Thompson*,
390 U.S. 727 (1968) ................................................................................ 17, 18

*Time, Inc. v. Pape*,
401 U.S. 279 (1971) ................................................................................ 18, 19

*United States v. Alvarez*,
567 U.S. 709 (2012) ......................................................................... 12, 13, 14

**Other Authorities**

Cameron Joseph, *Why The Media Should Listen To Voters' 'Wrong' Answers In Polls*, Columbia Journalism Review (May 24, 2024),
https://perma.cc/TB4M-32V9 ....................................................................... 12

Frank Newport, *Six Reasons Polling Is Valuable in a Representative Democracy*, Gallup (Apr. 21, 2023),
https://perma.cc/JN37-LWE6 ....................................................................... 11

Lisa Intrabartola, *Why Do Election Polls Matter?*, Rutgers Today (Oct. 27, 2025),
https://perma.cc/3HTL-NKJ8 ....................................................................... 11

Vicki Krueger, *2 Ways to Tell Stories With Polls*, Poynter (Jan. 18, 2017),
https://perma.cc/F4NX-GHL8 ....................................................................... 11

*Why public opinion matters and how to measure it*, Pew Research Center (Dec. 20, 2024),
https://perma.cc/CK7W-9N27 ........................................................................ 11

## STATEMENT OF IDENTITY, INTEREST, AND AUTHORITY TO FILE

Amici curiae are the Reporters Committee for Freedom of the Press (the "Reporters Committee"), AIM Media Midwest LLC, American Broadcasting Companies, Inc., American Public Media Group, The Associated Press, Association of Alternative Newsmedia, The Atlantic Monthly Group LLC, Axios, Bloomberg News, CalMatters, The Center for Investigative Reporting, Cityside Journalism Initiative, Courthouse News Service, Dallas Free Press, Dow Jones & Company, Inc. (The Wall Street Journal), Erie Reader, The Guardian U.S., Harper's Magazine, Hearst Corporation, HuffPost, Institute for Nonprofit News, The Intercept Media, Inc., Iowa Freedom of Information Council, Local Independent Online News Publishers (LION), The McClatchy Company, LLC, MediaNews Group Inc., Minnesota Public Radio, Montana Free Press, National Newspaper Association, National Press Photographers Association, NBCUniversal Media, LLC, The Nevada Independent, New York Public Radio, The New York Times Company, News/Media Alliance, Newsday LLC, Online News Association, Open Vallejo, Pro Publica, Inc., Radio Television Digital News Association, Reuters News & Media Inc., Rocky Mountain PBS, The Seattle Times Company, Slate, Society of Professional Journalists, Undark Magazine, The War Horse News (collectively, "amici"). Amici are newsrooms and media organizations that publish news and information or advocate for the First Amendment freedom to

gather and publish the news. They rely on, and understand the importance of, data-based journalism, including polls and predictive analysis. Amici write to underscore the significant dangers that Appellant's novel claims, if accepted, would have for news organizations and for the dissemination of data-based news reporting.

Lead amicus the Reporters Committee is an unincorporated nonprofit association. It was founded by leading journalists and media lawyers in 1970 when the nation's news media faced an unprecedented wave of government subpoenas forcing reporters to name confidential sources. Today, its attorneys provide *pro bono* legal representation, amicus curiae support, and other legal resources to protect First Amendment freedoms and the newsgathering rights of journalists. It regularly serves as amicus in federal and state courts around the country, including before this Court, in cases implicating the publishing rights of journalists and the free flow of news and information to the public. *See, e.g.*, Br. of Amici Curiae Reps. Comm. for Freedom of the Press, et al., *Animal Legal Def. Fund v. Reynolds*, 89 F.4th 1071 (8th Cir. 2024), 2023 WL 3129816; Br. of Amici Curiae Reps. Comm. for Freedom of the Press, et al., *Animal Legal Def. Fund v. Vaught*, 8 F.4th 714 (8th Cir. 2021), 2020 WL 4060481; Br. of Amici Curiae Reps. Comm. for Freedom of the Press, et al., *Ness v. City of Bloomington*, 11 F.4th 914, 918 (8th Cir. 2021), 2020 WL 5947385.

All parties to this appeal have consented to the filing of this brief, and amici file it pursuant to Fed. R. App. P. 29(a)(2).

## RULE 29(A)(4)(E) CERTIFICATION

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), amici certify that no party's counsel authored this brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting the brief; and no person—other than amici, their members, or counsel—contributed money that was intended to fund preparing or submitting the brief.

## SUMMARY OF ARGUMENT

At the core of the First Amendment is "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). Consistent with this commitment, political speech—including speech about elections and candidates for public office—"occupies the 'highest rung of the hierarchy of First Amendment values,'" *Connick v. Myers*, 461 U.S. 138, 145 (1983) (quoting *Cary v. Brown*, 447 U.S. 455, 467 (1980)), and is entitled to "special protection," *Snyder v. Phelps*, 562 U.S. 443, 458 (2011); *see also Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 871 (8th Cir. 2012) ("[P]rotection of political speech is the very stuff of the First Amendment."). Such protection is particularly invaluable to the press as it carries out its favored role in our constitutional system to gather information and disseminate news and ideas to keep the public informed. *See, e.g.*, *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 573 (1980); *Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 490–91 (1975); *Mills v. Alabama,* 384 U.S. 214, 218 (1966).

This case tests these bedrock First Amendment protections. For roughly four decades, Appellee *Des Moines Register* has published polls conducted by Appellee Selzer & Co. that offer forecasts of upcoming elections in the state of Iowa (hereinafter, the "Iowa Poll" or the "Poll") and analysis thereof. Criticizing

the mismatch between the 2024 Iowa Poll and the results of that year's presidential election, Appellant Dennis Donnelly filed a putative class action suit against the newspaper defendants and Selzer & Co., alleging that publication of the Poll was actionable as "a fundamentally flawed product." App. 1112; R. Doc. 22, at 12 ¶¶ 2, 7. Although Appellant clothes his grievances in assertions of fraud and misrepresentation, the basic theory underlying his claims is that news organizations can be liable for their political speech if their campaign forecasts later turned out to be at odds with the actual votes once ballots were cast—in other words, as Donnelly maintains, if their forward-looking predictions for election-day outcomes were "false."

That theory collides head-on with well-established First Amendment precedent and the "practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs," including all manner of speech regarding candidates for public office and the holding of elections. *E.g.*, *Mills v. Alabama*, 384 U.S. 214, 218 (1966) (citing *Lovell v. City of Griffin*, 303 U.S. 444 (1938)). It would also, if accepted, have profound implications for news organizations, many of which publish data-driven predictive analysis, including polls tracking political races—from local city council contests to the highest national offices—as a regular part of their public affairs coverage. By seeking to hold Appellees liable for standard, everyday political reporting, this

lawsuit, if allowed to proceed, threatens to chill commonplace political speech, which is "the essence of self-government." *See Garrison v. Louisiana*, 379 U.S. 64, 74–75 (1964).

Amici write to inform the Court of the potential impact for news reporting that would result should Appellant's theory be adopted and to underline how the First Amendment protects this core speech on at least two independent grounds, each of which would be a basis for affirming the judgment of the District Court. First, the Iowa Poll is a form of predictive analysis and commentary that cannot be categorized as "false" and is not actionable under longstanding law protecting this form of opinion. Second, even if the Poll is considered "false" speech, it is, on these facts, still clearly entitled to First Amendment protection. Were it otherwise, and a fraud or misrepresentation claim could be spun out of a public opinion poll that ultimately diverged from future events, essential reporting would be chilled. For these reasons, amici respectfully ask the Court to affirm the judgment of the District Court.

## ARGUMENT

### I. Predictive analysis and commentary, including public opinion polls, are constitutionally protected opinions based on disclosed facts and cannot be characterized as "false" speech.

Appellant's legal theory rests on a mistaken premise: that because the Iowa Poll did not capture what ultimately transpired on November 5, 2024, it was

"false" and thus entitled to lessened First Amendment protection. As the District Court rightly noted in assessing the merits of Appellant's claims, a prediction about future events is not "false" simply because it does not come to pass, and an analysis of polling data is not "false" even when the poll's gauging of the electorate on any given day differs from the final vote tally it was intended to measure. App. 73; R. Doc. 48, at 12. Instead, the Iowa Poll and the related commentary interpreting its results are constitutionally protected expression and cannot form the basis of Appellant's novel claims for harm arising from such publication.

The case law on constitutionally protected "opinion" in the defamation context is instructive here. That line of precedent makes clear that the First Amendment protects statements that are not "provable as false," including statements of opinion that do not reasonably imply any "provably false factual connotation." *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 19–20 (1990). Therefore, statements of opinion are not actionable if they are not "susceptible of being proved true or false," *id.* at 21; *accord Janklow v. Newsweek, Inc.*, 788 F.2d 1300, 1302 (8th Cir. 1986) (explaining that a statement of opinion is not actionable if it "cannot plausibly be verified"), or if they are supported by disclosed facts that are themselves true, *see, e.g.*, *Moldea v. New York Times Co.*, 15 F.3d 1137, 1144 (D.C. Cir. 1994) ("[W]hen a writer gives a statement of opinion that is based upon

*true* facts that are revealed to readers or which are already known to readers, such opinions generally are not actionable . . . ." (emphasis in original)); *Riley v. Harr*, 292 F.3d 282, 289 (1st Cir. 2002) ("[W]hen an author outlines the facts available to him, thus making it clear that the challenged statements represent his own interpretation of those facts and leaving the reader free to draw his own conclusions, those statements are generally protected by the First Amendment." (quoting *Partington v. Bugliosi*, 56 F.3d 1147, 1156–57 (9th Cir. 1995)); *Biospherics, Inc. v. Forbes, Inc.*, 151 F.3d 180, 185 (4th Cir. 1998) (rejecting libel claim over news article predicting future weakness for a company's stock because when "the bases for the . . . conclusion are fully disclosed, no reasonable reader would consider the term anything but the opinion of the author drawn from the circumstances related" (omission in original)). Importantly, to determine whether a statement is verifiable, "a court must consider what we will call the 'public context' in which the statement was made." *Janklow*, 788 F.2d at 1303.

The "public context" of the Iowa Poll was clearly one of prediction and informed speculation—a concept familiar to the public at large and to followers of "horse race" political coverage who have long been accustomed to the role of polling in campaigns and elections. The Iowa Poll is therefore a publication of speech and commentary that contains no "provably false factual connotation." *See Milkovich*, 497 U.S. at 20. To the extent the Poll was predicting the outcome of

the upcoming presidential election in the Hawkeye State, it was not "susceptible of being proved true or false" at the time it was published because the event it was predicting was in the future and had not yet happened. *See id.* at 21; *see also, e.g.*, *S. Middlesex Opportunity Council, Inc. v. Town of Framingham*, 752 F. Supp. 2d 85, 119–20 (D. Mass. 2010) (finding "a statement about the probabilities of future events" to be a nonactionable opinion because it "was not capable of being proved false at the time" it was made); *Biospherics*, 151 F.3d at 184 (affirming dismissal of claim over magazine article providing stock tips that describes data but which is inherently "speculative").

And to the extent the Iowa Poll was commenting on the state of the presidential race at the time the Poll was conducted, this analysis was—as the District Court found—supported by true, disclosed facts. App. 73; R. Doc. 48, at 12. Specifically, "the poll results were accompanied by a thorough discussion of methodology," and Appellant "does not claim the disclosed methodology was not followed, that results were falsified, or that Defendants altered the poll in some other way." *Id.* "Defendants told readers exactly what they did and how they did it." *Id.* Because reasonable readers would understand the Poll's analysis to "represent [Appellees'] interpretation of the facts presented," and because those readers were "free to draw [their] own conclusions based upon those facts," *see Moldea*, 15 F.3d 1137 at 1144–45, this analysis has no "provably false factual

connotation," *see Milkovich*, 497 U.S. at 20. It is, accordingly, entitled to full First Amendment protection.

Although Appellant purports to allege fraud and related claims (failing, in any event, to plead facts in support of them), the District Court correctly rejected this window dressing, recognizing that "[a] party cannot evade First Amendment scrutiny by '[s]imply labeling an action one for "fraud."'" App. 67; R. Doc. 48, at 6 (quoting *Illinois ex rel. Madigan v. Telemarketing Assocs., Inc.*, 538 U.S. 600, 617 (2003)). Such labels, the Supreme Court warned in *Madigan*, will not "carry the day." 538 U.S. at 617. Stated simply, Appellant may not do through the law of consumer fraud what the First Amendment bars him from doing through the law of defamation. *Id.*; *Hustler Mag., Inc. v. Falwell*, 485 U.S. 46, 51–52 (1988) (applying heightened First Amendment review to emotional distress claim, rather than allowing plaintiff to evade protections developed under defamation law doctrine, because the Supreme Court must be "vigilant to ensure that individual expressions of ideas remain free from governmentally imposed sanctions") (citations omitted); *Farah v. Esquire Mag.*, 736 F.3d 528, 540 (D.C. Cir. 2013) ("A plaintiff may not use related causes of action to avoid the constitutional requisites of a defamation claim.") (cleaned up).

Allowing Appellant to skirt these First Amendment protections would have profound implications for news organizations, many of which rely on predictive

analysis and commentary as a regular part of their public affairs coverage. Were these organizations to face liability—class action suits, no less—any time they published public opinion polls concerning elections or issue referendums that departed from the eventual real-world outcomes, they would be unable to provide any kind of predictive analysis, and the public would be worse off for it. Polling, after all, is one way for elected representatives to come to see and understand the views of the people they serve and for Americans to gain perspective on what their neighbors, or people in other communities, believe. *See Why public opinion matters and how to measure it*, Pew Research Center (Dec. 20, 2024), https://perma.cc/CK7W-9N27 (explaining that public opinion polls help elected leaders "set priorities" and learn "how the policies they're enacting are affecting people's lives"); Lisa Intrabartola, *Why Do Election Polls Matter?*, Rutgers Today (Oct. 27, 2025), https://perma.cc/3HTL-NKJ8 ("Taken together, polls give voice to the public – representing citizens as they exist in the population – and connect that collective sentiment to policymakers and candidates alike."); Frank Newport, *Six Reasons Polling Is Valuable in a Representative Democracy*, Gallup (Apr. 21, 2023), https://perma.cc/JN37-LWE6 (explaining that in a large country, polling helps policymakers understand public sentiment and needs and allows citizens to better understand one another's views). The insights gathered from public opinion polling are an important part of both daily news reporting and historical

journalism. Vicki Krueger, *2 Ways to Tell Stories With Polls*, Poynter (Jan. 18, 2017), https://perma.cc/F4NX-GHL8; Cameron Joseph, *Why The Media Should Listen To Voters' 'Wrong' Answers In Polls*, Columbia Journalism Review (May 24, 2024), https://perma.cc/TB4M-32V9.

News organizations choose whether to devote coverage—and how much coverage—to a particular poll or other type of predictive analysis, and there can be no question that this decision is one the First Amendment leaves to the sound discretion of editors. *See Miami Herald Publ'g v. Tornillo*, 418 U.S. 241, 258 (1974) (explaining that the First Amendment protects "the exercise of editorial control and judgment"). This kind of predictive analysis cannot be said to be "false." Instead, it is entitled to the same First Amendment protection as other kinds of speculative analysis or opinion based on disclosed underlying facts, even when plaintiffs opportunistically cloak it under the label of "fraud."

## II. Even if the Poll could be characterized as "false," it is still entitled to strong First Amendment protection.

Recognizing that "some false statements are inevitable if there is to be an open and vigorous expression of views," the Supreme Court has made clear that falsity alone "may not suffice to bring . . . speech outside the First Amendment." *United States v. Alvarez*, 567 U.S. 709, 718–19 (2012); *see also 281 Care Comm. v. Arneson*, 638 F.3d 621, 633–34 (8th Cir. 2011) ("[T]he Supreme Court has never placed knowingly false campaign speech categorically outside the protection

of the First Amendment and we will not do so today.”). While fraud is one of the “well-defined and narrowly limited classes of speech” traditionally punishable, *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571–72 (1942), a “[f]alse statement alone does not subject” one to “fraud liability,” *Illinois ex rel. Madigan*, 538 U.S. at 619–20; *see also Alvarez*, 567 U.S. at 717. Instead, as the Supreme Court in *Madigan* cautioned, a fraud claim must be “properly tailored” to target intentionally false statements that were made to secure pecuniary benefit and must be subject to “exacting proof requirements” to be consistent with constitutional protections for speech. 538 U.S. at 620.

The First Amendment requires that courts be “particularly vigilant” in scrutinizing all claims to ensure that protected speech is not punished or chilled. *Hustler Mag.*, 485 U.S. at 51–52; *see also Brown v. Ent. Merchs. Ass’n*, 564 U.S. 786, 793 (2011) (rejecting attempt to “shoehorn speech about violence into obscenity”); *Abbas v. Foreign Pol’y Grp., LLC*, 783 F.3d 1328, 1339 (D.C. Cir. 2015) (Kavanaugh, J.) (rejecting “novel defamation theory” that would “necessarily ensnare a substantial amount of speech that is essential to the marketplace of ideas and would dramatically chill the freedom of speech”). The exercise of such vigilance is required here. Though Appellant asserts a range of claims sounding in fraud, his theory—that a newspaper can be liable for “false” statements simply because subscribers pay to receive the publication—stretches

the cause of action beyond recognition and raises serious concerns for the press and our system of free expression more broadly. *See* App. 38; R. Doc. 22, at 28 ¶ 140 (alleging that "[t]he Plaintiff and the Plaintiff Class were *injured* by the Poll's fraudulence" because "they pay good money to subscribe to the *Register* to read accurate and important news, not to be misled by fraudulent misrepresentations" (emphasis in original)). If accepted, this theory would circumvent the First Amendment's strong protections for political speech, including the inevitable false statement. *See Alvarez*, 567 U.S. at 718–19.

Under the guise of a fraud claim, Appellant asks this Court to punish allegedly "false" speech. But even if the Poll could be viewed in any sense as "false," it would still be entitled to a heightened fault standard, as Appellant himself acknowledges. Appellant's Br. at 29–30 (recognizing that First Amendment requires a showing of actual malice "for claims involving speech on matters of public concern"); *see Alvarez*, 567 U.S. at 719 (noting that "[e]ven when considering some instances of defamation and fraud" the Court has required that the statement "be a knowing or reckless falsehood"); *see also Illinois ex rel. Madigan*, 538 U.S. at 620 (highlighting that plaintiff alleging fraud must show, *inter alia*, a knowing misrepresentation by "clear and convincing evidence" and observing that such "[e]xacting proof requirements . . . in other contexts, have been held to provide sufficient breathing room for protected speech"). The District

Court applied the heightened constitutional actual malice standard and, recognizing that a mere falsehood is not knowing falsity, correctly found Appellant failed to plausibly plead actual malice. *See* App. 70–73; R. Doc. 48, at 9–12.[1]

The perils for free speech, and specifically news publishing, that prompted the Supreme Court to adopt the actual malice standard still exist today. Prominent individuals and organizations routinely sue journalists and media organizations for reporting they perceive as critical, unfavorable, or insufficiently calibrated to their side. *See, e.g.*, *Fairfax v. CBS Corp.*, 2 F.4th 286, 296 (4th Cir. 2021) (holding that former lieutenant governor did not sufficiently allege actual malice in case against news organizations for reporting sexual assault allegations he denied); *Cheng v. Neumann*, 51 F.4th 438, 445–47 (1st Cir. 2022) (holding that vice president of media company did not state claim for defamation against online news outlet because statements she challenged were all either true or "expressions of opinion and unprovable as false"); *Janklow v. Newsweek, Inc.*, 788 F.2d 1300, 1301–02 (8th Cir. 1986) (affirming summary judgment for magazine in defamation case brought by then-governor for reporting sexual assault allegations he denied);

[1] As Appellees set forth in their briefs, to establish actual malice, a plaintiff must show by "clear and convincing" evidence, *Milkovich*, 497 U.S. at 15, that the defendant made a false statement "with knowledge that it was false or with reckless disregard of whether it was false or not," *Sullivan*, 376 U.S. at 280. Failure to allege and plead "facts sufficient to give rise to a reasonable inference of actual malice" warrants dismissal. *Nelson Auto Ctr., Inc. v. Multimedia Holdings Corp.*, 951 F.3d 952, 958 (8th Cir. 2020) (internal quotations omitted).

*Arpaio v. Cottle*, 404 F. Supp. 3d 80, 86 (D.D.C. 2019) (holding that former sheriff and political candidate did not plead facts to support actual malice in suit against newspaper columnist who described sheriff's law enforcement practices). Actual malice protection is critical to journalists who investigate and publish news and commentary and whose work not infrequently draws the resentment of public officials and public figures.

A robust application of the actual malice standard protects free and open public debate; without it, the press would be hamstrung in its ability to provide important, newsworthy information to the American people. *See, e.g., Hustler Mag.*, 485 U.S. at 50–51 ("At the heart of the First Amendment is the recognition of the fundamental importance of the free flow of ideas and opinions on matters of public interest and concern. The freedom to speak one's mind is not only an aspect of individual liberty—and thus a good unto itself—but also is essential to the common quest for truth and the vitality of society as a whole." (cleaned up)); *Kahl v. Bureau of Nat'l Affs., Inc.*, 856 F.3d 106, 113 (D.C. Cir. 2017) (Kavanaugh, J.) (noting that the actual malice standard was designed "[t]o encourage and facilitate debate over matters of public concern"). As the Supreme Court has put it, "erroneous statement is inevitable in free debate" and "must be protected if the freedoms of expression are to have the breathing space that they

need . . . to survive." *Sullivan*, 376 U.S. at 271–72 (internal quotations omitted) (omission in original).

Against this backdrop, amici draw this Court's attention to three well-settled principles of defamation law that allow the media to fulfill its critically important role of informing the public and which have direct relevance to this appeal.

*First*, mere journalistic error or negligence is not evidence of actual malice. "[R]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing." *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968). Nor is it measured by a publisher's adherence to or deviation from professional standards of journalism. *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 664–66 (1989) (finding even "a showing of highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers" insufficient to establish actual malice). Rather, actual malice is a *subjective* standard that looks only to the defendant's state of mind at the time of publication. Accordingly, the plaintiff must plausibly plead, and then show through "clear and convincing proof," *id.* at 659, that "the defendant in fact entertained serious doubts as to the truth of his publication," *St. Amant*, 390 U.S. at 731, such that the false publication was made with a "high degree of awareness of [its] probable falsity," *Garrison*, 379 U.S. at 74.

Appellant devotes much of his Amended Complaint to allegations that Appellees' decision to publish the Iowa Poll deviated from journalistic custom. *See* App. 31; R. Doc. 22, at 21 ¶ 99 ("The Defendants' recklessness is seen when comparing their actions to industry customs and practices."); App. 32; R. Doc. 22, at 22 ¶ 100 (alleging that publication of the Iowa Poll contravened "journalistic custom and practice"); *id.* ¶¶ 101–04 (citing the American Association for Public Opinion Research's professional code of ethics); App. 33; R. Doc. 22, at 23 ¶ 105 (citing Gannett's principles of ethical conduct). Even taken as true, these allegations are insufficient to establish actual malice because, simply put, the question is not "whether a reasonably prudent man would have published." *St. Amant*, 390 U.S. at 731. The question, rather, is what Appellees subjectively knew or believed when they published. None of these allegations raises a reasonable inference that Appellees knew or believed the Iowa Poll results to be inaccurate at the time they were published.

*Second*, and by the same token, actual malice does not exist when the speaker expresses a rational interpretation of inherently complex or ambiguous information. In such circumstances, the speaker's choice to adopt "one of a number of possible rational interpretations" can amount at most to a negligent "error of judgment" and not, as required, to "reckless conduct." *Time, Inc. v. Pape*, 401 U.S. 279, 290–92 (1971); *see, e.g.*, *Melaleuca, Inc. v. Clark*, 66 Cal.

App. 4th 1344, 1365 (1998) (finding no actual malice where the "libel is based on choices the defendant has made in . . . drawing conclusions from extensive or complex research").

Here, Appellees' determination that the Poll results represented an accurate picture of the state of the race was a "rational interpretation[]" of the complex information before them. *See Pape*, 401 U.S. at 290. Appellant makes much of the fact that the Poll results diverged from "other publicly available polling in Iowa, polling in other swing states, and election results in similar races in recent Iowa history," App. 31; R. Doc. 22, at 21 ¶ 98, but Appellees were considering that information alongside the results of their own meticulous research, which Appellant himself calls the "gold standard" of political polling, App. 26; R. Doc. 22, at 16 ¶ 77. In this context, Appellees' judgment that the Poll results were accurate was rational and, thus, cannot amount to actual malice.

*Third*, evidence of mere falsity cannot suffice to show actual malice. Simply put, "there is a significant difference between proof of actual malice and mere proof of falsity." *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 511 (1984). While courts occasionally look to evidence of falsity as circumstantial evidence of actual malice, they do so only "when a statement is so obviously false that any rational person making it would have to know that it is false." *See Jolliff v. N.L.R.B.*, 513 F.3d 600, 615 (6th Cir. 2008) (rejecting the

"unwarranted inference" that the falsity of a statement alone shows "the statement was made with knowledge of its falsity"). Indeed, to conflate mere falsity with subjective knowledge of falsity would effectively transform the underlying claims into strict-liability torts, an outcome wholly inconsistent with *Sullivan* and inimical to the Supreme Court's animating principle "that debate on public issues should be uninhibited, robust, and wide-open." *Sullivan*, 376 U.S. at 270.

Throughout his Amended Complaint, Appellant suggests that the very fact that the Iowa Poll inaccurately predicted the election results demonstrates that Appellees knew or believed it to be inaccurate before publishing. *See, e.g.*, App. 15; R. Doc. 22, at 5 ¶ 17 ("[A] miss by 16 points is not an innocent error—it is either intentional fraud or reckless disregard for accuracy."); App. 31; R. Doc. 22, at 21 ¶ 98 ("The[] Iowa Poll was not merely wrong—it was obviously, patently wrong."). In other words, Appellant asks the Court to infer actual malice simply because the Poll's predictions did not match the subsequent election outcome.

Such an inference is jurisprudentially unwarranted and contrary to the record here. Appellant does not allege, for example, that Appellees knowingly used an unrepresentative sample, knowingly prepared misleading questionnaires, or otherwise knowingly employed unreliable polling methods. Absent such allegations, it is implausible that the snapshot of the electorate captured in the Iowa Poll was "so obviously false" that Appellees "would have to know that it is false."

*See Jolliff*, 513 F.3d at 615. Short of such a showing, the mere fact that the Poll did not accurately predict the outcome of the election cannot establish that Appellees knew or believed it to be "false."

In sum, Appellant's allegations are insufficient to support a reasonable inference that Appellees published the Iowa Poll with actual malice.

## CONCLUSION

For the reasons set forth above, Amici urge this Court to find that the First Amendment bars Appellant's claims and to affirm the District Court's order granting Appellees' motions to dismiss.

Dated: April 22, 2026

Respectfully submitted,

*/s/ Bruce D. Brown*

Bruce D. Brown
*Counsel of Record for Amici Curiae*
Lisa Zycherman*
Mara Gassmann*
Claudia Liss-Schultz*
**Of counsel*
REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1020
Washington, D.C. 20005
Telephone: (202) 795-9300
Facsimile: (202) 795-9310
bruce.brown@rcfp.org
*Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on April 22, 2026, I caused the foregoing Brief of Amici Curiae the Reporters Committee for Freedom of the Press and Other News and Media Organizations to be electronically filed with the Clerk of the Court using CM/ECF, which will automatically send notices of such filing to all counsel of record.

/s/*Bruce D. Brown*
Bruce D. Brown
*Counsel of Record for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f):

☒ this document contains 4770 words, **or**

☐ this brief uses a monospaced typeface and contains _________ lines of text.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because:

☒ this document has been prepared in a proportionally spaced typeface using Microsoft Word in Size 14 Times New Roman, **or**

☐ this document has been prepared in a monospaced typeface using _______________ with ___________________.

/s/*Bruce D. Brown*
Bruce D. Brown
*Counsel of Record for Amici Curiae*

Date: April 22, 2026

## ADDENDUM: INDIVIDUAL AMICI CURIAE STATEMENTS OF IDENTITY

AIM Media Midwest publishes 16 newspapers and news websites in Ohio, including The Lima News, Greenville Daily Advocate and Bowling Green Sentinel-Tribune. It focuses on news, sports and features of interest to its readership, including local, statewide and national stories.

American Broadcasting Companies, Inc. is a broad-based communications company. Alone or through its subsidiaries, it owns ABC News, abcnews.com, and local broadcast television stations that regularly gather and report news to the public. ABC News produces the television programs World News with David Muir, Good Morning America, Nightline, 20/20, and This Week, among others.

American Public Media Group (APMG) is a tax-exempt, nonprofit parent support organization that provides administrative, financial, and human resources services to its supported nonprofit organizations in the field of public media. APMG is the parent corporation of Minnesota Public Radio (MPR), one of the nation's premier public radio organizations, producing programming for radio, digital and live audiences. Operating a 45-station terrestrial radio network, MPR serves nearly all of Minnesota and parts of surrounding states. MPR has earned more than 1,000 broadcasting and journalism awards, including seven George Foster Peabody Awards (dubbed the "Oscar of broadcasting"), six Robert F.

Kennedy Journalism Awards, a prestigious Alfred I. duPont-Columbia University Gold Baton Award and a Grammy Award.

The Associated Press ("AP") is a news cooperative organized under the Not-for-Profit Corporation Law of New York. The AP's members and subscribers include the nation's newspapers, magazines, broadcasters, cable news services and Internet content providers. The AP operates from 280 locations in more than 100 countries. On any given day, AP's content can reach more than half of the world's population.

Association of Alternative Newsmedia ("AAN") is a not-for-profit trade association which represents nearly 100 alternative newspapers across North America. There are a wide range of publications in AAN, but all share an intense focus on local news, culture and the arts; an emphasis on point-of-view reporting and narrative journalism; a tolerance for individual freedoms and social differences; and an eagerness to report on issues and communities that many mainstream media outlets ignore. AAN members speak truth to power.

The Atlantic Monthly Group LLC is the publisher of The Atlantic and TheAtlantic.com. Founded in 1857 by Oliver Wendell Holmes, Ralph Waldo Emerson, Henry Wadsworth Longfellow and others, The Atlantic continues its 160-year tradition of publishing award-winning journalism that challenges

assumptions and pursues truth, covering national and international affairs, politics and public policy, business, culture, technology and related areas.

Axios Media Inc. is a digital media company with a mission to deliver news in an efficient format that helps professionals get smarter faster across an array of topics, including politics, science, business, health, tech, media, and local news.

Bloomberg L.P. is the owner and operator of Bloomberg News. Bloomberg's newsroom of more than 2,700 journalists and analysts delivers thousands of stories a day, producing content that is featured across multiple platforms, including digital, TV, radio, print and live events.

CalMatters is a nonpartisan, nonprofit journalism organization based in Sacramento, California. It covers state policy and politics, helping Californians to better understand how their government works while serving the traditional journalistic mission of bringing accountability and transparency to the state's Capitol. The work of its veteran journalists is shared, at no cost, with more than 180 media partners throughout the state.

The Center for Investigative Reporting, Inc. is the nation’s oldest nonprofit investigative newsroom in the country that runs the brands Mother Jones, Reveal, and CIR Studios. Mother Jones is a reader-supported news magazine and website known for ground-breaking investigative and in-depth journalism on issues of national and global significance. Reveal produces investigative journalism for the

Reveal national public radio show and podcast, and CIR Studios produces feature length documentaries distributed on Netflix, Hulu and other streaming channels. Reveal often works in collaboration with other newsrooms across the country.

Cityside Journalism Initiative is a nonpartisan, nonprofit media organization committed to building community through local journalism. Cityside publishes Berkeleyside and The Oaklandside, two of the leading independent, online news sites in the country.

Courthouse News Service is a California-based legal news service that publishes a daily news website with a focus on politics and law. The news service also publishes daily reports on new civil actions and appellate rulings in both state and federal courts throughout the nation. Subscribers to the daily reports include law firms, universities, corporations, governmental institutions, and a wide range of media including newspapers, television stations and cable news services.

The Dallas Free Press focuses on community journalism efforts in South Dallas and West Dallas, two of the city's historically redlined neighborhoods, and collaborates with community stakeholders to tackle complex civic issues with solutions journalism, with the belief that all neighborhoods deserve reporting and storytelling that values their community and holds leaders accountable. Founded in 2020 by award-winning journalist Keri Mitchell, who previously spent 15 years dedicated to community and civic journalism at Dallas' Advocate magazines, the

Dallas Free Press was named 2021's "New Publisher of the Year" by Local Independent Online News (LION) Publishers for "being truly rooted in community and public service … starting from a place of community listening, meeting real information needs, and centering equity."

Dow Jones & Company is the world's leading provider of news and business information. Through The Wall Street Journal, Barron's, MarketWatch, Dow Jones Newswires, and its other publications, Dow Jones has produced journalism of unrivaled quality for more than 130 years and today has one of the world's largest newsgathering operations. Dow Jones's professional information services, including the Factiva news database and Dow Jones Risk & Compliance, ensure that businesses worldwide have the data and facts they need to make intelligent decisions. Dow Jones is a News Corp company.

Flagship Multimedia, Inc. publishes Erie Reader, an independent publication covering arts, culture, and civic affairs in Erie, Pennsylvania, and the surrounding region.

Guardian US is the New York City-based American online presence, through the website https://www.theguardian.com/us, of the British print newspaper The Guardian and its website theguardian.com. Launched in September 2011, Guardian US covers American and international news for an online, global audience. Guardian US is renowned for the Paradise Papers

investigation and other award-winning work including the NSA revelations, Panama Papers and The Counted investigations. The website theguardian.com is one of the world's leading English-language newspaper websites and operates two international online editions of the Guardian - Guardian US (Guardian News & Media LLC) and Guardian Australia (GNM Australia PTY Ltd). Traffic from outside the UK now represents around two-thirds of the Guardian's total digital audience.

Harper's Magazine, the oldest general-interest monthly in America, explores the issues that drive our national conversation, through long-form narrative journalism and essays, and such celebrated features as the iconic Harper's Index. With its emphasis on fine writing and original thought Harper's provides readers with a unique perspective on politics, society, the environment, and culture.

Hearst is one of the nation's largest diversified media, information and services companies with more than 360 businesses. Its major interests include ownership of 15 daily and more than 30 weekly newspapers, including the San Francisco Chronicle, Houston Chronicle, and Albany Times Union; hundreds of magazines around the world, including Cosmopolitan, Good Housekeeping, ELLE, Harper's BAZAAR and O, The Oprah Magazine; 31 television stations such as KCRA-TV in Sacramento, Calif. and KSBW-TV in Monterey/Salinas, CA, which

reach a combined 19 percent of U.S. viewers; ownership in leading cable television networks such as A&E, HISTORY, Lifetime and ESPN; global ratings agency Fitch Group; Hearst Health; significant holdings in automotive, electronic and medical/pharmaceutical business information companies; Internet and marketing services businesses; television production; newspaper features distribution; and real estate.

HuffPost is a news and information website owned by BuzzFeed, Inc., a social news and entertainment company that provides shareable breaking news, original reporting, entertainment, and video across the social web to its global audience of more than 200 million.

The Iowa Freedom of Information Council (the "Council") was organized in 1976 and incorporated in 1977 as a nonprofit, nonpartisan corporation. Since then, the Council has constantly and consistently worked to protect the press and speech rights of Iowans. The Council's corporate articles reflect this by specifying that its purposes include, among other things, "promoting laws, policies, and practices . . . that preserve First Amendment liberties." The Council speaks up and speaks out to protect rights guaranteed by Iowa's public records and open meeting laws and freedoms arising under the First Amendment. Its members include newspapers, broadcasters, academics, labor organizations, and everyday Iowans.

The Institute for Nonprofit News is a nonprofit charitable organization that provides education and business support services to our nonprofit member organizations and promotes the value and benefit of public service and investigative journalism.

The Intercept Media, Inc. is a non-profit digital media venture committed to rigorous, adversarial journalism in the public interest.

The mission of Local Independent Online News Publishers (LION) is to strengthen the local news industry by helping independent news publishers build more sustainable businesses.

The McClatchy Company, LLC is a publisher of iconic brands such as the Miami Herald, The Kansas City Star, The Sacramento Bee, The Charlotte Observer, The (Raleigh) News & Observer, and the Fort Worth Star-Telegram. McClatchy operates media companies in 30 U.S. markets in 16 states, providing each of its communities with high-quality news and advertising services in a wide array of digital and print formats.  McClatchy is headquartered in Sacramento, California.

MediaNews Group is a leader in local, multi-platform news and information, distinguished by its award-winning original content and high quality local media. It is one of the largest news organizations in the United States, with print and online publications across the country.

Montana Free Press ("MTFP") is an independent, 501(c)(3) nonprofit source for Montana news, information, and analysis. Our mission is to produce in-depth public-service journalism that creates positive change and helps move society toward justice and equity. MTFP seeks to uncover the truth and bring to light essential news stories by studying arcane bureaucratic processes, seeking out dark corners of major institutions, digging deep into data and documents, and holding power accountable to the people.

National Newspaper Association is a 2,000 member organization of community newspapers founded in 1885. Its members include weekly and small daily newspapers across the United States. It is based in Pensacola, FL.

The National Press Photographers Association ("NPPA") is a 501(c)(6) non-profit organization dedicated to the advancement of visual journalism in its creation, editing and distribution. NPPA's members include television and still photographers, editors, students and representatives of businesses that serve the visual journalism industry. Since its founding in 1946, the NPPA has vigorously promoted the constitutional rights of journalists as well as freedom of the press in all its forms, especially as it relates to visual journalism. The submission of this brief was duly authorized by Mickey H. Osterreicher, its General Counsel.

NBCUniversal Media, LLC is one of the world's leading media and entertainment companies in the development, production and marketing of news,

entertainment and information to a global audience. Among other businesses, NBCUniversal Media, LLC owns and operates the NBC television network, the Spanish-language television network Telemundo, NBC News, several news and entertainment networks, including MSNBC and CNBC, and a television-stations group consisting of owned-and-operated television stations that produce substantial amounts of local news, sports and public affairs programming. NBC News produces the "Today" show, "NBC Nightly News with Lester Holt," "Dateline NBC" and "Meet the Press."

The Nevada Independent is a statewide, reader-supported, digital-only nonprofit newsroom committed to illuminating the state's most pressing issues, fostering insightful conversations and holding those in power to account. We tell the story of the Silver State and its people in a timely and nuanced way that promotes civic engagement and empowers Nevadans to improve their communities and quality of life.

With an urban vibrancy and a global perspective, New York Public Radio produces innovative public radio programs, podcasts, and live events that touch a passionate community of 23.4 million people monthly on air, online and in person. From its state-of-the-art studios in New York City, NYPR is reshaping radio for a new generation of listeners with groundbreaking, award-winning programs including Radiolab, On the Media, The Takeaway, and Carnegie Hall Live, among

many others. New York Public Radio includes WNYC, WQXR, WNYC Studios, Gothamist, The Jerome L. Greene Performance Space, and New Jersey Public Radio. Further information about programs, podcasts, and stations may be found at www.nypublicradio.org.

The New York Times Company is the publisher of The New York Times and operates the news website nytimes.com.

The News/Media Alliance represents over 2,200 diverse publishers in the U.S. and internationally, ranging from the largest news and magazine publishers to hyperlocal newspapers, and from digital-only outlets to papers who have printed news since before the Constitutional Convention. Its membership creates quality journalistic content that accounts for nearly 90 percent of daily newspaper circulation in the U.S., over 500 individual magazine brands, and dozens of digital-only properties. The Alliance diligently advocates for newspapers, magazine, and digital publishers, on issues that affect them today.

Newsday LLC ("Newsday") is the publisher of the daily newspaper, Newsday, and related news websites.  Newsday is one of the nation's largest daily newspapers, serving Long Island through its portfolio of print and digital products. Newsday has received 19 Pulitzer Prizes and other esteemed awards for outstanding journalism.

The Online News Association is the world's largest association of digital journalists. ONA's mission is to inspire innovation and excellence among journalists to better serve the public. Membership includes journalists, technologists, executives, academics and students who produce news for and support digital delivery systems. ONA also hosts the annual Online News Association conference and administers the Online Journalism Awards.

Open Vallejo is an award-winning, independent, non-partisan, nonprofit newsroom serving the public interest. Open Vallejo seeks to illuminate a small city long burdened by police violence, corruption, and neglect. As the first project of the Informed California Foundation, Open Vallejo is also a permanent design laboratory for open source, high-impact, broadly-accessible frameworks for ensuring local transparency, accountability, and information justice.

Pro Publica, Inc. ("ProPublica") is an independent, nonprofit newsroom that produces investigative journalism in the public interest. It has won six Pulitzer Prizes, most recently a 2020 prize for national reporting, the 2019 prize for feature writing, and the 2017 gold medal for public service. ProPublica is supported almost entirely by philanthropy and offers its articles for republication, both through its website, propublica.org, and directly to leading news organizations selected for maximum impact. ProPublica has extensive regional and local operations, including ProPublica Illinois, which began publishing in late 2017 and

was honored (along with the Chicago Tribune) as a finalist for the 2018 Pulitzer Prize for Local Reporting, an initiative with the Texas Tribune, which launched in March 2020, and a series of Local Reporting Network partnerships.

Radio Television Digital News Association ("RTDNA") is the world's largest and only professional organization devoted exclusively to electronic journalism. RTDNA is made up of news directors, news associates, educators and students in radio, television, cable and electronic media in more than 30 countries. RTDNA is committed to encouraging excellence in the electronic journalism industry and upholding First Amendment freedoms.

Reuters, the news and media division of Thomson Reuters, is the world's largest multimedia news provider. Founded in 1851, it is committed to the Trust Principles of independence, integrity and freedom from bias. With unmatched coverage in over 16 languages, and reaching billions of people worldwide every day, Reuters provides trusted intelligence that powers humans and machines to make smart decisions. It supplies business, financial, national and international news to professionals via desktop terminals, the world's media organizations, industry events and directly to consumers.

Rocky Mountain PBS began in Denver in 1956 as Colorado's first public television station. It is now Colorado's only statewide television network, with

stations in Denver, Pueblo/Colorado Springs, Steamboat Springs, Grand Junction and Durango.

The Seattle Times Company, locally owned since 1896, publishes the daily newspaper The Seattle Times, together with the Yakima Herald-Republic and Walla Walla Union-Bulletin, all in Washington state.

The Slate Group publishes Slate, a daily online magazine. Slate features articles and podcasts analyzing news, politics and contemporary culture.

Society of Professional Journalists ("SPJ") is dedicated to improving and protecting journalism. It is the nation's largest and most broad-based journalism organization, dedicated to encouraging the free practice of journalism and stimulating high standards of ethical behavior. Founded in 1909 as Sigma Delta Chi, SPJ promotes the free flow of information vital to a well-informed citizenry, works to inspire and educate the next generation of journalists and protects First Amendment guarantees of freedom of speech and press.

Undark Magazine is a prize-winning nonprofit and editorially independent digital magazine exploring the intersection of science and society. Its original, scrupulously fact-checked news features and investigations are published at undark.org, as well as in partnership with other news organizations.

The War Horse is an award-winning nonprofit newsroom and the most trusted source for bulletproof reporting on the human impact of military service. It

reporting seeks to strengthen democracy by holding power to account and improving the public's understanding of the true cost of military service. The U.S. government spends nearly $1 trillion annually on defense and veterans affairs, more than twice what it spends on health care, education, infrastructure, and diplomacy combined; yet, less than 5% of journalism focuses on military service. This imbalance negatively impacts not only U.S. national security and the viability of the all-volunteer military force, but the everyday lives of veterans, military families, and our nation as a whole. The War Horse team is setting the standard for reporting stories that matter, with diligence and integrity, to rebuild Americans' trust in the press.