**No. 25-3451**

---

IN THE U.S. COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

---

DENNIS DONNELLY,

*PLAINTIFF-APPELLANT*,

*V.*

DES MOINES REGISTER AND TRIBUNE CO., INC.;
GANNETT CO., INC.; ANN SELZER; AND SELZER & COMPANY.

*DEFENDANTS-APPELLEES.*

---

*Appeal from the U.S. District Court*
*for the Southern District of Iowa*

Case No. 4:25-cv-00150-RGE-WPK
Hon. Rebecca G. Ebinger

---

# REPLY BRIEF OF APPELLANT

---


Daniel R. Suhr
Center for American Rights
1341 W. Fullerton Ave.,
Suite 170
Chicago, IL 60614
414.588.1658
dsuhr@americanrights.org


May 22, 202

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** .......... **ii**

**STATEMENT OF THE CASE** .......... **1**

**ARGUMENT** .......... **2**

I. REMAND IS APPROPRIATE UNDER CAFA. .......... 2

*A. Donnelly has satisfied the primary defendant prong.* .......... *2*

*B. Donnelly has satisfied the principal injuries prong* .......... *5*

II. THE FIRST AMENDMENT DOES NOT GRANT ABSOLUTE IMMUNITY TO NEWSPAPERS OR POLLSTERS TO REPORT FAKE NEWS. .......... 9

III. DONNELLY HAS PLEAD ACTUAL MALICE. .......... 19

IV. DONNELLY HAS PLED THE ELEMENTS OF HIS CLAIMS. .......... 21

*A. Donnelly pled an intentional false representation.* .......... *21*

*B. Negligent misrepresentation.* .......... *25*

*C. Iowa Consumer Fraud Act.* .......... *26*

*D. Professional malpractice.* .......... *31*

*E. Interference with the right to vote.* .......... *33*

**CONCLUSION** .......... **34**

**CERTIFICATE OF COMPLIANCE** .......... **35**

**CERTIFICATE OF VIRUS SCAN** .......... **35**

**CERTIFICATE OF SERVICE** .......... **35**

## TABLE OF AUTHORITIES

CASES

*281 Care Comm. v. Arneson*, 638 F.3d 621 (8th Cir. 2011) ............. 17, 18

*281 Care Comm. v. Arneson*, 766 F.3d 774 (8th Cir. 2014) ............. 17, 18

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*, 651 F.Supp.2d 155 (S.D.N.Y. 2009) ............................................................ 16

*Animal Legal Def. Fund v. Reynolds*, 8 F.4th 781 (8th Cir. 2021). passim

*Animal Legal Def. Fund v. Reynolds*, 89 F.4th 1065 (8th Cir. 2024)..... 15

*Blatty v. New York Times Co.*, 42 Cal. 3d 1033 (1986) .......................... 16

*Brandt v. Weather Channel, Inc.,* 42 F. Supp. 2d 1344 (S.D. Fla. 1999) 33

*Cantrell v. Forest City Pub. Co.*, 419 U.S. 245 (1971)............................ 14

*Celadon Trucking Servs., Inc. v. Wilmoth*, 70 N.E.3d 833 (Ind. Ct. App. 2017)......................................................................................... 4

*Cheapside Mins., Ltd. v. Devon Energy Prod. Co., L.P.,* 94 F.4th 492 (5th Cir. 2024) ........................................................................................ 6

*City of O'Fallon, Mo. v. CenturyLink, Inc.*, 930 F. Supp. 2d 1035 (E.D. Mo. 2013) ........................................................................................ 8

*Compuware Corp. v. Moody's Investors Servs.*, 499 F.3d 520 (6th Cir. 2007)....................................................................................... 15

*Daniele v. ABC*, 2011 U.S. Dist. LEXIS 81273 (D.N.J. July 26, 2011).. 13

*Emerito Estrada Rivera-Isuzu de P.R., Inc. v. Consumers Union of U.S., Inc.*, 233 F.3d 24 (1st Cir. 2000) ........................................................ 16

*First Equity Corp. v. Standard & Poor's Corp.*, 690 F. Supp. 256 (S.D.N.Y. 1988) ............................................................... 13, 30

*Gibson v. ITT Hartford Ins. Co.*, 621 N.W.2d 388 (Iowa 2001)............. 24

*Gutter v. Dow Jones, Inc.*, 22 Ohio St. 3d 286 (1986) ............................. 13

*Hustler Mag., Inc. v. Falwell*, 485 U.S. 46 (1988)................................... 15

*Illinois ex rel. Madigan v. Telemarketing Assocs., Inc.*, 538 U.S. 600 (2003) ............................................................................................ 10, 14

*Johnson v. United States*, 534 F.3d 958 (8th Cir. 2008)........................... 7

*Libertelli v. Hoffman-La Roche Inc.*, 1981 U.S. Dist. LEXIS 11049 (S.D.N.Y. Feb. 23, 1981)........................................................................ 13

*Lucas v. Downtown Greenville Investors Ltd. Pshp.*, 248. Ill. App. 3d 37 (2d Dist. 1996) ............................................................................. 27

*Luebbers v. BJC Health Sys.,* 2025 U.S. Dist. LEXIS 31286 (E.D.Mo. Feb. 21, 2025) ........................................................................................ 9

*Marks v. United States,* 430 U.S. 188 (1977) .......................................... 17

*McAllister v. St. Louis Rams, LLC*, 2016 U.S. Dist. LEXIS 173419 (E.D.Mo. Dec. 15, 2016)......................................................................... 9

*Nelson Auto Ctr., Inc. v. Multimedia Holdings Corp.,* 951 F.3d 952 (8th Cir. 2020) ............................................................................................. 20

*New York Times Co. v. Sullivan*, 376 U.S. 254 (1964)............................ 14

*Peoples Bank & Trust Co. v. Globe Int'l Pub*., 978 F.2d 1065 (8th Cir. 1992)................................................................................................. 15, 24

*Pudlowski v. St. Louis Rams, LLC*, 829 F.3d 963 (8th Cir. 2016) ....... 2, 8

*Single St. Paul Fire & Marine Ins. Co. v. Compaq Computer Corp.*, 539 F.3d 809 (8th Cir. 2008) ......................................................................... 4

*Stancik v. CNBC,* 420 F. Supp. 2d 800 (N.D. Ohio 2006)....................... 33

*Time, Inc. v. Hill*, 385 U.S. 374 (1967) .................................................. 15

*Tumminello v. Bergen Evening Rec., Inc.*, 454 F. Supp. 1156 (D.N.J. 1978) ........ 13

*Unelko Corp. v. Rooney*, 912 F.2d 1049 (9th Cir. 1990) ........ 15

*United States v. Alvarez*, 567 U.S. 709 (2012) ........ 11, 17, 18

*Vodenichar v. Halcón Energy Props.*, 733 F.3d 497 (3d Cir. 2013) .. 5, 6, 7

*Webster Groves School Dist. v. Pulitzer Pub. Co.*, 898 F.2d 1371 (8th Cir. 1990) ........ 12

*Wilkins v. St. Louis Hous. Auth.*, 314 F.3d 927 (8th Cir. 2002) ........ 4

## Rules

Federal Rule of Civil Procedure 9(b) ........ 20

Federal Rule of Civil Procedure 56 ........ 7, 8

## Codes

Iowa Code § 714.16(1)(e) ........ 28

Iowa Code § 714H.4(1)(c) ........ 28

## STATEMENT OF THE CASE

Donnelly notes one observation from Gannett's facts section. Gannett writes that the *Register*'s article on the presidential poll said "a Harris victory would be a 'shocking development,'" and later that its separate article on the First Congressional District poll showed a 16-point lead for the Democrat even while "[e]lection forecasters rate the race as a toss-up." Gannett Br. 2 & 4.

The *Register*'s contemporaneous caveats only support Donnelly's claims. The *Register*'s own reporters knew that the polling was "shocking" and contrary to the consensus among "election forecasters." But rather than running the poll again, or bringing in an independent expert to evaluate the methodology, or just not publishing the poll—despite Gannett policies urging caution with polling data—the Defendants ran the poll as headline, above-the-fold, banner news that sent a shockwave across the country on the Sunday immediately preceding the presidential election. Gannett's own facts section supports an inference that they had subjective doubts about the poll's veracity.

## ARGUMENT

### I. Remand is appropriate under CAFA.[1]

Before reaching the First Amendment or deciding issues of Iowa law, this Court should resolve this appeal on a mundane but important predicate question: why is this case even in federal court in the first place? It's the Iowa Poll, published in Iowa's main newspaper, for a readership of mostly Iowans. The answer—removal under the Class Action Fairness Act (CAFA)—is no answer at all, because the Act has several exceptions that contemplate situations just like this one where the case is predominantly associated with a specific state.[2]

#### A. Donnelly has satisfied the primary defendant prong.

The District Court's erroneous reading of the "primary defendant" prong of the home-state exception remains the obvious and correct way

---

[1] This Court uses garden-variety abuse of discretion to review denial of jurisdictional discovery under CAFA. *Pudlowski v. St. Louis Rams, LLC*, 829 F.3d 963, 964 (8th Cir. 2016). Contra Gannett Br. 6.

[2] Dr. Selzer "adopts and incorporates" Gannett's arguments on this issue, Selzer Br. 3 n.2, but she did not have standing to remove below and did not participate in briefing the issue below, so it is unclear why she can join Gannett's arguments now.

to resolve this appeal. Gannett is not a "principal" or "fundamental" defendant (Gannett Br. 14)—it did not conduct the poll (Dr. Selzer and Selzer & Co. did that) and it did not publish the newspaper that reported the poll (the Des Moines Register & Tribune Co. did that). Gannett is present as the corporate parent of the Des Moines Register & Tribune Co. responsible for setting corporate policy. That it is active in setting corporate policy rather than hands-off (Gannett Br. 15) means it is an appropriate defendant (we're not here arguing about piercing the corporate veil or something), but that does not automatically translate into being a *primary* defendant. That's also the reason that Donnelly spent more time making specific allegations as to Gannett than the others (Gannett Br. 16)—because all of the generic allegations as to the overall enterprise apply to the poll and its publication, which were the direct result of work and decisions by Dr. Selzer and the *Register*, not Gannett.

Donnelly did not waive or forfeit this argument. He argued below that Gannett was not a "primary defendant," but rather was "present as a

secondary defendant for its role managing and setting policy for the *Register*." R. Doc. 21-1, at 9-10. He then cited several cases supporting his view that a "parent company" was not a primary defendant because it played a "secondary role" in the case. *Id.* He then reiterated this argument in his reply brief, R. Doc. 25, at 5, and the District Court ruled on it. App. 59-60; R. Doc. 47, at 8-9. This is not like when a party devoted a single sentence in a brief to a broad concept or phrase. *Single St. Paul Fire & Marine Ins. Co. v. Compaq Computer Corp.*, 539 F.3d 809, 824 (8th Cir. 2008) (finding waiver). The issue was raised, briefed, and ruled on and thus was preserved. *See Wilkins v. St. Louis Hous. Auth.*, 314 F.3d 927, 932 n.9 (8th Cir. 2002).

The rule against waiver "does not preclude a party from expanding upon arguments made to the trial court and presenting additional authorities to the appellate court." *Celadon Trucking Servs., Inc. v. Wilmoth*, 70 N.E.3d 833, 841 (Ind. Ct. App. 2017). Donnelly tried to help this Court by giving a comprehensive overview of the law in this area as it makes its first ruling on this topic, describing the different approaches

before making a robust case for his view of the right approach. Giving this Court a framework to think through the issue and an awareness of all persuasive authorities was meant to be helpful; it wasn't waiver that he failed to give a similarly comprehensive narrative to the trial court before asking it to adopt his argument.

**B. Donnelly has satisfied the principal injuries prong.**

Donnelly's interpretation of "principal injuries" is hardly "new" (Gannet Br. 11) or uniquely his own—it is drawn from precedent, starting with the Third Circuit's decision in *Vodenichar v. Halcón Energy Props.*, 733 F.3d 497 (3d Cir. 2013). In *Vodenichar*, the Third Circuit found the prong satisfied where "most class members who sought to lease their oil and gas rights allegedly reside in, and all of the land is located in, Mercer County, Pennsylvania." *Id.* at 508. *Most*, not *all*, class members who suffered an economic injury resided in Mercer County, Pennsylvania.

Gannett's own briefing is utterly inconsistent as to *Vodenichar*. On "primary defendant," Gannett refers to *Vodenichar* as "[t]he leading case on this issue" and uses its three-pronged test as "the test." Br. 14-15, 17.

But then on "principal injuries," Gannett rejects *Vodenichar* as "atextual" and reliant on "legislative history." Br. 11 (discussing Op.Br. 25 & n.10).

It's true that *Vodenichar* cites on "legislative history," for instance, Senator Specter's statement that "principal injuries [must be] concentrated within the forum State." 733 F.3d at 508 n.11. In fact, the Fifth Circuit even acknowledges its reading runs contrary to these materials: "the legislative history of CAFA suggests that not all plaintiffs are required to suffer their principal injuries in the forum state to satisfy the principal injuries prong." *Cheapside Mins., Ltd. v. Devon Energy Prod. Co., L.P.,* 94 F.4th 492, 500 n.10 (5th Cir. 2024) (quoting Senate Committee Report: "By this criterion, the Committee means that all or almost all of the damage caused by defendants' alleged conduct occurred in the state where the suit was brought.").

The textualist way to read this (and the reason, respectfully, the Fifth Circuit got it wrong) is to remember that the principal injuries are incurred *by the class.* One prong ensures two-thirds of class members live in the forum state. Another prong ensures the principal injuries *to that*

*class* occurred in the forum state. It's not that every member of the class had to be injured in the forum state, but rather that the principal injuries to the class *as a whole* were incurred in the forum state. Here, as in *Vodenichar*, the principal injuries to the class as a whole were incurred in Iowa, as *Register* subscribers are concentrated in Iowa. That's not to say the two provisions are duplicative: the first focuses on the collective citizenship of the class members, a diversity concept, while the second focuses on the location of the primary injuries to the class. To secure remand, a movant must check both boxes. Donnelly can do so here.

Finally, Gannett's supposed requirement for an affidavit to access jurisdictional discovery is not a hard-and-fast rule. Gannett Br. 19. Nothing in CAFA requires such an affidavit or incorporates Rule 56. And Rule 56 by its terms applies to summary judgment, not jurisdictional discovery. Parties and courts "look to decisions under Rule 56 for guidance in determining whether to allow discovery on jurisdictional facts." Gannett Br. 19 (quoting *Johnson v. United States*, 534 F.3d 958, 965 (8th Cir. 2008)). "[G]uidance" is not the same as a hard-and-fast rule

that adopts Rule 56 in every respect. Moreover, Donnelly's counsel did submit a signed document to the District Court explaining why he could not reasonably be expected to independently access the mailing address information of the *Register*'s subscribers (indeed, it is awkward to require someone to testify under oath as to what he does not know and why he cannot otherwise learn it).

Even if Donnelly failed in a procedural aspect of his motion, CAFA's first two exceptions are jurisdictional, and the trial court "has an independent obligation to ensure that the case is properly before it. Discovery is often necessary because jurisdictional requirements rest on facts that can be disputed, for instance, the domicile of the parties." *Pudlowski v. St. Louis Rams, LLC*, 829 F.3d 963, 964-965 (8th Cir. 2016). These are "mandatory exceptions to federal jurisdiction under CAFA." *City of O'Fallon, Mo. v. CenturyLink, Inc.*, 930 F. Supp. 2d 1035, 1039 (E.D. Mo. 2013). The trial court must be assured of its jurisdiction when a substantial question has been raised.

Moreover, Donnelly's request is not "speculative." As he explained, the district courts of this circuit have granted requests in similar circumstances where "[i]t is reasonable to infer" such a concentration of class members in a single state. *Luebbers v. BJC Health Sys.*, 2025 U.S. Dist. LEXIS 31286, *7 (E.D.Mo. Feb. 21, 2025). *See, e.g., McAllister v. St. Louis Rams, LLC*, 2016 U.S. Dist. LEXIS 173419, *8 (E.D.Mo. Dec. 15, 2016) ("The Rams were located in St. Louis, and intuitively a Missouri team would be patronized by Missouri citizens."). The point of discovery is that Donnelly does not have—cannot access—the necessary facts, so any such request is in some sense "speculative." The question is whether the plaintiff's assertion is reasonable and common sense, or speculative and subject to substantial skepticism. Here, it is entirely reasonable to think that two-thirds of *Des Moines Register* subscribers live in Iowa.

## II. The First Amendment does not grant absolute immunity to newspapers or pollsters to report fake news.

The Defendants and their Amici are desperate to make this case into something it's not: a battle royale over the First Amendment. Yet everyone acknowledges, as they must, that the First Amendment does

not protect fraud. *Illinois ex rel. Madigan v. Telemarketing Assocs., Inc.*, 538 U.S. 600 (2003). Donnelly's first two claims—fraudulent misrepresentation and consumer fraud—are both fraud claims. So the First Amendment should be nothing more than an opening sentence in the standards-setting section of the analysis: "Because the plaintiff brings fraud claims against public-facing speakers publishing on a topic of public interest, namely an election, the First Amendment requires that he thoroughly plead the elements of a fraud claim and that he plead now and prove later that the defendants acted with actual malice." That's it. And then we should all focus on the real argument, whether Donnelly has pled the requisite elements of those claims and has raised a reasonable inference that defendants acted with actual malice. If he has, then he can proceed; if not, his case is subject to "swift dismissal." Selzer Br. 30 (quoting *Madigan*, 538 U.S. at 617).

Donnelly's next two claims—professional malpractice and election interference—do not sound in fraud. But that should require no more than a second sentence: "Though the Supreme Court has not dealt with

these particular torts in prior cases, its rule is simple enough: private plaintiffs can bring claims for 'defamation, fraud, or some other legally cognizable harm associated with a false statement.' *United States v. Alvarez*, 567 U.S. 709, 719 (2012) (plurality). *See id.* at 723 ('to effect a fraud or secure moneys or other valuable considerations'). *Accord Animal Legal Def. Fund v. Reynolds*, 8 F.4th 781, 786 (8th Cir. 2021) ('intentionally false speech undertaken to accomplish a legally cognizable harm may be proscribed without violating the First Amendment.'). Assuming professional malpractice and election interference are in fact legally cognizable harms under Iowa law, Donnelly is again required to plead then prove actual malice because of the nature of the speakers and their alleged false statements."

That should be it.

But perhaps because this case tangentially concerns President Trump, the Defendants (and their Amicus RCFP[3]) want to transform it into a

---

[3] The RCFP Amicus asserts the "press" has a "favored role in our constitutional system to gather information and disseminate news and ideas to keep the public informed." RCFP Br. 4. Actually, traditional media institutions do not have any favored or greater privilege or rights

holy war over the meaning of the First Amendment and the sanctity of the press [in the age of Trump.][4] This Court should refuse their invitation and just follow the law.

A few specific points.

One, Donnelly does not and has never asserted a cause of action for "fake news." Donnelly did not sue the Defendants based on a cause of action called "fake news." *Contra* Selzer Br. 7 & 14. He sued them for specific claims under Iowa law: fraudulent misrepresentation, consumer

---

or protections under the First Amendment than any other citizen or speaker. *Webster Groves School Dist. v. Pulitzer Pub. Co.*, 898 F.2d 1371, 1374 n.3 (8th Cir. 1990) ("If by this statement Pulitzer means to suggest that the media deserve special treatment not afforded the general public, we must disagree. The press has no greater right of access to the courts than does the public.").

[4] Dr. Selzer addresses President Trump's lawsuit in her facts section, Br. 5, and calls this a "copycat action" because it was filed after the president's. However, (1) Donnelly's counsel was working on bringing this case prior to the President's filing, (2) Donnelly's nonprofit public-interest law firm has a well-established track record of advocating for accountability for media organizations, (3) Donnelly's lawsuit was significantly different from the President's case—he was an Iowa citizen for purposes of diversity, he could file on behalf of a putative class, his standing was different based on his status as a *Register* consumer, and he brought three additional causes of action beyond the Iowa Consumer Fraud Act claim originally filed by the President.

fraud, professional malpractice, and election interference. The Defendants spend most of their briefs railing against a straw man, attacking a cause of action Donnelly never brought.[5]

The reality, however, is that numerous causes of action can cover "fake news," even if "fake news" is not a cause of action in itself. Defamation is based on "fake news"—the publication of false information about someone. False light is based on "fake news"—the publication of a bit of truth that's nevertheless so misleading as to be false. Fraud can be based on "fake news"—giving someone inaccurate information to their financial detriment. None is protected by the First Amendment. *New York Times*

---

[5] Dr. Selzer attacks Donnelly for bringing a "frivolous appeal from the dismissal of frivolous claims," highlighting his acknowledgment that "no governing precedent is directly on point" and no "case where such a claim succeeded." Br. 7. To be clear, the District Court *agreed* that there is no governing precedent directly on point, App. 68; R. Doc. 48, at 7; Add. 18, and several cases seek damages for false information in news reports, but none of them was able to sufficiently plead or prove actual malice. *See First Equity Corp. v. Standard & Poor's Corp.*, 690 F. Supp. 256, 258 (S.D.N.Y. 1988) (Mukasey, J.); *Gutter v. Dow Jones, Inc.*, 22 Ohio St. 3d 286, 287 (1986); *Tumminello v. Bergen Evening Rec., Inc.*, 454 F. Supp. 1156, 1159–60 (D.N.J. 1978); *Daniele v. ABC*, 2011 U.S. Dist. LEXIS 81273, *4 (D.N.J. July 26, 2011); *Libertelli v. Hoffman-La Roche Inc.*, 1981 U.S. Dist. LEXIS 11049, *6 (S.D.N.Y. Feb. 23, 1981).

*Co. v. Sullivan*, 376 U.S. 254 (1964) (defamation/libel); *Cantrell v. Forest City Pub. Co.*, 419 U.S. 245 (1971) (false light); *Madigan*, 538 U.S. 600 (fraud).

Two, arguing over an inversion of the First Amendment and immunity is just two sides of the same coin. The First Amendment presumptively protects all speech, and a reason must be found to show speech falls outside its protection. In the same way, as an example, Iowa's tort of professional malpractice presumptively covers all actionable professional malpractice, and a reason must be found to preempt the tort. If the First Amendment preempts Iowa's common law, it's fair to say it confers an immunity on otherwise actionable misconduct. That's what Defendants want: a categorical immunity holding that the First Amendment totally preempts any private damages actions other than fraud or defamation based on false speech. That's not the law.

Third, relatedly, Defendants talk a lot about "categories" of protected and unprotected speech. The Defendants insist that all false speech is protected by the First Amendment unless it fits in one of several clearly

enunciated and "exceedingly narrow exceptions," namely "defamation, fraud, and perjury." Gannett Br. 22-23. *See* Selzer Br. 8-9, 23-24.

That assertion cannot be squared with the U.S. Supreme Court's decisions in *Time, Inc. v. Hill*, 385 U.S. 374 (1967), for instance, which applied the same standard as defamation to a state statute protecting name/image/likeness, or *Hustler Mag., Inc. v. Falwell*, 485 U.S. 46 (1988), which applied the standard to the tort of intentional infliction of emotional distress. Nor can it be squared with this Court's decisions in *Animal Legal Def. Fund v. Reynolds*, 8 F.4th 781, 786 (8th Cir. 2021), saying that the First Amendment does not preempt a law grounded in trespass by misrepresentation; *Animal Legal Def. Fund v. Reynolds*, 89 F.4th 1065, 1068 (8th Cir. 2024), false claims to secure offers of employment; or *Peoples Bank & Trust Co. v. Globe Int'l Pub.*, 978 F.2d 1065, 1068 (8th Cir. 1992), false light and intentional infliction of emotional distress. Nor does it square with *Compuware Corp. v. Moody's Investors Servs.*, 499 F.3d 520, 531 (6th Cir. 2007) (breach of contract claim); *Unelko Corp. v. Rooney*, 912 F.2d 1049, 1057-58 (9th Cir. 1990)

(product disparagement, trade libel, and tortious interference with business relationships); or *Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*, 651 F.Supp.2d 155, 175 (S.D.N.Y. 2009) (fraud and contract claims).

Those decisions are right and Defendants are wrong because "[a]lthough the limitations that define the First Amendment's zone of protection for the press were established in defamation actions, they are not peculiar to such actions but apply to all claims whose gravamen is the alleged injurious falsehood of a statement: that constitutional protection does not depend on the label given the stated cause of action." *Blatty v. New York Times Co.*, 42 Cal. 3d 1033, 1042 (1986) (cleaned up). These are all just examples of the "ample precedent for applying *New York Times* requirements to falsehood claims beyond defamation." *Emerito Estrada Rivera-Isuzu de P.R., Inc. v. Consumers Union of U.S., Inc.*, 233 F.3d 24, 28 (1st Cir. 2000).[6]

[6] Gannett says: "Donnelly wrongly claims that the 'correct standard' for all claims 'involving speech on matters of public concern' is 'actual malice.' (Op.Br. 29.) No other court has accepted this proposition, and Donnelly identifies no authority to support it." Gannett Br. 25. Actually,

Put differently, there *is* a specific and well-defined category of false speech unprotected by the First Amendment: "intentionally false speech undertaken to accomplish a legally cognizable harm." *Animal Legal Def. Fund*, 8 F.4th at 786.

Fourth, Dr. Selzer attacks Donnelly for filing an appeal "without even citing controlling Supreme Court and Eighth Circuit cases," namely *Alvarez* and *Arneson I* and *II*. Selzer Br. 8. *See id.* at 10, 25, 27, 32 & 39. Actually, *Alvarez* isn't "controlling Supreme Court precedent." This Court has said its plurality and concurrence could not be squared consistent with the *Marks* rule, and thus "the only binding aspect of the decision is its specific result." *Animal Legal Def. Fund*, 8 F.4th at 785. And the supposedly "controlling" Eighth Circuit precedents, *Arneson I* and *II*, are also of limited utility. *Arneson I* predates both *Animal Legal Defense Fund* and *Alvarez*. And *Arneson I* specifically distinguishes a state statute criminalizing false speech from a private action for damages from

---

numerous precedents like these recognize actual malice as the right standard for claims besides defamation, and Donnelly cited these authorities to the Defendants below. R. Doc. 36, at 9.

false speech like defamation. *Arneson I* recognizes "the important private interests implicated by defamatory speech," 638 F.3d 621, 634 (8th Cir. 2011), underlining "[t]he importance of private interests to the foundations of defamation-law. . ." *Id. Arneson II* reiterates this distinction. 766 F.3d 774, 783 n.8 (8th Cir. 2014). So far from "controlling" this case, the *Arneson* cases explicitly distinguish themselves from controlling a private damages case.

If there's any case that should be labeled "controlling," it is the first *Animal Legal Defense Fund* (8 F.4th 781 (8th Cir. 2021)). There, this Court grappled in detail with the questions of false speech and the First Amendment in relation to historic torts like trespass, complete with a lead opinion, a concurrence, and a dissent. Coming a decade after *Arneson I*, and with the guidance of the Supreme Court's opinions in *Alvarez* (which *Arneson I* lacked), the Court's opinion is thoughtful and thorough. And it recognizes that any legally cognizable harm stemming from false speech falls outside the First Amendment's protections.

All of which is to say, the First Amendment rules of the road are straightforward in this case. The First Amendment does not protect fraud or other legally cognizable harms to private persons. To protect important First Amendment interests, however, courts require plaintiffs to plead and later prove actual malice when asserting claims based on false speech that injures their private interests. Therefore, all the First Amendment requires is that Donnelly plead the elements of each claim and raise a reasonable inference of actual malice.

## III. Donnelly has plead actual malice.

Gannett wants this Court to erect an impossible test for pleading any case against a newspaper: "Constitutional malice requires clear and convincing proof of Press Defendants' state of mind at the time the poll results were published." Gannett Br. 28. Ok. Short of having an admission or an inside man—a whistleblower—no defamation or other actual-malice claim could survive a motion to dismiss if the plaintiff must provide clear and convincing proof at the pleadings stage of the defendants' state of mind, before a single shred of document discovery or

depositions. That's why Federal Rule of Civil Procedure 9(b) allows, "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." How, then, does one plead subjective doubt without a window into a defendant's mind? Well, you do what Donnelly did—you show in as many ways as you can that that person, with their experience and skill and training, would doubt it. That's not urging an objective standard, *compare* Gannett Br. 28-29 with Op.Br. 33 ("all of which supports the inference they subjectively knew all was not well with the information"), but using what's available in the public record to demonstrate the person knew it was false or had doubts as to its veracity. Gannett's whole brief is an effort to front-load what Donnelly must prove at trial into what he must plead to survive a motion to dismiss. That is not the law set by this Court in *Nelson Auto Center*, which Gannett never refutes.

## IV. Donnelly has pled the elements of his claims.

### A. Donnelly pled an intentional false representation.

Gannett can only claim that Donnelly failed to plead false representation by artificially narrowing his claim to one statement and then claiming it was puffery, while ignoring all the other statements Gannett made. *Compare* Gannett Br. 35-36 *with* Op.Br. 45-47. Looking at the complete complaint shows Donnelly has pled all the necessary specifics for his false representation claim, such as specifying the "who, what, when, and where" of the *Register's* representation that "[t]he Iowa Poll is carefully constructed to ensure that it is accurate." App. 21; R. Doc. 22, at 11. *Contra* Gannett Br. 35.

Gannett also misunderstands the false representation claim specific to the Iowa Poll itself. Gannett Br. 37-38.[7] It is not that the poll

---

[7] AAPOR defends polling as social science, saying polls are "evidence" of "the will of the people" and that "scientifically conducted polling offers a broader and more accurate picture of what Americans think and feel." AAPOR Br. 2. If that's true, then a poll is not a mere "opinion" that is not falsifiable, that cannot be tested by jury, like "fair and balanced." It is an assertion of fact grounded in social *science*.

"predicted" the election wrong. *See* Selzer Br. 36. It is that the poll stated that at the time it was taken ("the snapshot"), it was accurate within 3.4 percentage points of the electorate's views *at that time*. One way we know it was radically inaccurate was that an actual election by that electorate occurred less than a week later, and it was off by 16 points. Another poll taken within a week is good evidence that the first poll was recklessly flawed. In other words, it is *not* "impossible to know what the state of the presidential race was during the days the poll was conducted." Gannett Br. 37 (quoting App. 74; R. Doc. 48, at 13, Add. 24). The actual election day results are one data point, but other polling in Iowa, results from previous elections in Iowa, and contemporaneous polling in other states all could allow a jury to reasonably conclude this poll was false, especially if discovery reveals that Defendants either knew or at least thoughtfully considered that it was false.

Similarly, Dr. Selzer repeats the District Court's misconstrual of the claim concerning the false representation at issue. Br. 46.[8] Donnelly addressed this extensively in his opening brief at 45-47. That's especially so when the poll could represent certain facts (the margin of error) but then not publish other facts with the story (the weighting), which is where a poll can easily get cooked. *See* App. 19; R. Doc. 22, at 9. (reweighting the sample moved the result by seven points).

The District Court did not address the other reasons that Gannett asserts for dismissing the first count, but because Defendants revive them on this appeal, Donnelly addresses them briefly. Gannett Br. 39-40; Selzer Br. 51-52. Donnelly is not alleging that he relied on the November 2024 Iowa Poll when he purchased a subscription. The fraud is that Gannett promised to deliver "trustworthy, accurate news," to adhere to the Gannett principles of ethical news coverage, and to take good care that all editions of the Iowa Poll were carefully designed to

---

[8] And again, Dr. Selzer's liability is dependent on her role as the "polling partner" in making the relevant representations.

ensure accuracy. Then Gannett utterly failed to fulfill those promises.[9] Donnelly could justifiably rely on those promises when deciding to subscribe, given the *Register*'s general track record and its representation to him that it was a real, legitimate, serious news outlet. *See Peoples Bank & Trust Co.*, 978 F.2d at 1070.

For the same reason, Donnelly has pled a compensable injury. The compensable injury is the subscription fee. He paid $69.99 on the promise of trustworthy, accurate news that Iowans can depend on. He didn't get what Gannett represented it would provide him. In our world of subscription boxes, it is hardly novel to suggest that a product delivered later could fail to fulfill a promise made earlier.

Here and on several other counts (Br. 42, 47-48), Dr. Selzer argues that she did not personally make any of these representations or owe Donnelly a duty. The answer on each is the same: the complaint alleges

[9] To be clear, Iowa's tort has its own definition of fraudulent misrepresentation, *Gibson v. ITT Hartford Ins. Co.*, 621 N.W.2d 388, 400 (Iowa 2001), which is not the exact same as other definitions of "fraud," *contra* Selzer Br. 46.

Dr. Selzer is, in the *Register*'s own phrase, the "polling partner" of the *Register*. App. 22; R. Doc. 22, at 12. The extent of that "partnership" will be subject to discovery, but it is certainly sufficient at the pleadings stage to show the two sets of defendants were deep in cahoots on the relevant material.

**B. Negligent misrepresentation.**

Dr. Selzer knocks Donnelly for pleading this count in a way that combines the Iowa tort standard (negligence) and the constitutional standard (actual malice). Selzer Br. 52-53. Donnelly tried to get ahead of the First Amendment issue from the outset by making clear he understood the actual malice burden, and Dr. Selzer uses it as an opportunity throw shade his way. C'est la vie.

Gannett and Selzer have a heavy burden: to say that the words at issue do not have their ordinary and obvious meaning. Their briefs on the provision of information add nothing to the District Court's analysis—Donnelly rests on the arguments made in his opening brief, 50-52. And to the extent Dr. Selzer addresses elements beyond those the District

Court decided (Selzer Br. 61), she does so by continuing to insist that the claim is brought against the November 2024 Poll alone while utterly ignoring all of the representations made about the *Register* and the poll's reliability.

**C. Iowa Consumer Fraud Act.**

Gannett's brief adds nothing to the District Court's analysis on its ruling—Donnelly rests on the arguments made in his opening brief, 53-60. Again, all Gannett can do (like the District Court) is artificially narrow the scope of Mr. Donnelly's claims against it, Br. 44, ignoring vast swaths of the complaint to reach its preferred result. And yes, the lack of disclosure about the weighting *does* matter—Gannett cannot say that it was forthright in disclosing all the relevant information to the consumer, when in fact the most relevant information was not disclosed.

Gannett then offers a number of alternative bases that the District Court did not address.

First, what constitutes a "material fact" is a question for the jury. *Contra* Gannett Br. 46. Only a jury can determine whether the promises

of accurate, trustworthy news were material to Donnelly or the putative class. *See Lucas v. Downtown Greenville Investors Ltd. Pshp.*, 248. Ill. App. 3d 37, 49 (2d Dist. 1996). On a motion to dismiss, it is reasonable to draw the inference that Donnelly and the putative class would act differently if they knew the *Register* would knowingly or with serious doubts publish an incorrect story on the front page concerning the most important political topic of the year. Put differently, a subscriber would expect to rely on the newspaper's reputation for trustworthy, accurate reporting when deciding to subscribe. *Contra* Selzer Br. 45-46.

Second, Gannett did make representations in connection with the product at issue. It promised that the *Register* would provide accurate news that Iowans could depend upon. It made that representation to Iowans like Donnelly to get them to subscribe.

Furthermore, Gannett misreads Iowa law. Br. 47. Iowa law says that the advertiser, not the newspaper publisher, is responsible for the content of the advertisement. If Subaru runs an advertisement in the *Register* promising a five-star crash test rating, when in fact it got three

stars, a consumer has to sue Subaru for that offense—Iowa law says you cannot sue the *Register* as the publisher of the advertisement for failing to check on the veracity of the ad before running it. Iowa Code § 714H.4(1)(c). The newspaper is still responsible for the content of and promises made when advertising itself, whether in its own pages or elsewhere.

Third, the product at issue is *The Des Moines Register*. *Contra* Selzer Br. 44. The Iowa Poll is not the merchandise—the newspaper is. And a newspaper fits within the capacious definition of "merchandise" in the statute: "any objects, wares, goods, commodities, intangibles, securities, bonds, debentures, stocks, real estate or services." Iowa Code § 714.16(1)(e). A newspaper is exactly one of "the everyday goods Iowans purchase." Selzer Br. 13. Donnelly did not purchase the Iowa Poll—he purchased a subscription to a newspaper which promised him accurate news.[10]

---

[10] As above, Dr. Selzer's liability on the IFCA claim is tied to the nature of her "polling partnership" with the newspaper.

Finally, Gannett asserts there is no "ascertainable loss of money or property as the result of a prohibited practice or act." Br. 48. To do so, Gannett once again misconstrues Donnelly's argument. The prohibited practice was making a series of promises that Gannett did not fulfill, such as the promise to provide him accurate news that he and other Iowans could rely upon. The poll was the failure to fulfill the promise, and the cost of his subscription is the specific amount of money he lost when he bought a product that failed to live up to its promises.

Donnelly will also willingly embrace the horrible of Dr. Selzer's brief: "Donnelly no more has a claim than a subscriber who places a large bet on a sportswriter's predicted outcome of the Super Bowl." Br. 42. If that sportswriter intentionally threw his prediction while secretly making a huge bet on long odds for the opposite result, and thus pocketed millions from the suckers who relied on his prediction, that wouldn't constitute fraud? At least, if the bettor had purchased a subscription to the product wherein he made the prediction? And that's for an actual prediction—all

the worse if it were a statement of fact based on some inside knowledge or science.

This actually happens in the context of business publications—people buy stocks based on news reports in places like *The Wall Street Journal* or S&P Global. If those news reports end up being inaccurate, the stocks plummet and the investors lose their shirt. In *First Equity Corp. v. Standard & Poor's Corp.*, 690 F. Supp. 256, 258 (S.D.N.Y. 1988), Judge Michael Mukasey held in such a case that "well-established First Amendment principles requir[e] a plaintiff to demonstrate actual malice when seeking to impose liability on a newspaper for publication of a non-defamatory misstatement." In other words, if the investor/subscriber could show that S&P knowingly reported a wrong fact, or subjectively entertained serious doubts about the fact and reported it anyway, then he could recover from the news outlet on a fraud claim.[11] Ends up the

[11] In that case, *at summary judgment*, Judge Mukasey ruled that they did not contend S&P had knowledge of the false statement, and that the plaintiffs did not provide sufficient evidence that S&P had subjective doubts as to its veracity. 690 F. Supp. at 259.

supposed horrible is actually precedent from a well-respected federal judge.

### D. Professional malpractice.

Everyone agrees no Iowa case addresses the duties of newspapers one way or the other. Gannett Br. 48. So we're all left to argue persuasive precedent and principles. Not just a single Hawaii case, but several cases from across the country support the commonsense proposition that the first-party author of an informational document owes a duty to those who purchase it, while the third-party publisher of the information does not owe that duty. Op.Br. 61 (collecting four such cases). Gannett's response is to throw its co-defendant Dr. Selzer under the bus: it was her, not Gannett, who "authored or designed" the poll. Gannett Br. 49. That's an unpersuasive answer: this was not a super PAC or campaign or party that provided the poll that the *Register* then just reported. The *Register* contracted with Dr. Selzer to conduct the *Register*'s signature poll, which the *Register* then reported as its own. *See* Selzer Br. 3 ("Selzer was the *Des Moines Register's* primary pollster for four decades, overseeing its

signature Iowa Poll."). At minimum, the *Register* warrantied or guaranteed Dr. Selzer's work to its readers by reporting it as its own work. *See* Gannett Br. 49. Dr. Selzer's discussion of the cases (56-59) basically acknowledges the precedents permit lawsuits for guaranteed products, and the only question (which should be *for a jury*) is whether the *Register's* promises of "trustworthy, accurate information" is the same as giving its reporting a Good Housekeeping Seal of Approval.

Dr. Selzer asserts that she and her company have no duty to Donnelly as the newspaper's independent contractor—Br. 54 & 59—but that's a factual assertion that waits until after a motion to dismiss and must be seen in the context of any evidence developed showing agency. And Donnelly even pled that he could show that Dr. Selzer owed a duty under these same Iowa precedents involving indirect customers, because she is a professional providing information to a limited and foreseeable class of users (namely the subscribers). App. 44; R. Doc. 22, at 34. More importantly, Donnelly's relationship to the *Register* is not that of "the general public," Selzer Br. 54-55, but that of a paying customer (which is

what distinguishes him from a television viewer, as in the *Brandt* and *CNBC* cases, Selzer Br. 55).

**E. Interference with the right to vote.**

Gannett's brief adds nothing to the District Court's analysis, and Donnelly stands on his opening brief to explain why that was in error. Op.Br. 64-65. Dr. Selzer asserts in a paragraph that Donnelly would fail the Restatement's formulation because "news articles and polls that might influence voting decisions do not prevent any voter from casting a ballot," Br. 63. But the Restatement formulation also covers serious interference with voting. Donnelly pled that "[a]cademic studies show that polling data of a race affects voter choices and voter turnout. Such polling may also change the candidates that voters select based on their assessment of their viability." App. 46; R. Doc. 22, at 36. The complaint goes on to cite polling that was ongoing when the *Register* poll was released; it showed a 9-point swing on voter expectations for a Harris victory. *Id.* Again, this is enough for Donnelly to put on an expert showing

that the poll's release substantially interfered with voters' prior choice by changing their attitudes at the last minute.

## CONCLUSION

This case concerns an Iowa poll by an Iowa newspaper and its Iowa-based pollster, delivered to an Iowa consumer who brought claims on behalf of himself and other mostly Iowan consumers primarily against Iowa defendants. It belongs in Iowa state court.

Failing that, for all the bluff and bluster, the First Amendment question should be resolved in Donnelly's favor based on established precedent, starting with *Animal Legal Defense Fund v. Reynolds* (8th Cir. 2021). It's relatively straightforward: claims for fraud or other legally cognizable harms based on false speech may go forward as long as the plaintiff pleads a reasonable inference of actual malice, which Donnelly has done here with voluminous circumstantial information.

Finally, the District Court erred in its application of the various elements of the different causes of action Donnelly brought (none of which, incidentally, is a cause of action for "fake news").

The District Court should be reversed, either for discovery on jurisdiction or to proceed to discovery on the merits.

Respectfully submitted,

/s/ Daniel R. Suhr
Daniel R. Suhr
Center for American Rights
1341 W. Fullerton Ave. Suite 170
Chicago, Illinois 60614
414.588.1658
dsuhr@americanrights.org

**CERTIFICATE OF COMPLIANCE**

This brief, including the footnotes, is presented in Century Schoolbook 14. The body is 6,486 words. *See* F.R.A.P. 32. /s/ Daniel R. Suhr

**CERTIFICATE OF VIRUS SCAN**

This brief was scanned for viruses by NordVPN. /s/ Daniel R. Suhr

**CERTIFICATE OF SERVICE**

This document was served on counsel for all parties and amici simultaneously with e-filing via ECF. /s/ Daniel R. Suhr